MAS-20030912
leakes

**Commonwealth of Massachusetts**
**SUFFOLK SUPERIOR COURT**
**Case Summary**
**Civil Docket**

08/31/2004
04:13 PM

# SUCV2004-03518
## Kiani v Trs of Boston University et al

| | | | | | |
|---|---|---|---|---|---|
| **File Date** | 08/09/2004 | **Status** | Disposed: transfered to other court (dtrans) | | |
| **Status Date** | 08/31/2004 | **Session** | C - Civil C | | |
| **Origin** | 1 | **Case Type** | A99 - Misc contract | | |
| **Lead Case** | | **Track** | F | | |

| | | | | | |
|---|---|---|---|---|---|
| **Service** | 11/07/2004 | **Answer** | 01/06/2005 | **Rule12/19/20** | 01/06/2005 |
| **Rule 15** | 01/06/2005 | **Discovery** | 06/05/2005 | **Rule 56** | 07/05/2005 |
| **Final PTC** | 08/04/2005 | **Disposition** | 10/03/2005 | **Jury Trial** | Yes |

**Plaintiff**
Layla Kiani
Active 08/09/2004

**Private Counsel 652042**
Ben Tahriri
343 Washington Street
Newton, MA 02458
Phone: 617-965-1090
Active 08/09/2004 Notify

**Defendant**
Trs of Boston University
Served: 08/10/2004
Served (answr pending) 08/20/2004

**Private Counsel 153900**
Lawrence S Elswit
Boston University General Counsel's Office
125 Bay State Road
Boston, MA 02215
Phone: 617-353-2326
Fax: 617-353-5529
Active 08/31/2004 Notify

**Defendant**
Ronald Cass
Served: 08/10/2004
Served (answr pending) 08/20/2004

*** See Attorney Information Above ***

**Defendant**
Andrew Kull
Served: 08/10/2004
Served (answr pending) 08/20/2004

*** See Attorney Information Above ***

**Commonwealth of Massachusetts**
SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket

## SUCV2004-03518
## Kiani v Trs of Boston University et al

| | |
|---|---|
| **Defendant**<br>Christine Marx<br>Served: 08/10/2004<br>Served (answr pending) 08/20/2004 | *** See Attorney Information Above *** |
| **Defendant**<br>Wendy Mariner (As Amended)<br>Served: 08/10/2004<br>Served (answr pending) 08/20/2004 | *** See Attorney Information Above *** |

| Date | Paper | Text |
|---|---|---|
| 08/09/2004 | 1.0 | Complaint & Jury demand |
| 08/09/2004 | | Origin 1, Type A99, Track F. |
| 08/09/2004 | 2.0 | Civil action cover sheet filed |
| 08/20/2004 | 3.0 | Amended complaint of Layla Kiani |
| 08/20/2004 | 4.0 | SERVICE RETURNED:  Trs of Boston University(Defendant) (in hand) |
| 08/20/2004 | 5.0 | SERVICE RETURNED: Ronald Cass(Defendant) (in hand) |
| 08/20/2004 | 6.0 | SERVICE RETURNED: Andrew Kull(Defendant) (in hand) |
| 08/20/2004 | 7.0 | SERVICE RETURNED: Christine Marx(Defendant) (in hand) |
| 08/20/2004 | 8.0 | SERVICE RETURNED: Wendy Mariner (As Amended)(Defendant) (in hand) |
| 08/27/2004 | | Certified Copy of Petition for removal of defts to US Dist court of defts (US Dist # 04-11839PBS) |
| 08/31/2004 | | Case REMOVED this date to US District Court of Massachusetts |

. HEREBY ATTEST AND CERTIFY ON

Sept. 1, 2004
_____, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY._____
Asst. Clerk.

Suffolk Superior Civil CP#
04-3518

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LAYLA KIANI, | ) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) CIVIL ACTION NO. _____ |
|  | ) |
| TRUSTEES OF BOSTON UNIVERSITY, ET AL. | ) |
| Defendants. | ) |

04 cv 11838

SUFFOLK SUPERIOR CO...
CIVIL CLERK'S OFFICE
FILED

AUG 2 7 2004

MICHAEL JOSEPH DONOVAN
CLERK OF COURT

## NOTICE OF REMOVAL

Removing parties, Defendants Trustees of Boston University, et al., by their undersigned attorney, respectfully state:

1.    Removing parties are the defendants in the above-entitled action.

2.    On August 9, 2004, the above-entitled action was commenced against the removing parties in Suffolk County (Massachusetts) Superior Court and is now pending therein. The case has been assigned Docket Number 04-3518.

3.    Copies of the summonses and complaint in the above-entitled action were served on the removing party on August 10, 2004, and are attached hereto.

4.    There have been no further proceedings in this action.

5.    According to the complaint, Plaintiff Layla Kiani is a resident of the Commonwealth of Massachusetts.

I HEREBY... 8-24-04
THAT THE... A FULL, TRUE
AND COP... THE ORIGINAL ON FILE
IN MY OF... CUSTODY.

TONY ANASTAS
CLERK U.S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BY:_____

6.     Defendant Trustees of Boston University is a corporation registered in accordance with the laws of the Commonwealth of Massachusetts, and doing business therein.  The individual defendants—Ronald Cass, Andrew Kull, Christine Marx and Wendy Mariner—were at all relevant times employed by the University and resided in Massachusetts.

7.     The above-entitled action is a civil action in which the plaintiff asserts, inter alia, that defendant engaged in conduct in violation of rights secured by the due process clause of the Fourteenth Amendment, the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Americans with Disabilities Act, 29 U.S.C. § 12101 et seq., and various Massachusetts common law claims.

8.     The United States District Court has original jurisdiction of the above-entitled action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

WHEREFORE, the removing party respectfully requests that the above-entitled action be removed from the Suffolk County (Massachusetts) Superior Court to United States District Court for the Eastern District of Massachusetts.

I HEREBY ATTEST AND CERTIFY ON
___Sept. 1, 2004 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY. _____
         Asst. Clerk.

Date:  August 23, 2004

Respectfully submitted,

TRUSTEES OF BOSTON UNIVERSITY, ET AL.,
By their attorney,

Lawrence S. Elswit
_____
Lawrence S. Elswit  (BBO #153900)
Boston University
Office of the General Counsel
125 Bay State Road
Boston, Massachusetts  02215
(617) 353-2326

**1**

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                                 SUPERIOR COURT

                                                            CIVIL ACTION NO.

| | |
|---|---|
| LAYLA KIANI | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| TRUSTEES OF BOSTON UNIVERSITY | ) |
| & | ) |
| RONALD CASS | ) |
| & | ) |
| WENDY MARINER | ) |
| & | ) |
| ANDREW KULL | ) |
| & | ) |
| CHRISTINE MARX | ) |
| Defendants. | ) |

04-3518 C

### COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiff, Layla Kiani, a handicapped law student, brings this action to recover the damages caused to her by the actions and conduct of the Defendants, Trustees of Boston University ("Defendant University"), et al, in connection with her status as a law student, her suspension from the Defendants' school, the Defendants' collective decision to ultimately drop her from the School, the fraud committed by the Defendants, and the resulting harm caused to the Plaintiff. The Plaintiff seeks to enjoin the Defendants from allowing her to continue and complete her studies and receive her law degree, and to recover for monetary and emotional damages caused by the Defendants.

### PARTIES

1. The Plaintiff is an individual, presently residing at 86 E. Howard Street, in Quincy, Norfolk County, Massachusetts.
2. Upon information and belief, the Defendant, Trustees of Boston University are trustees of a Trust established under the laws of Massachusetts, with a principal place of business at 125 Bay State Road, Boston, Suffolk County, Massachusetts.
3. Upon information and belief, the Defendants Ronald A. Cass, Wendy Mariner, Andrew Kull, and Christine Marx are employees of Defendant University.

## JURISDICTION AND VENUE

4. The Plaintiff resides in Norfolk County, Massachusetts.
5. The Defendant University has its principal place of business in Boston, Suffolk County, Massachusetts.
6. Upon information and belief, the Defendant Ronald Cass, is the former Dean of the Defendant University's law school, and resides in Massachusetts.
7. Upon information and belief, the Defendant Wendy Mariner is an employee of the Defendant University, who teaches at the Defendant University's law school and resides in Massachusetts.
8. Upon information and belief, the Defendant Andrew Kull is an employee of the Defendant University, who teaches at the Defendant University's law school and resides in Massachusetts.
9. Upon information and belief, the Defendant Christine Marx is an employee of the Defendant University, who is the Assistant Dean for Student Affairs for the Defendant University's law school and resides in Massachusetts.

## FACTS COMMON TO ALL COUNTS

10. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.
11. The Plaintiff is a 25 year-old female.
12. The Plaintiff has been a victim of a disease, generally known as Cerebral Palsy.
13. The Plaintiff, has suffered from a severe form of Cerebral Palsy since her birth.
14. The Plaintiff lacks mobility and carries herself through the use of a wheel chair as well as crutches.
15. In addition to her general handicaps, the Plaintiff suffers from poor motor skills in her legs, feet, toes, hands, and fingers. She also endures high anxiety resulting on occasional dry heaves, poor vision, metabolic disorder, digestive and gastronomical disorders.
16. The Plaintiff has a history of panic attacks, peptic ulcer disorder, and difficulties with attention and organization.
17. Since her birth, the Defendant has been receiving medical treatment and has undergone several surgeries related to the multitude of her medical problems.
18. The Plaintiff has undergone six major surgeries over a 20-year period.
19. The Plaintiff has been cared for by her single mother who has been providing her with full care since the Plaintiff's birth.
20. To this day, the Plaintiff has pursued a life as a student.
21. In the year 2000, the Plaintiff graduated with honors of Magna Cum Laude, from University of Texas. A true and accurate copy of the Plaintiff's transcript is annexed as Exhibit A hereto and is specifically incorporated herein by reference.
22. The Plaintiff then applied for admission to Defendant University's law school.
23. In the year 2000, the Defendant University, which operated a well-known law school with stringent admission requirements sent the Plaintiff a letter of acceptance.

2

24. The acceptance was based on the merits of the Plaintiff's qualification, and not due to any preference due to her gender or handicap status.

25. The Plaintiff, who lived in Texas at the time, along with her mother, moved to Massachusetts in 2000.

26. In September 2000, the Plaintiff enrolled in the Juris Doctor program of the Defendant University.

27. The Plaintiff spent her own funds, as well as student loans to support her through law school.

28. By the end of her first year in Defendant's law school, as the result of the intense course-load, the Plaintiff began experiencing more frequent and prolonged episodes of dry heaves and nausea.

29. In order to reduce the effect of the dry heaves on her studies, the Plaintiff began taking Phenergan, a suppository.

30. The drug, which had a calming effect on the Plaintiff, was a somnolence-inducing medicine and caused her to experience high rates of drowsiness during the day when she was in class and also when she was studying and writing her course papers. A true and accurate copy of the description of Phenergan as obtained from the Internet is annexed as Exhibit E hereto and is specifically incorporated herein by reference.

31. As the result of the medicine, during the second and third years of law school, she reported experiencing high degrees of difficulty with her studies.

32. As the result of the medicine, the Plaintiff also developed Dermatitis, another common side effect. The Plaintiff had to be treated by a Dermatologist and a pediatric plastic surgeon at Brigham and Women's Hospital. Both doctors stated that the medication was inappropriately prescribed for the Plaintiff.

33. In the spring of 2003, the Plaintiff was finally slated to attend a Commencement ceremony of the Defendant University's law school on May 18, 2003.

34. On May 12, 2003, six days before her graduation day, the Plaintiff received a letter from Defendant Ronald A. Cass ("Defendant Cass"), the dean of the Defendant University's law school, informing her that she was suspended immediately, and that she would not be allowed to take part in the Commencement ceremonies. A true and accurate copy of the Defendant Cass's letter is annexed as Exhibit B hereto and is specifically incorporated herein by reference.

35. As the reason for his decision, Dean Cass noted that it was "possible" that the Plaintiff had committed plagiarism on one of her papers in violation of Art. II, Paragraph 2(e) of the Disciplinary Regulations of the Defendant's law school. A true and accurate copy of the Regulations is annexed as Exhibit C hereto and is specifically incorporated herein by reference.

36. As the reason for his decision, Defendant Cass pointed to Defendant Wendy Mariner as the professor who had purportedly reported the alleged violation.

37. The Defendant Wendy Mariner had every opportunity to grade or re-grade the Plaintiff's paper during the spring of 2003.

38. Professor Mariner did not change the Plaintiff's grade for that term during the spring of 2003.

39. As it later became apparent, while under the influence of the medicine Phenergan, the Plaintiff had on four separate papers failed to notate fully the names of the authors, and attribute the sentences to them.

40. The Plaintiff had nonetheless, in the majority of these papers identified the authors by name and had used the term "according to" instead of quotation marks.

41. The Plaintiff has always maintained that by omitting the quotation marks, she had never intended to plagiarize.

42. The Plaintiff was subsequently charged with four counts of plagiarism.

43. Other than the charges brought on the eve of her graduation, over the course of the preceding three years, the Plaintiff had never been charged with any violation of the Defendant University's rules and regulations.

44. The Plaintiff selected a member of the faculty of the Defendant University to represent her before the Judicial Discipline Committee ("Committee").

45. The Plaintiff was never informed of her right to remain silent, as was required by the Defendant University's own procedural rules and regulations.

46. On September 12, 2003, the Committee found the Plaintiff in violation of Art. II, Paragraph 2(e) of the Disciplinary Regulations of the Defendant University's law school.

47. As a punishment, on November 12, 2003, the Committee suspended the Plaintiff for a period of six months.

48. The Committee then allowed the professors for the four courses to change the grades, which they had given to the courses.

49. The Defendant Wendy Mariner, a professor, who had been the individual who initially reported the alleged violation to Defendant Cass, suddenly decided to change her grade to an F, causing the Plaintiff's Grade Point Average to fall below 2.00.

50. The Defendant Mariner had had the opportunity to change her grade at the onset in the Spring of 2003, but she had opted not to do so.

51. On December 18, 2003, the Plaintiff was informed by the Registrar of the Defendant University that she had been dropped from the law school due to "academic deficiency." A true and accurate copy of the letter is annexed as Exhibit D hereto and is specifically incorporated herein by reference.

52. By this time, because of her reliance on the Defendants' representations, the Plaintiff had spent approximately $185,562.00, at least half of it borrowed funds, including the tuition and living expenses.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

53. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

54. Upon information and belief, the Defendants have engaged in conduct designed to violate the terms of an implied contract with the Plaintiff as a student of Defendant University.

4

55. As a university, the Defendant University had engaged in a contractual relationship with its student, the Plaintiff.

56. As university employees, the individual Defendants had engaged in a contractual relationship with the student, the Plaintiff.

57. More specifically, the Defendant University's own procedural rules and regulations require that a student be afforded the right to remain silent. *See* Disciplinary Regulations for All BUSL Students, Art. IV, Section 1. A true and accurate copy of the Disciplinary Regulations is annexed as Exhibit F hereto and is specifically incorporated herein by reference.

58. The Defendants failed to provide the Plaintiff with a verbal and written document informing her of her right to remain silent.

59. By the above stated actions, the Defendants have breached their contract and policy with the Plaintiff, who as direct result, has incurred monetary damages in amount approximately $185,562.00 plus interest, costs, and attorney's fees.

COUNT II
VIOLATION OF PROCEDURAL DUE PROCESS

60. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

61. Upon information and belief, the Defendant University receives federal financial assistance and is therefore subject to the provisions of the 14th Amendment of the US Constitution.

62. As a student of the Defendant University, the Plaintiff had a property and liberty interest that made her eligible for protection under the Due Process Clause of the 14th Amendment. *See* Goss v. Lopez, 419 U.S. 565(1975).

63. When the Defendant University failed to afford the Plaintiff her right to remain silent, it violated the Plaintiff's right to a full due process.

64. As the result of the Defendants' actions, since May 12, 2003, the Plaintiff has been forced to remain out of school, out of work, and consequently, out of funds.

65. The individual Defendants, all of whom were upon information and belief licensed attorneys, also violated the Plaintiff's right to Due Process by agreeing to allow an attorney to represent her, in violations of the Massachusetts Model Rules of Professional Conduct Rule 1.7.

66. More specifically, the attorney was on the faculty of the Defendant University.

67. Clearly, considering the high stakes such as the risk of expulsion--a property interest, it would have been virtually impossible for a member of the faculty to adequately defend the Plaintiff in a highly contentious case, while remaining on the faculty.

68. There was an apparent conflict of interest, which made it impossible for a just outcome of the case.

69. The Defendants are jointly and severally liable to the Plaintiff for all attendant damages caused by their failure to afford the Plaintiff the process, which was due her, as well as the fact that her attorney was also an employee of the Defendant University.

## COUNT III
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)
## 42 U.S.C. §§ 12101 et seq. (1990)

70. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

71. The Plaintiff suffers from a severe form of Cerebral Palsy, and is considered a disabled individual under ADA.

72. At all times, the Plaintiff was qualified to continue her studies as a law student at the Defendants' school;

73. The individual Defendants had on several occasions intentionally made remarks such as that the Plaintiff was "not intellectually up to" the Defendants' standards.

74. One of the employees of the Defendant University, a professor had remarked that there had been "some regret admitting her" to the School.

75. Based on the subsequent actions of the Defendants, it is clear that the Plaintiff's disability was a motivating factor in her exclusion from the JD program.

## COUNT IV
## VIOLATION OF THE REHABILITATION ACT OF 1973
## 29 U.S.C. § 794

76. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

77. The Plaintiff is a qualified handicapped individual as defined as defined in 29 U.S.C. § 706(7).

78. The Plaintiff was excluded from the Program, which she was pursuing, in violation of the Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

79. Solely because of the Plaintiff's handicapped status, the Defendants engaged in conduct, which ultimately resulted in her complete exclusion from the Defendants' school.

80. This conduct included various attempts by the Defendants to isolate the Plaintiff and discriminate against her by depriving her of the essentials necessary for a severely handicapped student.

81. More specifically, since the very beginning of the First year, and in fact throughout the course of her studies, the Defendants refused the Plaintiff's request that she be accommodated with a Stenographer, which was essential to her work.

82. For a considerable period, the Plaintiff was also deprived of accommodation by not being given access to a private room in the library to listen to her class tapes.

83. The Plaintiff was therefore forced to use the main lobby of the library to study, thus depriving her of the opportunity to listen to her class tapes, as was necessary for a successful study program.

84. The Plaintiff was forced to wait until the second year before she could be given a key to use a room in the library.

85. As a result of this delay in accommodation, the Plaintiff academically and emotionally suffered.

6

COUNT V

FRAUD

86. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

87. Upon information and belief, the Defendants have engaged in conduct designed to defraud the Plaintiff.

88. Specifically, the Defendants, at the outset as well as throughout the Plaintiff's three years of law school, had made misrepresentations to the Plaintiff in order to obtain money for tuition and services from the Plaintiff under false pretenses.

89. The Plaintiff reasonably relied to her detriment upon the representations of the Defendants when she paid the tuition and other school-related fees for every semester and continued to incur costs and expenses in connection with her legal education and in preparation for graduation from a law school.

90. Upon information and belief, the Defendants knew that their misrepresentations to the Plaintiff were false, were relied upon by the Plaintiff, and were made with the intent to defraud the Plaintiff.

91. As a result, the Defendants are jointly and severally liable for all damages caused by their fraud, plus interests and costs.

COUNT VI

CONSPIRACY TO COMMIT FRAUD

92. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

93. Upon information and belief, the Defendants engaged in conduct amounting to a Civil Conspiracy to commit fraud. *See* Commonwealth. Kyte v. Philip Morris Inc., 408 Mass. 162 (1990).

94. The Defendants' conduct has consistently illustrated a common design by the Defendants to engage in fraud.

95. More specifically, the Defendants had over the period of the three years, which the Plaintiff spent in law school, had made comments that they were not content with the presence of the Plaintiff.

96. Nonetheless, the Defendants collectively continued to mislead the Plaintiff and they never informed her that they planned to eject her from the School after she had fully paid her tuition for three years and after she had incurred a substantial amount of her family's and borrowed funds.

COUNT VII

UNLAWFUL DISCRIMINATION

97. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

98. The Plaintiff, an handicapped immigrant female, is member of protected group under M.G.L. c 151B.

99. Upon information and belief, the Defendants discriminated against the Plaintiff because of her status.

7

100. More specifically, the Defendants systematically refused to accommodate her by not allowing her to use the services of a stenographer.

101. The Defendants also delayed other forms of accommodation by not providing her access to the library for the entire first year of her law school.

102. Other Students in the similar position as the Plaintiff were treated differently from her.

103. The Defendants also discriminated against the Plaintiff by charging her with plagiarism, and by placing her before the Committee, while failing to afford her a written document apprising her of her right to remain silent.

104. As a result of the Defendants' discrimination, the Plaintiff has suffered academically, emotionally, as well as financially.

COUNT VIII
UNJUST ENRICHMENT

105. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

106. As a result of the above-described actions of the Defendants, the Defendants have been unjustly enriched at the Plaintiff's expense in the amount of $71,862.00.

107. Accordingly, the Defendants are jointly and severally liable to the Plaintiff in the amount of $71,862.00, plus interest and costs.

COUNT IX
CONVERSION

108. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

109. Based on their acts and conduct described above, the Defendants have wrongfully exercised improper dominion and control over the funds belonging to the Plaintiff, and have wrongfully converted the sum of $71,862.00, to which the Plaintiff is entitled.

110. The Plaintiff has been damaged as the result of said conversion by the Defendants.

111. As a result, the Defendants are liable to the Plaintiff for all damages caused by their conversion, in the amount of $71,862.00, plus interest and costs.

## COUNT X

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

112. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

113. The actions of the Defendants in informing the Plaintiff Six (6) days before her graduation, their maltreatment of her during her studies, their subsequent refusal to allow her to attend the graduation ceremony, and finally their action in dropping her under the guise of "academic deficiency" were extreme.

114. The Defendants' actions transcended all bounds of decency by human standards.

115. The Defendants' actions were intentional.

116. The Defendants' actions were outrageous.

117. The Defendants' actions were continuous.

118. As the result of the Defendants' actions, the Plaintiff suffered, and continues to suffer emotionally.

119. As the result of the Defendants' actions, the Plaintiff has become chronically traumatized and suffers from sleepless nights and recurrent nightmares.

120. As the result of the Defendants' actions, the Plaintiff has been seeking professional help through a hypnotherapist.

121. Consequently, the Plaintiff asks that the Defendants be found liable for her emotional distress and all attendant expenses for curing same.

### DAMAGES

122. The Plaintiff reavers, realleges and incorporates by reference the allegations contained in the above paragraphs as if each had been separately set forth herein.

123. The Defendants have inflicted a substantial emotional and financial loss upon the Plaintiff.

124. For the past four years, the Plaintiff has expended money and time in order to pursue her studies at the Defendant University.

9

125. The Plaintiff seeks monetary compensation in the amount equal to what she has suffered, including direct, incidental, consequential, and reliance damages.

126. The Plaintiff also seeks punitive damages in an amount commensurate with the gravity of the harm caused by the Defendants.

**WHEREFORE**, the Plaintiff, Layla Kiani, prays for judgment against the Defendants as follows:

(1) by ordering the Defendant University, to reinstate the Plaintiff and allow her to retake the requisite course(s), if necessary;

(2) by ordering the Defendant University to re-adjudicate the Plaintiff's case;

(3) in the alternative, by holding the Defendants jointly and severally liable for all the damage they have caused the Plaintiff;

(4) for temporary as well as permanent injunction by enjoining all the Defendants, and each of them, and their agents, servants, and employees, and all persons acting under, in concert with, or for them from discriminating against the Plaintiff by preventing the Plaintiff from transferring to another ABA accredited law school, if she wishes to;

(5) for direct, statutory, incidental, consequential, and punitive compensation for injuries caused by the Defendants as described above;

(6) for attorney fees, prejudgment interest, and costs; and

(7) for any other relief that the Court deems just.

DATED: August 9, 2004

Respectfully submitted

I HEREBY ATTEST AND CERTIFY ON

Sept. 1, 2004 , THAT THE

FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY
Asst. Clerk

Plaintiff, by her attorney

Ben Tahriri
343 Washington Street
Newton, MA 02458
Tel: (617) 965-1090
Fax: (617) 965-5020
BBO# 652042

# THE UNIVERSITY OF TEXAS AT ARLINGTON

**Name** Janshid, Layla
**Last** 86 E Howard St   Apt 408
**Known**
**Address** Quincy, MA 02169

**Degree** HONORS BACHELOR OF ARTS IN POLITICAL SCIENCE - May 13, 2000
**Awarded** BACHELOR OF ARTS IN SPANISH - Aug 12, 2000

**Student ID** 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
**Birthdate** 08/22/1978
**Page** 1 of 2

PAGE 02

| Acad Dept | Subj | Course Description | Grade | Contact Hrs Lec | Lab | Cr | Grade Pts | Core Area |
|---|---|---|---|---|---|---|---|---|
| | | **TASP TEST** | | | | | | |
| | | Passed All Sections | | | | | | |
| MATH | | 254 11/1996 TASP | | | | | | |
| READING | | 238 09/1996 TASP | | | | | | |
| WRITING | | 300 09/1996 TASP | | | | | | |
| | | **FALL 1996** | | | | | | |
| ECON | 2305 | PRIN MACRO ECO | B | 3 | | 3 | 9 | 080 |
| EDUC | 1130 | PEER SEMINAR | P | 1 | | 1 | | |
| EDUC | 1131 | COL ADJUNT | P | 1 | | 1 | | |
| ENGL | 1301 | EXPOS WRITING | B | 3 | | 3 | 9 | 010 |
| SPAN | 1441 | LEVEL I | A | 4 | | 4 | 16 | |
| SPAN | 1442 | LEVEL I   CLEP | CLEP | | | 4 | 16 | 070 |
| EXSA | 0120 | BOWLING U S | C | 2 | 2 | 1 | 4 | 020 |
| MATH | 1302 | COLLEGE ALG | A | 3 | | 3 | 6 | |
| | | Semester UG Totals | | | | GPA 3.333 | 20 | 60 |
| | | Accumulated UG Totals | | | | GPA 3.333 | 20 | 60 |
| | | 39 - HONOR ROLL. | | | | | | |
| | | **SPRING 1997** | | | | | | |
| ECON | 2306 | PRIN MICRO ECO | B | 3 | | 3 | 9 | |
| SPCH | 1301 | HONR INT SPEECH | B | 3 | | 3 | 9 | 010 |
| ENGL | 1302 | ARND WRT EXPER | A | 3 | | 3 | 12 | |
| SPAN | 2313 | LEVEL III | A | 3 | | 3 | 12 | |
| SPAN | 2314 | LEVEL IV | A | 3 | | 3 | 12 | |
| POLS | 2312 | STATE&LOCAL GOV | C | 3 | | 3 | 6 | 070 |
| | | Semester UG Totals | | | | GPA 3.333 | 18 | 60 |
| | | Accumulated UG Totals | | | | GPA 3.333 | 38 | 120 |
| | | 39 - HONOR ROLL. | | | | | | |
| | | **FALL 1997** | | | | | | |
| BLAW | 3311 | LAW I | A | 3 | | 3 | 12 | |
| ENGL | 2329 | AMERICAN LIT | A | 3 | | 3 | 12 | |
| SPAN | 3314 | ADV SP GRAMMAR | B | 3 | | 3 | 9 | 040 |
| EXSA | 0120 | BOWLING | A | 2 | | 1 | 4 | |
| POLS | 4395 | CONF RDGS POLS | A | | | 3 | 12 | |
| | | Semester UG Totals | | | | GPA 3.769 | 13 | 49 |
| | | Accumulated UG Totals | | | | GPA 3.449 | 51 | 169 |
| | | 39 - HONOR ROLL. | | | | | | |

| Acad Dept | Subj | Course Description | Grade | Contact Hrs Lec | Lab | Cr | Grade Pts | Core Area |
|---|---|---|---|---|---|---|---|---|
| | | **SPRING 1998** | | | | | | |
| BLAW | 3312 | LAW II | A | 3 | | 3 | 12 | |
| ENGL | 2303 | GENO & HUMOR | A | 3 | | 3 | 12 | 040 |
| | | HONORS | | | | | | |
| SPAN | 3303 | ADV SPAN CONV | A | 3 | | 3 | 12 | |
| | | HONORS | | | | | | |
| POLS | 4393 | POL SCI INTERN | P | | | 3 | | |
| POLS | 4395 | CONF RDGS POLS | P | | | 3 | | |
| MATH | 1302 | COLLEGE ALG | B | 3 | | 3 | 9 | |
| | | Semester UG Totals | | | | GPA 3.750 | 18 | 45 |
| | | Accumulated UG Totals | | | | GPA 3.508 | 69 | 214 |
| | | 39 - HONOR ROLL. | | | | | | |
| | | **SUMMER I 1998** | | | | | | |
| POLS | 4393 | POL SCI INTERN | P | | | 3 | | |
| POLS | 4395 | CONF RDGS POLS | A | | | 3 | 12 | |
| | | Semester UG Totals | | | | GPA 4.000 | 6 | 12 |
| | | Accumulated UG Totals | | | | GPA 3.531 | 75 | 226 |
| | | **SUMMER II 1998** | | | | | | |
| POLS | 4393 | POL SCI INTERN | P | | | 3 | | |
| POLS | 4395 | CONF RDGS POLS | A | | | 3 | 12 | |
| POLS | 4395 | CONF RDGS POLS | A | | | 3 | 12 | |
| | | Semester UG Totals | | | | GPA 4.000 | 9 | 24 |
| | | Accumulated UG Totals | | | | GPA 3.571 | 84 | 250 |
| | | **FALL 1998** | | | | | | |
| SPAN | 3315 | ADV SP COMP | B | 3 | | 3 | 9 | 060 |
| HIST | 1311 | HIST OF U.S. | A | 3 | | 3 | 12 | |
| | | HONORS | | | | | | |
| POLS | 3303 | INTR PUB ADMN | A | 3 | | 3 | 12 | 020 |
| | | HONORS | | | | | | |
| MATH | 1308 | ELEM STATS | A | 3 | | 3 | 12 | |
| | | HONORS | | | | | | |
| | | Semester UG Totals | | | | GPA 3.750 | 12 | 45 |
| | | Accumulated UG Totals | | | | GPA 3.598 | 96 | 295 |
| | | 39 - HONOR ROLL. | | | | | | |

| Acad Dept | Subj | Course Description | Grade | Contact Hrs Lec | Lab | Cr | Grade Pts | Core Area |
|---|---|---|---|---|---|---|---|---|
| | | **SPRING 1999** | | | | | | |
| SPAN | 4307 | MOD HISP DRAMA | A | 3 | | 3 | 12 | 060 |
| HIST | 1312 | HIST OF U.S. | A | 3 | | 3 | 12 | |
| POLS | 3310 | RESEARCH METH | A | 3 | | 3 | 12 | 030 |
| | | HONORS | | | | | | |
| PHYS | 1445 | ASTRONOMY 1 | A | 3 | 2 | 4 | 16 | |
| | | HONORS | | | | | | |
| | | Semester UG Totals | | | | GPA 4.000 | 13 | 52 |
| | | Accumulated UG Totals | | | | GPA 3.653 | 109 | 347 |
| | | 39 - HONOR ROLL. | | | | | | |
| | | **SUMMER I 1999** | | | | | | |
| SOCI | 3312 | JUVENILE DEL | A | 3 | | 3 | 9 | |
| | | Semester UG Totals | | | | GPA 3.000 | 3 | 9 |
| | | Accumulated UG Totals | | | | GPA 3.633 | 112 | 356 |
| | | **SUMMER II 1999** | | | | | | |
| POLS | 3331 | ISSUE CIVIL LIB | A | 3 | | 3 | 12 | |
| | | Semester UG Totals | | | | GPA 4.000 | 3 | 12 |
| | | Accumulated UG Totals | | | | GPA 3.644 | 115 | 368 |
| | | **SUMMER 11 WK 1999** | | | | | | |
| POLS | 4322 | IDEOLOGIES | A | 4 | | 3 | 12 | |
| | | Semester UG Totals | | | | GPA 4.000 | 3 | 12 |
| | | Accumulated UG Totals | | | | GPA 3.654 | 118 | 380 |
| | | ----------- End of Page 1. ----------- | | | | | | |
| | | Transcript issued on 07/23/2001 at 01:05:50 PM | | | | | | |

**EXHIBIT " A "**
(2 PAGES)

**Address inquiries to:**
Office of the Registrar
P.O. Box 19088
Arlington, Texas   76019

**Sent to:**
Layla Janshid
86 E Howard St   Apt 408
Quincy, MA 02169

Official transcripts are printed in black on burnt-orange safety paper, imprinted with the signature of the Registrar in blue ink, embossed with the seal of The University of Texas, and include explanatory information on the reverse side.

LAYLA KIANI                   61777312288

08/05/2004  12:26

# THE UNIVERSITY OF TEXAS AT ARLINGTON

Name: Jamshid, Layla
Apt 408
86 E Howard St
Quincy, MA 02169

Degree: HONORS BACHELOR OF ARTS IN POLITICAL SCIENCE - May 13, 2000
Awarded: BACHELOR OF ARTS IN SPANISH - Aug 12, 2000

Student ID 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
Birthdate 08/22/1978
Page 2 of 2

| Acad Dept | Subj | Course Description | Grade | Contact Hrs Lec Lab | Cr | Grade Pts | Core Area |
|---|---|---|---|---|---|---|---|
| | | **FALL 1999** | | | | | |
| SPAN | 3311 | SPAN COLLECTIVE | W | 3 | | | 080 |
| SPAN | 3318 | SEL READINGS | B | 3 | 3 | 9 | 080 |
| HIST | 2314 | HIST OF ENGL | A | 3 | 3 | 12 | |
| | | HONORS | | | | | |
| POLS | 3333 | JURISPRUDENCE | B | 3 | 3 | 9 | |
| POLS | 3335 | CRIMINAL LAW | B | 3 | 3 | 9 | |
| | | HONORS | | | | | |
| PHYS | 1446 | ASTRONOMY II | A | 3 | 2 | 4 | 16 | 030 |
| | | HONORS | | | | | |
| | | Semester UG Totals | GPA 3.438 | | 16 | 55 | |
| | | Accumulated UG Totals | GPA 3.625 | | 134 | 435 | |
| | | 39 - HONOR ROLL. | | | | | |
| | | **SPRING 2000** | | | | | |
| SPAN | 3302 | CONT LIT. TRANS | A | 3 | 3 | 12 | 080 |
| SPAN | 4326 | HISPANIC ESSAY | A | 3 | 3 | 12 | |
| PHIL | 1301 | CRITICAL THINK | A | 3 | 3 | 12 | 040 |
| POLS | 3394 | HON THESIS/PROJ | A | 3 | 3 | 12 | |
| PHYS | 4181 | SPECIAL PROB | A | 1 | 1 | 4 | |
| | | HONORS | | | | | |
| PHYS | 4281 | SPECIAL PROB | A | 2 | 2 | 8 | |
| | | HONORS | | | | | |
| | | Semester UG Totals | GPA 4.000 | | 15 | 60 | |
| | | Accumulated UG Totals | GPA 3.667 | | 149 | 495 | |
| | | 39 - HONOR ROLL. | | | | | |
| | | HONORS BACHELOR OF ARTS IN POLITICAL SCIENCE | | | | | |
| | | conferred Magna Cum Laude May 13, 2000 | | | | | |
| | | RANK: Class 014/1117 College 054/371 POLS 005/019 | | | | | |
| | | **SUMMER I 2000** | | | | | |
| SPAN | 4313 | MAGICAL REALISM | B | 3 | 3 | 9 | |
| HIST | 4391 | CONF COURSE | B | 3 | 3 | 12 | |
| PHYS | 4181 | SPECIAL PROBLEM | A | 1 | 1 | 4 | |
| PHYS | 4281 | SPECIAL PROBLEM | A | 2 | 2 | 8 | |
| | | Semester UG Totals | GPA 3.667 | | 9 | 33 | |
| | | Accumulated UG Totals | GPA 3.657 | | 158 | 528 | |
| | | **SUMMER II 2000** | | | | | |
| PHYS | 4181 | SPECIAL PROBLEM | A | 1 | 1 | 4 | |
| PHYS | 4281 | SPECIAL PROBLEM | A | 2 | 2 | 8 | |
| | | Semester UG Totals | GPA 4.000 | | 3 | 12 | |
| | | Accumulated UG Totals | GPA 3.673 | | 161 | 540 | |
| | | BACHELOR OF ARTS IN SPANISH | | | | | |
| | | conferred Magna Cum Laude Aug 12, 2000 | | | | | |
| | | RANK: Class 0061/0614 College 016/187 SPAN 002/016 | | | | | |

Degrees: HONORS BACHELOR OF ARTS IN POLITICAL SCIENCE - May 13, 2000
Awarded: BACHELOR OF ARTS IN SPANISH - Aug 12, 2000

-------- End of Official Transcript --------
Transcript Issued on 07/23/2001 at 01:05:50 PM

Official transcripts are printed in black on tan-orange safety paper, imprinted with the signature of the Registrar in blue ink, embossed with the seal of The University of Texas. See reverse side for explanatory information on the reverse side.

★ LASER PRINTED

Address inquiries to:
Office of the Registrar
P.O. Box 19088
Arlington, Texas   76019

Sent to:
Layla Jamshid
86 E Howard St   Apt 408
Quincy, MA 02169

**Boston University**

School of Law
765 Commonwealth Avenue
Boston, Massachusetts 02215
617-353-3112
Fax: 617-353-7400



**EXHIBIT " B "**

Ronald A. Cass
Dean and Melville Madison Bigelow
Professor of Law

May 12, 2003

Ms. Layla Kiani
86 E. Howard Street, Apt. 408
Quincy, MA  02169-8727

*via Federal Express*

Dear Ms. Kiani:

I am writing to inform you that, pursuant to Article IV, Section 4 of the Boston University School of Law Disciplinary Regulations, you are suspended effective immediately. This suspension is an interim sanction pending completion of an investigation of a possible violation or our disciplinary regulations related to a paper submitted in Professor Mariner's *Managed Healthcare* course. You will be notified of the resolution of this investigation.

As a result of this suspension, you will not be permitted to participate in the May 18, 2003 Commencement ceremonies.

If you have any questions concerning this matter, please feel free to contact my office.

Sincerely,

*Ronald A. Cass (chm)*

Ronald A. Cass

cc:    Professor William Ryckman
       Mary Jo Sullivan, Registrar

**EXHIBIT "** $C$ **"**
(2 PAGES)

# DISCIPLINARY REGULATIONS FOR ALL BUSL STUDENTS

**NOTE:** BUSL students also are subject to the Boston University Code of Student Responsibilities. For a copy of the Code, see www.bu.edu/judicialaffairs/studentres.htm.

## Article I. School of Law (BUSL) Disciplinary Action

1. **Jurisdiction over disciplinary cases.** Students at BUSL are subject both to these Disciplinary Regulations and to the Code of Student Responsibilities of Boston University (the University). BUSL and the University may agree under which rules and regulations any disciplinary case is to be brought. BUSL ordinarily will not bring any separate action with respect to a charge that is the subject of disciplinary proceedings initiated by the University.

2. **Scope of disciplinary action by BUSL.** Disciplinary action by BUSL is governed by these Regulations. Such action extends to the following conduct:

   a.  *Conduct in violation of BUSL regulations.* Such conduct is defined in Article II, below.

   b.  *Other conduct, including but not limited to conduct in violation of Boston University rules or public law, when such conduct is not commensurate with professional standards of conduct required of lawyers.* Such conduct is defined in Article III, below.

   An individual shall assume student status, for purposes of these Regulations, upon his or her formal enrollment in BUSL, and such status shall continue until his or her permanent severance from BUSL by graduation, expulsion, completed withdrawal, or other like event. Misconduct in connection with an application for admission, however, shall be deemed to continue in effect through enrollment. An individual whose student status has terminated for any reason other than graduation shall remain subject to discipline under these Regulations with respect to his or her conduct while in student status. In any case, the disciplinary sanctions of expulsion and suspension shall be deemed respectively to effect permanent or temporary disqualification for readmission to BUSL. The Faculty retains its inherent power to take appropriate action, after such reasonable process as it may prescribe, with respect to a graduate's conduct while in student status.

## Article II. Violations of BUSL Rules and Regulations

1. **General rule.** Any student who violates BUSL's rules or regulations, as published from time to time, may be subject to disciplinary action pursuant to these Regulations. The examples contained in section 2 below are not intended to be exhaustive.

2. **Specific examples.** The following are examples of BUSL rules and regulations, the violation of which may be subject to disciplinary action pursuant to these Regulations.

   a.  *BUSL Academic Regulations and rules and procedures of the Law Library.* Students are expected to comply with BUSL Academic Regulations, with any academic regulations adopted by an applicable LL.M. program, and with the rules and procedures established for the use of the Law Library. Willful or repeated failure to comply with such regulations, rules or procedures may be subject to disciplinary action.

   b.  *Classroom rules.* Students are required to comply with the rules established by members of the Faculty and other instructors at BUSL for the conduct of their classes. An example of a rule that has been adopted and promulgated by some Faculty members for the conduct of their classes is the exclusion from class of students who arrive late or are unprepared. Should an instructor announce such a rule to students in the instructor's classes, willful or repeated failure

by a student in such a class to comply with the instructor's rule may be subject to disciplinary action.

c.  *Disruption of BUSL activities or operations.* Conduct that disrupts or impairs BUSL activities or operations may be subject to disciplinary action. The kind of conduct referred to is conduct that by itself or in conjunction with the conduct of others disrupts or impairs the effective carrying on of the activity, a result that the student knew or reasonably should have known would occur.

d.  *Damage to or abuse of BUSL property, facilities or services.* Students are expected to make responsible and appropriate use of BUSL property and facilities, and of the services provided by BUSL. Conduct that damages or abuses BUSL property, facilities, or services, including, for example willful damage to Law Library materials, or to furniture, classrooms, or offices, and unauthorized use of photo-copying or secretarial services, may be subject to disciplinary action.

e.  *Plagiarism.* Plagiarism is the knowing use, without adequate attribution, of the ideas, expressions, or work, of another, with intent to pass such materials off as one's own. All written work, whether in preliminary or final form, submitted by a student in the course of law study, in the course of employment, or in the course of other activities, whether or not related to the study or profession of law, is assumed to be the student's own work. Anything copied or paraphrased from another author or source must be appropriately identified, acknowledged, and attributed. The use of the exact language of another without identification as a direct quotation by quotation marks or otherwise is plagiarism even though the source is cited in the student's work. Violation of the rules stated in this paragraph may be subject to disciplinary action.

f.  *Examinations.* Students are required to comply with the rules established for examinations, including both those established by BUSL and those established by the instructor giving the examination. Violation of the rules set for any examination, including "take-home" examinations, may be subject to disciplinary action. The examination rules established by BUSL include the following:

  (1) Students may have in their possession only those materials permitted by the instructor, and they may consult books, notes, other material, or other persons, only as authorized by the instructor.

  (2) Students must stop writing and turn in their in-class examination papers when time is called.

g.  *Sales or purchase of class notes.* The sale, offering for sale, or purchase, directly or indirectly, of lecture notes, class notes, case abstracts, or similar material, acquired through attendance at BUSL, by any student or group of students or their agents, is prohibited and may be subject to disciplinary action.

h.  *Recording devices.* Recording devices are prohibited in the classroom except with the permission of the Dean and of the instructor. The use of such devices in the classroom without such permission may be subject to disciplinary action.

i.  *Rules of the Career Development Office.* Students are required to comply with the rules established by BUSL Career Development Office. In particular, no student who has accepted an offer of employment shall use the facilities of the Office to secure interviews for employment to a conflicting position. No student who has accepted an offer of employment in a law-related position shall rescind that acceptance or accept an offer for employment to a

Boston University

**EXHIBIT " D "**



Registrar's Office
School of Law
765 Commonwealth Avenue
Boston, Massachusetts 02215
617/353-3115
Fax 617/353-7400

December 18, 2003

Ms. Layla Kiani
86 E. Howard Street, Apt. 408
Quincy, MA  02169-8727

*Via FedEx and Regular Mail*

Dear Layla:

Enclosed is an updated transcript that reflects grade changes submitted by Professor Pettit, Professor Mariner and Mr. Bendremer. (These grade changes resulted from their reevaluation of your papers after they were notified of the Judicial Committee's decision). Also, upon reevaluation, Professor Pettit has decided that you have not satisfied the upper-class writing requirement. Your weighted average is 1.90, which is below the minimum average of 2.00 required for good standing. In addition, you have failed a total of 6 upper-class credits, which is one more than allowed by the current Academic Regulations. I regret to advise you that you have been dropped for academic deficiency.

If you wish to petition the Academic Standards Committee for reinstatement, all relevant supporting documents must accompany the petition. If you decide to petition, please submit the petition and accompanying documentation, if relevant, to Aida Ten, Associate Registrar, Fourth Floor Registrar's Office (her e-mail address is ten@bu.edu). A petition for reinstatement..."must address all circumstances related to the student's failure to meet BUSL standards...If a student's medical condition has been a contributing factor, an examining physician's statement must accompany the petition." (Article X, Section 1, Boston University School of Law Academic Regulations).

If you wish to discuss any matters relating to your status, please feel free to contact Assistant Dean Christine Marx at her office number: 617/353-3112.

Sincerely,

Mary Jo Sullivan
Registrar

cc:  Assistant Dean Marx



**EXHIBIT "E"**
(3 PAGES)

### Geriatric Use

Clinical studies of Phenergan formulations did not include sufficient numbers of subjects aged 65 and over to determine whether they respond differently from younger subjects. Other reported clinical experience has not identified differences in responses between the elderly and younger patients. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range, reflecting the greater frequency of decreased hepatic, renal or cardiac function, and of concomitant disease or other drug therapy.

Sedating drugs may cause confusion and over-sedation in the elderly; elderly patients generally should be started on low doses of Phenergan Tablets and Suppositories and observed closely.

## ADVERSE REACTIONS
### Central Nervous System

Drowsiness is the most prominent CNS effect of this drug. Sedation, somnolence, blurred vision, dizziness; confusion, disorientation, and extrapyramidal symptoms such as oculogyric crisis, torticollis, and tongue protrusion; lassitude, tinnitus, incoordination, fatigue, euphoria, nervousness, diplopia, insomnia, tremors, convulsive seizures, excitation, catatonic-like states, hysteria. Hallucinations have also been reported.

**Cardiovascular**–Increased or decreased blood pressure, tachycardia, bradycardia, faintness.

**Dermatologic**–Dermatitis, photosensitivity, urticaria.

**Hematologic**–Leukopenia, thrombocytopenia, thrombocytopenic purpura, agranulocytosis.

**Gastrointestinal**–Dry mouth, nausea, vomiting, jaundice.

**Respiratory**–Asthma, nasal stuffiness, respiratory depression (potentially fatal) and apnea (potentially fatal). (See **WARNINGS–Respiratory Depression**.)

**Other**–Angioneurotic edema. Neuroleptic malignant syndrome (potentially fatal) has also been reported. (See **WARNINGS–Neuroleptic Malignant Syndrome**.)

### Paradoxical Reactions

Hyperexcitability and abnormal movements have been reported in patients following a single administration of promethazine HCl. Consideration should be given to the discontinuation of promethazine HCl and to the use of other drugs if these reactions occur. Respiratory depression, nightmares, delirium, and agitated behavior have also been reported in some of these patients.

## OVERDOSAGE

Signs and symptoms of overdosage with promethazine HCl range from mild depression of the central nervous system and cardiovascular system to profound hypotension, respiratory depression, unconsciousness, and sudden death. Other reported reactions include hyperreflexia, hypertonia, ataxia, athetosis, and extensor-plantar reflexes (Babinski reflex).

Stimulation may be evident, especially in children and geriatric patients. Convulsions may rarely occur. A paradoxical-type reaction has been reported in children receiving single doses of 75 mg to 125 mg orally, characterized by hyperexcitability and nightmares.

Atropine-like signs and symptoms–dry mouth, fixed, dilated pupils, flushing, as well as gastrointestinal symptoms–may occur.

## Treatment

Treatment of overdosage is essentially symptomatic and supportive. Only in cases of extreme overdosage or individual sensitivity do vital signs, including respiration, pulse, blood pressure, temperature, and EKG, need to be monitored. Activated charcoal orally or by lavage may be given, or sodium or magnesium sulfate orally as a cathartic. Attention should be given to the reestablishment of adequate respiratory exchange through provision of a patent airway and institution of assisted or controlled ventilation. Diazepam may be used to control convulsions. Acidosis and electrolyte losses should be corrected. Note that any depressant effects of promethazine HCl are not reversed by naloxone. Avoid analeptics which may cause convulsions.

The treatment of choice for resulting hypotension is administration of intravenous fluids, accompanied by repositioning if indicated. In the event that vasopressors are considered for the management of severe hypotension which does not respond to intravenous fluids and repositioning, the administration of norepinephrine or phenylephrine should be considered. EPINEPHRINE SHOULD NOT BE USED, since its use in patients with partial adrenergic blockade may further lower the blood pressure. Extrapyramidal reactions may be treated with anticholinergic antiparkinsonian agents, diphenhydramine, or barbiturates. Oxygen may also be administered.

Limited experience with dialysis indicates that it is not helpful.

## DOSAGE AND ADMINISTRATION

**Phenergan Tablets and Phenergan Rectal Suppositories are not recommended for children under 2 years of age (see WARNINGS-Use in Pediatric Patients).**

Phenergan Suppositories are for rectal administration only.

### Allergy

The average oral dose is 25 mg taken before retiring; however, 12.5 mg may be taken before meals and on retiring, if necessary. Single 25-mg doses at bedtime or 6.25 to 12.5 mg taken three times daily will usually suffice. After initiation of treatment in children or adults, dosage should be adjusted to the smallest amount adequate to relieve symptoms. The administration of promethazine HCl in 25-mg doses will control minor transfusion reactions of an allergic nature.

### Motion Sickness

The average adult dose is 25 mg taken twice daily. The initial dose should be taken one-half to one hour before anticipated travel and be repeated 8 to 12 hours later, if necessary. On succeeding days of travel, it is recommended that 25 mg be given on arising and again before the evening meal. For children, Phenergan Tablets, Syrup, or Rectal Suppositories, 12.5 to 25 mg, twice daily, may be administered.



Join Ciao -

Books    Cameras    Cars    Computers    Electronics    Films    Household    Music    Phones    Trave

[Search]

· Join now

FREE Panasonic X70

mobile shop

Home > Health & Beauty > Health > Medicine > Over-the-Counter Medicine > Sedatives > Phenergan

## Phenergan > Reviews > Be careful

**Overall user rating:** ★ ★ ★ ⯪
Rated by 4 Ciao members

→ Write a review

→ Join and earn n

No image
available

**eb**¥  **Offers for Phenergan**

→ Free Mail Order

Overview          Auctions          **Reviews**          Resource

All reviews                                         Previous review |

## Be careful

A review by starry on Phenergan
December 29th, 2000

**Author's product rating:**  ★ ★

**Pros:**    Good antihistamine if used correctly
**Cons:**    It can be misused

**Recommend to potential buyers:**    no

**Full review**

Phenergan is a product which is available for purchase over the counter in most
pharmacies and it has an infamous reputation among mothers for use as a sedative for
their young children as it causes drowsiness.

For any of you who are not familiar with the product, Phenergan contains an
antihistamine called Promethazine Hydrochloride. As it is one of the older type
antihistamines it causes drowsiness in both adults and children. Obviously children are
more susceptible to its effects (but every person is different).

Because of this drowsiness side effect, over the years, it has gained the reputation of
being an ideal sedative for children. This probably stems from the fact that doctors used
to prescribe it to mothers who found it difficult to settle their children down at night. For

**Related resourc**

1. **Medicine? Buy & ear
   here**
   Register with MutualP(
   & earn points when yo
   online at 300 UK sites
   JohnLewis, Amazon, E
   MFI & eBay. Points are
   redeemable for cash a
   MutualPoints.com site.

2. **HealthExpress.co.uk
   medicines**
   The UK's first online cl
   impotence, obesity and
   pattern baldness. You
   information on the con
   treatments and get a fr
   medical diagnosis. Tre
   are available.

**EXHIBIT " F "**
(2 PAGES)

conflicting position without first notifying the Office and discussing the matter with a representative of that Office. Willful or repeated violation of the requirements of this paragraph may be subject to disciplinary action.

## Article III.  Unprofessional Conduct

1.  **General rule.** Any student who engages in unprofessional conduct with regard to any matter, whether or not related to BUSL or to Boston University, may be subject to disciplinary action pursuant to these Regulations.

2.  **Definition.** Unprofessional conduct includes:

    a.  illegal conduct involving moral turpitude;

    b.  conduct that involves dishonesty, fraud, or deceit; or

    c.  conduct that violates the standards of professional ethics established for lawyers or otherwise adversely reflects on the fitness of the student for admission to the bar.

3.  **Specific examples.** Subject to the standard defined in section 2 above, the following are examples of conduct that may be determined to be unprofessional conduct subject to disciplinary action pursuant to these Regulations:

    a.  *Failure to comply with University rules relating to student conduct and discipline.* Students are required to comply with the rules established by Boston University relating to student conduct and discipline. For example, students are expected to comply with the University Policy on Sexual Harassment. Willful or repeated failure to comply with such rules may be determined to be unprofessional conduct subject to disciplinary action pursuant to these Regulations whether or not such conduct is also subject to disciplinary action pursuant to University rules.

    b.  *Violations of public law.* Conduct in violation of public law may be determined to be unprofessional conduct subject to disciplinary action pursuant to these Regulations whether or not such conduct is also subject to criminal or other sanctions.

    c.  *False statement.* Making a false statement in any document or record related to the study or practice of law may be the basis for disciplinary action, whether the statement is made on a document submitted to BUSL, Boston University, or to a third party. Included within this category would be any false statement on an application for admission to BUSL or other academic institution, on an application or other document submitted for financial aid, or on a resume submitted to a potential employer or agent for a potential employer.

    d.  *Other conduct.* Conduct defined as unprofessional conduct under section 2, above, may be subject to disciplinary action pursuant to these Regulations whether or not such conduct is related to the academic process at Boston University, and whether or not such conduct is also subject to other sanctions. These examples of unprofessional conduct are not intended to be exhaustive.

## Article IV.  Investigation and Presentation of Charges

1.  **Investigation of reported student misconduct.** All reports and all complaints of student misconduct, including reports and complaints involving LL.M. students, shall be referred to the Office of the Dean, which shall promptly conduct an investigation of the matter. At the direction of the Dean, an Associate Dean or other delegate of the Dean shall discuss the matter with the student at the earliest opportunity, and in the case of students in an LL.M. program, consult with the

appropriate Director. All students are to be informed of the right to counsel and the right to remain silent, and shall be warned that anything the student may say may be used against the student. The student shall be requested to sign a statement to the effect that he or she has been informed of the above rights and has received the above warning.

2. **Informal disposition.** If, in the Dean's judgment, the report or complaint is unfounded or warrants no formal action, no action shall be taken and no record shall be made of the matter in the student's permanent record or upon the student's transcript. The student shall be informed promptly of the Dean's determination and the matter shall be considered closed.

3. **Presentation of charges.** If, in the Dean's judgment, the report or complaint appears to warrant disciplinary action, the Dean shall direct that charges against the student be drawn and that the matter be referred to a Judicial Committee. The Dean's delegate promptly shall draw charges and transmit them in writing both to the student and to the Judicial Committee convened under Article V, below. Charges may be amended in writing at any time before completion of the Judicial Committee's hearing, provided that the amendment is made within a reasonable time after discovery of evidence supporting the amendment. Such amendment shall be allowed if it refers to the same or a similar transaction that was the subject of the initial charge. The student shall have a reasonable time to prepare to respond to any amendment.

4. **Interim Sanction.** The Dean may withhold credit for a course or seminar, withhold the award of any honors or other academic privileges, delay the award of a degree, or suspend the student involved pending completion of an investigation and hearing of alleged student misconduct. In determining whether to withhold, delay, or suspend, the Dean shall consider the gravity of the charge and the apparent strength of the case against the student, and the feasibility of avoiding interim sanctions by expediting the disciplinary proceedings.

## Article V. The Judicial Committee

1. **Convening the Judicial Committee.** When the Dean determines that charges against any student shall be referred to a Judicial Committee, the Dean shall convene the Committee in accordance with the provisions of this Article. Except in the case of joint hearings as provided in section 2, below, a separate Judicial Committee shall be convened to hear the case of each student against whom charges are brought.

2. **Joint hearings.** Where two or more students are charged with participating in the same act or transaction, or in the same series of acts or transactions, constituting a rule violation or unprofessional conduct under these Regulations, the charges shall be referred to a single Judicial Committee for a joint hearing. If, in the judgment of the Committee, a separate hearing should be held for any reason in the case of any such student, the Committee convened to hear the charges shall hold such separate hearings as are required. If one or more, but fewer than all, students charged in a joint hearing elect to have the Committee consist solely of Faculty members as provided in section 4, below, the Faculty members of the single Committee constituted pursuant to this section shall constitute the Judicial Committee in the case of such student or students and shall hold a separate hearing or hearings as required.

3. **Composition of the Judicial Committee.** Except as provided in section 4, below, each Judicial Committee convened to hear charges brought against a student or students pursuant to these Regulations shall consist of one student and two members of the BUSL Faculty selected as provided in this Article. If the Chair of the Faculty Judicial Panel does not serve on a Judicial Committee, [t] he Faculty members selected for the Committee shall elect one of their number to serve as Chair of the Committee.

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT

CIVIL ACTION NO.

LAYLA KIANI )
         Plaintiff, )
            )
            )
vs.           )
            )
            )
TRUSTEES OF BOSTON UNIVERSITY,  ET AL )
            )
         Defendants. )

# STATEMENT OF DAMAGES FROM JUNE 2000- MAY 2003

The Plaintiff has suffered monetary damages according to the following:

1) Preparation-for-Law School courses -------------------------------------$5,800.00

2) Tuition to Boston University --------------------------------------- ---$71,862.00

3) Rent ---------------------------------------------------------------$54,900.00

4) Tuition to Suffolk University -------------------------------------------$4000.00

5) Books --------------------------------------------------------------$2,500.00

6) New York Living Expenses as an Intern ------------------------------$10,000.00

7) Living Expenses ----------------------------------------------------$36,500.00

Total Amount of Damages:        $ 185,562.00

| CIVIL ACTION COVER SHEET | DOCKET NO.(S)<br>J4-3518 C | Trial Court of Massachusetts<br>Superior Court Department<br>County: SUFFOLK | 2 |
|---|---|---|---|

| PLAINTIFF(S)<br>LAYLA KIANI | DEFENDANT(S)<br>BOSTON UNIVERSITY, ET AL· |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE<br>BEN TAHRIRI, 343 WASHINGTON ST., NEWTON<br>MA 02458. (617)965-1090 | ATTORNEY (if known)<br>LAWRENCE S. ELSWIT |
| Board of Bar Overseers number: 652042 | |

### Origin code and track designation

Place an x in one box only:

- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P.60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

CODE NO.  
A99

TYPE OF ACTION (specify)     TRACK  ( F )  IS THIS A JURY CASE?  
BREACH OF CONTRACT; FRAUD; ADA        (X) Yes   ( ) No

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses .......................................................... $ ...........
2. Total Doctor expenses ............................................................. $ ...........
3. Total chiropractic expenses ..................................................... $ ...........
4. Total physical therapy expenses ............................................... $ ...........
5. Total other expenses (describe) ............................................... $ ...........
   Subtotal $ ...........

B. Documented lost wages and compensation to date ............................. $ ...........
C. Documented property damages to date .......................................... $ ...........
D. Reasonably anticipated future medical and hospital expenses ............... $ ...........
E. Reasonably anticipated lost wages .............................................. $ ...........
F. Other documented items of damages (describe)
   $ ...........

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

   PLEASE SEE ATTACHED COMPLAINT
   $ ...........
   TOTAL $ ...........

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

   PLEASE SEE STATEMENT OF DAMAGES & COMPLAINT

   TOTAL $. 185,562.00

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____    DATE: Aug. 9, 04

AOTC-6 mtc005-11/99  
A.O.S.C. 1-2000

I HEREBY ATTEST AND CERTIFY ON

Sept. 1, 2004 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN  
CLERK / MAGISTRATE  
SUFFOLK SUPERIOR CIVIL COURT  
DEPARTMENT OF THE TRIAL COURT

BY _____  
Asst. Clerk.

2/

## COMMONWEALTH OF MASSACHUSETTS
## TRIAL COURT OF THE COMMONWEALTH

*Suffolk* , ss.

*SUPERIOR* ~~District~~ Court

Civil Action No. _____

8-9-04
Allowed
(Cratsky J.)
Attest: _____  04-3518C

LAYLA KIANI )
)
v. )
)
TRUSTEES OF BOSTON )
UNIVERSITY, ET AL )

**MOTION FOR APPOINTMENT AS
SPECIAL PROCESS SERVER AND
ORDER OF APPOINTMENT**

In accordance with the provisions of Rule 4c of the M.R. Civ. P. the undersigned hereby motions this Honorable Court for the appointment of MARVIN A. FEINMAN as process server in the above entitled action. The undersigned swears that to the best of his/her knowledge and belief the person to be appointed process server is a Constable of the Town of Brookline who is experienced in the service of process, is 18 years of age or over and is not a party to this action.

_Ben Tahiri_
Name of Affiant
Attorney for Plaintiff (Defendant)

_543 Washington St._
Address
_Newton, MA 02458_
_(617) 965-t 90_
Telephone

Signature

---

### ORDER APPOINTING SPECIAL PROCESS SERVER

The foregoing Motion is allowed and pursuant to Rule 4c of the M.R. Civ. Pl. IT IS ORDERED THAT MARVIN A. FEINMAN is hereby appointed as Special Process Server in the above entitled action.

By: _____          Date: _____
        Justice

. HEREBY ATTEST AND CERTIFY ON

  Sept. 1, 2004 , THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
        Asst. Clerk

**3**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                      SUPERIOR COURT

                                                 DOCKET NO. **04-3518C**

LAYLA KIANI                              )
                         Plaintiff, )
                                         )
                                         )
vs.                                      )
                                         )
                                         )
TRUSTEES OF BOSTON UNIVERSITY            )
&                                        )
RONALD CASS                              )
&                                        )
WENDY MARINER                            )
&                                        )
ANDREW KULL                              )
&                                        )
CHRISTINE MARX                           )
                         Defendants. )

## Plaintiff's Amendments to the Complaint

Now comes the Plaintiff, Layla Kiani, and submits her amendments pursuant to Mass. R. CIV. P. 15 (a). The Plaintiff's amendments are as follows:

1) Paragraph 26 should be redacted and substituted with:

   **26. On August 27, 2000, the Plaintiff enrolled in the Juris Doctor program of the Defendant University.**

2) Paragraph 32 should be redacted and substituted with:

   **32. As a result of the medicine, the Plaintiff also developed Dermatitis, another common side effect. The Plaintiff had to be treated by a Dermatologist and a Plastic Surgeon at Brigham and Women's Hospital.**

3) Exhibit "E" should be replaced with the attached **Exhibit "E"**.

DATED: August 16, 2004

I HEREBY ATTEST AND CERTIFY ON

___Sept. 1, 2004___, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY. _____
       Asst. Clerk.

Respectfully submitted

Plaintiff, by her attorney

Ben Tahriri, Esquire
343 Washington Street
Newton, MA 02458
Tel: (617) 965-1090
Fax: (617) 965-5020
BBO# 652042

# COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

Superior Court
Docket No. 04-3518C

**Layla Kiani**

v.

**Trustees of Boston University, et al**

### CERTFICATE OF SERVICE

I, Ben Tahriri, Esquire, hereby certify that I have this 16th day of August, 2004 served 5 copies of the foregoing documents via First Class Mail to:

Attorney Lawrence S. Elswit
Boston University
Office of the General Counsel
125 Bay State Road
Boston, MA 02215

Ben Tahriri, Esquire
BBO# 652042
343 Washington Street
Newton, MA 02458
Tel: (617) 965-1090
Fax: (617) 965-5020

**EXHIBIT** " E "
(10 Pages)

# Wyeth®

## Phenergan®
(promethazine HCl)
**Tablets and Suppositories**

℞ **only**

### DESCRIPTION

Each tablet of Phenergan contains 12.5 mg, 25 mg, or 50 mg promethazine HCl. The inactive ingredients present are lactose, magnesium stearate, and methylcellulose. Each dosage strength also contains the following:

12.5 mg–FD&C Yellow 6 and saccharin sodium;
25 mg–saccharin sodium;
50 mg–FD&C Red 40.

Each rectal suppository of Phenergan contains 12.5 mg, 25 mg, or 50 mg promethazine HCl with ascorbyl palmitate, silicon dioxide, white wax, and cocoa butter. Phenergan Suppositories are for rectal administration only.

Promethazine HCl is a racemic compound; the empirical formula is $C_{17}H_{20}N_2S \cdot HCl$ and its molecular weight is 320.88.

Promethazine HCl, a phenothiazine derivative, is designated chemically as 10$H$-Phenothiazine-10-ethanamine, $N,N,\alpha$-trimethyl-, monohydrochloride, ($\pm$)- with the following structural formula:



Promethazine HCl occurs as a white to faint yellow, practically odorless, crystalline powder which slowly oxidizes and turns blue on prolonged exposure to air. It is freely soluble in water and soluble in alcohol.

### CLINICAL PHARMACOLOGY

Promethazine is a phenothiazine derivative which differs structurally from the antipsychotic phenothiazines by the presence of a branched side chain and no ring substitution. It is thought that this configuration is responsible for its relative lack (1/10 that of chlorpromazine) of dopamine antagonist properties.

1

Promethazine is an $H_1$ receptor blocking agent. In addition to its antihistaminic action, it provides clinically useful sedative and antiemetic effects.

Promethazine is well absorbed from the gastrointestinal tract. Clinical effects are apparent within 20 minutes after oral administration and generally last four to six hours, although they may persist as long as 12 hours. Promethazine is metabolized by the liver to a variety of compounds; the sulfoxides of promethazine and N-demethylpromethazine are the predominant metabolites appearing in the urine.

## INDICATIONS AND USAGE

Phenergan, either orally or by suppository, is useful for:

Perennial and seasonal allergic rhinitis.

Vasomotor rhinitis.

Allergic conjunctivitis due to inhalant allergens and foods.

Mild, uncomplicated allergic skin manifestations of urticaria and angioedema.

Amelioration of allergic reactions to blood or plasma.

Dermographism.

Anaphylactic reactions, as adjunctive therapy to epinephrine and other standard measures, after the acute manifestations have been controlled.

Preoperative, postoperative, or obstetric sedation.

Prevention and control of nausea and vomiting associated with certain types of anesthesia and surgery.

Therapy adjunctive to meperidine or other analgesics for control of post-operative pain.

Sedation in both children and adults, as well as relief of apprehension and production of light sleep from which the patient can be easily aroused.

Active and prophylactic treatment of motion sickness.

Antiemetic therapy in postoperative patients.

## CONTRAINDICATIONS

Phenergan Tablets and Suppositories are contraindicated in comatose states, and in individuals known to be hypersensitive or to have had an idiosyncratic reaction to promethazine or to other phenothiazines.

Antihistamines are contraindicated for use in the treatment of lower respiratory tract symptoms including asthma.

2

## WARNINGS
### CNS Depression
Phenergan Tablets and Suppositories may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks, such as driving a vehicle or operating machinery. The impairment may be amplified by concomitant use of other central-nervous-system depressants such as alcohol, sedatives/hypnotics (including barbiturates), narcotics, narcotic analgesics, general anesthetics, tricyclic antidepressants, and tranquilizers; therefore such agents should either be eliminated or given in reduced dosage in the presence of promethazine HCl (see **PRECAUTIONS–Information for Patients** and **Drug Interactions**).

### Respiratory Depression
Phenergan Tablets and Suppositories may lead to potentially fatal respiratory depression.

Use of Phenergan Tablets and Suppositories in patients with compromised respiratory function (e.g., COPD, sleep apnea) should be avoided.

### Lower Seizure Threshold
Phenergan Tablets and Suppositories may lower seizure threshold. It should be used with caution in persons with seizure disorders or in persons who are using concomitant medications, such as narcotics or local anesthetics, which may also affect seizure threshold.

### Bone-Marrow Depression
Phenergan Tablets and Suppositories should be used with caution in patients with bone-marrow depression. Leukopenia and agranulocytosis have been reported, usually when Phenergan (promethazine HCl) has been used in association with other known marrow-toxic agents.

### Neuroleptic Malignant Syndrome
A potentially fatal symptom complex sometimes referred to as Neuroleptic Malignant Syndrome (NMS) has been reported in association with promethazine HCl alone or in combination with antipsychotic drugs. Clinical manifestations of NMS are hyperpyrexia, muscle rigidity, altered mental status and evidence of autonomic instability (irregular pulse or blood pressure, tachycardia, diaphoresis and cardiac dysrhythmias).

The diagnostic evaluation of patients with this syndrome is complicated. In arriving at a diagnosis, it is important to identify cases where the clinical presentation includes both serious medical illness (e.g. pneumonia, systemic infection, etc.) and untreated or inadequately treated extrapyramidal signs and symptoms (EPS). Other important considerations in the differential diagnosis include central anticholinergic toxicity, heat stroke, drug fever and primary central nervous system (CNS) pathology.

The management of NMS should include 1) immediate discontinuation of promethazine HCl, antipsychotic drugs, if any, and other drugs not essential to concurrent therapy, 2) intensive symptomatic treatment and medical monitoring, and 3) treatment of any concomitant serious medical problems for which specific treatments are available. There is no general agreement about specific pharmacological treatment regimens for uncomplicated NMS.

Since recurrences of NMS have been reported with phenothiazines, the reintroduction of promethazine HCl should be carefully considered.

**Use in Pediatric Patients**

**PHENERGAN TABLETS AND SUPPOSITORIES ARE NOT RECOMMENDED FOR USE IN PEDIATRIC PATIENTS LESS THAN TWO YEARS OF AGE.**

**CAUTION SHOULD BE EXERCISED WHEN ADMINISTERING PHENERGAN TABLETS AND SUPPOSITORIES TO PEDIATRIC PATIENTS 2 YEARS OF AGE AND OLDER BECAUSE OF THE POTENTIAL FOR FATAL RESPIRATORY DEPRESSION. ANTIEMETICS ARE NOT RECOMMENDED FOR TREATMENT OF UNCOMPLICATED VOMITING IN PEDIATRIC PATIENTS, AND THEIR USE SHOULD BE LIMITED TO PROLONGED VOMITING OF KNOWN ETIOLOGY. THE EXTRAPYRAMIDAL SYMPTOMS WHICH CAN OCCUR SECONDARY TO PHENERGAN TABLETS AND SUPPOSITORIES ADMINISTRATION MAY BE CONFUSED WITH THE CNS SIGNS OF UNDIAGNOSED PRIMARY DISEASE, e.g., ENCEPHALOPATHY OR REYE'S SYNDROME. THE USE OF PHENERGAN TABLETS AND SUPPOSITORIES SHOULD BE AVOIDED IN PEDIATRIC PATIENTS WHOSE SIGNS AND SYMPTOMS MAY SUGGEST REYE'S SYNDROME OR OTHER HEPATIC DISEASES.**

Excessively large dosages of antihistamines, including Phenergan Tablets and Suppositories, in pediatric patients may cause sudden death (see **OVERDOSAGE**). Hallucinations and convulsions have occurred with therapeutic doses and overdoses of Phenergan in pediatric patients. In pediatric patients who are acutely ill associated with dehydration, there is an increased susceptibility to dystonias with the use of promethazine HCl.

**Other Considerations**

Administration of promethazine HCl has been associated with reported cholestatic jaundice.

**PRECAUTIONS**
**General**

Drugs having anticholinergic properties should be used with caution in patients with narrow-angle glaucoma, prostatic hypertrophy, stenosing peptic ulcer, pyloroduodenal obstruction, and bladder-neck obstruction.

Phenergan Tablets and Suppositories should be used cautiously in persons with cardiovascular disease or with impairment of liver function.

4

**Information for Patients**

Phenergan Tablets and Suppositories may cause marked drowsiness or impair the mental and/or physical abilities required for the performance of potentially hazardous tasks, such as driving a vehicle or operating machinery. The use of alcohol or other central-nervous-system depressants such as sedatives/hypnotics (including barbiturates), narcotics, narcotic analgesics, general anesthetics, tricyclic antidepressants, and tranquilizers, may enhance impairment (see **WARNINGS–CNS Depression** and **PRECAUTIONS–Drug Interactions**). Pediatric patients should be supervised to avoid potential harm in bike riding or in other hazardous activities.

Patients should be advised to report any involuntary muscle movements.

Avoid prolonged exposure to the sun.

**Drug Interactions**

*CNS Depressants* - Phenergan Tablets and Suppositories may increase, prolong, or intensify the sedative action of other central-nervous-system depressants, such as alcohol, sedatives/hypnotics (including barbiturates), narcotics, narcotic analgesics, general anesthetics, tricyclic antidepressants, and tranquilizers; therefore, such agents should be avoided or administered in reduced dosage to patients receiving promethazine HCl. When given concomitantly with Phenergan Tablets and Suppositories, the dose of barbiturates should be reduced by at least one-half, and the dose of narcotics should be reduced by one-quarter to one-half. Dosage must be individualized. Excessive amounts of promethazine HCl relative to a narcotic may lead to restlessness and motor hyperactivity in the patient with pain; these symptoms usually disappear with adequate control of the pain.

*Epinephrine* - Because of the potential for Phenergan to reverse epinephrine's vasopressor effect, epinephrine should NOT be used to treat hypotension associated with Phenergan Tablets and Suppositories overdose.

*Anticholinergics* - Concomitant use of other agents with anticholinergic properties should be undertaken with caution.

*Monoamine Oxidase Inhibitors (MAOI)* - Drug interactions, including an increased incidence of extrapyramidal effects, have been reported when some MAOI and phenothiazines are used concomitantly. This possibility should be considered with Phenergan Tablets and Suppositories.

**Drug/Laboratory Test Interactions**

The following laboratory tests may be affected in patients who are receiving therapy with promethazine HCl:

*Pregnancy Tests*

Diagnostic pregnancy tests based on immunological reactions between HCG and anti-HCG may result in false-negative or false-positive interpretations.

*Glucose Tolerance Test*

An increase in blood glucose has been reported in patients receiving promethazine HCl.

**Carcinogenesis, Mutagenesis, Impairment of Fertility**
Long-term animal studies have not been performed to assess the carcinogenic potential of promethazine, nor are there other animal or human data concerning carcinogenicity, mutagenicity, or impairment of fertility with this drug. Promethazine was nonmutagenic in the *Salmonella* test system of Ames.

**Pregnancy**
*Teratogenic Effects–Pregnancy Category C*
Teratogenic effects have not been demonstrated in rat-feeding studies at doses of 6.25 and 12.5 mg/kg of promethazine HCl. These doses are from approximately 2.1 to 4.2 times the maximum recommended total daily dose of promethazine for a 50-kg subject, depending upon the indication for which the drug is prescribed. Daily doses of 25 mg/kg intraperitoneally have been found to produce fetal mortality in rats.

Specific studies to test the action of the drug on parturition, lactation, and development of the animal neonate were not done, but a general preliminary study in rats indicated no effect on these parameters. Although antihistamines have been found to produce fetal mortality in rodents, the pharmacological effects of histamine in the rodent do not parallel those in man. There are no adequate and well-controlled studies of Phenergan® Tablets and Suppositories in pregnant women.

Phenergan (promethazine HCl) Tablets and Suppositories should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

*Nonteratogenic Effects*
Phenergan Tablets and Suppositories administered to a pregnant woman within two weeks of delivery may inhibit platelet aggregation in the newborn.

**Labor and Delivery**
Promethazine HCl may be used alone or as an adjunct to narcotic analgesics during labor (see **DOSAGE AND ADMINISTRATION**). Limited data suggest that use of Phenergan during labor and delivery does not have an appreciable effect on the duration of labor or delivery and does not increase the risk of need for intervention in the newborn. The effect on later growth and development of the newborn is unknown. (See also *Nonteratogenic Effects*.)

**Nursing Mothers**
It is not known whether promethazine HCl is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from Phenergan Tablets and Suppositories, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use**
Safety and effectiveness in children under 2 years of age have not been established.

Phenergan Tablets and Suppositories should be used with caution in pediatric patients 2 years of age and older (see **WARNINGS–Use in Pediatric Patients**).

6

**Geriatric Use**

Clinical studies of Phenergan formulations did not include sufficient numbers of subjects aged 65 and over to determine whether they respond differently from younger subjects. Other reported clinical experience has not identified differences in responses between the elderly and younger patients. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range, reflecting the greater frequency of decreased hepatic, renal or cardiac function, and of concomitant disease or other drug therapy.

Sedating drugs may cause confusion and over-sedation in the elderly; elderly patients generally should be started on low doses of Phenergan Tablets and Suppositories and observed closely.

## ADVERSE REACTIONS
### Central Nervous System

Drowsiness is the most prominent CNS effect of this drug. Sedation, somnolence, blurred vision, dizziness; confusion, disorientation, and extrapyramidal symptoms such as oculogyric crisis, torticollis, and tongue protrusion; lassitude, tinnitus, incoordination, fatigue, euphoria, nervousness, diplopia, insomnia, tremors, convulsive seizures, excitation, catatonic-like states, hysteria. Hallucinations have also been reported.

**Cardiovascular**–Increased or decreased blood pressure, tachycardia, bradycardia, faintness.

**Dermatologic**–Dermatitis, photosensitivity, urticaria.

**Hematologic**–Leukopenia, thrombocytopenia, thrombocytopenic purpura, agranulocytosis.

**Gastrointestinal**–Dry mouth, nausea, vomiting, jaundice.

**Respiratory**–Asthma, nasal stuffiness, respiratory depression (potentially fatal) and apnea (potentially fatal). (See **WARNINGS–Respiratory Depression**.)

**Other**–Angioneurotic edema. Neuroleptic malignant syndrome (potentially fatal) has also been reported. (See **WARNINGS–Neuroleptic Malignant Syndrome**.)

### Paradoxical Reactions

Hyperexcitability and abnormal movements have been reported in patients following a single administration of promethazine HCl. Consideration should be given to the discontinuation of promethazine HCl and to the use of other drugs if these reactions occur. Respiratory depression, nightmares, delirium, and agitated behavior have also been reported in some of these patients.

## OVERDOSAGE

Signs and symptoms of overdosage with promethazine HCl range from mild depression of the central nervous system and cardiovascular system to profound hypotension, respiratory depression, unconsciousness, and sudden death. Other reported reactions include hyperreflexia, hypertonia, ataxia, athetosis, and extensor-plantar reflexes (Babinski reflex).

Stimulation may be evident, especially in children and geriatric patients. Convulsions may rarely occur. A paradoxical-type reaction has been reported in children receiving single doses of 75 mg to 125 mg orally, characterized by hyperexcitability and nightmares.

Atropine-like signs and symptoms—dry mouth, fixed, dilated pupils, flushing, as well as gastrointestinal symptoms—may occur.

## Treatment

Treatment of overdosage is essentially symptomatic and supportive. Only in cases of extreme overdosage or individual sensitivity do vital signs, including respiration, pulse, blood pressure, temperature, and EKG, need to be monitored. Activated charcoal orally or by lavage may be given, or sodium or magnesium sulfate orally as a cathartic. Attention should be given to the reestablishment of adequate respiratory exchange through provision of a patent airway and institution of assisted or controlled ventilation. Diazepam may be used to control convulsions. Acidosis and electrolyte losses should be corrected. Note that any depressant effects of promethazine HCl are not reversed by naloxone. Avoid analeptics which may cause convulsions.

The treatment of choice for resulting hypotension is administration of intravenous fluids, accompanied by repositioning if indicated. In the event that vasopressors are considered for the management of severe hypotension which does not respond to intravenous fluids and repositioning, the administration of norepinephrine or phenylephrine should be considered. EPINEPHRINE SHOULD NOT BE USED, since its use in patients with partial adrenergic blockade may further lower the blood pressure. Extrapyramidal reactions may be treated with anticholinergic antiparkinsonian agents, diphenhydramine, or barbiturates. Oxygen may also be administered.

Limited experience with dialysis indicates that it is not helpful.

## DOSAGE AND ADMINISTRATION

**Phenergan Tablets and Phenergan Rectal Suppositories are not recommended for children under 2 years of age (see WARNINGS–Use in Pediatric Patients).**

Phenergan Suppositories are for rectal administration only.

## Allergy

The average oral dose is 25 mg taken before retiring; however, 12.5 mg may be taken before meals and on retiring, if necessary. Single 25-mg doses at bedtime or 6.25 to 12.5 mg taken three times daily will usually suffice. After initiation of treatment in children or adults, dosage should be adjusted to the smallest amount adequate to relieve symptoms. The administration of promethazine HCl in 25-mg doses will control minor transfusion reactions of an allergic nature.

## Motion Sickness

The average adult dose is 25 mg taken twice daily. The initial dose should be taken one-half to one hour before anticipated travel and be repeated 8 to 12 hours later, if necessary. On succeeding days of travel, it is recommended that 25 mg be given on arising and again before the evening meal. For children, Phenergan Tablets, Syrup, or Rectal Suppositories, 12.5 to 25 mg, twice daily, may be administered.

**Nausea and Vomiting**

Antiemetics should not be used in vomiting of unknown etiology in children and adolescents (see **WARNINGS-Use in Pediatric Patients**).

The average effective dose of Phenergan for the active therapy of nausea and vomiting in children or adults is 25 mg. When oral medication cannot be tolerated, the dose should be given parenterally (cf. Phenergan Injection) or by rectal suppository. 12.5- to 25-mg doses may be repeated, as necessary, at 4- to 6-hour intervals.

For nausea and vomiting in children, the usual dose is 0.5 mg per pound of body weight, and the dose should be adjusted to the age and weight of the patient and the severity of the condition being treated.

For prophylaxis of nausea and vomiting, as during surgery and the postoperative period, the average dose is 25 mg repeated at 4- to 6-hour intervals, as necessary.

**Sedation**

This product relieves apprehension and induces a quiet sleep from which the patient can be easily aroused. Administration of 12.5 to 25 mg Phenergan by the oral route or by rectal suppository at bedtime will provide sedation in children. Adults usually require 25 to 50 mg for nighttime, presurgical, or obstetrical sedation.

**Pre- and Postoperative Use**

Phenergan in 12.5- to 25-mg doses for children and 50-mg doses for adults the night before surgery relieves apprehension and produces a quiet sleep.

For preoperative medication, children require doses of 0.5 mg per pound of body weight in combination with an appropriately reduced dose of narcotic or barbiturate and the appropriate dose of an atropine-like drug. Usual adult dosage is 50 mg Phenergan with an appropriately reduced dose of narcotic or barbiturate and the required amount of a belladonna alkaloid.

Postoperative sedation and adjunctive use with analgesics may be obtained by the administration of 12.5 to 25 mg in children and 25- to 50-mg doses in adults.

Phenergan Tablets and Phenergan Rectal Suppositories are not recommended for children under 2 years of age.

9

**HOW SUPPLIED**

Phenergan® (promethazine HCl) Tablets are available as follows:

12.5 mg, orange tablet with "WYETH" on one side and "19" on the scored reverse side.

NDC 0008-0019-01, bottle of 100 tablets.

25 mg, white tablet with "WYETH" and "27" on one side and scored on the reverse side.

NDC 0008-0027-02, bottle of 100 tablets.

NDC 0008-0027-07, Redipak® carton of 100 tablets (10 blister strips of 10).

50 mg, pink tablet with "WYETH" on one side and "227" on the other side.

NDC 0008-0227-01, bottle of 100 tablets.

**Keep tightly closed.**

**Store at controlled room temperature 20° to 25°C (68° to 77°F).**

**Protect from light.**

**Dispense in light-resistant, tight container.**

**Use carton to protect contents from light.**

Phenergan® (promethazine HCl) Rectal Suppositories are available in boxes of 12 as follows:

12.5 mg, ivory, torpedo-shaped suppository wrapped in copper-colored foil, NDC 0008-0498-01.

25 mg, ivory, torpedo-shaped suppository wrapped in light-green foil, NDC 0008-0212-01.

50 mg, ivory, torpedo-shaped suppository wrapped in blue foil, NDC 0008-0229-01.

**Store refrigerated between 2°-8°C (36°-46°F).**

**Dispense in well-closed container.**

# Wyeth®

Wyeth Pharmaceuticals Inc.
Philadelphia, PA 19101

W10448C002
ET02
Rev 08/03

# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. _04 − 3518 C_

_LAYLA KIANI_
_____ , Plaintiff(s)

v.

_TRUSTEES OF BOSTON UNIVERSITY_
_RONALD CASS, WENDY MARINER,_ Defendant(s)
_ANDREW KULL & CHRISTINE MARX_

## SUMMONS

To the above-named Defendant: _TRUSTEES OF BOSTON UNIVERSITY_

You are hereby summoned and required to serve upon _BEN TAHRIRI, ESQ_
_343 WASHINGTON ST, NEWTON, MA. 02458_
plaintiff's attorney, whose address is_____ , an answer to
the complaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You are also required to file your answer to the complaint in the office
of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable
time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject
matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at Boston, the_____ _9 TH_ _____ day of
_AUGUST_ _____, in the year of our Lord two thousand _04_ _____ .

_Michael Joseph Donovan_

Clerk/Magistrate

NOTES
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant,
   each should be addressed to the particular defendant.
TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:
(1) TORT  (2) MOTOR VEHICLE TORT  (3) CONTRACT  (4) EQUITABLE RELIEF  (5) OTHER

FORM CIV.P. 1 3rd Rev.

. HEREBY ATTEST AND CERTIFY ON
Sept. 1, 2004 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY.
Asst. Clerk.

# Commonwealth of Massachusetts

**5**

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. _04 – 3518 C_

_LAYLA KIANI_
_____ , Plaintiff(s)

v.

_TRUSTEES OF BOSTON UNIVERSITY_
_RONALD CASS, WENDY MARINER_ Defendant(s)
_ANDREW KULL + CHRISTINE MARX_

## SUMMONS

To the above-named Defendant: _RONALD CASS_

You are hereby summoned and required to serve upon _BEN TAHRIRI, ESQ_
_343 WASHINGTON ST, NEWTON, MA 02458_
plaintiff's attorney, whose address is _____ , an answer to
the complaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You are also required to file your answer to the complaint in the office
of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable
time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject
matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at Boston, the _9 TH_ _____ day of
_AUGUST_ _____ , in the year of our Lord two thousand _04_ _____.

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant,
   each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT   (2) MOTOR VEHICLE TORT   (3) CONTRACT   (4) EQUITABLE RELIEF   (5) OTHER

FORM CIV.P. 1 3rd Rev.

. HEREBY ATTEST AND CERTIFY ON
Sept. 1, 2004 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY _____
Asst. Clerk.

# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 04 – 3518 C

*LAYLA KIANI* , Plaintiff(s)

v.

*TRUSTEES OF BOSTON UNIVERSITY
RONALD CASS WENDY MARINER*, Defendant(s)
*ANDREW KULL + CHRISTINE MARX*

## SUMMONS

To the above-named Defendant: *ANDREW KULL*

You are hereby summoned and required to serve upon *BEN TAHRIRI ESQ 343 WASHINGTON ST NEWTON, MA 02458*

plaintiff's attorney, whose address is_____, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at Boston, the_____ *9 TH* _____ day of _____ *AUGUST* _____, in the year of our Lord two thousand _____ *04* _____.

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT   (2) MOTOR VEHICLE TORT   (3) CONTRACT   (4) EQUITABLE RELIEF   (5) OTHER

FORM CIV.P. 1 3rd Rev.

• HEREBY ATTEST AND CERTIFY ON

Sept. 1, 2004 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY.

Asst. Clerk.

# Commonwealth of Massachusetts

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. _04 - 3518 C_

_LAYLA KIANI_ , Plaintiff(s)

v.

_TRUSTEES OF BOSTON UNIVERSITY
RONALD CASS, WENDY MARINER,_ Defendant(s)
_ANDREW KULL + CHRISTINE MARX_

## SUMMONS

To the above-named Defendant: _CHRISTINE MARX_

You are hereby summoned and required to serve upon _BEN TAHRIRI, ESQ
343 WASHINGTON ST, NEWTON, MA 02458_
plaintiff's attorney, whose address is_____ , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at Boston, the_____ 9 _TH_ _____ day of
_AUGUST_ _____ , in the year of our Lord two thousand _____ 0 4 _____ .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT (2) MOTOR VEHICLE TORT (3) CONTRACT (4) EQUITABLE RELIEF (5) OTHER

FORM CIV.P. 1 3rd Rev.

. HEREBY ATTEST AND CERTIFY ON
_Sept. 1, 2004_ , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY_____
Asst. Clerk

# Commonwealth of Massachusetts



SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. _O 4 - 3 5 1 8 C_

_LAYLA KIANI_, Plaintiff(s)

v.

_TRUSTEES OF BOSTON UNIVERSITY_
_RONALD CASS, WENDY MARINER,_ Defendant(s)
_ANDREW KULL + CHRISTINE MARX_

## SUMMONS

To the above-named Defendant: _WENDY MARINER_

You are hereby summoned and required to serve upon _BEN TAHRIRI, ESQ_
_343 WASHINGTON ST, NEWTON, MA 02458_
plaintiff's attorney, whose address is_____, an answer to
the complaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You are also required to file your answer to the complaint in the office
of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable
time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject
matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at Boston, the_____ _9 TH_ _____ day of
_AUGUST_ _____, in the year of our Lord two thousand _____ _04_ _____

_Michael Joseph Donovan_

Clerk/Magistrate

NOTES
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant,
   each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT   (2) MOTOR VEHICLE TORT   (3) CONTRACT   (4) EQUITABLE RELIEF   (5) OTHER

FORM CIV.P. 1 3rd Rev.

I HEREBY ATTEST AND CERTIFY ON
Sept. 1, 2004
THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY. _____
Asst. Clerk.