# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**C. A. NO. 04-CV-11838-PBS**

| | |
|---|---|
| LAYLA KIANI<br><br>               Plaintiff,<br><br><br><br><br><br><br>TRUSTEES OF BOSTON<br>UNIVERSITY, et al.<br>             Defendants. | **PLAINTIFF'S OBJECTION TO<br>THE MAGISTRATE JUDGE'S<br>REPORT AND<br>RECOMMENDATION<br>ON THE MOTION TO DISMISS<br>DATED NOVEMBER 29, 2004** |

Now comes Plaintiff, Layla Kiani, through her attorney, and respectfully objects, in part, to the Honorable Magistrate Judge Cohen's Report and Recommendation on the Motion to Dismiss, dated November 29, 2004 ("Report"), which summarily recommends dismissal of eight of Plaintiff's ten COUNTS of her Complaint, as well as the individual defendants. In response, as stated below, Plaintiff has consented to certain modifications of her Complaint. Nonetheless, Plaintiff respectfully requests that the Honorable Judge Patti B. Saris, the Judge assigned to hear her case, to make a de novo determination upon the record pursuant to Fed. R. Civ. P. 72(b), and either adopt, reject, or modify the Report and Recommendation.

In her Objection, Plaintiff will further reiterate and represent to the Court that her claims are valid and meritorious, and that contrary to certain conclusions reached in the Report[1], she is truly a victim of the Defendants' unlawful actions. [2]

---

[1] The Report purports to argue that Plaintiff's complaint and her Memorandum in Opposition to Defendants' Motion to Dismiss in some measure lack clarity. Assuming arguendo, that this assertion is true, it should not cloud the Court's decision as to the ultimate issue in this case. A handicapped student who has spent three grueling years in law school, who has substantially exhausted all her financial resources (her own funds as well as borrowed funds), has been aggrieved by the actions of the Defendants. She has always argued that she did not commit plagiarism, and that she was under the influence of a medicine when she failed to correctly and adequate cite her sources on her term papers. In fact, she never intended to do anything wrong or unlawful. If the Defendants have their way, as the Report seems to recommend, Plaintiff will never have any means to redress her grievances. As this document will further establish, this is not a frivolous action. Defendants have committed an injustice, and need to be accountable for their actions.

## PLAINTIFF RESPECTFULLY RENEWS HER REQUEST FOR AN ORAL HEARING [3]

Insofar as it is relevant to the issues objected to in Plaintiff's response, the Magistrate Judge has erred on both the facts of the case, as well as on the principles of law. This is not a case about a plagiarizing student who once caught red-handed, now wishes to be afforded another opportunity. [4]   This case, as stated before, is about a handicapped student who did *not* commit plagiarism. This case is also about a school, which refuses to reopen a case simply because it knows it was wrong the first time.[5] It would not be in the interest of justice if the Court simply throws out the student's claims, without considering the merits of the case. Plaintiff also alerts the Court that because of Defendants' current Motions to dismiss, no discovery has been undertaken by either party, and as a result, she has been unable to move to amend her complaint.

---

Moreover, Plaintiff's claims should not be dismissed simply because of their form. It is their substance, the core of her claims, which have sound legal bases, and therefore would be fair to survive. Indeed, it would be utterly unfortunate if form prevailed over substance in such a high-stakes case. It must also be noted that this is not a zero-sum game where if one party prevails, the other party necessarily loses. In other words, if Plaintiff prevails, the School will not need to be the "losing" party. To elaborate further, the main remedy, which the Plaintiff is seeking is not monetary. It is an equitable remedy: she is asking that her case be reopened and be readjudicated before the School 's Judicial Discipline Committee. Plaintiff strongly believes, if given another opportunity to present her case, she will be able to convince the Committee that she was under the influence of a medicine during the period in question. In fact, it is noteworthy that even the same Committee, which decided the case, did not vote unanimously. There, one Member, a professor, dissented and stated that she did not believe that Plaintiff intended to plagiarize. See Judicial Committee Memo, attached as Exhibit A.

In other words, at most, the School will have to conduct another disciplinary hearing,, albeit this time observing all the procedural rules. The Plaintiff, on the other  hand, will be tremendously impacted if the case fails to go forward. For instance, she will lose the opportunity to finish her degree at the Defendants' school, or transfer to a different ABA-accredited school. She will also be deprived of any prospect to ever becoming an attorney. Finally, in addition to her financial losses, albeit unemployed, she will still be forced to pay back with interest her student loans. These are the injustices, which gravely concern the Plaintiff.

---

[2] This case appears to be a case of first impression for this Court. Plaintiff, and apparently the Defendants and the Magistrate have not been able to locate any cases, which could be analogous, either legally or factually, to the case at hand.

[3] This case raises novel issues of law in the somewhat un-chartered territory of academic setting. Plaintiff, therefore, requests an oral argument, pursuant to Local Rule 7.1 (D). An oral argument will also assist the court in elucidating the intricacies of the various issued raised in this case.

[4] On its first page, the Report also highlights the damages claimed by Plaintiff, by stating the amount of $185,000. Plaintiff brings the Court's attention to the fact that this amount, more or less, represents the actual amount lost by Plaintiff as represented in her "Statement of Damages from June 2000-May 2003," initially submitted with her Complaint. It is noteworthy, however, that in her Prayer for Judgment in her complaint, she is not primarily seeking monetary damages. See Complaint at 10. Despite her tremendous financial losses, Plaintiff, a student with a middle-class background, has as her main goal, to be able to continue her studies either at the Defendants' school, or at a different school. More than anything, she wants Defendants to reopen her case and afford her another hearing, which comports with her right to due process. She is largely seeking equitable remedies. Monetary gain has never been the central focus of her complaint.

[5] See Exhibit A.

## PRELIMINARY STATEMENT

Plaintiff hereby consents to the withdrawal of her claims against all the individual defendants[6] without prejudice and without costs to any party. Furthermore, Plaintiff consents to the withdrawal of Counts II, VI, VII, VIII, and IX against all defendants. Plaintiff, however, requests that facts contained in all counts of her Complaint survive and be incorporated into the Section of her complaint, entitled, "Facts Common to All Counts." Moreover, Plaintiff respectfully, but strenuously objects to the Magistrate Judge's Report and Recommendations (hereinafter referred to as the "Report") pertaining to all remaining COUNTS insofar as they involve the Trustees of Boston University, as Plaintiff states hereinafter.

## OBJECTIONS

1.      Plaintiff objects to the recommendation made in the Report that Count I of her complaint regarding Defendants, Trustees of Boston University's (hereinafter referred to as "Defendants") breach of contract be dismissed for failure to state a claim upon which relief can be granted, on the grounds that Defendants breached their contract when they **(1)** failed to advise Plaintiff to remain silent, **(2)** when they failed to provide appropriate and much needed accommodations to Plaintiff, and **(3)** when they allowed an adjunct member of the School to represent the Plaintiff against the same school.

Apparently, there is no question that a contract existed between the parties.

Neither the Honorable Magistrate Judge in his report, nor Defendants through their counsel have refuted this assertion. In fact, the Report, at p.4, reads:

> To be sure, she [Plaintiff] says that when she enrolled in the Law School, there was a contractual relationship. That, of course, goes without saying. . .

---

[6] All references to "Defendants" in the main body of this document shall mean Trustees of Boston University, and not the individual defendants.

The issue at hand, therefore, is, whether there was a breach of this contract by Defendants. In order to adequately address this issue, one needs to scrutinize the various actions of Defendants and then upon weighing their individual actions and considering the totality of circumstances to determine whether a breach has indeed occurred. A review of Contracts 101 defines a contract as `a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.` Restatement Second of Contracts, § 1, American Law Institute (1981).

More particularly, in interpreting "university contracts" the courts are generally guided by the principles set out in Schaer v. Brandeis Univ., 432 Mass. 474, 735 N.E.2d 373 (2000). There, as also further explored in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Mem.")[7], the Court required a standard of "reasonable expectation -- what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." Id. at 478, (quoting Giles v. Howard University, 428 F. Supp. 603, 605 (D.D.C. 1977)); Cloud v. Trustees of Boston University, 720 F.2d 721, 724 (1st Cir. 1983). When Plaintiff applied to the Defendants' school it was certainly reasonable for her to expect that Defendants would adhere to their own rules and standards. Equally, while she was at the School, dutifully abiding by all the various rules of the School, she reasonably expected Defendants to at least do the same.

**(1)** Defendants failed to abide by their own rules when they did not provide a written warning as mandated by the School's disciplinary rules and regulations

---

[7] Pl. Mem. at 7.

promulgated by Defendants. Article IV (1) of the Disciplinary Regulations states in

pertinent part that:

> All students are to be informed of the right to counsel and the right to remain silent, and shall be warned that anything the student may say may be used against the student. The student [*shall be requested to sign a statement to the effect that he or she has been informed of the above rights and has received the above warning*]. (Emphasis added).
> Exhibit A of Pl. Mem.

Indeed, it is far from unreasonable for a prospective student to expect *full* mutual

adherence of material terms of his or her contract with an academic institution. Plaintiff

reasonably expected the Defendants' school, a law school, to make sure that it had a

uniform disciplinary rules and policy, and that such rules and policy were followed in the

most concise and even-handed manner. In fact, when Plaintiff applied to the law school

in the year 2000, the school had apparently made its disciplinary rules available on Line[8].

In the Report, the Magistrate argues that because Plaintiff was not aware of these rules,

she should not have relied on the school to follow them. See Report, n.9 ("If plaintiff

never even perused the disciplinary manual, it could hardly be said by her or anyone that

she enrolled in, and maintained her enrollment in, the School of Law on account of the

representations set forth in that disciplinary manual.").

However, this argument would militate against holding any contract valid. For

example, when an individual enters into a contract with a credit card company or a bank,

he or she reasonably expects that that despite the fact that he or she has not read their

rules as they pertain to the individual, such as actions that they could take in the event of

default by the individual, they would surely be followed as written. After all, if the

---

[8]  The document, titled "Disciplinary Regulations for all BUSL Students," in its first paragraph provides a web address of : "www.bu.edu/judicialaffairs/studentres.htm." Plaintiff's attempts to connect to this website as of the date of this Objection were not successful. See also Exhibit C of Complaint.

individual is bound by these rules, so should the party, who in fact wrote them. Otherwise, any company can decide to not follow its own rules by simply arguing that the other contracting party has not read the rules. In this case, these Rules specifically pertained to Plaintiff as a student. They were crucial and material parts of the contract. Even if she never read them, by virtue of the fact that they were made available, it was reasonable to expect adherence of them.  Also, the reference in the Report to the Plaintiff's obvious lack of knowledge of the intricate details of the disciplinary rules would not give further credence to the argument that she did not rely on them. That is not the case. In fact, it would have been quite reasonable for Plaintiff to rely on the School of Law, which promulgated the Rules, to follow them.

The Report also seeks to clarify whether and when Plaintiff was not warned.[9]  The Plaintiff in her Complaint, has stated that "[t]he Plaintiff was *never* informed of her right to remain silent."(Emphasis added). Complaint ¶  45; Pl. Mem. at 6; See also Complaint ¶ 58 ("The Defendants failed to provide the Plaintiff with a verbal and written document informing her of her right to remain silent.").  To reiterate, at no point, before, during, or after the disciplinary proceedings of Sept. 12, 2003, did the Defendants advise Plaintiff of her right to remain silent. They did not do so verbally or in writing. Nor did they ask her attorney to have sign a document to this effect. As the result of Defendants' failure to forewarn Plaintiff of her right during the hearing, where for well over five hours she was placed on the witness stand and was extensively questioned by the judges, she has been

---

[9] The Magistrate writes:

> From this, it is not clear that she contends that she was not informed of her so-called right to remain silent, or that she was not requested to sign a statement indicating that she was so informed, or both. Indeed, it is not even clear whether she says  that she was not afforded that right at the Judicial Committee hearing, or sometime prior thereto.
> Report, n. 4.

irreparably harmed by the fact that her statements, made during these proceedings,

obviously led to her suspension and ultimate ejection from the School. In fact, during her

testimony, Plaintiff discussed her term papers in great detail, which in hindsight gravely

implicated her. It would not be unreasonable to argue that Defendants' action or lack

thereof in not providing the warning, has in essence, invalidated the hearing and rendered

its outcome null.[10]

       The Magistrate also refers to the "right" to remain silent and questions whether it

could even be considered a right:

> Plaintiff refers to it as her "right" to remain silent without further elucidation. It
> is not clear whether that so-called "right" is based on notions of contract law, or
> based on constitutional underpinnings.

Report, n.3.

       Primarily, the main reason the Plaintiff calls the right to remain silent a "right" is

not because of Plaintiff's allusion to the Constitutions of United States or the

Commonwealth of Massachusetts. It is simply, yet precisely, because that *is* what the

---

[10] In footnote 10 of the Report, the Magistrate writes:

> While it is true that Sections IV.1 and VI.6 of the Disciplinary Rules refer to a student's right to
> remain silent, Section VI.12 makes clear that any procedural error - and, in this case, that is all that
> plaintiff alleges – will not result in the invalidation of "...the proceeding or disposition of the
> case." Thus, while Sections IV.1 and VI.6 may giveth, so, too, does Section VI.12 taketh away.

However, upon reading of the pertinent section of the Disciplinary Regulations, it appears that in
the event of procedural errors, at the very least "corrective measures" should have been taken, which they
obviously were not.  In fact, in observance of the doctrine of completeness, the relevant section reads as
follows:

> [VI] 12. Effect of procedural error. If, in the judgment of the Judicial Committee, any
> representative of the Dean's Office has failed to comply with the obligations of the Dean's Office
> under this Code or has otherwise acted in a manner that unduly prejudices the student, appropriate
> corrective measures may be directed at any stage of the proceedings. Corrective measures shall be
> within the discretion of the Committee, but procedural error *need not* require exclusion of
> evidence or otherwise invalidate the proceeding or disposition of the case. The proceedings of the
> Judicial Committee shall not ordinarily be invalid by reason of a defective mechanical recording
> of the proceeding.
> Emphasis added.

By using the term, "need not" instead of  the ubiquitous "shall not," it appears that in fact, this
section tends to keep open the possibility of invalidation of the hearing even under its own rules.

Defendants' own Disciplinary Regulations handbook calls it. <u>See</u> Exhibit A of Pl. Mem., <u>Supra</u>.

In addition, the cases cited in the Report regarding "rights" of individuals are also respectfully, yet soundly, inapposite. <u>See</u> Report at 5.  To begin with, <u>O'Brien v. New England Telephone and Telegraph Company,</u> 422 Mass. 686, 664 N.E.2d 843 (Mass. 1996) and all the other cases cited in the pertinent section of the Report concern employment contracts. While it is true that the courts in this Circuit may be bound by prior on-point decisions<u>, See</u> <u>Williams v. Ashland Eng'g Co.,</u> 45 F.3d 588, 592 (1st Cir. 1995) (noting generally that First Circuit panels are bound by prior panel decisions directly on point), it can be deduced that the Court should disregard cases, which are not even remotely apposite.  The fact that there are no on-point school-related cases on the subject should not be reason to rely on cases far outside the academic realm. In <u>O'Brien</u>, the Supreme Judicial Court considered the case of a former employee, who argued that the employer's personnel manual created contractual obligations with which it must comply.[11] The Court held that the manual indeed created certain rights for the employee. The Court based its decision partially on the absence of a satisfactory disclaimer in the manual (i.e., the employer had failed to reserve the right to unilaterally alter or eliminate the policies contained in the manual). <u>See</u> <u>Id.</u> at 693. The holding notwithstanding, the Court also found that the manual imposed certain obligations on the employee: for instance, before the employee could bring legal action, the employee must have already pursued a remedy through the employer's internal grievance procedure contained in the

---

[11] 422 Mass. 686, 664 N.E.2d 843 (Mass. 1996)

manual. Because the plaintiff did not, the Court held that she lost whatever rights the personnel manual provided to her. See Id. at 690-691.

Plaintiff could not identify anything in her case, that somehow makes it similar to that of O'Brien's.  Employment contracts are generally arm's-length contracts where both parties have negotiated at least some of the key terms of the contract such as the term of employment and the rate of pay. In the current case, as also asserted in the Report[12], the student did not negotiate with the school. There can be, therefore, no reasonable analogy drawn between an employment contract and a student's application to a school and his or her subsequent enrollment.[13] The student's contract can in fact be considered as a contract of adhesion, a take-it-or-leave-it contract where one party basically imposes all its conditions on the other side. See Black's Law Dictionary, p. 40 (6th Ed. 1990).  Even in that case, the party with the obvious power, is expected to least follow its own rules. If anything, in the current case, it would be reasonable to assume that the Disciplinary Regulations were published  in order to inform and perhaps even entice the students to apply to the School, and also to illustrate to the prospective students the kind of school Boston University Law School was.

Given the above explanations, it is somewhat surprising that the Report seems to completely exonerate and release the School from any liability vis-à-vis its students when it states:

---

[12] See Report at 8.
[13] Even if we could draw an analogy, as the Court in O'Brien confirms, "the principle that promises made in a personnel manual may be binding on an employer is accepted in a clear majority of American jurisdictions. "O'Brien v. New England Telephone and Telegraph Company, 422 Mass. at 691. The Court also observed that "the idea that an employer may ignore promises made in a personnel manual is in increasing disfavor in this country." Id. ;  See also Small v. Spring Indus., Inc., 292 S.C. 481, 485--486 (1987).

In short, there is nothing alleged in this case which even suggests that the School of Law, expressly or impliedly, promised the plaintiff that it would follow all of the provisions set forth in the disciplinary manual, much less that plaintiff chose to enroll at, or remain at, the School of Law based on such promises.

Report at 8.

It would be inconceivable if this were indeed the case. After all, it should go without saying that all schools are expected to follow all of the material provisions set forth in their disciplinary manual. In fact, any school worth its salt would not have it otherwise. Also, it is reasonable to assume that by the mere fact that Plaintiff enrolled in the law program of the School, she indeed relied on the School's implied promises that it would follow its own internal procedures. To expect anything less would have been illogical. There was no need for specific reference to the disciplinary rules. It is surely understood that when a student enrolls in a school, he or she has such an expectation.

The Magistrate then further suggests that Plaintiff was both advised, and also that as a result, she did remain silent:

[], even it could be said that the School of Law impliedly promised to Plaintiff that she would be advised of her right to remain silent, plaintiff has alleged nothing to suggest that such failure to do so constituted a material breach. For one thing, plaintiff does not allege in any of the 121 paragraphs of her complaint that she did not maintain her silence during the course of the entire investigation and judicial committee proceedings.

Report at 9-10.

Moreover, in a relevant footnote, the Report also states that:

It is thus clear beyond peradventure that whether or not plaintiff was advised of her right to remain silent (and as shown immediately above, plaintiff's own references show that she was so advised), it was and is simply a matter of no harm, no foul, since she did maintain her silence.

Report, n. 11.

Both of these observations are inaccurate. The Plaintiff has maintained that she was never advised of her right to remain silent. See Complaint, supra. The Defendants' Memorandum Exhibit 1, concerning the hearing, which is reproduced in part in footnote 11 of the Report, does not contradict this assertion. As evidenced in this Exhibit, at that hearing, Professor Ryckman stated that "obviously the student has the right to remain silent." This is clearly far from advising someone to remain silent. The statement was not even directed to the Plaintiff. The facts also show that because of the lack of warning, the Plaintiff did not remain silent, before, during, and after the proceedings. As stated before, Plaintiff was 'grilled" for over five hours. See Pl. Mem. at 11. Unaware of her right, she also wrote letters to various members of the faculty and members of Judicial Discipline Committee, making inculpatory statements, which she otherwise, would not have made. During the hearing, for example, she was asked numerous questions regarding the alleged plagiarism. Had she become aware of her right, she could have chosen not to answer them.

Finally, the Report seems to essentially conclude that the Plaintiff must have committed plagiarism, otherwise, she would have appealed the decision of the Judicial Discipline Committee, or she would have made certain allegations in her pleadings.[14] This conclusion seems to be rather subjective at this juncture especially because the

---

[14] See Report, n. 13. There, the Magistrates states:

In her memorandum of law, plaintiff suggests that, in her view, she did not commit acts of plagiarism as defined by Section II.2.e of the disciplinary rules. Significantly, however, she has not alleged in her complaint, and has not said in her opposition, that the Judicial Committee could not have reasonably concluded that she committed plagiarism based on the evidence before that Committee. In this respect, it is significant that plaintiff did not even choose to seek further review of the decision of that Committee, even though she was entitled to do so under Article VIII of those disciplinary rules. Nor has plaintiff ever maintained that the professors who revised her grades downward based on their view that she had plagiarized papers in their respective courses acted in an arbitrary or capricious fashion.

main premise of the Plaintiff's complaint is that she did not plagiarize. The fact that, as the Report suggests, she has not alleged that the Judicial Discipline Committee could not have "reasonably concluded" that she had plagiarized goes to form, not the substance of the pleadings. Similarly, it was certainly implied, but not expressed in her complaint, that the professors acted in an "arbitrary and capricious manner," as the Report apparently requires.

Moreover, the Magistrate inquires about the reason why Plaintiff did not take advantage of her right to appeal the Committee's decision. The fact is that at the time, Plaintiff believed, and upon advice of counsel, that under the School rules, she could not appeal in the absence of new evidence. See Disciplinary Regulations for All BUSL Students, Art. VI, § 13. Moreover, an appeal would have been futile mainly because Plaintiff believed that Dean Cass, considering his unfavorable attitude toward Plaintiff, would have denied her Petition for Reconsideration and/or appeal, hence, a fool's errand.

**(2)** The Defendants breached their contract when they failed to provide appropriate and much-needed accommodations to the Plaintiff. As part of her expectations, the Plaintiff reasonably expected to receive reasonable accommodations in order to enable her to undergo the rigor of law school.[15] For example, when she enrolled, she expected to benefit of the assistance of a stenographer. However, when she asked for one, within the first two weeks of her enrollment, she was summarily told by Allen McCurdy, an employee of Defendants that she would not be able to have

---

[15] According to the School's own web site, handicapped students were expected to receive special accommodations based on their needs. See http://www.bu.edu/disability.

one. She was also deprived of the use of a library room for the duration of her first

year in law school, simply because she could not use a room during this period.

(3) Defendants have also breached their contract when they allowed a

professor, affiliated with the School to represent Plaintiff against the same School.

Ordinarily, it would be acceptable in academic settings to allow a student's advocate

to also be remunerated by the School. As the Magistrate aptly puts it, "core concepts

of due process do not require the appearance of chosen counsel." (Emphasis in

original). Report, n. 18. However, this was not an ordinary case. As it has been

proven, the stakes were exceptionally high for the student. It was a matter of

expulsion, depriving the student of any and all possibility to obtain a law degree, and

in effect, depriving her of the opportunity to earn a living. In Constitutional settings,

the 14th Amendment requires that a person cannot be deprived of "life, liberty, or

property, without due process of law."  Duncan v. Louisiana,  391 U.S. 145 (1968).

Although this is not that setting, it would be reasonable to expect that schools would at

least give the semblance that certain Constitutional standards would be followed. After

all, it should go without saying that Right to Counsel as mandated by the Sixth

Amendment of the U.S. Constitution, means right to an impartial counsel.[16] It is not

unreasonable to conclude therefore that an attorney who is on the payroll of a school

cannot possibly adequately represent a student against the School in a high-stakes case

such as that of Plaintiff's.

It is also noteworthy that the use of an attorney in the current case is by no

means analogous to the use of attorneys as Federal Defenders or in court martial

---

[16] See U.S. Const. amend. VI.

proceedings, as suggested in the Report.[17]  The distinctions lie in the context of the proceedings and the position of the attorneys vis-à-vis the judicial system against which they defend their clients.  For instance, Federal defenders operate in very large, fluid, and rather impersonal settings, where their interactions and defense tactics will not result in repercussions by the judge or jury. This issue is even more salient when we add the element of "adversalism," a key element of successful defense strategies. It is understood by all those involved that a Federal defender is simply doing his or her job within this context. By contrast, the setting in an extrajudicial hearing of a private school is far from impersonal. It is also considerably less, if at all, adversarial. It could not be. After all, the advocate in the latter setting does not aim to "win" for his or her client as it is meant in the Federal court setting. The advocate here attempts to present the student's case in the most favorable light possible, albeit under the rules of the academic institution. Its shortcomings notwithstanding, these attorney-student arrangements usually work well because generally the effects of "judicial" decisions in a school setting are not as dramatic as regular courts vis-à-vis the accused student, and therefore the parties involved do not have to feel as though they are adversaries.

But this arrangement falls by the wayside in those unusual circumstances such as the present case where the student has much to lose. It is in these rare instances that the school-affiliated advocate, who will need to literally go to legal combat against the school, can no longer be effective, much to the detriment of the student. In fact, because of the small size of the "judicial" system in a private school, the politically-charged atmosphere of the school-faculty setting,  and also due to the cozy nature of

---

[17] See Report at n. 18.

the judicial-faculty relationship, it would not be unreasonable to expect occasional repercussions in the event of adversarial tactics employed by the student's defender. Consequently, it would not be too far-fetched to suggest that a student's advocate might balk at engaging the opposing parties in the same manner as in a court setting. After all, once the student's case is adjudicated, it is they, the defender and the members of the judicial committee, as well as any professors involved, who would continue to interact and coexist in an intimate and eye-to-eye environment. This is of course, not to suggest that the Plaintiff's counsel in any way shirked from his responsibility to adequately advocate for his client. The issue is about whether the setting was conducive to such a possibility. Plaintiff believes that it was.

      For the above reasons, Plaintiff hereby objects to the dismissal of Count I of her complaint.

2.      Plaintiff hereby withdraws Count II of her complaint, concerning Violation of Procedural Due Process.

3.      Plaintiff objects to the Magistrate's recommendation in the Report that Count V ( Fraud )  regarding the Defendants, Trustees of Boston University, be dismissed for failure to state a claim upon which relief can be granted, on the grounds that the Plaintiff has alleged sufficient facts to sustain a claim of fraud.

      First, Plaintiff reproduces in part, her previously-submitted response:[18]

      Although under Fed. R. Civ. P. 9(b) and Mass.R.Civ.P. 9(b), circumstances constituting fraud must be stated with particularity, it must be noted that most of the cases [cited by Defendants], which deal with "particularity" issues deal with securities fraud, where specificity of action is of a much higher

---

[18] Pl.Mem.at 15.

importance. <u>See</u> <u>Baron v. Smith</u> No. 03-2440 (1st Cir. 08-18-2004). The Defendants rely on <u>U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.</u>, 360 F.3d 220, 226 (1st Cir. 2004). Although factually <u>Karvelas</u> is inapposite, where the Plaintiff there was relying on the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., nonetheless, Ms. Kiani will rely on the same case to dislodge the Defendants from their position. In <u>Karvelas,</u> the Court held that Rule 9(b) applied to claims under the FCA. <u>Id</u>.

However, Rule 9(b) can be "relaxed" in certain instances. For example, the Rule may be relaxed "when the opposing party is the only practical source for discovering the specific facts supporting a pleader's conclusion." <u>Id.</u> (quoting from <u>Boston & Maine Corp. v. Hampton</u>, 987 F.2d 855, 866 (1st Cir. 1993). Also, in <u>Karvelas</u> the Court held that relaxing the Rule 9(b) particularity requirements, would be "an opportunity for the plaintiff to plead generally at the outset and then later amend the complaint, filling in the blanks through discovery." <u>Id</u>. at 227.

More particularly, the rules of civil procedure, both State and Federal were "designed to facilitate pleading and to eliminate technicalities and niceties nurtured by our former system of pleading." <u>Friedman v. Jablinski</u>, 371 Mass. 482, 488 (1976). For instance, in Federal practice, a claim for fraud, "which reveals an apparent lack of timeliness, need not allege more than the basic claim and that discovery of the fraud was made within the statute of limitations period preceding suit." <u>Id.</u>

Ms. Kiani's Complaint contained sufficient references to time, place and content of Defendants' misrepresentation. <u>See</u> Complaint ¶¶88-91. The Complaint sufficiently states the time [] [2000-2003], place (Law School), and content (misrepresentation in order to obtain the tuition). In fact, in her Complaint, she had purposely used the term "specifically" to underscore the importance of the particularity requirement of Rule 9(b). In addition, as a whole, Ms. Kiani's Complaint is replete with references to time, place, and content. Moreover, there is no set formula under the Federal Rules of Civil Procedure to allege claims of fraud. As the Court in <u>Karvelas</u> aptly observed, "[t]hese details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint. " <u>Karvelas,</u> 360 F.3d at 227. To satisfy Rule 9(b), the Court required that "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." <u>Id</u>. (quoting <u>United States ex rel. Clausen v. Lab. Corp. of Am., Inc.</u>, 290 F.3d, 1301, 1312 n.21. (11th Cir. 2002), <u>cert. denied</u>, 537 U.S. 1105 (2003). Ms. Kiani, has pled sufficient information concerning the time and place of the fraud in her other claims, including the section of the Complaint entitled "Facts Common to All Counts," to satisfy this requirement. <u>See</u> Complaint, ¶¶ 10-52. Moreover, once given the opportunity through discovery, she intends to amend her Complaint by leave of Court, in order to allege more specific averments.

In addition, Plaintiff's claim is based on the specific contents of Defendants' Web page concerning their services for handicapped students. For example, one document, entitled "Office of Disability Services," contains the following:

> The University is committed to providing equal and integrated access for individuals with disabilities to all the academic, social, cultural, and recreational programs it offers. This commitment is consistent with legal requirements, including Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act ("ADA") of 1990, and embodies the University's historic determination to ensure the inclusion of all members of its communities.
>
> At the Office of Disability Services ("Disability Services"), our goal is to provide services and support to ensure that students are able to access and participate in the opportunities available at Boston University. In keeping with this objective, students are expected and encouraged to utilize the resources of Disability Services to the degree they determine necessary.
>
> See  http://www.bu.edu/disability.

Despite these promises, Plaintiff was unable to use the library, both because its isles were too narrow, and also because during the first year, she could not access a room to listen to her lecture tapes. This was in direct contravention of the representations made by the School, above, as well as promises made by the School on another page of its website where it reads:

> As a BUSL student, you will have access to the library's collection of more than 500,000 volumes and microform equivalents as well as a wide range of law-related CD-ROM titles and educational interactive materials from the Center for Computer Assisted Legal Instruction (CALI).
>
> See http://www.bu.edu/law/facilities.

Moreover, as stated above and elsewhere, in her first year of law school, Plaintiff had asked for a stenographer, but despite her obvious need, she was refused. See ¶ 1, Supra.

In another instance, on February 2, 2003, former individual Defendant, Christine Marx from the former individual defendant Dean Cass's office suggested to Plaintiff that in order for Plaintiff to graduate, she needed to take a course at Suffolk University Law School. Upon reliance on this representation, Plaintiff registered at that university and took the course. Once she received her passing credit, however, Dean Cass refused to accept the credit. In another instance, Professor Kull, also a former individual defendant, had promised Plaintiff in February of 2003 that she would not be severely punished for her apparent failure to cite properly. Later, however, he advocated against her and also lost her paper, only to find it after add/drop deadline had passed, forcing her to take the course at Suffolk University.

The Magistrate's Report seems to recommend dismissal largely because Plaintiff did not specifically include the actions of the individual defendants in her complaint. Since this issue is now moot because Plaintiff has already consented to drop her claims against these individuals, and also because she has sufficiently pleaded the elements of fraud against the Trustees of Boston University, Count V should continue to be maintained.

4.        Plaintiff hereby withdraws Count VI of her complaint, concerning Conspiracy to Commit Fraud.

5.        Plaintiff hereby withdraws Count VII of her complaint, concerning Unlawful Discrimination.

6.        Plaintiff hereby withdraws Count VIII of her complaint, concerning Unjust Enrichment.

7.    Plaintiff hereby withdraws Count IX of her complaint, concerning

Conversion.

8.    Plaintiff objects to the Magistrate's recommendation that Count X
(Intentional Infliction of Emotional Distress) regarding Defendants, Trustees
of Boston University be dismissed  for failure to state a claim upon which relief
can be granted, on the grounds that Plaintiff has sufficiently represented and
alleged, in her previous pleadings, that as the result of the Defendants' actions,
she suffered severe emotional distress.

In her Memorandum in Opposition to Defendants' Motion to Dismiss, Plaintiff

squarely relies on the same well-established principles, enunciated in  Agis v. Howard

Johnson Co., 371 Mass. 140, 355 N.E.2d 315 (1976), as the Report does. Unfortunately,

however, the Magistrate seems to disagree with Plaintiff's conclusions. For example, the

Report states that:

> The fact that she was suspended some six days before her graduation would not
> provide any reasonable trier of fact a basis to find that that conduct was extreme
> and outrageous, and beyond all possible bounds of decency and was utterly
> intolerable in a civilized community.
> Report at 27.

Clearly, the Report does not take into account Plaintiff's peculiar medical and

mental condition as well as the circumstances under which she received the Dean's letter,

sent via Federal Express, six days before her graduation. The letter tersely informed her that

she would not be permitted to take part in graduation ceremonies. See Complaint Exhibit B.

Courts in Massachusetts have generally held that an individual who is given bad

news, with the intent to shock the individual, and to which the individual reacts negatively,

depending on the gravity of the harm, can suffer emotional distress. See e.g., Kelly's Case,

394 Mass. 684 (1985) ("we hold that an employee who has an emotional breakdown as a

result of being told that she will be laid off from one department and transferred to another one, has suffered a personal injury "arising out of and in the course of ... employment" within the meaning of G. L. c. 152, § 26.");  Mello v. Stop & Shop Co. Inc., 402 Mass. 555, 562 (1988) (arguing that it is not extreme and outrageous conduct when a former employee at will was transferred to a different department when" [o]n the day he was discharged, a Stop & Shop representative told Mello that Stop & Shop would set him up in new employment."). Moreover, in assessing the Defendants' conduct, "the jury [Sic] are entitled to draw reasonable inferences from the totality of circumstances." Boyle v. Wenk, 378 Mass. 592, 595 (1979). The Court in Agis also observed that:

> While many of her allegations are not particularly well stated, we believe that the "[p]laintiff has alleged facts and circumstances which reasonably could lead the trier of fact to conclude that defendant's conduct was extreme and outrageous, having a severe and traumatic effect upon plaintiff's emotional tranquility."

Agis, 371 Mass. at 145, quoting Alcorn v. Anbro Eng'r, Inc., 2 Cal. 3d 493, 498 (1970).

As for the facts of the current case, the actions of Defendants should be viewed in context of May 13, 2003, the day when Plaintiff received the letter from Dean Cass. As stated in her pleading documents, Plaintiff, a wheel-chair dependent individual who is highly immobile, and physically suffering on a daily basis due to her physical ailments, had overcome great many obstacles to finally be admitted to law school, and had looked forward to her nascent new title as a Counsellor of law. The day of graduation promised to be a day to eternally remember, both for Plaintiff and her family. After all, since Plaintiff's birth, her mother had spent all her life caring for the young ailing daughter, overcoming adversity and constantly looking forward to every snippet of good news. It was indeed great news when earlier in the same month, Plaintiff had received her commencement tickets for her family. She euphorically shared the good news with her brother, who had been both emotionally and

financially supporting her throughout law school. The day of graduation was going to be a big day for the Kiani family. Understandably excited at the prospect, her brother even took photographs of Plaintiff in her graduation gown, smiling with pride and joy.[19]

When Plaintiff received the ominous letter from Dean Cass, however, she felt as if the world had come to a standstill. She was dumbfounded. Plaintiff immediately developed psychological symptoms akin to those suffering traumatic experiences. For example, she began to shake uncontrollably, and developed dry heaves. Her toes began to become numb. Her mother too, was trembling and crying involuntarily. This day, which had promised to be one of few happy and bright days in her daughter's life had suddenly turned into a deep, dark, and gloomy day, all in a matter of minutes. This day had become a truly disastrous day for both Plaintiff and her family. Since she knew full well that she had never intended to plagiarize, she could not fathom the prospect that in one day, she was on the verge of losing all the fruits of her efforts, which she had intensely labored for almost 19 years. All that hard work had unexpectedly come to naught. Since that day, Plaintiff continues to suffer. She spends her days at home, fretting, languishing, and not knowing what the next day will bring. According to her physician, Plaintiff has also developed a psychological condition, known as Obsessive Compulsive Disorder.[20]

Plaintiff meets all the requirements laid out in Agis v. Howard Johnson Co. [21] There, the Court held that "[t]hese requirements are "aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." Id. at 145 quoting Womack v. Eldridge, 215 Va. 338, 342 (1974). Clearly, the

---

[19] These graduation photographs are available and will be submitted as evidence during the upcoming trial.
[20] The physician's report will be provided, if necessary.
[21] 371 Mass. 140, 355 N.E.2d 315 (1976).

issues raised by Plaintiff are from just bad manners, they concern the real detrimental impact of Defendants' actions. It would be difficult to imagine that a reasonable trier of fact would not find the actions of the Defendants as described above, as anything less than extreme and outrageous. On these grounds, Plaintiff objects to the dismissal of Count X.

## CONCLUSION

WHEREFORE, Plaintiff hereby consents to the withdrawal of her claims against all the individual defendants without prejudice and without costs to any party. Furthermore, Plaintiff consents to the withdrawal of Counts II, VI, VII, VIII, and IX against all defendants. Plaintiff, however, requests that facts contained in all these counts survive, and be incorporated into the Section of her complaint, entitled, "Facts Common to All Counts." Moreover, Plaintiff respectfully, but strenuously objects to the Magistrate Judge's Report pertaining to all remaining COUNTS insofar as they involve the Trustees of Boston University.

If the Court is inclined to grant any motion for failure to state a claim upon which relief can be granted, plaintiff respectfully requests an explanation of how her complaint is deficient, and leave to amend accordingly rather than dismissal. Plaintiff also requests an oral hearing on all the matters contained herein.

Respectfully submitted,

Dated: December 9, 2004              Plaintiff, Layla. Kiani, by her
                                     attorney

                                     '/s/ Ben Tahriri'

                                     343 Washington Street
                                     Newton, MA 02458
                                     Tel: (617) 965-1090
                                     Fax: (617) 965-5020
                                     BBO# 652042

**CERTFICATE OF SERVICE**

I, Ben Tahriri, Esquire, hereby certify that
I have this 9th  day of December, 2004, served
a true copy of the above document upon
the Defendants' attorney of record
via electronic mail.
_____
'/s/Ben Tahriri' , Esquire