**ORIGINAL**

Volume:    1
Pages:     1-95
Exhibits:  1-26

UNITED STATES DISTRICT COURT          **Exhibit 1**
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-11838-PBS

*******************************************x
LAYLA KIANI
          Plaintiff

          vs.

TRUSTEES OF BOSTON UNIVERSITY
                    Defendant
*******************************************x

          **DEPOSITION OF LAYLA KIANI,** a witness

called on behalf of the Defendant, pursuant to the

applicable provisions of the Massachusetts Rules of

Civil Procedure, before Camille Macomber, Registered

Professional Reporter and Notary Public within and

for the Commonwealth of Massachusetts, at Boston

University, 765 Commonwealth Avenue, Boston,

Massachusetts, on Thursday, April 21, 2005,

commencing at 10:00 a.m.

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MASSACHUSETTS 02108
(617)227-3097

```
 1    A    The last time we did not review documents.

 2    Q    Have you reviewed documents on your own or with

 3         your attorney in preparation for this

 4         deposition?

 5    A    Yes.

 6    Q    What did you review?

 7    A    What is my review?

 8    Q    What did you review?

 9    A    Anything that we had from BU that was sent over,

10         anything that I had when the charges were filed,

11         and there was some of it that I had.  I had sent

12         him medical records on my own and stuff.  So

13         things like that.

14    Q    Ms. Kiani, where do you live right now?

15    A    Do you want the physical address?

16    Q    Please.

17    A    86 East Howard Street in Quincy.

18    Q    Do you have a home telephone number?

19    A    Yes, (781)929-9966.

20    Q    Do you live with your mother?

21    A    I do.

22    Q    Anybody else?

23    A    No.

24    Q    You graduated from the University of Texas at
```

| | | |
|---|---|---|
| 1 | | Arlington in 2000; correct? |
| 2 | A | I did. |
| 3 | Q | You were at Boston University Law School from |
| 4 | | the fall of 2000 until the spring of 2003; |
| 5 | | correct? |
| 6 | A | Yes. |
| 7 | Q | Have you had any other education since the |
| 8 | | spring of 2003? |
| 9 | A | I have not. |
| 10 | Q | Have you been employed since the spring of 2003? |
| 11 | A | I have not. |
| 12 | Q | In your response to Boston University's request |
| 13 | | for documents, you submitted several letters |
| 14 | | from law firms in response to in inquiry about |
| 15 | | your efforts to find work. |
| 16 | A | Right. |
| 17 | Q | Do those letters reflect the cumulative effort |
| 18 | | to seek work on your part? |
| 19 | A | Yes. |
| 20 | Q | I want to just take care of some preliminary |
| 21 | | business with you quickly.  I'm going to ask |
| 22 | | Ms. Macomber to mark the Complaint in this case |
| 23 | | as Exhibit 1, and your response to Boston |
| 24 | | University's First set of Answers to |

```
 1           Who signed Exhibit 6?

 2      A    It's Ida Ten, she's the Associate Registrar.

 3      Q    So Exhibit 6 is a letter from Ms. Ten to you --

 4      A    Yes.

 5      Q    -- confirming the accommodations?

 6      A    Yes.

 7      Q    That's dated October 6, 2000?

 8      A    Yes.

 9      Q    Ms. Kiani, were you satisfied with the

10           accommodations set out in Exhibits 4 through 6?

11      A    At what point?

12      Q    You requested the accommodations that

13           Dr. Herring recommended; right?

14      A    Right.

15      Q    In Exhibit 4, you sent those accommodations to

16           Mr. Macurdy?

17      A    Right.

18      Q    In Exhibit 5, Mr. Macurdy recommended that Dean

19           Cass endorse them, and he did, as we can see by

20           his signature?

21      A    Yes.

22      Q    And Exhibit 6 is a letter from Ms. Ten to you

23           formally informing you of the accommodations.

24      A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | Were you content with those accommodations? |
| 2 | A | No. |
| 3 | Q | Why not? |
| 4 | A | These accommodations -- when I first asked for |
| 5 | | them, I wasn't a law student.  I had gotten |
| 6 | | accepted to the University, but it's a whole |
| 7 | | different thing when you're a prospective |
| 8 | | student than when you're a current student.  So |
| 9 | | when I got there and saw after the first two |
| 10 | | weeks, I saw what it was like to be a law |
| 11 | | student, I wasn't happy with them, no. |
| 12 | Q | Why was that? |
| 13 | A | It's my own disability, I couldn't take notes. |
| 14 | Q | Did you seek additional accommodations as a |
| 15 | | result? |
| 16 | A | I did. |
| 17 | Q | What accommodations did you seek? |
| 18 | A | I went to talk to Mr. Macurdy to let him know |
| 19 | | that I was uncomfortable and I needed a |
| 20 | | stenographer. |
| 21 | Q | What did Mr. Macurdy say? |
| 22 | A | No. |
| 23 | Q | Did he tell you why? |
| 24 | A | I couldn't have one -- I couldn't have one here |

```
 1          because I didn't have one in college.

 2     Q    Was this a face-to-face conversation?

 3     A    Yes.

 4     Q    Did this conversation take place after you

 5          received the letter from Ms. Ten on October 6,

 6          2000?

 7     A    I believe so.

 8     Q    Where did this take place?

 9     A    In his office.

10     Q    Did this conversation take place in Macurdy's

11          office?

12     A    Yes.

13     Q    At 19 Deerfield Street?

14     A    Yes.

15     Q    What did you do next?

16     A    Nothing.  That whole conversation was so

17          uncomfortable.  He didn't let me explain why I

18          thought I needed the stenographer.  So then he

19          kind of looked at me like, "Is this conversation

20          over?"  And it wasn't over for me.

21     Q    Did he say that?

22     A    No, you could tell, it was just in his face that

23          the whole conversation was like combative.

24          So -- sorry.
```

1    Q    Do you want to take a break?

2    A    No.  So then he sent me -- I didn't do anything.

3         I left because I didn't want to make enemies.  I

4         knew that I needed him for other things.  It was

5         first year, it was two weeks into the school

6         year, so I didn't want to make enemies, and I

7         didn't know anything.  So I didn't have to do

8         anything.  He sent me what I thought was a nasty

9         e-mail afterwards.

10   Q    Did you save that e-mail?

11   A    No.

12   Q    There were no e-mails produced between you and

13        Mr. Macurdy?

14   A    That's not true.

15   Q    Well, we can get to that.  What did this e-mail

16        that you've just described as nasty say?

17   A    It wasn't vulgar or anything, I want to be

18        really clear about that.  It wasn't vulgar.  He

19        said some things that I didn't think were his

20        place to say.

21   Q    What did he say?

22   A    Well, when he wasn't listening to me, my mom was

23        in there with me.  He had invited her in, so she

24        was trying to explain to him through me that I

1        was tired and that she was noticing some of my

2        medical symptoms.  But he -- I guess, he didn't

3        like that.  So then in the e-mail he said, this

4        is a direct quote, I remember this exactly,

5        "While the presence of a personal care attendant

6        is not unique, giving deference to a personal

7        care attendance is."

8                And then this is another direct quote,

9        that he urged me not to have, quote, "triangular

10       conversations," as between me, someone else and

11       a third party such as my mother.

12               I didn't like what he had to say

13       because I didn't think it was -- didn't think it

14       was his place for him to be referring to my

15       mother as a personal care attendant and getting

16       into a section of my personal life.  But

17       nonetheless, I wrote him back and I said, "I

18       appreciate that you've been candid with me, and

19       I hope that you will do that throughout my years

20       here at BU.  My mother is special to me.  If she

21       tries to be my advocate, I won't say no."

22   Q   Did you save that e-mail?

23   A   No, I didn't.  I had it saved until second year.

24   Q   After this exchange with Mr. Macurdy, what did

1   Mr. Macurdy?

2 A Yes.

3 Q Did she tell you what to do next?

4 A No.

5      (The document was marked as Exhibit

6      No. 7.)

7 Q Ms. Kiani, please read Exhibit 7.

8 A (Witness reviews document.)

9 Q Just let me know when you're done?

10 A I'm finished.

11 Q You have read the whole thing?

12 A Yes.

13 Q Ms. Kiani, Exhibit 7 is a printout of an e-mail

14   exchange between you and Dean Marx; correct?

15 A Yes.

16 Q It has been Bate stamped as BU 0232 and produced

17   to your attorney during the course of discovery.

18 A This is the first time I have seen this.

19 Q Do you recall this e-mail exchange back in

20   October of 2000?

21 A I don't.  I'm sorry.

22 Q Let's pick it up in the middle, beginning with

23   what appears to be an e-mail from you, "Dean

24   Marx, Hi, I went to my appointment with Alan

| | | |
|---|---|---|
| 1 | | Macurdy," et cetera. |
| 2 | A | Okay. |
| 3 | Q | Does this sound like what you would have said to |
| 4 | | the Dean after your appointment -- |
| 5 | A | Yes. |
| 6 | Q | -- with Allan Macurdy?  Wait until I'm finished. |
| 7 | A | I'm sorry. |
| 8 | Q | Does this sound like what you would have written |
| 9 | | to Dean Marx after you met with Mr. Macurdy? |
| 10 | A | Yes. |
| 11 | Q | Now, in your e-mail to Dean Marx, you write -- |
| 12 | | I'm going to paraphrase and you tell me if my |
| 13 | | paraphrase is accurate. |
| 14 | A | Right. |
| 15 | Q | Your e-mail to Dean Marx basically says, "I need |
| 16 | | more than I have been given.  How do I get it?" |
| 17 | A | Right. |
| 18 | Q | Is that a fair and accurate paraphrase? |
| 19 | A | Yes. |
| 20 | Q | In the last paragraph of your e-mail you write, |
| 21 | | "What is the exact procedure of getting in touch |
| 22 | | with the Provost, and is there any documentation |
| 23 | | that can be used to show how my request is |
| 24 | | supported by my disability."  Did I read that |

1   correctly?

2 A Yes.

3 Q So you have basically said to Dean Marx, "How do

4   I get in touch with the Provost?  What do I need

5   to do to show that I need more accommodations."

6 A Right.

7 Q Is that accurate?

8 A Right.

9 Q Now, let's turn to the top half of Exhibit 7,

10   this is Dean Marx's reply to you; correct?

11 A Yes.

12 Q Now, Dean Marx says, "There is a grievance

13   procedure for the University for those who

14   believe they have been discriminated against on

15   the basis of disability.  This procedure is in

16   the BU Life Book.  I will put a copy of that

17   procedure in your mail file on the first floor."

18   Did I read that accurately?

19 A Yes.

20 Q What is a mail file?  Is that a mailbox that all

21   students have?

22 A Yes.

23 Q Did you read the BU Student Life Book and see

24   the procedure for filing a complaint for

```
 1        discrimination?

 2   A    When?

 3   Q    At the time that Dean Marx put --

 4   A    I'm sure.  I don't remember, but I must have.

 5   Q    Did you file a complaint of discrimination on

 6        the basis of disability?

 7   A    No.

 8   Q    Why not?

 9   A    I don't know why.

10   Q    Further down, I'm going to read a little bit

11        more, "It sounds to me like you're not alleging

12        discrimination on the basis of disability, but

13        rather you are not satisfied with Mr. Macurdy's

14        determination that the transcriber is not

15        supported by your disability."  Did I read that

16        correctly?

17   A    Yes.

18   Q    Dean Marx then goes on to tell you what to do to

19        get your accommodation.

20   A    Yes.

21   Q    She says to write to the Provost, Dr. Berkey,

22        and explain what accommodations you are

23        requesting, what accommodations Disability

24        Services provided you, why they were wrong.
```

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | And then she says, and I'm quoting from Dean |
| 3 | | Marx's e-mail to you, "You should also provide |
| 4 | | documentation that might support your request." |
| 5 | A | Right. |
| 6 | Q | Did I read that correctly? |
| 7 | A | That's correct. |
| 8 | Q | Then she tells you how to reach the Provost, |
| 9 | | Dr. Berkey? |
| 10 | A | Right. |
| 11 | Q | Did you write to Provost Berkey requesting an |
| 12 | | accommodation? |
| 13 | A | I did not. |
| 14 | Q | Did you appeal to anyone from Mr. Macurdy's |
| 15 | | decision? |
| 16 | A | No, because I was told that Mr. Macurdy handles |
| 17 | | the accommodations.  I don't remember anything |
| 18 | | about this e-mail. |
| 19 | Q | Do you remember whether you wrote to Dr. Berkey, |
| 20 | | the Provost? |
| 21 | A | Absolutely not, I would have remembered that.  I |
| 22 | | did not write to him. |
| 23 | Q | Did you send Dr. Berkey additional documentation |
| 24 | | that might support your request for a |

1          transcriber?

2     A    No.

3     Q    Did you send anyone documentation that might

4          support your request for a transcriber?

5     A    No, I didn't know what other documentation I

6          could have given that I hadn't already.

7     Q    Did you ask Dean Marx what other documentation

8          you could have given?

9     A    No.

10                        (Witness confers with Mr. Tariri

11                        off the record.)

12    Q    Ms. Kiani, I'm going to ask you not to talk with

13         your attorney unless you want me to learn about

14         it.

15    A    Okay.

16    Q    I don't want to do that, but you need to

17         understand the ground rules here.

18    A    Right, okay.

19    Q    Ms. Kiani, did you make any further attempts to

20         get additional accommodations?

21    A    I did not.

22                        (The document was marked as Exhibit

23                        No. 8.)

24    A    (Witness reviews document.)

1    Q    In 2003, when did you read them?

2    A    I had had some familiarity with it before I went

3         to visit Professor Rosenfeld to ask him to

4         represent me.

5    Q    When did you visit Professor Rosenfeld?

6    A    That same day that that e-mail that you don't

7         have was written.

8    Q    So that was sometime after you received notice

9         that you were suspended?

10   A    Yes.

11   Q    Sometime after Dean Cass' letter of May 12,

12        2003?

13   A    A few days after, yes.

14   Q    Did you read the disciplinary regulations

15        between the time you received Dean Cass' May 12,

16        2003 letter and the time you went to see Arnie

17        Rosenfeld?

18   A    I know that I went and read them right before I

19        went to see Professor Rosenfeld, but I couldn't

20        tell you what I did in those days between when I

21        was charged and when I went to see Professor

22        Rosenfeld.  I was so out of it, I wished I was

23        dead.

24   Q    We don't need to get into specifics about what

1       you did, I just need a general timeframe here.

2                  Did you have the opportunity to meet

3       with Professor William Ryckman in advance of the

4       Judicial Committee Hearing?

5    A   You mean did I meet with him?

6    Q   Did you have the opportunity to meet with him?

7    A   Define opportunity.

8    Q   Did you have the chance to meet with Professor

9        Ryckman?  Let me put it a different way.

10   A   Please.

11   Q   Did Professor Ryckman ask to meet with you or

12       invite you to meet with him?

13   A   Did he ask me directly?

14   Q   Either you or through your attorney.

15   A   He asked my attorney, but before he asked my

16       attorney, I had gone to -- The reason I went to

17       Professor Rosenfeld to ask him to represent me

18       because I did not, for the life of me, want to

19       talk to Professor Ryckman.

20   Q   Why was that?

21   A   He is legendary.

22   Q   In what respect?

23   A   I have heard that he makes students emotionally

24       uncomfortable.

| | | |
|---|---|---|
| 1 | Q | Had you ever met him before? |
| 2 | A | No. |
| 3 | Q | Have you heard that he makes students, I'm using |
| 4 | | your phrase now, emotionally uncomfortable in |
| 5 | | his classes? |
| 6 | A | Yes. |
| 7 | Q | Have you heard anything about Professor |
| 8 | | Ryckman's role in the discipline process? |
| 9 | A | I didn't know until charges -- I didn't know |
| 10 | | until after I went to see Professor |
| 11 | | Rosenfeld that -- well, no.  Steve Marx had |
| 12 | | already advised me a little bit about the |
| 13 | | process and what was going to happen, so I think |
| 14 | | I heard it from him that it was going to be |
| 15 | | Professor Ryckman. |
| 16 | Q | Was Arnie Rosenfeld a professor at that time? |
| 17 | A | Yes, he was. |
| 18 | Q | A visiting professor? |
| 19 | A | I don't know his title. |
| 20 | Q | Did you talk with Professor Rosenfeld about |
| 21 | | meeting with Professor Ryckman? |
| 22 | A | I did.  I told him I didn't want to do it. |
| 23 | Q | You told him you did not want to do it? |
| 24 | A | Yes. |

1    Q    I don't want to ask you about what he told you,

2         but after talking with Professor Rosenfeld, did

3         you decline to meet with Professor Ryckman?

4    A    No, what I thought and what I had said that I

5         didn't want to meet with him was only

6         reaffirmed.

7    Q    So the combination of your own desire not to

8         meet with Professor Ryckman and your meeting

9         with Professor Rosenfeld led you not to meet

10       with Professor Ryckman; is that fair?

11   A    Yes.

12   Q    When was the first time you met with Professor

13       Ryckman?

14   A    I only saw him at the hearing on September 12,

15       2003.

16   Q    Did you have any written communications with

17       Professor Ryckman before the hearing in

18       September 2003?

19   A    No.

20   Q    Did Professor Ryckman communicate to you in

21       writing before September 2003?

22   A    No.

23   Q    Did he communicate either verbally or in writing

24       with Professor Rosenfeld about your case before

1   September 2003?

2 A Yes.

3 Q When?

4 A I know that that they talked throughout the

5   course of Professor Rosenfeld representing me,

6   I'm not sure when.  I don't know specific dates.

7 Q Do you think they talked before the hearing in

8   September 2003?

9 A Yes.

10 Q Do you know what they talked about?

11 A Professor Rosenfeld was trying to be my

12   advocate.  I don't know what was said.

13 Q Do you know if Professor Ryckman communicated to

14   Professor Rosenfeld any desire to meet with you?

15 A Yes.

16 Q Your testimony is that Professor Ryckman told

17   Professor Rosenfeld that he wanted to meet with

18   you?

19 A Yes.

20 Q What did Professor Rosenfeld tell Professor

21   Ryckman?

22 A This is not a direct quote, but he said that my

23   client doesn't want to meet with you, and I have

24   advised her not to.

1   Q    Ms. Kiani, did you read Boston University's

2        Motion to Dismiss?

3   A    Yes -- wait.  Was that the initial one or the

4        one that you filed and then Judge Saris ruled

5        on?

6   Q    I will show you.  (Mr. Elswit scans documents.)

7        Actually, I don't have those documents here, and

8        we're going to have to just address this theme

9        after lunch.

10  A    Okay.

11            THE WITNESS:  May I just ask a general

12       question?

13            MR. ELSWIT:  Sure.  Do you want to be

14       on the record or not?

15            THE WITNESS:  It doesn't matter.

16            MR. ELSWIT:  I will give you that

17       liberty that I don't ordinarily give witnesses.

18            THE WITNESS:  Is it possible that I

19       communicate with counsel outside of these

20       proceedings?

21            MR. ELSWIT:  I will tell you what.

22       Why don't we take a lunch break a little earlier

23       than usual, and you can talk all you want, and I

24       will decide how much I want to inquire of those

```
 1          conversations.  And if Mr. Tariri objects, we'll

 2          go from there.  Would that be all right?

 3                    THE WITNESS:  That's fine.  Thank you.

 4                    (Wherein the lunch break was held.)

 5

 6   BY MR. ELSWIT:

 7     Q    Ms. Kiani, before the lunch break -- and I

 8          should remind you that the same rules are in

 9          effect.  You're under oath, and if you need a

10          break at any time, you can ask for one, and

11          we'll, of course, get it.

12     A    I understand.

13     Q    Ms. Kiani, before the lunch break, we were

14          talking about the disciplinary rules.  I believe

15          you said you skimmed them in your first year and

16          then read them more carefully in the spring or

17          summer of 2003?

18     A    That's correct.

19     Q    Had you read them before you skimmed them in

20          your first year?

21     A    No.

22     Q    So you didn't read them when you applied to law

23          school?

24     A    No.
```

1       Do you see page 7 up on the top right?

2    A  Right, I do.

3    Q  The first text is, "Mr. Rosenfeld:  I thought

4       you were doing it," and then Professor Ryckman.

5    A  Right.

6    Q  Please read to yourself Professor Ryckman's

7       remarks that start at the top of page 7 and go

8       to the bottom.

9    A  (Witness reviews document.) Yes.

10   Q  The second paragraph contains the following

11      sentence.  This is Professor Ryckman now.

12      "Obviously, the student has a right to remain

13      silent, and on advice of counsel, I was informed

14      that Ms. Kiani did not wish to be interviewed by

15      me."

16   A  Right.

17   Q  Were you at the hearing when Professor Ryckman

18      said, "Obviously, the student has a right to

19      remain silent"?

20   A  Yes.

21   Q  Do you recall Professor Ryckman saying this?

22   A  Yes.

23   Q  You knew you had this right because you had read

24      the discipline rules; is that correct?

| | | |
|---|---|---|
| 1 | A | No, like I said, I just skimmed procedurally to |
| 2 | | see what the process was. |
| 3 | Q | Your testimony so far is, you skimmed the rules |
| 4 | | in the fall of 2000? |
| 5 | A | Right. |
| 6 | Q | And that you read then more carefully after you |
| 7 | | received your letter of suspension? |
| 8 | A | Yes. |
| 9 | Q | Did you read them or skim them? |
| 10 | A | I don't remember. |
| 11 | Q | Did you discuss your right to remain silent with |
| 12 | | Professor Rosenfeld, your attorney? |
| 13 | A | No. |
| 14 | Q | This text, Professor Ryckman's text says, |
| 15 | | "Obviously, the student has a right to remain |
| 16 | | silent, and on the advice of counsel, I was |
| 17 | | informed that Ms. Kiani did not wish to be |
| 18 | | interviewed by me."  Is that correct? |
| 19 | A | Yes. |
| 20 | Q | Did you speak at this hearing on September 12, |
| 21 | | 2003? |
| 22 | A | Yes. |
| 23 | Q | Was your attorney present? |
| 24 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | Did your attorney ask you questions? |
| 2 | A | Yes. |
| 3 | Q | Did your attorney tell you not to respond to any |
| 4 | | questions? |
| 5 | A | No. |
| 6 | Q | Did you answer questions from other participants |
| 7 | | of the hearing? |
| 8 | A | Yes. |
| 9 | Q | Did your attorney tell you to answer or not to |
| 10 | | answer any of those questions? |
| 11 | A | No. |
| 12 | Q | Now Ms. Kiani, in light of this transcript, is |
| 13 | | it accurate to say that you were advised of your |
| 14 | | right to remain silent? |
| 15 | A | No. |
| 16 | Q | Why not? |
| 17 | A | My previous testimony, if you recall, was that |
| 18 | | before I even went to Professor Rosenfeld to ask |
| 19 | | him to represent me, was that I knew I didn't |
| 20 | | want to talk to Professor Ryckman.  So it wasn't |
| 21 | | based on anybody's advice that I shouldn't talk |
| 22 | | to him.  It was, as I said before, it |
| 23 | | reconfirmed what I already knew. |
| 24 | Q | Which was? |