# Plaintiff's Exhibit "D"

1

```
 1                    Volume: I
 2                    Pages: 1-71
 3          UNITED STATES DISTRICT COURT
 4          DISTRICT OF MASSACHUSETTS
 5
    - - - - - - - - - - - - - - - - - x
 6  LAYLA KIANI,
 7             Plaintiff,
 8    v.
 9  TRUSTEES OF BOSTON UNIVERSITY,
10             Defendants.
    - - - - - - - - - - - - - - - - - x
11
12          DEPOSITION OF WENDY K. MARINER
13        Tuesday April 26, 2005, 10:20 a.m.
14           Law Office of Ben Tariri
15            343 Washington Street
16           Newton, Massachusetts 02458
17  -------Reporter:  Toni F. Beckwith, RMR-------
18
19               ********
20
21
22     Toni F. Beckwith, Registered Merit Reporter
                50 Winsor Avenue
23        Watertown, Massachusetts 02472
                Tel: 617.924.2731
24             Fax: 617.924.9899
```

2

```
 1  APPEARANCES:
 2
 3    LAW OFFICE OF BEN TARIRI
 4    By Ben Tariri, Esquire
 5    343 Washington Street
 6    Newton, Massachusetts 02458
 7    Counsel for the Plaintiff
 8
 9    BOSTON UNIVERSITY
10    OFFICE OF THE GENERAL COUNSEL
11    By Lawrence S. Elswit, Esquire
12    125 Bay State Road
```

13    Boston, Massachusetts 02215
14    Counsel for the Defendants
15
16
17
18
19
20
21
22
23
24


                                        3
1              I N D E X
2    Deposition of:   Direct Cross Redirect Recross
3    WENDY K. MARINER
4       By Mr. Tariri    4
5
6
7
8
9
10
11              E X H I B I T S
12   No.                          Page
13
14   1    Document Entitled Charges
15        in the Matter of Layla Kiani      29
16
17
18
19
20
21
22
23
24


                                        4
1              P R O C E E D I N G S
2         MR. TARIRI:  Are you ready?
3         MR. ELSWIT:  Ready.
4
5              WENDY K. MARINER,
6    having been satisfactorily identified by the

7    production of her driver's license, and duly
8    sworn by the Notary Public, was examined and
9    testified as follows:
10
11            DIRECT EXAMINATION
12   BY MR. TARIRI:
13       Q.  Good morning.  My name is Ben Tariri.
14   I'm the attorney for the plaintiff Layla Kiani.
15   This is a deposition of Professor Wendy Mariner.
16   Today is April 26, 2005.  Present in my office
17   is Attorney Lawrence Elswit and Professor Wendy
18   Mariner.
19            Professor Mariner, the understanding
20   is that your attorney is welcome to object.
21   Notwithstanding his objections, you are required
22   to answer any questions regarding anything that
23   transpires in this room.  Is that
24   understandable?  Is that acceptable?

                        5
1        A.  I take my lead from...
2            MR. ELSWIT:  That's all right.
3            MR. TARIRI:  I'm sorry.  Did you want
4    to say something?
5            MR. ELSWIT:  No.
6        Q.  Professor Mariner, would you spell
7    your name, please.
8        A.  First or last?
9        Q.  Both.
10       A.  Wendy is W E N D Y, Mariner is
11   M A R I N E R.
12       Q.  There is no middle initial?
13       A.  I have a middle initial K.
14       Q.  What do you do, Professor Mariner?
15       A.  I beg your pardon?
16       Q.  If I speak in too low a tone of voice,
17   please let me know.
18            What do you do for a living?
19       A.  I teach.
20       Q.  What do you teach and where do you
21   teach?
22       A.  I teach at Boston University, and I
23   teach courses in health law.
24       Q.  How long have you been doing that?
                        6

1    A.  At Boston University?
2    Q.  No, as a teacher.  How long have you
3  been a teacher?
4    A.  A long time.  More than 20 years.
5  Since about 1980, 1981.
6    Q.  So you've been teaching law since
7  1981?
8    A.  Since about then, yes.
9    Q.  Where have you been teaching?
10    A.  I began teaching at Harvard Medical
11  School.
12    Q.  What did you teach there?
13    A.  I taught health law issues in courses
14  called Social Medicine in the Social Medicine
15  Department.
16    Q.  When did you move on to a law school,
17  any law school?
18    A.  Not until I got a joint appointment at
19  Boston University Law School.
20    Q.  When was that?
21    A.  In the 1990s.  I forget the year.
22    Q.  Would you say late 1990s or early
23  1990s?
24    A.  I don't remember.  I'd have to look it

7

1  up.
2    Q.  Are you a tenured professor?
3    A.  I'm a professor at Boston University
4  School of Public Health.  I have a joint
5  appointment at Boston University School of
6  Medicine and Boston University School of Law.
7       The medical campus does not have
8  tenure.
9    Q.  Again, I asked you, so are you tenured
10  anywhere at the school?
11    A.  No.
12    Q.  How many courses do you teach at
13  Boston University School of Law?
14    A.  One.
15    Q.  What is the name of that course?
16    A.  It's now called Health Insurance,
17  Managed Care and the Law.
18    Q.  What was it called previously?
19    A.  Managed Care and the Law.
20    Q.  When did it change its name?

21    A.  This year.
22    Q.  Do you know why?
23    A.  Because the course content covered
24  health insurance and it seemed a better

8

1  description.
2    Q.  How often do you teach in a week?
3    A.  Once a week in the spring semester.
4    Q.  How many hours is your class?
5    A.  About two hours.  If you're referring
6  to the health insurance managed care class?
7    Q.  I am.  Thank you.  I'll be more
8  specific.
9      How many students do you have in your
10  class of Managed Care and the Law at Boston
11  University School of Law.
12    A.  It varies year to year.
13    Q.  How many students do you have this
14  year as we speak?
15    A.  24.
16    Q.  How many students did you have last
17  year in the spring?
18    A.  I don't remember specifically.
19    Q.  Do you recall how many students you
20  had in the spring of 2003?
21    A.  Not specifically.
22    Q.  Do you have an approximate number?
23    A.  I think it was somewhere between 10
24  and 15; maybe 11 or 12.  I don't recall

9

1  specifically.
2    Q.  Professor Mariner, do you know Layla
3  Kiani?  Have you heard of Layla Kiani?
4    A.  She was a student in my seminar.
5    Q.  Which year?
6    A.  2003, I believe.
7    Q.  Was it in the spring of 2003?
8    A.  The course is always in the spring.
9    Q.  Your courses are always in the --
10    A.  That course.
11    Q.  What level students do you teach at
12  the law school?
13    A.  I teach second- and third-year
14  students in that course.

15      Q. Are you told if a student is a
16  second-year student or third-year student?
17      A. I don't think so.
18      Q. Do you ever find out to see if the
19  student is a third-year, 3L or 2L?
20      A. I usually don't need to.
21      Q. Because you already know?
22      A. No.  It doesn't matter.
23      Q. Can you describe the setting of the
24  class that you teach, that you currently teach?

                    10
1  What is the setting?  Is it like a roundtable
2  setting, or is it like a lecture setting?
3      A. This year?
4      Q. This year.
5      A. This year it's in a regular classroom
6  with rows of desks and chairs.
7      Q. Where do you position yourself?
8      A. I'm sorry.  I'm mistaken.  We moved
9  the desks and chairs to form a square.
10     Q. Can you describe where your position
11 is in that square?
12     A. I usually stand or sit on one side of
13 the square near the blackboard.
14     Q. Do you ever sit down?
15     A. Yes.
16     Q. If you could just very briefly
17 elaborate on how you go about teaching in this
18 class.  You know, the actual -- I'm not
19 concerned about the substantive matters, just
20 procedurally, when you walk into the classroom,
21 do you start talking?  What do you do?
22     A. The teaching method depends on the day
23 and the topic, so it varies.  I usually
24 introduce the topic and describe generally what

                    11
1  I want to talk about, then ask questions of
2  students.
3      Q. How do you determine who to ask
4  questions from?
5      A. Students usually volunteer.  And if
6  students don't volunteer, I call on them.
7      Q. So would it be fair to say that you
8  ask a question and you wait for someone to raise

9  their hands or volunteer to answer without
10  actually pointing at a student?
11      A.  Usually students volunteer.
12      Q.  To answer?
13      A.  Yes.
14      Q.  How do you ensure that all the
15  students participate in such a transaction, in
16  such an environment?
17      A.  It's not always easy.  I try to make
18  sure to ask questions of students who have not
19  volunteered.
20      Q.  So would it be fair to say that you
21  try to be evenhanded and make sure everyone is
22  included in this interaction?
23      A.  Like anyone, I try to make sure
24  everyone gets to participate.

                        12
1       Q.  If a student does not participate,
2   what do you do?
3       A.  If they don't participate when I call
4   on them, I may encourage them after class.
5       Q.  Do you have any handicapped students
6   in your class this year that you know of?
7       A.  Not that I'm aware of.
8       Q.  When was the last time you had a
9   handicapped student in your class?
10      A.  It may have been in Layla's class.
11      Q.  And it was Layla?
12      A.  Well, it depends on what you mean by
13  handicapped.
14      Q.  I'm just asking you if you were aware
15  of -- handicapped is a person who could be
16  disabled for various reasons known or unknown to
17  others; it may be visual and not be visual.  So
18  I'm asking you if you could visually determine
19  if a person was handicapped by, you know, i.e.,
20  seeing a wheelchair or crutches or a
21  stenographer, you know, and the like.
22      A.  I noticed that Layla was in a
23  wheelchair, and another student had crutches and
24  told me that he was undergoing treatment for

                        13
1   cancer.
2       Q.  But was he handicapped?

3      MR. ELSWIT:  Objection.
4      MR. TARIRI:  Objection noted.
5      Q.  I'm asking you if you saw any students
6   who were handicapped by your standards?
7      A.  I thought you asked if I saw anyone on
8   crutches, and I did.
9      Q.  Thank you.  Yes, you did answer if
10   there were anyone with crutches.
11      Now I'm asking if you saw any students
12   who you believe were handicapped.
13      MR. ELSWIT:  You're asking the witness
14   to reach a conclusion of law, and I've been
15   pretty patient with this line, as I was
16   yesterday with Professor Kull.  But I think
17   we've about explored this to the extent I'm
18   going to allow you.
19      MR. TARIRI:  We haven't explored it
20   with this witness at all.
21      MR. ELSWIT:  We've explored it
22   sufficiently.  You asked her several questions
23   that ask her to make a conclusion of law about
24   students with disabilities.  She's done that to

14

1   the best of her ability.  Her judgment on
2   whether or not a student with crutches
3   undergoing chemotherapy is handicapped has no
4   bearing whatsoever on this case.
5      MR. TARIRI:  I object to your
6   response, to your objection.  I believe that I'm
7   asking her to -- we're not looking for a
8   conclusion of law from her.  I'm asking her
9   directly if she saw anybody who she believed was
10   handicapped.
11      MR. ELSWIT:  She answered.  She told
12   you that the plaintiff had an obvious disability
13   and another student was on crutches and was
14   undergoing treatment for cancer.
15   BY MR. TARIRI:
16      Q.  Let's move on to the next question.
17   Did you see anyone else who was handicapped in
18   your class since you've been at BU Law School?
19      A.  I don't recall seeing anyone with
20   visible wheelchair or crutches or something like
21   that --
22      Q.  Thank you.

23      A. -- in my classes.
24      Q. That's what I meant, in your class.

                                15
1          Professor Mariner, what do you expect
2   your students to do in your class other than
3   attending the class?
4      A. It's in the course objectives.  I
5   expect them to read the assigned material,
6   participate in class discussion, and write two
7   original papers on assigned topics.
8      Q. These topics vary, I take it, from
9   semester to semester?
10     A. Sometimes.
11     Q. How long are these papers required to
12  be?
13     A. They're to be about 15 pages.  They
14  could be 14 or 16.
15     Q. Would that be each?
16     A. Yes.
17     Q. Would these papers be material that
18  you talked about already in class?
19     A. It's difficult to answer that way.
20     Q. I'll try to be more clear.  Are the
21  papers relevant to the subject matter of the
22  course?
23     A. Yes.
24     Q. Are the papers also relevant to the

                                16
1   books that you assign?  Are they related to the
2   books?
3      A. I don't always assign books.  I assign
4   articles and cases.  And the papers require, the
5   first paper requires students to analyze
6   proposed statute in light of the materials and
7   discussion in class.
8      Q. Have you published any articles
9   yourself?
10     A. Yes.
11     Q. How many?
12     A. Lots.
13     Q. Do you use your own articles in your
14  assignments?
15     A. Sometimes.
16     Q. Do all of your articles concern

17  healthcare and the law?
18      A.  In a general sense they concern legal
19  issues in health, yes.
20      Q.  Back to your class.  On a given day,
21  on an average day, do you give lectures as well
22  that students are required to follow and take
23  notes?
24      A. I don't lecture in the typical sense

                            17
1  of a large first-year lecture class.  I do often
2  explain things that may not be apparent to
3  students who ask questions.  I may provide some
4  background on a topic that I don't think
5  students would know.
6      Q.  Do your students take notes?
7      A.  Yes.  Some do; some may not.
8      Q.  What happens to the ones that don't
9  take notes?
10      A.  Nothing.
11      Q.  Do they pass the exam?  You don't have
12  to answer.
13      MR. ELSWIT:  Objection.
14      MR. TARIRI:  Strike that.
15      Q.  Professor Mariner, I'm going to take
16  you back to the year 2003, which is only two
17  years ago.  Do you recall the class of 2003?
18      A.  Generally.
19      Q.  Your class of 2003, how many students
20  do you recall you had in your class?
21      A. I think you asked me that.
22      Q. I did.
23      A.  Somewhere between 10 or 12.  I can't
24  quite remember exactly.

                            18
1      Q.  Would that be considered a small
2  class?
3      A.  By whom?
4      Q.  By your standards.
5      A.  Some seminars are small.  It's nice
6  when there are a small number of students.
7      Q.  What makes a class small, and what
8  makes a class bigger?
9      A.  I'm not following this.
10      Q.  You testified earlier that this year's

11  class contains 24 students?
12      A.  Yes.
13      Q.  So it consists of 24 students, and the
14  2003 class was 11.  What do you think
15  contributed to the size?
16      A.  I don't know.  I'd like to think the
17  popularity of the class.
18      Q.  So apparently it's more popular now.
19      A.  I don't know.
20      Q.  Do you recall any of the students in
21  the class of 2003?
22      A.  Probably if you named them.
23      Q.  Or if you saw them?
24      A.  If I saw them, I would probably

                          19
1  recognize them.  I don't always recall which
2  year they were in class.
3      Q.  What do you do with the assignments
4  that they turn in once they have finished the
5  class, once they graduated from that class?
6      A.  It depends.  I grade them.
7      Q.  I understand that.  But what do you do
8  subsequent to the grading once the school is
9  over and the students are gone?  Do you keep the
10  papers?  Do you hold onto the papers?
11      A.  I do.
12      Q.  For how long?
13      A.  Several years probably.
14      Q.  So would it be fair to say that you
15  have all the papers from the class of 2003?  And
16  what I mean by that is a class that you taught
17  in 2003 in the spring of 2003.
18      A.  I normally keep copies of papers.
19      Q.  Do you recall seeing Layla Kiani in
20  your class?
21      A.  Yes.
22      Q.  When did you first see her?
23      A.  On the first day of class.
24      Q.  Did you know her before that?

                          20
1      A.  No.
2      Q.  Had you heard of her before that?
3      A.  No.
4      Q.  When she came to your class, was she

5   in a wheelchair?
6       A.  Yes.
7       Q.  Did you talk to her on the first day
8   of class?
9       A.  I say hello to everyone.
10      Q.  No, but did you talk to her
11  individually?
12      A.  I probably said hello, yes.
13      Q.  I'm just asking you for what you
14  remember.  If you don't remember, of course
15  that's perfectly acceptable.
16          Did you have any interactions with her
17  in class from Day 1?
18      A.  I may have asked her if she was
19  comfortable at a particular spot beside the
20  table.
21      Q.  Do you recall that?
22      A.  Not specifically.
23      Q.  Do you recall if she was -- was she
24  taking notes?

                                21
1       A.  I don't remember specifically.
2       Q.  Were the other students taking notes?
3       A.  I don't pay attention to whether
4   students take notes.  That's their
5   responsibility.
6       Q.  Professor Mariner, was she a
7   participant in the discussions that you referred
8   to earlier?
9       A.  In class discussion?
10      Q.  In class discussion.
11      A.  Oh, yes.
12      Q.  Can you describe how she participated?
13      A.  She often volunteered and offered
14  opinions.
15      Q.  How did you perceive her opinions to
16  be?  Were they positive contributions?
17      A.  They were rarely about the legal
18  issues we were discussing.
19      Q.  What were they about?
20      A.  Sometimes they were about her opinions
21  about the way patients should be treated.
22      Q.  How did she rate in class compared to
23  the other students?
24      A.  On what criteria?

22

1    Q. In terms of the comments she made.
2    A. Not very well.
3    Q. Can you elaborate further, please?
4    A. I think I just explained. Her
5    comments were rarely on point and rarely about
6    the law and sometimes incorrect analyses of the
7    law.
8    Q. Did she seem to be "out of it"?
9    A. No, not at all.
10    Q. You said her comments were rarely on
11    point and were rarely related to the subject
12    matter?
13    A. Well, perhaps you could explain what
14    you mean by "out of it."
15    Q. I'm just using the slang term. I'm
16    sorry.
17        Was she focused on the subject matter?
18    A. She seemed to be paying attention to
19    the discussion.
20    Q. But was she focused on the subject
21    matter?
22    A. I don't know what her state of mind
23    was. I can only judge her facial expressions
24    and comments.

23

1    Q. Did you know that she suffered from
2    cerebral palsy?
3    A. No.
4    Q. Did you ever ask her?
5    A. No.
6    Q. Did you have any conversations with
7    her?
8    A. Conversations?
9    Q. Conversations.
10    A. About class work in class, sometimes
11    after class.
12    Q. So you had conversations about the
13    class subject matter?
14    A. Yes.
15    Q. In class and outside of the class?
16    A. I invited her to come talk to me, but
17    she only talked to me after class.
18    Q. And what did she talk about?

19    A.  In the classroom before she left.
20    Q.  Do you recall what she talked about?
21    A.  Not really.
22    Q.  Did you ever point out the fact that
23  the comments she made were rarely on point?
24    A.  I pointed it out in her paper.

24

1    Q.  No, to her personally?
2    A.  I may have.  I don't remember
3  specifically.
4    Q.  Were you concerned about her responses
5  in class?
6    A.  Not really.
7    Q.  Professor Mariner, you just said that
8  her comments were rarely on point or rarely
9  relevant to the subject matter.  Wouldn't that
10  be a concern?
11        MR. ELSWIT:  Asked and answered.
12    Q.  Do you have any other students in
13  class who also did not make sense?
14        MR. ELSWIT:  Objection.  That's not
15  what the witness said.
16    Q.  Did you have any other students in
17  class who did not make comments which were on
18  point?
19    A.  There are usually students who make
20  comments that aren't on point.
21    Q.  That's true.  I guess my question is,
22  did you have any other students who consistently
23  made comments that were not on point in that
24  particular class?

25

1    A.  I don't think anyone was consistently
2  not on point.
3    Q.  What I mean by consistently, I don't
4  mean all the time consistent, more than
5  infrequently.
6    A.  I've had students like that.
7    Q.  I was referring to that particular
8  class.
9    A.  I don't know if it was in that
10  particular class.
11    Q.  Professor Mariner, you have been a
12  professor since 1981, so that's a long time by

13   my standards.  I've never been a professor.
14        A.  You're a young man.
15        Q.  Not really.  Thank you.
16           My question is:  Do you form opinions
17   about a student's academic ability while they're
18   in your class?
19        A.  What do you mean?
20        Q.  Do you form opinions about your
21   students as to whether they're, you know, good
22   students, not so good students?  Just in your
23   mind do you do that?
24        A.  I can judge someone's comments in

                              26
1    class and whether they're pertinent.  I don't
2    want to prejudge a student because sometimes
3    students who make good comments write bad
4    papers; sometimes students who make bad comments
5    write good papers.  I've learned not to judge on
6    first impressions.
7         Q.  In other words, you would not judge a
8    student until they actually turned in a paper?
9         A.  Yes.  I would not judge a student at
10   all.  I would judge the work the student
11   submits.
12        Q.  That's what I meant.
13           And when are they supposed to turn in
14   that paper?
15        A.  There are scheduled deadlines.
16        Q.  Scheduled deadlines, can you
17   elaborate?
18        A.  The syllabus specifies dates for
19   turning in papers.
20        Q.  Would they be at the beginning, in the
21   middle, at the end, or how would they work?
22        A.  It depends on the class.  In this
23   course, the first paper is due roughly in the
24   middle, and the second paper is due at the end.

                              27
1         Q.  So the first paper of the two papers
2    which are the requisite is due in the middle,
3    and the second paper is due at the end; am I
4    correct?
5         A.  Yes.
6         Q.  So once you receive the first paper in

7  the middle, you would know what kind of a
8  student this student is, more or less?
9        MR. ELSWIT:  Objection.
10     Q.  Once you receive the first paper in
11  the middle, in the middle of the course period,
12  do you form an opinion as to what kind of a
13  student this student is academically?
14     A.  I only grade the paper.
15     Q.  You don't form any opinion about the
16  student?
17     A.  There are too many reasons why
18  students could do well or poorly on one paper,
19  so it doesn't necessarily reflect the student.
20     Q.  Do you form any opinion as to the
21  academic ability of the student after the second
22  paper?
23     A.  I grade the course on the basis of the
24  papers.

28

1     Q.  Professor Mariner, are you saying that
2  you will not form any opinion about your student
3  regardless of how they perform in your class and
4  on their papers?
5     A.  Of the student personally, no.
6     Q.  No.  I meant consistently referring to
7  the student's academic abilities.
8     A.  I grade them on what they do in my
9  class.  I'm not sure what you're asking me.
10     Q.  I'm just asking you if you have any
11  opinion about the student after the student
12  performs in your class.
13        MR. ELSWIT:  Ben, you've asked this in
14  every conceivable way.  And Professor Mariner
15  has indicated that she judges the student's
16  work, both written and oral.  I'm not sure how
17  much more you are going to get out of this.  The
18  answer has been consistent every time it's been
19  asked.
20     Q.  Do you recall what the paper, the
21  first paper was in the class of 2003 where Layla
22  Kiani was present?
23     A.  The assignment?
24     Q.  The first assignment.

29

1      A.  I believe it was to analyze one of
2  several possible provisions of a proposed
3  federal statute and to analyze it in some
4  detail.
5          MR. TARIRI:  Can we go off the record
6  for one second, please.
7        (Discussion off the record)
8          MR. TARIRI:  Back on.  Could you mark
9  this as Plaintiff's Exhibit 1.
10       (Exhibit 1 marked
11         for identification)
12         MR. ELSWIT:  Ben, there are some
13  handwritten notes, the word "typo" appears twice
14  on the first page of Mariner Exhibit 1.
15         MR. TARIRI:  That's correct.
16         MR. ELSWIT:  Are those your notes?
17         MR. TARIRI:  We can cross those out.
18  Can I have those back, and I can cross them out
19  and give them back to you.
20         MR. ELSWIT:  We can cross them out.  I
21  want this on the record.  I just want the record
22  to reflect that Exhibit 1 has some handwritten
23  notations.  The word "typo" appears twice on the
24  first page.  And these handwritten notations do

                          30
1  not appear in the original document that has
2  been marked as Exhibit 1.  That's all.
3          MR. TARIRI:  Thank you.  There were
4  some other handwritten notes that we actually
5  did white out, but this one somehow got missed.
6  BY MR. TARIRI:
7      Q.  Professor Mariner, could you examine
8  that document, Exhibit 1, please, and let me
9  know when you're done.
10       (Pause)
11      Q.  You're not required to read every
12  line, just to get a generalized idea.
13         MR. ELSWIT:  But you can if you want
14  to.
15      Q.  You are welcome to.
16       (Pause)
17      Q.  Professor Mariner, Exhibit 1 is an
18  excerpt from the Judicial Discipline Committee
19  charges that were brought against Layla Kiani.
20  Do you recognize that page?  Have you seen that

21  page before?
22      A. Actually, this is the first time I've
23  seen it.
24      Q. If you look towards the top of the

31

1  page where it says Count One, in the third line,
2  can you read that? Or in the vicinity of the
3  third line, can you read the title of the paper?
4      A. This (indicating)?
5      Q. Yes, the underlined title.
6      A. External Independent Review of Managed
7  Care Organization Decision, colon, Better At
8  State Level.
9      Q. Do you recognize this title?
10      A. I believe that's the title of a paper
11  she submitted.
12      Q. Is that the first paper that she
13  submitted?
14      A. No. That's the second paper, I think.
15      Q. I should have stayed with what I had
16  before. Can you please go to the second page of
17  Exhibit 1 and read the underlined title?
18      A. Disclosure of Information to Patients,
19  colon, Better At the Federal Level.
20      Q. Do you recognize this title?
21      A. I think that was the title of her
22  first paper.
23      Q. About when in the semester did you ask
24  the students to write this paper, what month,

32

1  what day maybe?
2      A. The requirement is in the syllabus
3  which they get before the class begins. And the
4  due date and description is in the syllabus, so
5  they have that before the class starts.
6      Q. But you were teaching that class?
7      A. Yes.
8      Q. And would you know about what period
9  they were supposed to turn this paper in?
10      A. The first paper is usually due about
11  halfway through the course. I'd have to look at
12  the syllabus to get the exact date. It
13  sometimes depends on holidays and topics, what
14  that specific class is.

15     Q.  I understand.  I'm not trying to pin
16  you down on a date.  I'm just interested --
17     A.  You could look it up.
18     Q.  I just thought where you taught this
19  course for so many years you would know more or
20  less was it in the month of March, was it --
21        MR. ELSWIT:  The witness has already
22  testified that more or less it was the middle of
23  the class, middle of the semester.
24     Q.  When does the class begin?

33

1     A.  In January.
2     Q.  Is it towards the beginning of
3  January, end of January?
4     A.  Depending on the school class
5  schedule, I do whatever they schedule me to do.
6     Q.  Would it be fair to say that you have
7  a term paper in the middle of the course and one
8  at the end of the course because you would like
9  to gauge the students to see how they would do
10  in the middle of the course?
11     A.  I give them two papers on different
12  topics to assess their comprehension of
13  different concepts covered in the course.
14     Q.  What's the purpose of leaving that
15  gap, giving them that gap to finish one paper?
16  What's the purpose of that?
17     A.  So that we could cover the material
18  that they need to know to write the second
19  paper.
20     Q.  In your current class, have the
21  students already turned in their first paper?
22     A.  Yes.
23     Q.  And have they been graded?
24     A.  Yes.

34

1     Q.  Do you know about when they were
2  graded?
3     A.  In the middle of the class.  Well, a
4  week or two after the middle of the class.
5     Q.  Do you recall how Ms. Kiani did on her
6  first paper?
7     A.  Yes.
8     Q.  How did she do?

9     A.  Not very well.

10     Q.  What do you mean by that?

11     A.  I gave her a C minus.

12     Q.  How did you determine that based upon

13  what standard you used to grade her?

14     A.  The same as I base it on all my

15  students:  The quality of the legal analysis and

16  responsiveness to the assignment.

17     Q.  Is it ever based on performance in

18  class?

19     A.  No.  That's separate.

20     Q.  So performance in class has no bearing

21  on the student's grade?

22     A.  Not on the grade for the paper.

23     Q.  For which paper, the first paper or

24  the second paper?

35

1     A.  Either.

2     Q.  If a student does very well on both

3  the first and second paper, would the student

4  receive a very good grade?

5     A.  Probably.

6     Q.  If the student received an A on both

7  papers, would he or she receive an A on his or

8  her final grade?

9     A.  Probably.

10     Q.  So would it be fair to say that that

11  performance in class does not have a bearing?

12     A.  It can improve your grade.

13     Q.  But if you do poorly on the papers and

14  you do well in class, your grade will still be

15  low because you did poorly on your paper?

16     A.  It might be better than if you just

17  had the papers.

18     Q.  Do you recall whether she had to cite

19  some authorities that she used on her first

20  paper?

21     A.  I require students to cite anything

22  they use as authority.  That's standard legal

23  writing.

24     Q.  Looking at the second page of

36

1  Exhibit 1, do you recall any of these

2  authorities and whether they were cited?

3     A.  Specifically?  Not without looking at
4  the paper again.
5     Q.  I'm just asking you whether that's
6  part of the requirement, that the students have
7  to cite authorities?
8        MR. ELSWIT:  Asked and answered.
9     Q.  On her first paper, did Ms. Kiani cite
10  any authorities -- actually, did she cite any
11  document, any publication that was published by
12  you, any article that was published by you?
13     A.  I don't remember.
14     Q.  Did she do that on her second paper?
15     A.  Yes, she did.
16     Q.  On her first paper, did you see any
17  lack of citation or improper citation?
18     A.  Yes.
19     Q.  Can you elaborate, please?
20      (Pause)
21     Q.  Again, I'm not looking for specifics.
22     A.  Later I recognized that there were
23  parts of the paper that were taken from other
24  published articles without attribution.

37

1     Q.  What do you mean by later?
2     A.  I didn't recognize it when I first
3  graded the paper.
4     Q.  When you say lack of attribution, what
5  do you mean by that?
6     A.  There were lines and paragraphs copied
7  from other articles.
8     Q.  Were they referred to, or were they
9  simply just copied without any reference?
10     A.  They were copied without any
11  indication that they were quotations from the
12  article.
13     Q.  Did she use any reference such as,
14  According to, Based on?
15     A.  She may have.
16     Q.  But that wasn't acceptable to you?
17     A.  I don't think it's acceptable to
18  anyone.
19     Q.  So she did use the terms According to
20  and Based on?
21     A.  I'd have to --
22        MR. ELSWIT:  Objection.  That's not

23  what the witness said.  The witness said she may
24  have.

38

1          MR. TARIRI:  I'm asking her the same
2  question.
3          MR. ELSWIT:  Well, then, you've asked
4  her the question already.  If you have the
5  paper, why don't you show it to her.
6          MR. TARIRI:  No.  There's no need for
7  that.
8          MR. ELSWIT:  Then the answer stands.
9  BY MR. TARIRI:
10     Q.  You testified that later you found out
11  that there was improper citation and lack of
12  attribution; is that correct?
13     A.  I looked at the paper again.
14     Q.  When did you do that?
15     A.  After I looked at her second paper.
16     Q.  About when was that?
17     A.  After the end of the course when the
18  papers were submitted, when the last papers were
19  submitted.
20     Q.  This is before the grades were due?
21     A.  Yes.
22     Q.  Had you talked to anyone else about
23  this, about the lack of proper citation at that
24  point?

39

1     A.  When I was grading the paper, no.
2     Q.  When you were grading the second
3  paper?
4     A.  When I was grading the second paper,
5  no.  I was just grading the second paper.
6     Q.  Were you told by anyone else to do
7  anything, to look at the first paper again?
8     A.  Not then.  At first I graded that
9  second paper and discovered problems.
10     Q.  So if you would, please, if you could
11  just take us back to the process of grading your
12  second paper.
13     A.  Mm-hmm.
14     Q.  How do you do it?  How did you do it?
15     A.  The same way I graded the first paper.
16     Q.  Which is how?

17      A.  As I said, I believe on the basis of
18  the quality of the legal analysis and the
19  responsiveness of the assignment.
20      Q.  Do you cross-check to see if citations
21  are correct as you read the paper?
22      A.  If citations are correct?
23      Q.  Right.
24      A.  What do you mean by cross-check?

40

1      Q.  Do you actually check the authority to
2  see if the citation is the exact quotation from
3  that authority and whether it was placed in
4  block or quotation marks?
5      A.  Sometimes.
6      Q.  When do you do that?
7      A.  When it appears to be not someone's
8  original writing.
9      Q.  How do you determine that?
10      A.  When you've read as many papers as I
11  have, you can get a sense.
12      Q.  Was Ms. Kiani a good writer?
13      A.  Well, it's hard to say since much of
14  the paper does not appear to be her writing.
15      Q.  When you were grading her second
16  paper, were you looking for citations?
17      A.  No, not particularly.  That was not
18  the first focus of grading.
19      Q.  No.  But as part of your grading, you
20  would look to see if the citations are proper.
21  Would that be a fair statement?
22      A.  What do you mean by proper?
23      Q.  Proper that it was attributed to the
24  correct authority and it was done correctly

41

1  procedurally, technically?
2      A.  Yes.  I look to see if there is a
3  reference for any statement of authority.
4      Q.  Would you recognize works of others if
5  they looked familiar to you?
6      A.  Sometimes.
7      Q.  If you could look back to the first
8  page of Exhibit 1.
9      A.  Yes.
10      Q.  The sixth line from the bottom?

11      A. From the bottom?
12      Q. Yes.
13      A. Yes.
14      Q. Actually, I'm sorry, the fifth line
15   from the bottom.
16      A. Yes.
17      Q. Can you read that line, please, the
18   fifth line from the bottom?
19      A. Wendy Mariner, Independent External
20   Review of Health Maintenance Organizations'
21   Medical Necessity Decisions.  That's more than
22   one line.
23      Q. Is that an article that you wrote?
24      A. Yes.

42

1      Q. And you wrote that in the New England
2   Journal of Medicine?
3      A. Yes.  It was published in the New
4   England Journal of Medicine.
5      Q. And it was published in the year 2002?
6      A. I believe so.  I would want to check
7   it to make certain.  It sounds right.
8      Q. Do you recognize this article as you
9   see it?
10      A. Yes.  I should recognize the article
11   if I see it.
12      Q. Do you recognize your own writing?
13      A. Usually.
14      Q. This was one of the improper citations
15   that the charges were brought for; am I correct?
16      A. It appears to be one of many.
17      Q. Exactly.  Would it be fair to say that
18   you saw your own work not being cited correctly?
19      A. I saw my own work as part of the text
20   of the paper.  I recognized that.
21      Q. What did you do when you recognized
22   that?
23      A. I looked carefully at the rest of the
24   text in the paper.

43

1      Q. And what did you find?
2      A. I found unfortunately that a great
3   deal of the text in the paper was from other
4   articles.

5    Q.  And did you form an opinion at this
6  point?
7    A.  About what?
8    Q.  About the paper and the author of the
9  paper.
10    A.  I thought the paper was not original.
11    Q.  Did you think that the paper was
12  plagiarized?
13    A.  Yes.
14    Q.  So you believed that the paper was a
15  plagiarized document?
16    A.  I believed that there were lots of
17  instances of plagiarizing other work.
18    Q.  So you believed that it was plagiarism
19  that had occurred?
20      MR. ELSWIT:  Asked and answered.
21    Q.  Did you believe that Ms. Kiani had
22  plagiarized?
23      MR. ELSWIT:  Asked and answered.
24      MR. TARIRI:  I haven't asked that

                                    44
1  question.
2      MR. ELSWIT:  You have.  But you can
3  answer again.
4    A.  Well, she submitted the paper.  It was
5  her paper apparently, so it would have been her
6  doing.
7    Q.  Her doing of what?
8    A.  What I just explained.
9    Q.  Could you just repeat it again because
10  I'm not clear?
11      MR. ELSWIT:  Ben, the witness has
12  already said that the paper was not original and
13  was plagiarized.  I'm not sure what more you
14  want to get out of this.
15    Q.  What did you do when you found out
16  that the paper was plagiarized?
17    A.  When I read the paper, I called the
18  law school to see what process there might be,
19  what should be done about something like this.
20    Q.  Who did you talk to?
21    A.  I don't remember who I spoke to, but
22  it was in the Dean's Office.
23    Q.  Did you call that same day?
24    A.  Probably, I'm not sure.

45

1    Q.  Same day, next day?
2    A.  Soon.
3    Q.  But it was within a reasonable time?
4    A.  Yes, as soon as I finished reviewing
5  the paper.
6    Q.  This was before submitting the grades,
7  before the grades were due?
8    A.  Yes.
9    Q.  When you said you believed the paper
10  was plagiarized, was it based on improper
11  citations concerning the article that you wrote
12  or other articles?
13    A.  Both.
14    Q.  Which one became salient first?
15    A.  Which one what?
16       MR. ELSWIT:  Do mean what
17  Professor Mariner recognized first?
18       MR. TARIRI:  First.
19       MR. ELSWIT:  In other words, when
20  Professor Mariner read the paper, what did she
21  recognize first, her own work or the work of
22  others?
23       MR. TARIRI:  Exactly.
24    Q.  What prompted you to suspect

46

1  plagiarism?
2    A.  Well, the writing style changed from
3  paragraph to paragraph, and then I recognized my
4  own writing in the text of the paper, and then I
5  looked at others.
6    Q.  So you recognized your work first?
7    A.  Before some of the others.
8    Q.  What happened next after you called
9  the Dean's Office?
10    A.  They said I should talk to the dean,
11  who was out of town.
12    Q.  So what did you do?
13    A.  At the office's suggestion I e-mailed
14  the dean and said I have a concern, what should
15  we do.
16    Q.  Then what did you do?
17    A.  I think the dean suggested or said
18  there is a process for academic evaluation, and

19  I should deliver the papers to the responsible
20  assistant deans.  I'm sorry, I don't know the
21  correct term or title.
22      Q.  Assistant dean or associate dean?
23      A.  Yes, whoever is responsible for this
24  sort of thing.

47

1      Q.  What did you do then?  Did you talk to
2  anybody else?
3      A.  I believe it was Ryckman that I was
4  supposed to deliver it to, so I delivered the
5  paper to Professor Ryckman.
6      Q.  Did you do that physically?
7      A.  Yes.
8      Q.  Did you talk to Professor Ryckman?
9      A.  Yes.
10     Q.  Who else did you talk to?
11     A.  That's all.  That's all I remember.
12     Q.  Did you talk to other professors?
13         MR. ELSWIT:  When?
14     Q.  Concerning this particular period that
15  you e-mailed Dean Cass, then you were told to
16  talk to one of the associate deans, and then you
17  took the paper to Professor Ryckman?
18     A.  Yes.
19     Q.  During this period, did you talk to
20  any other professors?
21     A.  No.
22     Q.  Did you talk to Assistant Dean Chris
23  Marx?
24     A.  No.

48

1      Q.  Do you know Assistant Dean Chris Marx?
2      A.  Yes.
3      Q.  How do you know her?
4      A.  She's an assistant dean, and she is
5  responsible for dual degree programs, and I'm a
6  coordinator for the J.D./MPH dual degree
7  program, so we communicate on requirements for
8  the dual degree.
9      Q.  How long have you known her?
10     A.  I don't know.  Quite a few years,
11  several years.
12     Q.  Are you close with her?

13      A.  No.
14      Q.  Do you socialize with her?
15      A.  No.
16      Q.  Do you go to meetings with her in the
17  school?
18      A.  Yes.  The dual degree program has a
19  meeting every fall, which she and I both attend.
20      Q.  Who else is involved in the dual
21  degree program from the school?
22      A.  As far as I know, she's the only one
23  responsible directly at the School of Law.
24      Q.  So what happened when you took the

                                    49
1  papers -- both papers, right?
2      A.  No.
3      Q.  Just the second paper?
4      A.  Yes.
5      Q.  The second paper.  What happened when
6  you took the second paper to Professor Ryckman?
7  What did you do with the first paper?
8      A.  Professor Ryckman suggested that I
9  should look at that again, and I did.
10      Q.  What did you do once you looked at the
11  first paper?
12      A.  I found the same kind of copying of
13  text and language from other articles.
14      Q.  Were you surprised that you found what
15  you just referred to as lack of attribution
16  these papers?
17      A.  I'm not following what you mean.
18      Q.  Were you surprised by what you saw in
19  these papers?  Were you surprised?
20      A.  I'm always surprised and disappointed
21  if someone -- yes.
22      Q.  Were you disappointed as well?
23      A.  I'm always disappointed if my students
24  don't do well.

                                    50
1      Q.  Did you call Ms. Kiani to tell her
2  that?
3      A.  No.
4      Q.  Why not?
5      A.  Professor Ryckman said that there is a
6  process to handle it, and I should let that

7    process go forward without doing anything
8    further myself.
9        Q.  Did you understand what that process
10   was going to be?
11       A.  I wasn't sure.  He described it
12   generally.  It was new to me.
13       Q.  So I take it you haven't been involved
14   in other cases involving students and
15   plagiarism?
16       A.  At the law school?
17       Q.  At the law school.
18       A.  No.
19       Q.  Did you know that the end result may
20   be that she would get expelled?
21       A.  No.
22       Q.  Did you think that?  Did you think
23   that she might get expelled?
24       A.  No.  I didn't know what -- there could

51

1    be any number of possibilities, I presume, in an
2    academic process.
3        Q.  Did you know that you still had the
4    right and the ability to contact Ms. Kiani to
5    just find out?
6            MR. ELSWIT:  Objection.  Go ahead.
7    You can answer.
8        A.  It just didn't seem -- why would I
9    contact her at that point?
10       Q.  To find out -- this was your student.
11   To find out what happened.  You already had the
12   papers, so she wasn't going to change anything.
13   Just to find out?
14           MR. ELSWIT:  There's no question.  You
15   don't have to respond.
16       Q.  Did you ever contact her?
17       A.  After the class was over?
18       Q.  Even before the class.  Did you ever
19   contact her individually as a student?  Not as a
20   group.  But as an individual student, did you
21   ever contact her?
22       A.  I may have responded to some e-mails.
23   I e-mail back and forth with students.
24       Q.  But did you on your own volition, did

52

1  you ever contact her to talk to her?
2      A.  No.  I prefer to --
3          MR. ELSWIT:  Your answer is no.
4      Q.  Did you ever ask her how she was doing
5  in class?
6      A.  I ask everybody in the beginning of
7  class how they're doing.
8      Q.  I mean specifically did you ask her
9  how she was doing?
10      A.  I may have.  I often ask students, How
11  are you doing, is everything okay.
12      Q.  Were you ever curious how she was
13  doing considering her disability?
14      A.  I don't presume.
15      Q.  I'm not asking you to presume.  I'm
16  just asking you if you -- you were her
17  professor.  You weren't somebody off the street.
18  Did you ever ask her or did you ever wonder how
19  she was managing?
20      A.  No more than any student.  Every
21  student...
22      Q.  What did you do after you looked at
23  the first paper?
24      A.  I'm sorry.  I don't understand.

                           53
1      Q.  What did you do once you looked at
2  the first paper which you testified
3  Professor Ryckman suggested for you to look at?
4  What did you do once you found what you
5  considered improper citation?
6      A.  I didn't say I considered it improper
7  citation.
8      Q.  I'm sorry.  What did you say?
9      A.  I don't know.  That's what you said.
10      Q.  I'm asking you questions, so you
11  should tell me what you thought.
12      A.  You're asking me what I did --
13      Q.  What did you do once you examined the
14  first paper?
15      A.  The second time after the end of the
16  course?
17      Q.  Subsequent.
18      A.  I examined the paper and found new
19  problems and advised Ryckman and sent that paper
20  over as well.

21     Q.  And this is still before the grades
22  were due?
23     A.  I believe so.
24     Q.  So at this point both papers were with

54

1  Professor Ryckman?  This was before the grades
2  were due?
3     A.  I can't be certain about the dates,
4  but I believe so.
5     Q.  Then what did you do?
6     A.  I waited.
7     Q.  Did you grade it?
8     A.  I beg your pardon?
9     Q.  Did you grade her?
10    A.  Yes.
11    Q.  And what was that grade?
12    A.  I initially submitted a D.
13    Q.  I'm asking you what was the grade that
14  you graded her as in the spring of 2003?
15    A.  D.
16    Q.  At this point you knew that she had
17  plagiarized?
18    A.  I believed she had plagiarized.
19    Q.  Did you talk to anyone else after you
20  graded her paper?
21    A.  Did I talk to anyone else?
22       MR. TARIRI:  Could you strike that,
23  please.
24    Q.  Did you talk to anyone else regarding

55

1  this matter after you graded the paper, graded
2  her paper in the spring of 2003?
3     A.  Probably, yes.
4     Q.  Who did you talk to?
5     A.  I think I spoke to Professor Ryckman
6  who told me that there was a proceeding, in
7  fact, going on, and I might hear more in the
8  future.  And at some point someone in a
9  committee -- I apologize, I don't recall the
10  proper name of the committee -- called to say
11  there would be a hearing.
12    Q.  Do you know what prompted that, what
13  you called the proceeding?
14    A.  The submission of the papers, I'm

15  told.
16      Q.  To you?  Submission of the papers to
17  you?
18      A.  I guess...
19      Q.  I'm asking you do you know what
20  initiated the proceedings?
21      A.  I think Professor Ryckman said they
22  would look at what I had submitted to them and
23  decide whether it would be appropriate to pursue
24  it with some committee evaluation, and they did

56

1  that.
2      Q.  So the proceedings began, were
3  actually convened due to your notification?
4      MR. ELSWIT:  No.  I object.  The
5  witness has testified about what she did, what
6  she heard and what she knows.  You can't --
7  well, you can infer whatever you want.  But you
8  can't ask her to testify about what other people
9  did unless she has specific knowledge that the
10  committee was convened because of something that
11  Professor Mariner did.
12      Q.  I'm asking you whether you knew why
13  the committee was convened?  What prompted it?
14      A.  I know they said they were going to
15  decide whether or not to have the committee, and
16  you can draw your own conclusions about why.
17      Q.  Would it be fair to say that it was
18  because of your papers?
19      MR. ELSWIT:  Objection.
20      A.  I don't know.
21      Q.  You never asked?
22      A.  No.
23      Q.  Were you curious as to what they were
24  planning on doing with her, with Ms. Kiani?

57

1      A.  Not curious.
2      Q.  Did you want to know?
3      A.  I would assume that they were going to
4  tell me as soon as anything relevant to me
5  happened.
6      Q.  Did you ever talk to Professor Kull
7  about this matter?
8      A.  What matter?

9     Q.  The papers, the so-called, quote,
10  plagiarism.
11         MR. ELSWIT:  Objection.
12     A.  I think so, yes.
13     Q.  When did you talk to him?
14     A.  I don't remember.  Much later.
15     Q.  Much later than what, and when?
16     A.  Much later than the spring, maybe in
17  the summer.  To be honest with you, I don't
18  remember.
19     Q.  What did you talk about?
20     A.  He said he had a similar experience.
21     Q.  Did you ask him what that experience
22  was?
23     A.  He told me he had a paper that he was
24  concerned about, yes, and I wondered if there

58

1  was any procedure.  But then we knew.
2     Q.  Did he tell you what he did once he
3  had what you called a similar experience?
4     A.  He may have.  He may have reported it
5  also.
6     Q.  Did he tell you whether a panel was
7  convened?
8     A.  I don't really remember.
9     Q.  Did he tell you what the outcome of
10  that reporting was?
11     A.  I don't remember.
12     Q.  Who else did you talk to about this
13  matter between the time that you gave the grade
14  and September 12, 2003?
15     A.  I think the chair of the committee
16  called me to say that I might be called to the
17  hearing and to save the date on my calendar,
18  which I did.
19     Q.  And were you, in fact, called?
20     A.  No.
21     Q.  Were you told why you weren't called?
22     A.  No.
23     Q.  You were happy that you weren't
24  called.

59

1         MR. ELSWIT:  Objection.
2     Q.  Who else did you talk with?

3      A.  Mr. Elswit.

4      Q.  Who else?

5      A.  That's all, as far as I know.

6      Q.  So just to recount, you spoke to the

7   chair of the committee, you spoke to

8   Professor Ryckman?

9      A.  Yes.

10     Q.  And you spoke to Assistant Dean Marx?

11     A.  No.

12     Q.  You never talked to Assistant Dean

13  Marx about this?

14     A.  No.

15     Q.  You spoke to Professor Kull?

16     A.  Briefly.

17     Q.  Professor Mariner, when you were

18  giving the grade, on what basis did you give

19  Ms. Kiani a grade of D?

20     A.  I guess I was being generous.

21     Q.  I'm asking you on what academic basis

22  did you -- was the paper that good to receive a

23  D?

24     A.  No.  I credited her with class

60

1   participation, and I wanted to wait to see if

2   there were going to be committee process, if

3   that would confirm my concerns about plagiarism

4   apart from problems with originality; and if so,

5   I would have an opportunity to change the grade

6   then.

7      Q.  Why did you need confirmation

8   regarding your own work?  You already knew that

9   your own work was improperly cited.

10     A.  I guess I just wanted to be as

11  generous as I could with her.

12     Q.  Professor Mariner, did you talk to

13  anyone regarding -- in your tenureship at BU,

14  have you ever talked to anyone at the school

15  regarding handicapped students?

16        MR. ELSWIT:  Objection.  Would you

17  clarify the question, please?

18     Q.  Have you ever talked to anyone

19  regarding accommodations for handicapped

20  students?

21     A.  At the law school?

22     Q.  At the school, not just the law

23  school.
24      A.  Not often.  But I sometimes receive

61

1  information from the disabilities office at the
2  University for accommodation for students in
3  other classes, yes.
4      Q.  What sort of accommodations?  What
5  sort of requests for accommodations do you
6  receive?
7      A.  I've received requests for extra time
8  to take an examination, to take an examination
9  in a private room, to take an examination on
10  computer instead of handwriting.
11      Q.  Did you ever receive a request for a
12  stenographer?
13      A.  I don't recall one.  Actually, that
14  would not come to me.
15      Q.  Did you ever see a stenographer in
16  your class?
17      A.  I think I have seen a stenographer for
18  a blind student.
19      Q.  Any other stenographers?
20      A.  It's possible.  I sometimes teach
21  large lecture courses where it's difficult to
22  see.
23      Q.  Did you ever have any students in your
24  class, not just in the law school, who you

62

1  believe needed accommodations?
2      A.  I'm not sure I could judge that.
3      Q.  Regardless of whether they received it
4  or not, but did you have a student in your class
5  whose hands had dexterity issues who couldn't
6  write?
7      A.  I don't know about students with
8  hands.  There are certainly students at the
9  School of Public Health in wheelchairs.
10      Q.  But do you have any students whose
11  hands were not -- who weren't able to use their
12  hands?
13      A.  I don't know of any.  It's possible
14  that they were in my lecture classes and I
15  wasn't aware of it because they already had
16  someone with them.

17      Q.  Is it generally the school's policy to
18  inform you if someone is coming to your class
19  other than the student?
20      A.  No, not in a big lecture class.  Not
21  necessarily.  I'm informed of things I need to
22  do.
23      Q.  Are you not supposed to be aware of
24  who is in a class?

                              63
1      A.  When there are 100 students in the
2  class, no, not every day.
3      Q.  When did you come in contact with this
4  issue again after the spring of 2003?
5      MR. ELSWIT:  What issue?
6      MR. TARIRI:  The issue of the two
7  papers.
8      MR. ELSWIT:  Could you rephrase that
9  question, please?
10      Q.  When did you become involved again in
11  the issue of the papers in any manner after the
12  spring of 2003?
13      A.  I really wasn't involved.  I was
14  notified that there would, in fact, be a
15  hearing.
16      Q.  Well, the hearing was convened, and
17  there was a decision?
18      A.  Yes.
19      Q.  Did they notify you about the
20  decision?
21      A.  I didn't get notification of the
22  decision until very late.
23      Q.  When did you receive notification?
24      A.  I don't recall, but it was probably in

                              64
1  December.
2      Q.  Was it December of 2003?
3      A.  Probably.  It was the same year, I
4  think.
5      Q.  How were you notified?
6      A.  I think I got a letter.
7      (Pause)
8      A.  I don't remember.
9      Q.  But you were notified?
10      A.  Oh, yes.  I think I was notified

11  because the -- I'm not certain of this.  The
12  only thing that would have prompted me to
13  recognize it would be there was a request for an
14  opportunity to change grades.
15      Q.  Which office did that come from?
16      A.  Probably the Registrar's.
17      Q.  Would it be an e-mail?
18      A.  I don't remember.
19      Q.  How was it delivered?
20      A.  Probably in a form letter.  I
21  sometimes get mail late from the School of Law
22  because it comes to the School of Public Health
23  and is collected, and so sometimes it comes to
24  me a little late, very late.

65

1      Q.  Do you have that letter?
2      A.  I don't know.
3          MR. ELSWIT:  Mr. Tariri, the letter
4  was produced during discovery.  You have a copy
5  of that letter.
6          MR. TARIRI:  I'm asking her if she has
7  that letter.
8          THE WITNESS:  I gave everything to
9  you.
10         MR. ELSWIT:  We'll stipulate that the
11  letter was produced.
12  BY MR. TARIRI:
13      Q.  What did you do when you received that
14  notification?
15      A.  I decided to change the grade.
16      Q.  You decided to change the grade?
17      A.  Yes.
18      Q.  Why did you decide that?
19      A.  Because I couldn't justify a higher
20  grade anymore.
21      Q.  And you changed the grade to what?
22      A.  F.
23      Q.  At that time, were you aware that by
24  changing the grade, this would have

66

1  ramifications, negative ramifications for
2  Ms. Kiani?
3      A.  I assume all Fs have negative
4  ramifications.

5    Q.  Granted.
6        And what did you think the
7    ramifications were?
8    A.  Specifically, I didn't know.
9    Q.  Did you know that the grade of F would
10   contribute to her GPA being dropped below a 2.0?
11   A.  No.
12   Q.  Did you know that as a consequence,
13   she would be dropped from school?
14   A.  As a consequence of what?
15   Q.  As a consequence of her grade, her GPA
16   being dropped below 2.0, she would be dropped
17   from the school for academic deficiency?
18   A.  No.
19   Q.  Are you familiar with the term
20   academic deficiency?
21   A.  No.
22   Q.  Are you familiar with the academic
23   requirements of the school for a student to be
24   in good standing?

67

1    A.  I know that schools generally have
2    minimum grade point averages, but I didn't know
3    the law schools did.
4    Q.  So you did not know that 2.0 was the
5    absolute minimum to stay in law school?
6    A.  No.  I would think it would be higher.
7    Q.  When did you find out?
8    A.  After all of this.
9    Q.  When did you find out?
10   A.  I think when there was a claim by
11   Ms. Kiani having left the school and having
12   been -- I don't know what the proper term is.
13   Q.  Having been ejected from the school?
14   MR. ELSWIT:  Objection to the use of
15   the word ejected.  I think Professor Mariner has
16   made it pretty clear that she did not know what
17   the minimum GPA was that was required for a
18   student to stay in school.
19   Q.  Professor Mariner, how do you define
20   plagiarism in your own mind?
21   A.  Is this a theory class?
22   Q.  This is not a quiz.
23   A.  I could think about it.  But in
24   general, using someone else's work without

68

1  acknowledgment.
2      Q.  Does it require the person to intend
3  to conceal?
4      A.  Intent?  I don't really think about
5  intent.
6      Q.  It intent required?
7      A.  I don't think about intent.
8      Q.  So if you use someone else's work
9  without proper citation, that would be
10  plagiarism?
11      A.  It could be.
12      Q.  And that's your definition?
13      A.  I think I have tried to explain what I
14  would characterize as plagiarism.
15      Q.  Do you believe that Ms. Kiani intended
16  to plagiarize?
17          MR. ELSWIT:  Objection.
18  Professor Mariner has already testified that in
19  her view, the plaintiff plagiarized.  And from
20  that point on, the definition of plagiarism is
21  dependent not on Professor Mariner's views but
22  on the law school's views.  And her perception
23  of plaintiff's intent has no bearing on this
24  case.

69

1          MR. TARIRI:  I'm not asking her to
2  define plagiarism anymore.  I'm just asking for
3  her view of her student to let -- I'm just
4  asking her whether she had an opinion about her
5  student who was in her class for more than three
6  months.
7      A.  I have no way of knowing what
8  Ms. Kiani did or didn't intend.  All I know is
9  what she submitted on her paper to me.
10          MR. TARIRI:  I have no further
11  questions.  Thank you so much.
12          MR. ELSWIT:  No questions.  Thank you.
13      (The deposition was concluded at 12:10 p.m.)
14
15
16
17
18

19
20
21
22
23
24

70

1   IN RE: Kiani v. Trustees of Boston University
2   TAKEN: Tuesday, April 26, 2005
3
4          C E R T I F I C A T E
5      I, WENDY K. MARINER, do hereby certify
   that I have read the foregoing transcript of my
6   testimony, and further certify that it is a true
   and accurate record of my testimony (with the
7   exception of the corrections listed below):
   Page   Line              Correction
8
_____ _____ _____
9
_____ _____ _____
10
_____ _____ _____
11
_____ _____ _____
12
_____ _____ _____
13
_____ _____ _____
14
_____ _____ _____
15
_____ _____ _____
16
_____ _____ _____
17
_____ _____ _____
18
_____ _____ _____
19
_____ _____ _____
20
_____ _____ _____
21
         _____

22
            WENDY K. MARINER
23
24

                                    71
1              CERTIFICATE
2   Commonwealth of Massachusetts
3   Suffolk, ss.
4     I, Toni F. Beckwith, Registered Merit
5   Reporter and Notary Public in and for the
6   Commonwealth of Massachusetts, do hereby certify
7   that WENDY K. MARINER, the witness whose
8   deposition is hereinbefore set forth, was duly
9   sworn by me and that such deposition is a true
10  record of the testimony given by the witness.
11    I further certify that I am neither related
12  to or employed by any of the parties in or
13  counsel to this action, nor am I financially
14  interested in the outcome of this action.
15    In witness whereof, I have hereunto set my
16  hand and seal this 2nd day of May 2005.
17            _____
18                  Notary Public
19                  CSR No. 111293
20  My commission expires:
21  February 11, 2011
22
23
24