**Plaintiff's Exhibit "F"**

1

```
                                    Volume:   1
                                    Pages:    1-95
                                    Exhibits: 1-26


              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS


                    C.A. NO. 04-CV-11838-PBS



*******************************************x
LAYLA KIANI
          Plaintiff

             vs.

TRUSTEES OF BOSTON UNIVERSITY
                    Defendant
*******************************************x
```

DEPOSITION OF LAYLA KIANI, a witness

called on behalf of the Defendant, pursuant to the

applicable provisions of the Massachusetts Rules of

Civil Procedure, before Camille Macomber, Registered

Professional Reporter and Notary Public within and

for the Commonwealth of Massachusetts, at Boston

University, 765 Commonwealth Avenue, Boston,

Massachusetts, on Thursday, April 21, 2005,

commencing at 10:00 a.m.

```
              SHEA COURT REPORTING SERVICES
            ONE UNION STREET, SECOND FLOOR
              BOSTON, MASSACHUSETTS 02108
                    (617)227-3097
```

                                                    2


APPEARANCES:


        By Benjamin B. Tariri, Esquire
        343 Washington Street
        Newton, Massachusetts 02458
                On behalf of the Plaintiff




        BOSTON UNIVERSITY
        Office of the General Counsel
        By Lawrence S. Elswit, Esquire
        125 Bay State Road
        Boston, Massachusetts 02215
                On behalf of the Defendant

3

### I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

Layla Kiani
  By Mr. Elswit.....5.................92
  By Mr. Tariri............90

### E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Complaint and Demand for Jury Trial...........12 | |
| 2 | Response to Defendant's First Set of Interrogatories Directed to Plaintiff.........12 | |
| 3 | Letter from Dr. Herring of Texas Scottish Rite Hospital, dated 6/6/00...................14 | |
| 4 | Letter to Mr. Macurdy from Layla Jamshid.......16 | |
| 5 | Letter to Dean Cass from Allan Macurdy, dated 7/28/00.................................16 | |
| 6 | Letter to Layla Jamshid from Aida Ten, dated 10/6/00.................................17 | |
| 7 | E-Mail to Layla Kiani from Chris Marx.........25 | |
| 8 | E-Mail exchanges between Ms. Mark, Allan Macurdy, Mr. Berkowitz.......................30 | |
| 9 | Letter to The Academic Standards Committee from Layla Kiani, dated 2/25/05...............47 | |
| 10 | Letter to the Academic Standards Committee from Layla Kiani, dated 2/25/05...............47 | |
| 11 | Letter to Layla Kiani from Christine Marx dated 4/1/03.................................49 | |
| 12 | E-Mail to Layla Kiani from Chris Marx, dated 5/15/03.................................50 | |

- Exhibits Continued -

4

### E X H I B I T S

NO.   DESCRIPTION                                    PAGE

13    Letter to Layla Kiani from Ronald Cass,
      dated 5/12/03...................................57

14    E-Mail to Dean Cass from Layla Kiani,
      dated 5/16/03...................................59

15    Letter to Dean Cass from Layla Kiani,
      dated 5/16/03...................................59

16    Letter to Professor Mariner from Layla
      Kiani, dated 5/22/03...........................62

17    Letter to Layla Kiani from Ronald Cass,
      dated 7/17/03..................................62

18    Charges in the Disciplinary Matter of
      Layla Kiani....................................64

19    Partial Transcript of Hearing of the School
      of Law Judicial Committee......................78

20    Letter to Ms. Kiani from Mr. Cass, dated
      11/12/03.......................................82

21    Letter to Layla Kiani from Mary Jo Sullivan,
      dated 12/18/03.................................83

22    Layla Kiani's final transcript, with attached
      Suffolk Course.................................83

23    Letter to the Faculty from Layla Kiani.........84

24    Letter to Layla Kiani from Christine Marx,
      dated 1/14/04..................................85

25    Letter to Layla Kiani from Christine Marx,
      dated 2/5/04...................................85

26    Letter to Mr. Rosenfeld from Mr. Cass,
      dated 3/1/04...................................86

                (Exhibits Retained by Attorney Elswit)

                                                        5


1                      LAYLA KIANI,

2                      whose identify was attested to by

3              Attorney Elswit and Attorney Tariri, was duly

```
 4          sworn by the Notary Public, was examined and

 5          testified as follows:

 6

 7                    DIRECT EXAMINATION

 8   BY MR. ELSWIT:

 9     Q    Ms. Kiani, I'm Larry Elswit.

10     A    Hi.

11     Q    How do you do.

12              MR. ELSWIT:  I want to propose a few

13          stipulations before we begin, Ben.  I would

14          propose that we take this deposition in

15          accordance with the Massachusetts Rules of Civil

16          Procedure.  That we waive the filing.  I would

17          like the witness to sign the transcript, which

18          she need not sign it in front of a Notary.

19          Would reserve all motions to strike, and reserve

20          all evidentiary objections, except as to form

21          until trial, if it gets that far.  Are you okay

22          with those stipulations?

23              MR. TARIRI:  So stipulated.

24     Q    Ms. Kiani, this is the deposition in the lawsuit
```

                                                        6

```
 1          that you brought against Boston University and

 2          several faculty and administrators who have

 3          since been dismissed.  In the Massachusetts

 4          Rules of Civil Procedure, the protocol is as

 5          follows.  I have the right to ask you questions

 6          about any subject that relates to this case, as
```

```
 7          I see fit.  You are required to answer them,

 8          except insofar as your attorney may instruct you

 9          not to answer them because of a privilege or

10          some other matter.  Your attorney may object

11          from time to time because of procedural issues

12          or form issues or evidentiary issues, but you

13          still need to answer the questions unless he

14          tells you not to.  Do you understand those

15          rules?

16    A     I realize that, yes.

17    Q     Because this is a formal proceeding, everything

18          that is said here is going to be recorded, and

19          everything that is said here will end up in a

20          transcript that Mr. Tariri and I can use to

21          advocate for our respective clients in this

22          case.  Do you understand that?

23    A     Yes, I do.

24    Q     Because you're under oath, your sole obligation
```
                                                                7

```
 1          today is to tell the truth.

 2    A     Absolutely.

 3    Q     Can you understand me in this tone of voice?

 4    A     I can.

 5    Q     I tend to speak fast, please tell me to slow

 6          down, feel free to tell me if you don't

 7          understand a question, if it's inarticulate or

 8          run together or complex or any other problem
```

```
9              that you have with the way I ask questions,

10             because if you answer the question, the law

11             assumes that you understand the question.

12      A      I understand.

13      Q      If you need a break for any reason at any time,

14             you're free to take it.

15      A      Right.

16      Q      No explanations are necessary.  The only

17             exception is that if there is a question

18             pending, you need to answer the question before

19             you take your break.

20      A      I understand that.

21      Q      If you talk to your attorney at any time during

22             the course of this proceeding while you're under

23             oath, I have the right to ask you about those

24             communications, which I generally will not do,
```

                                                    8

```
1              but I'm just telling you that that's the law.

2                      Ms. Kiani, are you in relatively good

3              health at the moment?

4       A      No.

5       Q      Give me your health situation.

6       A      I have gotten worse since I filed this case.

7       Q      Perhaps we'll explore that, but I'm mostly

8              interested in your ability to understand my

9              questions.

10      A      Yes.

11      Q      You can hear me and you can understand me?
```

```
12    A    Yes.

13    Q    Your comprehension is in tact?

14    A    Yes.

15    Q    Have you ever been deposed before?

16    A    I have not.

17    Q    Have you ever given sworn testimony in any

18         proceeding?

19    A    I have not.

20    Q    Did you meet with your attorney in preparation

21         for this deposition?

22    A    I did.

23    Q    Was anyone else present?

24    A    My mother.
```

9

```
1    Q    Because your mother was present, and she is not

2         a party to this case, your communications with

3         your attorney are not privileged; however, I do

4         not intend to explore that area, but I just want

5         you to understand that the privilege is broken

6         when a non participant in this matter is a party

7         to communications between you and your attorney.

8              MR. TARIRI:  If I may object.  She was

9         present, but we spoke in English and she does

10        not speak English.

11             MR. ELSWIT:  That simplifies matters.

12   Q    When did you meet with your attorney?

13   A    The last time?
```

14     Q     In preparation for this deposition?

15     A     Last Thursday, I believe it was.

16     Q     Did you review documents?

17     A     Yes.

18     Q     Do you remember what documents you reviewed?

19             MR. TARIRI:  Can you ask that question

20     again?

21     Q     Do you remember what documents you reviewed?

22     A     You just said when the last time was that I met

23     with him.

24     Q     Yes.

                                                    10

1      A     The last time we did not review documents.

2      Q     Have you reviewed documents on your own or with

3      your attorney in preparation for this

4      deposition?

5      A     Yes.

6      Q     What did you review?

7      A     What is my review?

8      Q     What did you review?

9      A     Anything that we had from BU that was sent over,

10     anything that I had when the charges were filed,

11     and there was some of it that I had.  I had sent

12     him medical records on my own and stuff.  So

13     things like that.

14     Q     Ms. Kiani, where do you live right now?

15     A     Do you want the physical address?

16     Q     Please.

17    A    86 East Howard Street in Quincy.

18    Q    Do you have a home telephone number?

19    A    Yes, (781)929-9966.

20    Q    Do you live with your mother?

21    A    I do.

22    Q    Anybody else?

23    A    No.

24    Q    You graduated from the University of Texas at

                                                        11

1          Arlington in 2000; correct?

2     A    I did.

3     Q    You were at Boston University Law School from

4          the fall of 2000 until the spring of 2003;

5          correct?

6     A    Yes.

7     Q    Have you had any other education since the

8          spring of 2003?

9     A    I have not.

10    Q    Have you been employed since the spring of 2003?

11    A    I have not.

12    Q    In your response to Boston University's request

13         for documents, you submitted several letters

14         from law firms in response to in inquiry about

15         your efforts to find work.

16    A    Right.

17    Q    Do those letters reflect the cumulative effort

18         to seek work on your part?

```
19    A    Yes.

20    Q    I want to just take care of some preliminary

21         business with you quickly.  I'm going to ask

22         Ms. Macomber to mark the Complaint in this case

23         as Exhibit 1, and your response to Boston

24         University's First set of Answers to
```

                                                    12

```
 1         Interrogatories as Exhibit 2.

 2                    (The documents were marked as

 3                     Exhibit Nos. 1 and 2.)

 4    Q    Ms. Kiani, have you had an opportunity to look

 5         at Exhibit 1, the Complaint in this case?

 6    A    I have.

 7    Q    Did you read the Complaint before it was filed?

 8    A    Yes.

 9    Q    Do you agree with all of the assertions of fact

10         contained in the Complaint?

11    A    Yes.

12    Q    Ms. Kiani, turning to Exhibit 2, the very last

13         page, which is not numbered, but it's the last

14         page, is a signature above your name.  Is that

15         your signature?

16    A    Yes.

17    Q    Did you review the response to interrogatories

18         before they were submitted to Boston University?

19    A    Which one is that?

20    Q    The document in front of you, Exhibit 2.

21    A    Yes.
```

22    Q    Are you today willing to say that these

23         accurately reflect the events as you best

24         understood them at the time?

                                                        13


1     A    Yes.

2     Q    By the way, Ms. Kiani, at some point you changed

3          your name from Jamshid, I believe?

4     A    Yes.

5     Q    When did that take place?

6     A    Summer of 2001.

7     Q    After your first year of law school?

8     A    Yes.

9     Q    Why did you change your name?  Very briefly, I

10         don't want to get into anything personal here.

11    A    Familiar reasons.

12    Q    Ms. Kiani, do you know who Allan Macurdy is?

13    A    I do.

14    Q    Who is Allan Macurdy?

15    A    He works with the Office of Disability Services.

16    Q    At Boston University?

17    A    Yes.

18    Q    If I were to tell you that Mr. Macurdy is the

19         Director of Disability Services, would you have

20         any reason to disagree with me?

21    A    No.

22    Q    Do you know whether he is, in fact, the

23         director --

24    A    He is, I have looked at the website.

                                                            14


1     Q    Have you met with Mr. Macurdy?

2     A    I have.

3     Q    Did you talk with Mr. Macurdy about your need

4          for accommodations?

5     A    I did.

6     Q    When?

7     A    Well, after I had gotten accepted to BU, that's

8          usually the process of when you go and apply for

9          that.

10    Q    Did you talk with Mr. Macurdy in the summer of

11         2000?

12    A    That's correct.

13    Q    Did you tell Mr. Macurdy that you needed

14         accommodations?

15    A    Yes.

16    Q    Did you give Mr. Macurdy any documents to

17         support your request for accommodations?

18    A    I did.

19                    (The document was marked as Exhibit

20                    No. 3.)

21    Q    Ms. Kiani, can you identify the document that

22         has been marked as Exhibit 3?

23    A    Yes, it's a letter by my physician from Scottish

24         Rite Hospital saying that he has treated me

                                                            15

```
 1          since the age of 4 until 1996, and he talks

 2          about my symptoms of having Cerebral Palsy.  I

 3          guess that's it.

 4    Q     In the second paragraph, he writes, and I'm

 5          going to read this and just tell me if I read it

 6          correctly.  Quoting now, "Due to Layla's

 7          decreased hand function, she will require extra

 8          time for exams and will need to be allowed to

 9          tape lectures.  She also will need a table that

10          is wheelchair accessible."

11    A     That's correct.

12    Q     I read it correctly?

13    A     Yes.

14    Q     Did you present this letter to Mr. Macurdy --

15    A     I did.

16    Q     -- in the summer of 2002?

17    A     Of 2002?

18    Q     I beg your pardon, the summer of 2000.

19    A     Yes.

20    Q     Ms. Kiani, just to make it easier for

21          Ms. Macomber, please wait until I finish the

22          question even though you know the answer.

23    A     Sorry.

24    Q     It's okay, it's a very common practice among
```

                                                         16

```
 1          enthusiastic witnesses.

 2                        (The document was marked as Exhibit
```

```
 3                        No. 4.)

 4    Q    Have you read Exhibit 4?

 5    A    I have.

 6    Q    Can you identify it?

 7    A    Yes, I wrote this to Mr. Macurdy.

 8    Q    Exhibit 4 says, in part, "Attached is the letter

 9         from my doctor discussing my disability and the

10         accommodations I will be needing."  Did you send

11         Exhibit 3, the letter from Dr. Herring with

12         Exhibit 4 to Mr. Macurdy?

13    A    I did.

14                        (The document was marked as Exhibit

15                        No. 5.)

16    Q    Have you read Exhibit 5?

17    A    I have.

18    Q    Have you seen Exhibit 5.

19    A    I have not.

20    Q    Exhibit 5 refers to you by your former name?

21    A    Correct.

22    Q    As does Exhibit 4 and as does Exhibit 3?

23    A    Yes.

24    Q    We're still talking about you, though?
```
```
                                                  17


 1    A    Yes.

 2    Q    Ms. Kiani, although you have not seen Exhibit 5

 3         before, would you agree that Exhibit 5 is a

 4         recommendation that you receive the

 5         accommodations suggested by Dr. Herring and
```

```
 6          requested by you?

 7    A     Yes.

 8    Q     Do you see Dean Cass' signature on the bottom of

 9          Exhibit 5?

10    A     Yes.

11    Q     Looks like Dean Cass signed off on this

12          recommendation on September 13th?

13    A     That looks to be correct.

14    Q     That's of the year 2000, your first year of law

15          school?

16    A     Yes.

17                    (The document was marked as Exhibit

18                     No. 6.)

19    Q     Have you looked at Exhibit 6?

20    A     I have.

21    Q     What is Exhibit 6?

22    A     It's a letter from Mr. Macurdy to myself

23          confirming the accommodations.

24    Q     Take a look at Exhibit 6, who's the signatore?
```

                                                    18

```
 1          Who signed Exhibit 6?

 2    A     It's Ida Ten, she's the Associate Registrar.

 3    Q     So Exhibit 6 is a letter from Ms. Ten to you --

 4    A     Yes.

 5    Q     -- confirming the accommodations?

 6    A     Yes.

 7    Q     That's dated October 6, 2000?
```

```
 8    A    Yes.

 9    Q    Ms. Kiani, were you satisfied with the

10         accommodations set out in Exhibits 4 through 6?

11    A    At what point?

12    Q    You requested the accommodations that

13         Dr. Herring recommended; right?

14    A    Right.

15    Q    In Exhibit 4, you sent those accommodations to

16         Mr. Macurdy?

17    A    Right.

18    Q    In Exhibit 5, Mr. Macurdy recommended that Dean

19         Cass endorse them, and he did, as we can see by

20         his signature?

21    A    Yes.

22    Q    And Exhibit 6 is a letter from Ms. Ten to you

23         formally informing you of the accommodations.

24    A    Yes.
```

                                                        19

```
 1    Q    Were you content with those accommodations?

 2    A    No.

 3    Q    Why not?

 4    A    These accommodations -- when I first asked for

 5         them, I wasn't a law student.  I had gotten

 6         accepted to the University, but it's a whole

 7         different thing when you're a prospective

 8         student than when you're a current student.  So

 9         when I got there and saw after the first two

10         weeks, I saw what it was like to be a law
```

```
11          student, I wasn't happy with them, no.

12    Q     Why was that?

13    A     It's my own disability, I couldn't take notes.

14    Q     Did you seek additional accommodations as a

15          result?

16    A     I did.

17    Q     What accommodations did you seek?

18    A     I went to talk to Mr. Macurdy to let him know

19          that I was uncomfortable and I needed a

20          stenographer.

21    Q     What did Mr. Macurdy say?

22    A     No.

23    Q     Did he tell you why?

24    A     I couldn't have one -- I couldn't have one here
```

                                                      20

```
1           because I didn't have one in college.

2     Q     Was this a face-to-face conversation?

3     A     Yes.

4     Q     Did this conversation take place after you

5           received the letter from Ms. Ten on October 6,

6           2000?

7     A     I believe so.

8     Q     Where did this take place?

9     A     In his office.

10    Q     Did this conversation take place in Macurdy's

11          office?

12    A     Yes.
```

13    Q    At 19 Deerfield Street?

14    A    Yes.

15    Q    What did you do next?

16    A    Nothing.  That whole conversation was so

17         uncomfortable.  He didn't let me explain why I

18         thought I needed the stenographer.  So then he

19         kind of looked at me like, "Is this conversation

20         over?"  And it wasn't over for me.

21    Q    Did he say that?

22    A    No, you could tell, it was just in his face that

23         the whole conversation was like combative.

24         So -- sorry.

                                                    21


1    Q    Do you want to take a break?

2    A    No.  So then he sent me -- I didn't do anything.

3         I left because I didn't want to make enemies.  I

4         knew that I needed him for other things.  It was

5         first year, it was two weeks into the school

6         year, so I didn't want to make enemies, and I

7         didn't know anything.  So I didn't have to do

8         anything.  He sent me what I thought was a nasty

9         e-mail afterwards.

10   Q    Did you save that e-mail?

11   A    No.

12   Q    There were no e-mails produced between you and

13        Mr. Macurdy?

14   A    That's not true.

15   Q    Well, we can get to that.  What did this e-mail

16          that you've just described as nasty say?

17    A     It wasn't vulgar or anything, I want to be

18          really clear about that.  It wasn't vulgar.  He

19          said some things that I didn't think were his

20          place to say.

21    Q     What did he say?

22    A     Well, when he wasn't listening to me, my mom was

23          in there with me.  He had invited her in, so she

24          was trying to explain to him through me that I

                                                        22


1           was tired and that she was noticing some of my

2           medical symptoms.  But he -- I guess, he didn't

3           like that.  So then in the e-mail he said, this

4           is a direct quote, I remember this exactly,

5           "While the presence of a personal care attendant

6           is not unique, giving deference to a personal

7           care attendance is."

8                     And then this is another direct quote,

9           that he urged me not to have, quote, "triangular

10          conversations," as between me, someone else and

11          a third party such as my mother.

12                    I didn't like what he had to say

13          because I didn't think it was -- didn't think it

14          was his place for him to be referring to my

15          mother as a personal care attendant and getting

16          into a section of my personal life.  But

17          nonetheless, I wrote him back and I said, "I

18          appreciate that you've been candid with me, and

19          I hope that you will do that throughout my years

20          here at BU.  My mother is special to me.  If she

21          tries to be my advocate, I won't say no."

22    Q    Did you save that e-mail?

23    A    No, I didn't.  I had it saved until second year.

24    Q    After this exchange with Mr. Macurdy, what did

                                                          23


1           you do in regard to your accommodations?

2     A     I'm not sure exactly the time line of this,

3           whether it was before or after I went to speak

4           with Mr. Macurdy, but at some point I did try

5           and speak with Dean Cass.  I went to his office,

6           and on the way there I bumped into Sunny

7           Schlicter.  She works with the Dean.  I believe

8           she is in charge of the political plan.  I told

9           her what had happened, I need a stenographer,

10          and I need to talk to Dean Cass.  And she said

11          that she would relay the message, and Dean Cass

12          never got back to me.

13    Q     Did you ever directly phone or send an e-mail to

14          Dean Cass?

15    A     I did not.  I believe I tried to talk to Dean

16          Chris Marx, and whenever I would talk to her

17          about accommodations, she would just wave her

18          hands like this (gestures), and say that is not

19          her area.  It was my experience that everyone

20          pretty much in the law school was like

```
21          standoffish and didn't want to deal with the

22          issue of accommodations.

23     Q    Did you ever have a face-to-face conversation

24          with Dean Marx in the fall of 2000 about your
```

                                                          24

```
1           accommodations requests?

2      A    Yes, a couple.

3      Q    How many?

4      A    Several.

5      Q    In one of your interrogatory answers you

6           mentioned that at some point Dean Marx put her

7           hands over her ears.

8      A    That was later.

9      Q    Not in the fall of 2000?

10     A    That was much later.  I will get to that, that's

11          a sensitive point.

12     Q    What happened during your face-to-face

13          conversations with Dean Marx?

14     A    Exactly what I had told you before, that she

15          would just wave her hands in the air and say,

16          "Well, that's just not our area."  It's like

17          they would get so scared, and I didn't

18          understand why.

19     Q    Did Dean Marx tell you who to take your

20          accommodation requests to?

21     A    Mr. Macurdy.

22     Q    Did you tell Dean Marx that you had not been
```

23          satisfied with your work with Mr. Macurdy --

24          your efforts to work things out with

                                                    25


1           Mr. Macurdy?

2     A     Yes.

3     Q     Did she tell you what to do next?

4     A     No.

5                    (The document was marked as Exhibit

6                    No. 7.)

7     Q     Ms. Kiani, please read Exhibit 7.

8     A     (Witness reviews document.)

9     Q     Just let me know when you're done?

10    A     I'm finished.

11    Q     You have read the whole thing?

12    A     Yes.

13    Q     Ms. Kiani, Exhibit 7 is a printout of an e-mail

14          exchange between you and Dean Marx; correct?

15    A     Yes.

16    Q     It has been Bate stamped as BU 0232 and produced

17          to your attorney during the course of discovery.

18    A     This is the first time I have seen this.

19    Q     Do you recall this e-mail exchange back in

20          October of 2000?

21    A     I don't.  I'm sorry.

22    Q     Let's pick it up in the middle, beginning with

23          what appears to be an e-mail from you, "Dean

24          Marx, Hi, I went to my appointment with Alan

                                                    26

```
 1          Macurdy," et cetera.
 2    A     Okay.
 3    Q     Does this sound like what you would have said to
 4          the Dean after your appointment --
 5    A     Yes.
 6    Q     -- with Allan Macurdy?  Wait until I'm finished.
 7    A     I'm sorry.
 8    Q     Does this sound like what you would have written
 9          to Dean Marx after you met with Mr. Macurdy?
10    A     Yes.
11    Q     Now, in your e-mail to Dean Marx, you write --
12          I'm going to paraphrase and you tell me if my
13          paraphrase is accurate.
14    A     Right.
15    Q     Your e-mail to Dean Marx basically says, "I need
16          more than I have been given.  How do I get it?"
17    A     Right.
18    Q     Is that a fair and accurate paraphrase?
19    A     Yes.
20    Q     In the last paragraph of your e-mail you write,
21          "What is the exact procedure of getting in touch
22          with the Provost, and is there any documentation
23          that can be used to show how my request is
24          supported by my disability."  Did I read that
```

                                                              27

```
 1          correctly?
```

2    A    Yes.

3    Q    So you have basically said to Dean Marx, "How do

4         I get in touch with the Provost?  What do I need

5         to do to show that I need more accommodations."

6    A    Right.

7    Q    Is that accurate?

8    A    Right.

9    Q    Now, let's turn to the top half of Exhibit 7,

10        this is Dean Marx's reply to you; correct?

11   A    Yes.

12   Q    Now, Dean Marx says, "There is a grievance

13        procedure for the University for those who

14        believe they have been discriminated against on

15        the basis of disability.  This procedure is in

16        the BU Life Book.  I will put a copy of that

17        procedure in your mail file on the first floor."

18        Did I read that accurately?

19   A    Yes.

20   Q    What is a mail file?  Is that a mailbox that all

21        students have?

22   A    Yes.

23   Q    Did you read the BU Student Life Book and see

24        the procedure for filing a complaint for

                                                      28


1         discrimination?

2    A    When?

3    Q    At the time that Dean Marx put --

4    A    I'm sure.  I don't remember, but I must have.

5    Q    Did you file a complaint of discrimination on

6         the basis of disability?

7    A    No.

8    Q    Why not?

9    A    I don't know why.

10   Q    Further down, I'm going to read a little bit

11        more, "It sounds to me like you're not alleging

12        discrimination on the basis of disability, but

13        rather you are not satisfied with Mr. Macurdy's

14        determination that the transcriber is not

15        supported by your disability."  Did I read that

16        correctly?

17   A    Yes.

18   Q    Dean Marx then goes on to tell you what to do to

19        get your accommodation.

20   A    Yes.

21   Q    She says to write to the Provost, Dr. Berkey,

22        and explain what accommodations you are

23        requesting, what accommodations Disability

24        Services provided you, why they were wrong.

                                                    29


1    A    Right.

2    Q    And then she says, and I'm quoting from Dean

3         Marx's e-mail to you, "You should also provide

4         documentation that might support your request."

5    A    Right.

6    Q    Did I read that correctly?

 7   A   That's correct.

 8   Q   Then she tells you how to reach the Provost,

 9       Dr. Berkey?

10   A   Right.

11   Q   Did you write to Provost Berkey requesting an

12       accommodation?

13   A   I did not.

14   Q   Did you appeal to anyone from Mr. Macurdy's

15       decision?

16   A   No, because I was told that Mr. Macurdy handles

17       the accommodations.  I don't remember anything

18       about this e-mail.

19   Q   Do you remember whether you wrote to Dr. Berkey,

20       the Provost?

21   A   Absolutely not, I would have remembered that.  I

22       did not write to him.

23   Q   Did you send Dr. Berkey additional documentation

24       that might support your request for a

                                                      30

 1       transcriber?

 2   A   No.

 3   Q   Did you send anyone documentation that might

 4       support your request for a transcriber?

 5   A   No, I didn't know what other documentation I

 6       could have given that I hadn't already.

 7   Q   Did you ask Dean Marx what other documentation

 8       you could have given?

 9   A   No.

```
10                    (Witness confers with Mr. Tariri

11                    off the record.)

12   Q   Ms. Kiani, I'm going to ask you not to talk with

13       your attorney unless you want me to learn about

14       it.

15   A   Okay.

16   Q   I don't want to do that, but you need to

17       understand the ground rules here.

18   A   Right, okay.

19   Q   Ms. Kiani, did you make any further attempts to

20       get additional accommodations?

21   A   I did not.

22                    (The document was marked as Exhibit

23                    No. 8.)

24   A   (Witness reviews document.)

                                                        31


1    Q   Let me know when you're finished reading the

2        document that has been marked as Exhibit 8.

3    A   I have finished.

4    Q   Ms. Kiani, you are not copied on Exhibit 8, but

5        I wonder if you have seen it before either

6        because we produced it in discovery or it was

7        given to you at the time it was written?

8    A   I have not.

9    Q   Exhibit 8 is an exchange between Dean Marx and

10       the Office of Disability Services regarding

11       additional accommodations for your examinations;
```

12          is that correct?

13     A    I disagree with the fact that you're saying that

14          they are additional.

15     Q    Okay, go ahead, please explain why.

16     A    When I had applied for accommodations, this is

17          something that I had requested, but it wasn't

18          through Dr. Herring.  Mr. Macurdy said that I

19          could have whatever I had in college, and I did

20          have a scribe in college.  And I provided him

21          documentation that showed my college

22          accommodations, so this was the original -- this

23          wasn't additional.

24     Q    What is the difference between a scribe and a

                                                        32


1           stenographer?

2      A    The difference between a scribe is that I would

3           dictate to a scribe, whereas a stenographer just

4           records conversations verbatim.  I would dictate

5           to the scribe what I wanted written and whether

6           I wanted a period or a question mark, paragraph

7           indentation.  A stenographer would already know

8           that.

9      Q    So to take a practical example, would it be fair

10          to say that Ms. Macomber, our court reporter

11          today, is a stenographer?

12     A    Yes.

13     Q    But not a scribe?

14     A    Yes.

15    Q    In any case, you had a scribe for your

16         examinations?

17    A    Yes.

18    Q    Did the subject of your accommodations come up

19         at all at any point after the initial activity

20         in October of 2000?

21    A    I do not recall.

22    Q    Ms. Kiani, did you take any courses with

23         Professor Kate Silbaugh?

24    A    I did.

                                                        33


1     Q    What courses did you take with Professor

2          Silbaugh?

3     A    I took Torts, and I also took Family Law.

4     Q    When did you take each of these courses?

5     A    Torts was first semester, so fall of 2000; and

6          Family Law was spring of 2003.

7     Q    Did the issue of plagiarism arise in your Family

8          Law course with Professor Silbaugh?

9     A    I was never charged with plagiarism.

10    Q    Did the issue come up?

11    A    How?

12    Q    You tell me.

13    A    It was addressed in the hearing.

14    Q    What was the issue in Professor Silbaugh's

15         course?

16    A    What did I write my paper on?

17    Q    What did you write your paper on, and what were

18         the concerns that were raised about the paper

19         you wrote?

20    A    I wrote my paper on comparing four states and

21         how they dealt with -- I don't recall this

22         exactly, but it was like how they dealt with

23         like if a spouse divorces you, what does he owe

24         you in supporting you or how the relationship is

                                                      34


1          defined.  I'm not exactly sure.

2     Q    Was there some question about the originality of

3          your work?

4     A    Yes.

5     Q    What was the question?

6     A    Whether it was original, I guess.

7     Q    Who raised that question?

8     A    BU did.

9     Q    Did Professor Silbaugh?

10    A    No.

11    Q    Did she ever talk to you about it?

12    A    No.

13    Q    How did the subject come up?

14    A    Well, in July of 2003 when I was charged -- no,

15         wait.  No, that's not correct.  It came up

16         during a hearing, and that's all I can remember.

17    Q    Ms. Kiani, please take a look at Exhibit 2, the

18         Plaintiff's Answers to Interrogatories submitted

19         by Boston University.  In particular, I would

```
20          like you to look at Interrogatory Number 20,

21          which is three pages from the back.  The pages

22          are not numbered.

23    A     (Witness reviews document.) Yes.

24    Q     Let me know when you have read --
```

                                                        35

```
1     A     The response is on a different page?

2     Q     Yes.  Read the interrogatory and then read the

3           answer.

4     A     (Witness reviews document.) Yes.

5     Q     Have you read Interrogatory Number 20 and your

6           answer to Interrogatory Number 20?

7     A     I have.

8     Q     In Interrogatory Number 20, you indicate that

9           you became aware of discrimination during the

10          fall semester of 2000 because a student sitting

11          next to you in exam writing workshop had a

12          stenographer.

13    A     Right.

14    Q     The way you write this, I just don't understand.

15          You write, "I was sitting next to a stenographer

16          and I asked whom she was scribing for."

17    A     Right.

18    Q     "And she said that she was scribing for a

19          student."

20    A     Right.

21    Q     Earlier you testified that a stenographer and a
```

```
22          scribe are different?
23    A     Right.
24    Q     Was this stenographer stenotyping or scribing?
```
                                                        36

```
 1    A     Like Ms. Macomber is doing now.
 2    Q     So she wasn't scribing?
 3    A     No.
 4    Q     Did you find out if the student for whom this
 5          particular stenographer was working had a
 6          disability?
 7    A     The stenographer said that she was stenographing
 8          for a student that couldn't be here.
 9    Q     Did the stenographer have the same sort of
10          machine that Ms. Macomber is using?
11    A     Yes, it was very hard to miss, I was sitting
12          right next to her.
13    Q     Did she tell you anything more about that
14          student?
15    A     No, I was just in awe that I wish I had fingers
16          like that.  I was just in awe, I was looking at
17          her screen, so I didn't bother to ask.
18    Q     So all you knew is that someone who was not
19          there had a stenographer?
20    A     Right.
21    Q     That didn't inform you about that individual's
22          disabilities or whether that individual had
23          disabilities; right?
24    A     No.  You're correct.
```

37

```
 1   Q   Further on down, the answer to Interrogatory
 2       Number 20, you state, "I again discovered
 3       discrimination during the spring semester of
 4       2003 when I was taking Family Law with Professor
 5       Silbaugh and I saw a disabled student sitting in
 6       front of me with his stenographer."  Did I read
 7       it correctly?
 8   A   Yes.
 9   Q   Ms. Kiani, I keep asking you if I read things
10       correctly because I just want the record to
11       reflect not that I'm a good reader, but that you
12       and I are in agreement that we're talking about
13       the same subject.  So bear with me with what
14       probably seems like a silly question.
15   A   That's fine.
16   Q   Do you know the name of the disabled student
17       sitting in front of you?
18   A   I do not.
19   Q   Do you know what his or her disability was?
20   A   I do.
21   Q   Was it male or female?
22   A   Male.
23   Q   What was his disability?
24   A   He was deaf.
```

38

```
1    Q    Was there some unique technology that this
2         particular stenographer had?
3    A    No, it was like Ms. Macomber.
4    Q    So this student could not hear anything.  Was he
5         profoundly deaf?
6    A    I have no way of knowing that.  However, I do
7         know that one time Professor Silbaugh had called
8         on him to answer a question.  I could see him
9         writing his response, typing it out with his
10        fingers on the computer screen, and the
11        stenographer read it back to Professor Silbaugh.
12        So they communicated through the stenographer.
13   Q    Do you know anything about what documentation
14        this student submitted to support that
15        particular accommodation?
16   A    I don't.
17   Q    Are you doing okay right now?
18   A    I'm fine.
19   Q    Remember, you can take a break whenever you
20        want.
21   A    This is so interesting that I just don't want to
22        stop.
23   Q    Most people don't have such positive reactions
24        to having their deposition taken.
```

                                                          39


```
1    A    It's okay, I have had worse.
2    Q    My job is not to make you feel bad.
3              MR. TARIRI:  You're doing a wonderful
```

```
 4          job.

 5     A    Yes, you're being nice.

 6     Q    Who is Andrew Kull?

 7     A    He's my Restitution professor.

 8     Q    Professor Kull was one of the original

 9          defendants in this lawsuit?

10     A    Yes.

11     Q    He has since been dismissed?

12     A    Yes.

13     Q    Why did you sue Professor Kull?

14     A    My life was never the same after my encounters

15          with Professor Kull.

16     Q    Why is that?

17     A    It was just -- I just felt like my whole life

18          had been turned upside down by him, by what he

19          had done.

20     Q    What did he do?

21     A    I wrote a paper like other students did, I told

22          him that I was going to be going away.  He said

23          it was fine.  I left and I came back in February

24          and I noticed that all my grades were there
```

                                                        40


```
 1          besides his.

 2     Q    Excuse me, but when did you take this class?

 3     A    The fall semester of 2003.

 4     Q    Of 2003?

 5     A    3.
```

6   Q   Could it be the fall semester of 2002?

7   A   No, I think it was fall semester of 2003,

8       because then spring semester would have been my

9       last semester, so it was one semester before my

10      last one.

11  Q   So it was the fall semester of the 2002/2003

12      academic year?

13  A   Right.

14  Q   We ordinarily refer to that as the fall of 2002.

15      I just need to understand that.

16  A   Right.

17  Q   So you took this course with Professor Kull in

18      the fall of 2002, you wrote a paper, told him

19      you were going away, and he said it was fine.

20      Was he referring to the paper?  What was he

21      referring to when he said it was fine?

22  A   I asked him whether it was okay that I go away.

23  Q   Did he have any say over whether you went away

24      or not?

                                                    41


1   A   Well, I do care, so if he would have said that,

2       "I don't think you're going to finish on time,

3       or I'm just not happy," I would have stayed.

4   Q   Where did you go?

5   A   Middle East.

6   Q   Where in the Middle East?

7   A   Iran.

8   Q   Had you planned that trip far in advance?

9   A   It was during that same semester, earlier.

10  Q   You planned it in September, October?

11  A   Yes, we knew we were leaving by October.

12  Q   Of 2002?

13  A   Yes.

14  Q   When did you leave?  At the end of the semester?

15  A   When all my exams were over.  I don't remember.

16  Q   The dates don't particularly matter, I just want

17      to tie this down.  You took Restitution in the

18      fall of 2002?

19  A   Yes.

20  Q   You planned to go to Iran in October?

21  A   Um-hmm.

22  Q   And when the semester ended in December, you

23      went to Iran.

24  A   Right.

                                                42


1   Q   Before you went to Iran, you turned in your

2       paper to Professor Kull and told him you were

3       going away?

4   A   Right, and several times before that I told him

5       I was going away.

6   Q   How long were you there?

7   A   Three weeks.

8   Q   So you returned, you said February, would it be

9       January that you returned?

10  A   I returned in January.  I found out about the

11          problem with the paper in February.

12   Q      What did you find out?

13   A      Well, as I said, I looked on the student link,

14          and all my other grades were there except for

15          his.  So I e-mailed him -- I remember this

16          clearly.  This was a Friday, and I e-mailed him

17          over the weekend, and I said, "I hope you had a

18          nice holiday.  I was wondering why I didn't get

19          my grade in yet."  He didn't respond to me.  So

20          my first reaction was to think that he had some

21          grades outstanding.  It's not uncommon for

22          professors not to have the grades in.  So I

23          checked the Registrar's website because they

24          list who still needs to show their grades.  I

                                                        43

1           didn't see any notes for his class on there.  So

2           I called Mary Jo Sullivan, she said that all the

3           grades are in.  So at that point I knew there

4           was a problem.

5                   So Monday morning I go earlier and I

6           wait outside his office.  He comes in, he looks

7           like he is not happy with me.  He looks daunting

8           to me.  So I said, "Can I talk to you?"  He's

9           like, "I have a class right now.  Why don't you

10          go and come back."  So I go, so I come back, and

11          he sits me down and says, "I have discovered

12          that you have --" this is a direct quote --

13          "inadequate citations in your paper, and I have

14          decided to give you an F."  And I say, "Well,

15          why didn't you tell me about this sooner?"  He

16          says that he had lost my paper so he just now

17          found the paper again, so he couldn't have told

18          me about it sooner.  I say, "But you did know I

19          was a third-year, right?"  Because I'm

20          automatically thinking it is now the spring

21          semester, I'm thinking how am I going to make up

22          this class.  He said, "Yes, I knew you were a

23          third-year."

24                  I basically asked him what to do.  And

                                                        44


 1          then I took -- I did what he told me to do which

 2          was go to Chris Marx, talk to Chris Marx, see

 3          what she says, try and sign up for an extra

 4          class either during the summer or during that

 5          same term.

 6    Q     Those are Dean Marx's recommendations?

 7    A     No, those were Professor Kull's.  So I go to

 8          Dean Marx's office, and my biggest issue at that

 9          point was to try to tell Dean Marx that he lost

10          the paper, so at least because he lost the

11          paper, I thought the add/drop deadline should

12          have been extended, because it was his mistake

13          to lose the paper.  And she advised me -- she

14          didn't let me tell her that part, she advised me

15          about petitioning the Academic Standards

16          Committee.  Then when I tried to tell her, "But

17          Dean Marx, he lost the paper, therefore, I think

18          the add/drop deadline should be extended."

19          That's when she put her hands on her ears and

20          said, "I don't to hear it, Layla."

21    Q     What happened next?

22    A     I was in shock, like that whole entire time that

23          I was even talking to Professor Kull, I wanted

24          to die.  I knew that what he said, that I didn't

                                                              45


1           agree with it, but at that point you can't argue

2           at that point because you're so close to getting

3           done.  So I just want you to know how in shock I

4           was.  It was just awful.  After that, I went

5           to -- Professor Pettit had always been like a

6           surrogate parent to me and an advisor.  So I

7           went to go and find him and say, "Professor

8           Pettit, please advise me.  This is what Dean

9           Marx did, please advise me."

10                So on the way there, I bump into Dean

11          Cass, and I say, "I have problem, can I please

12          talk to you."  He's like, "Not today."  I'm

13          like, "What about tomorrow?"  He said, "I'm out

14          of town."  So at that point I go to Professor

15          Pettit's office and I say, "Dean Cass is out of

16          town, Dean Marx just did this, I can't wait, I

17          need to talk to someone.  Who is next in line to

18          Dean Cass?"  And he says it was Dean Steve Marx.

19  Q  Go ahead.

20  A  So I go and I talk to Dean Steve Marx.

21  Q  That was the Associate Dean at the time?

22  A  I would say so.  I talked to Dean Steve Marx, he

23     is very, very kind.  He helps me write the

24     petition to the Academic Standards Committee.

46

1      And I told him about all the problems that I had

2      with this particular Kull situation.  So that's

3      when our relationship began that he started to

4      help me with all this.  All these conversations

5      that I had were within a day or two, but the

6      whole process with Dean Steve Marx took a long,

7      long time.  That was it.

8  Q   What was the petition to the Academic Standards

9      Committee?

10 A   The petition was to sign up for an independent

11     study class to take during the spring semester.

12     I had asked Wally Miller if I could take a class

13     with him, and I had explained to him the

14     problem -- the situation from Professor Kull.

15     And he had said that if it's fine with the

16     Academic Standards Committee, it's fine with

17     him.

18 Q   What did the Academic Standards Committee say?

19 A   They said no.

20 Q   Why?

```
21    A    Various reasons.  A few of them being that the

22         add/drop deadline had already passed, that they

23         were very stringent about only letting students

24         take three hours of independent study.  And
```

                                                          47


```
1          since I had already done my independent study

2          with Professor Pettit, that I could not have

3          another one, another independent study.  And the

4          third one being that there's just not enough

5          time, which wasn't true.

6                    (The documents were marked as

7                    Exhibit Nos. 9 and 10.)

8     Q    Please let me know when you have finished

9          Exhibits 9 and 10?

10    A    I'm finished.  They are the same thing, aren't

11         they?

12    Q    Not quite.

13    A    Oh yes, okay.

14    Q    Ms. Kiani, Exhibits 9 and 10 are letters to the

15         Academic Standards Committee from you, and they

16         are both dated February 25, 2005.

17    A    Yes.

18    Q    Ms. Kiani, Exhibits 9 and 10 are letters from

19         you to the Academic Standards Committee dated

20         February 25, 2005.

21    A    Yes, I will explain that.

22    Q    Please.

23    A    When you print it out, my computer has default
```

24          set to where the date changes every day.

                                                    48

1    Q    So these letters were printed, I assume for
2         purposes of discovery in this lawsuit on
3         February 25, 2005?  Let me rephrase the
4         question.
5                   Would it be fair to say that on
6         February 25, 2005, you printed these letters out
7         in order to comply with the discovery request
8         Boston University filed in this lawsuit?
9    A    Yes.
10   Q    Would it be fair to say that these letters were
11        both written in the winter of 2003?
12   A    Right.  Can I just point something out?
13   Q    Please do.
14   A    This one that is numbered 9, this was after
15        Number 10 was submitted.
16   Q    That's okay.  Why don't you just state for the
17        record which came first.  You have just said
18        that Exhibit 10 came first.
19   A    Right.
20   Q    Which is Exhibit 10?
21   A    Exhibit 10 is the one that I ask to take an
22        independent study course with Professor Wally
23        Miller.
24   Q    You testified earlier that the Academic

                                                    49

```
 1              Standards committee turned that request down?

 2    A    Yes.

 3    Q    Therefore, can we assume that, therefore, you

 4         wrote what we have now marked as Exhibit 9

 5         asking to take a course at Suffolk University of

 6         Law?

 7    A    Yes.

 8    Q    Did the Academic Standards Committee allow you

 9         to take the course at Suffolk?

10    A    Yes, but it's not the course listed on here.

11                   (The document was marked as Exhibit

12                    No. 11.)

13    A    I gave you this, I think.

14    Q    Can you please identify Exhibit 11?

15    A    Yes.  It is a note from Dean Chris Marx to

16         myself that approves the class that I had asked

17         to take at Suffolk.

18    Q    What's the date on that letter?

19    A    April 1, 2003.

20    Q    Did you end up taking the class?

21    A    I did.

22    Q    Now, I want to continue this thread with

23         Exhibit 12, even though it may appear that we're

24         jumping around a bit.
```

                                                          50

```
 1                   (The document was marked as Exhibit

 2                    No. 12.)
```

3   A   (Witness reviews document.)

4   Q   Can you identify Exhibit 12?

5   A   It's a letter, again, from Dean Chris Marx to

6       myself.  This was after I had been informed that

7       there were allegations of plagiarism,

8       subsequently I couldn't march in commencement

9       ceremonies.  Therefore, Dean Marx is advising me

10      basically that I'm taking this class at my own

11      risk.

12  Q   This class at Suffolk?

13  A   Yes, because depending on the outcome of the

14      hearing or if Professor Mariner decides to give

15      me a grade before or at any time, I guess,

16      during the class starting, then I may not

17      receive credit for the class.

18  Q   Do you remember receiving this e-mail?

19  A   I do.

20  Q   Just to complete with Professor Kull.  You

21      failed Professor Kull's Restitution class?

22  A   I did.  And this other class was the makeup

23      class for that.

24  Q   You said that Dean Steve Marx, I believe the

                                                    51


1       phrase you used, that he was nice?

2   A   Very kind.

3   Q   Very kind.  And you said that he helped you

4       petition the Academic --

5    A    The very first petition that says, "Due to a
6         lack of sufficient original work," he helped me
7         write that one, but the rest, I had written
8         myself.
9    Q    He helped you write Exhibit 10 to the Academic
10        Standards Committee?
11   A    May I see that again, please? (Witness reviews
12        document.) Yes.
13   Q    Did Associate Dean Steve Marx talk to you at all
14        about the flaws that Professor Kull found in
15        your paper?
16   A    Yes.
17   Q    What did he tell you?
18   A    Professor Kull never actually used the word
19        plagiarism when I met with him.  He just said,
20        "Improper citations," something like improper
21        inadequate citations.  So I went to Steve Marx,
22        I went to talk to him.  He was the first one to
23        mention the word plagiarism.  After --
24   Q    Did he tell you you had plagiarized?

52

1    A    Yes.
2    Q    Keep going.  You seem like you were in the
3         middle of a thought there.
4    A    After several conversations and when Professor
5         Kull decided not to press charges, which meant I
6         could continue on with the spring semester,
7         Steve Marx again handed -- told me about that

```
 8            decision, that Professor Kull had decided not to

 9            file disciplinary charges.  He said he had

10            never -- this is a direct quote, "he had never

11            seen anybody get off so easy."

12       Q    Did Professor Steve Marx explain what you had

13            done to plagiarize the paper you wrote for

14            Professor Kull?

15       A    We never sat down to look at the paper to say

16            here's what you have done, here's what you

17            haven't done.  He tried to explain it to me, but

18            I was foggy.  After that day that Professor Kull

19            had -- I met with Professor Kull in his office,

20            and as I said, I was shocked.  I was so shocked

21            that I didn't want to be anywhere anymore, even

22            on the earth.  It was that horrible.  So I

23            started to double up on the medication that I

24            was on, so anything anybody was saying, I was
```

                                                             53


```
 1            out of it.

 2       Q    Did you double up of your own accord?  Were you

 3            self-prescribing?

 4       A    No, I advised my physician that I was doubling

 5            up.

 6       Q    What medication is this?

 7       A    Phenaphen.

 8       Q    What were you taking Phenaphen to treat?

 9       A    Gastrointestinal distress, nerves basically.
```

10          Anything that had anything to do with anything

11          neurological.  It made me forget about what

12          happened with Kull.

13    Q     Now, with regard to Professor Kull, you write in

14          your response to interrogatories that he could

15          see that you were, quote, "out of it."  That

16          seems to be your phrase?

17    A     Those were his words.

18    Q     Professor Kull told you you were out of it?

19    A     He didn't tell me anything.  At the hearing, he

20          testified that he could see that I was out of

21          it.

22    Q     You write, "When he found out that I was on

23          medication, he told my University appointed

24          attorney that he never would have given me an F

                                                        54


1           had he known I was on medication."  Who was your

2           University appointed attorney?

3     A     Arnold Rosenfeld.

4     Q     So Interrogatory Number 12 states that Professor

5           Kull -- sorry, I will wait for you to get it.

6     A     (Witness reviews document.) Yes.

7     Q     Interrogatory Number 12 states that Professor

8           Kull told Arnie Rosenfeld that if he had known

9           you were on medication, he would not have given

10          you an F?

11    A     That's correct.

12    Q     And Mr. Rosenfeld told you that?

13     A     Yes.

14     Q     Now, I want to get back to your interactions

15           with Professor Steve Marx.  You said he had

16           never seen anybody get off so easy.  This is in

17           reference to a plagiarism finding?

18     A     I guess, or disciplinary actions, in general, I

19           don't know.

20     Q     Did you discuss at all with him what you had

21           done that was inappropriate in writing your

22           paper?

23     A     I asked him to please look at my paper.  I have

24           other papers to write, please look at it, tell

                                                            55


1            me what it is, we can sit down and go over it

2            together.  And he said, "Why do you want to go

3            over this?  We're not going to file charges, so

4            just let it go."

5      Q     You're familiar with the Judicial Discipline

6            Code, aren't you, the law school's --

7      A     The one that's in the Blue Book.  It's the one

8            that's in the Student Handbook?

9      Q     Yes.

10     A     Okay, yes.

11     Q     You're familiar with the definition of

12           plagiarism in there?

13     A     Yes.

14     Q     Ms. Kiani, please take a look at your Complaint,

15          Exhibit 1, and turn to page 6.

16    A     Yes.

17    Q     Please read paragraphs 82 to 84.

18    A     Um-hmm.

19    Q     Read them to yourself.

20    A     (Witness reviews document.) Yes.

21    Q     Are these assertions accurate?

22    A     Yes.

23    Q     In paragraph 82 you say that you were deprived

24          an accommodation because you were not given a

                                                           56


1           private room in the library to listen to class

2           tapes.

3     A     Yes.

4     Q     Did you ask for a private room in the library?

5     A     No.  What I meant by that was that the other

6           students had access to private rooms as such,

7           but I didn't because those rooms are downstairs,

8           so you would actually have to take a flight of

9           stairs down to get to those rooms.

10    Q     What floor are they on in this building?

11    A     I have never been, so I don't know.

12    Q     Is the law school library in the building where

13          the law school is housed?

14    A     Yes.

15    Q     And you get to the library by the elevator?

16    A     Yes.

17    Q     Were you chairbound for your entire three years

18          at the law school, or did you occasionally use

19          crutches or other mobility devices?

20     A    I used crutches occasionally, yes.

21     Q    Did you ever ask anyone for a private place to

22          listen to your tapes?

23     A    I don't remember.

24     Q    Ms. Kiani, did you take a course with Professor

                                                            57


1           Wendy Mariner?

2      A    I did.

3      Q    What course did you take?

4      A    Managed Care and The Law, that's the title of

5           it.

6      Q    Did you write a paper for Professor Mariner's

7           class?

8      A    Yes, I wrote two, actually.

9      Q    Let's talk about the second paper.

10     A    Right.

11     Q    Is the second paper the source of the plagiarism

12          charge in Professor Mariner's class?

13     A    It's not the only one.

14     Q    It was for both papers?

15     A    Yes.

16     Q    Did Professor Mariner determine that you had

17          plagiarized your papers in her class.

18     A    No, what she did was she sent allegations of

19          plagiarism to Dean Cass; Dean Cass sent them

20          over to his designee, which was Professor

21          Ryckman; Professor Ryckman did an investigation,

22          and then he decided to file charges.

23                    (The document was marked as Exhibit

24                    No. 13.)

                                                    58


1    Q    Ms. Kiani, your stamina is very impressive.

2    A    I'm going on pure adrenaline.  It's not a

3         testament to my physical strength.  I want you

4         to know that.

5    Q    We can take a break whenever you like.

6    A    Okay.  I want to get done with this.  If you

7         guys want to take a break, go ahead.

8    Q    I don't want you to put pressure on yourself

9         because both you and Boston University will be

10        well served if you can answer carefully and

11        thoughtfully and not under pressure to get this

12        done.  It will get done when it's done.

13   A    I just meant by getting done, I'm anxious to see

14        everything.  Half of this stuff, I haven't seen,

15        so I'm just like...

16                  MR. TARIRI:  Can we go off the record

17        for a second, please?

18                  MR. ELSWIT:  Sure.

19                    (Wherein a brief break was held.)

20

21   BY MR. ELSWIT:

22   Q    Can you identify Exhibit 13, please?

```
23    A    It's a letter from Dean Cass letting me know of
24         the allegations of plagiarism in Professor
```
                                                            59

```
 1         Mariner's class, and he is also letting me know
 2         that I'm barred from participating in
 3         commencement ceremonies because of this pending
 4         investigation.
 5                        (The documents were marked as
 6                        Exhibit Nos. 14 and 15.)
 7    Q    Please tell me when you have read Exhibits 14
 8         and 15.
 9    A    (Witness reviews document.) I'm finished.
10    Q    Both 14 and 15?
11    A    Yes, they are pretty much the same thing.  It's
12         just that 14 is in a different format, because
13         this was printed out from BU's system, I gather,
14         and this is off of my Computer.
15    Q    Ms. Kiani, Exhibit 14 has a Bate stamp number BU
16         0217, which indicates that Boston University
17         produced this document to your attorney in
18         response to discovery.
19    A    Um-hmm.
20    Q    It is an e-mail from you to Dean Cass, dated
21         May 16, 2003; correct?
22    A    Yes.
23    Q    But Exhibit 15 does not have a Bate stamp, which
24         indicates that your attorney produced it to
```

60

```
 1        Boston University.
 2     A  Yes.
 3     Q  The text of these documents is not the same,
 4        these are different documents.  I wonder if you
 5        can explain Exhibit 15?  Was this a draft or did
 6        you send this?
 7     A  This was a draft.
 8     Q  Exhibit 15 is a draft?
 9     A  Yes.  Can you help me out a little bit here.
10        Where is that you're saying they are not the
11        same.
12     Q  First of all, Exhibit 14 begins, "Dear Dean
13        Cass, I am writing this e-mail to you in regards
14        to a letter of suspension that I have received
15        this week."  Exhibit 15 begins, "Dean Cass, Hi!
16        I am writing to you in regards to my
17        suspension."  And from there the text is
18        dissimilar throughout each of the two documents.
19     A  I suppose that Exhibit 14 is a bit more polished
20        than 15 is.
21     Q  Can we conclude, and this is not a trick
22        question, I just want to make sure the record is
23        clean.  Can we conclude that Exhibit 15 is a
24        draft that you saved on your computer but never
```

61

```
 1        sent?
```

2    A    What I did was -- This was a draft from my

3         computer, yes.

4    Q    This, being 15?

5    A    Yes.  What I did was I did a copy and paste to

6         e-mail format.  And then what I did was polished

7         some of the words.  So I wouldn't say I never

8         sent it.

9    Q    Exhibit 15 in its present format was never

10        received by Boston University.  Would you agree

11        that you never sent Exhibit 15 as it exists

12        right now?

13   A    I don't remember.

14   Q    But Exhibit 14 clearly was sent?

15   A    Yes.

16   Q    And Exhibit 14 is your response to Dean Cass'

17        letter to you, which is Exhibit 13?

18   A    Yes.

19   Q    All I want to do is make sure that the

20        chronology is clean and that the record is

21        accurate.

22   A    Well, no, again, these are numbered --

23   Q    Don't worry about the numbering of the exhibits

24        in this deposition.  That doesn't matter, that's

                                                        62

1         simply the way they come up in deposition.

2    A    I was trying to let you know that I'm paying

3         attention.

4     Q     I have no doubt that you are paying attention.

5                     (The document was marked as Exhibit

6                     No. 16.)

7     A     (Witness reviews document.)

8     Q     Ms. Kiani, can you identify Exhibit 16?

9     A     Yes.

10    Q     What is Exhibit 16?

11    A     I wrote this to Professor Mariner hoping to

12          discuss the allegations.

13    Q     Did you hear back from Professor Mariner?

14    A     I did not.

15                    (The document was marked as Exhibit

16                    No. 17.)

17    Q     Have you read Exhibit 17?

18    A     Yes.

19    Q     Can you identify it?

20    A     Yes.  This was the letter informing me that I

21          have been charged formally.  It talks about the

22          process of what I would need to go through for

23          the hearing.  That is basically it.  And it lets

24          me know that I can have counsel of my choice.

                                                          63


1     Q     By the time you received Exhibit 17, was Arnold

2           Rosenfeld your counsel of choice?

3     A     Yes.

4     Q     Dean Cass must have known that?

5     A     Yes.

6     Q     How did he know that?

7    A    I have this in documentation if you need it.  I

8         went to see Professor Rosenfeld, Professor

9         Rosenfeld agreed to represent me.  He then sent

10        Dean Cass an e-mail that says, "Unless you have

11        any objection, I will be representing Layla

12        Kiani in the charges brought against her.

13        Please let Professor Ryckman know that if he is

14        to talk to her, he is to do it through me."  And

15        Professor Rosenfeld sent me this e-mail, along

16        with Dean Cass' response, which says, this is

17        verbatim, "I will let Professor Ryckman know.

18        Have a good weekend."

19   Q    That e-mail exchange was not produced to Boston

20        University.  Why not?

21   A    I guess it was an oversight.  I didn't mean to

22        not.

23   Q    Can you get me a copy of that e-mail exchange,

24        please?

                                                    64


1    A    Sure.

2    Q    Thank you.  Ms. Kiani, in the first paragraph of

3         Exhibit 17, the first sentence, actually, Dean

4         Cass refers to the Boston University School of

5         Law Disciplinary Regulations.

6    A    Yes.

7    Q    Are you familiar with the disciplinary

8         regulations?

```
 9    A    Yes.

10    Q    Did you read them insofar as there were parts of

11         it that pertained to you?

12    A    Yes.

13    Q    Did you read the whole thing cover to cover?

14    A    Yes.

15    Q    You did?

16    A    Yes.

17              (The document was marked as Exhibit

18               No. 18.)

19    Q    Can you identify Exhibit 18, please?

20    A    These are the charges.

21    Q    Ms. Kiani, when did you read them for the first

22         time?

23    A    For the first time, I skimmed over them the

24         first year.
```

                                                                65

```
 1    Q    In 2003, when did you read them?

 2    A    I had had some familiarity with it before I went

 3         to visit Professor Rosenfeld to ask him to

 4         represent me.

 5    Q    When did you visit Professor Rosenfeld?

 6    A    That same day that that e-mail that you don't

 7         have was written.

 8    Q    So that was sometime after you received notice

 9         that you were suspended?

10    A    Yes.

11    Q    Sometime after Dean Cass' letter of May 12,
```

12          2003?

13     A    A few days after, yes.

14     Q    Did you read the disciplinary regulations

15          between the time you received Dean Cass' May 12,

16          2003 letter and the time you went to see Arnie

17          Rosenfeld?

18     A    I know that I went and read them right before I

19          went to see Professor Rosenfeld, but I couldn't

20          tell you what I did in those days between when I

21          was charged and when I went to see Professor

22          Rosenfeld.  I was so out of it, I wished I was

23          dead.

24     Q    We don't need to get into specifics about what

                                                          66


1           you did, I just need a general timeframe here.

2                     Did you have the opportunity to meet

3           with Professor William Ryckman in advance of the

4           Judicial Committee Hearing?

5      A    You mean did I meet with him?

6      Q    Did you have the opportunity to meet with him?

7      A    Define opportunity.

8      Q    Did you have the chance to meet with Professor

9           Ryckman?  Let me put it a different way.

10     A    Please.

11     Q    Did Professor Ryckman ask to meet with you or

12          invite you to meet with him?

13     A    Did he ask me directly?

14   Q   Either you or through your attorney.

15   A   He asked my attorney, but before he asked my

16       attorney, I had gone to -- The reason I went to

17       Professor Rosenfeld to ask him to represent me

18       because I did not, for the life of me, want to

19       talk to Professor Ryckman.

20   Q   Why was that?

21   A   He is legendary.

22   Q   In what respect?

23   A   I have heard that he makes students emotionally

24       uncomfortable.

                             67

1   Q   Had you ever met him before?

2   A   No.

3   Q   Have you heard that he makes students, I'm using

4       your phrase now, emotionally uncomfortable in

5       his classes?

6   A   Yes.

7   Q   Have you heard anything about Professor

8       Ryckman's role in the discipline process?

9   A   I didn't know until charges -- I didn't know

10       until after I went to see Professor

11       Rosenfeld that -- well, no.  Steve Marx had

12       already advised me a little bit about the

13       process and what was going to happen, so I think

14       I heard it from him that it was going to be

15       Professor Ryckman.

16   Q   Was Arnie Rosenfeld a professor at that time?

17    A    Yes, he was.

18    Q    A visiting professor?

19    A    I don't know his title.

20    Q    Did you talk with Professor Rosenfeld about

21          meeting with Professor Ryckman?

22    A    I did.  I told him I didn't want to do it.

23    Q    You told him you did not want to do it?

24    A    Yes.

                                                    68

1     Q    I don't want to ask you about what he told you,

2           but after talking with Professor Rosenfeld, did

3           you decline to meet with Professor Ryckman?

4     A    No, what I thought and what I had said that I

5           didn't want to meet with him was only

6           reaffirmed.

7     Q    So the combination of your own desire not to

8           meet with Professor Ryckman and your meeting

9           with Professor Rosenfeld led you not to meet

10          with Professor Ryckman; is that fair?

11    A    Yes.

12    Q    When was the first time you met with Professor

13          Ryckman?

14    A    I only saw him at the hearing on September 12,

15          2003.

16    Q    Did you have any written communications with

17          Professor Ryckman before the hearing in

18          September 2003?

19    A    No.

20    Q    Did Professor Ryckman communicate to you in

21         writing before September 2003?

22    A    No.

23    Q    Did he communicate either verbally or in writing

24         with Professor Rosenfeld about your case before

                                                              69

1          September 2003?

2     A    Yes.

3     Q    When?

4     A    I know that that they talked throughout the

5          course of Professor Rosenfeld representing me,

6          I'm not sure when.  I don't know specific dates.

7     Q    Do you think they talked before the hearing in

8          September 2003?

9     A    Yes.

10    Q    Do you know what they talked about?

11    A    Professor Rosenfeld was trying to be my

12         advocate.  I don't know what was said.

13    Q    Do you know if Professor Ryckman communicated to

14         Professor Rosenfeld any desire to meet with you?

15    A    Yes.

16    Q    Your testimony is that Professor Ryckman told

17         Professor Rosenfeld that he wanted to meet with

18         you?

19    A    Yes.

20    Q    What did Professor Rosenfeld tell Professor

21         Ryckman?

22    A    This is not a direct quote, but he said that my
23         client doesn't want to meet with you, and I have
24         advised her not to.

                                                    70

1     Q    Ms. Kiani, did you read Boston University's
2          Motion to Dismiss?
3     A    Yes -- wait.  Was that the initial one or the
4          one that you filed and then Judge Saris ruled
5          on?
6     Q    I will show you.  (Mr. Elswit scans documents.)
7          Actually, I don't have those documents here, and
8          we're going to have to just address this theme
9          after lunch.
10    A    Okay.
11              THE WITNESS:  May I just ask a general
12         question?
13              MR. ELSWIT:  Sure.  Do you want to be
14         on the record or not?
15              THE WITNESS:  It doesn't matter.
16              MR. ELSWIT:  I will give you that
17         liberty that I don't ordinarily give witnesses.
18              THE WITNESS:  Is it possible that I
19         communicate with counsel outside of these
20         proceedings?
21              MR. ELSWIT:  I will tell you what.
22         Why don't we take a lunch break a little earlier
23         than usual, and you can talk all you want, and I

```
24          will decide how much I want to inquire of those
```
                                                        71


```
 1          conversations.  And if Mr. Tariri objects, we'll
 2          go from there.  Would that be all right?
 3                    THE WITNESS:  That's fine.  Thank you.
 4                    (Wherein the lunch break was held.)
 5
 6    BY MR. ELSWIT:
 7     Q    Ms. Kiani, before the lunch break -- and I
 8          should remind you that the same rules are in
 9          effect.  You're under oath, and if you need a
10          break at any time, you can ask for one, and
11          we'll, of course, get it.
12     A    I understand.
13     Q    Ms. Kiani, before the lunch break, we were
14          talking about the disciplinary rules.  I believe
15          you said you skimmed them in your first year and
16          then read them more carefully in the spring or
17          summer of 2003?
18     A    That's correct.
19     Q    Had you read them before you skimmed them in
20          your first year?
21     A    No.
22     Q    So you didn't read them when you applied to law
23          school?
24     A    No.
```
                                                        72

```
1    Q    Had you already enrolled in law school and

2         matriculated in your classes when you first

3         skimmed them?

4    A    Yes.

5    Q    When you read them in the spring of 2003, was

6         this after you received Exhibit 13, which is

7         Dean Cass' letter informing you that you were

8         put on suspension?

9    A    Yes.

10   Q    Now before the lunch break, we were talking

11        about --

12   A    Can you give us a minute, please.

13   Q    Sure.

14   A    Yes.

15   Q    Yes what?

16   A    Still yes to my last question.

17   Q    In other words, you read the disciplinary rules

18        through --

19             MR. TARIRI:  No, I'm sorry, she is

20        just saying yes, just reconfirming what she said

21        before that she received the letter from Dean

22        Cass on May 12th.  You were referring to

23        Exhibit 13, so she is saying yes to that.

24   Q    Let's clean that up a little bit.  We're in
```

                                                        73

```
1         agreement that you received Exhibit 13 some time

2         after it was written on May 12, 2003; is that
```

3          correct?

4    A    Yes.

5    Q    After you received Exhibit 13, Dean Cass'

6         letter, did you then read the disciplinary

7         rules?

8    A    Yes.

9    Q    Was that the first time you had read them

10        carefully?

11   A    Yes.

12   Q    Before the lunch break we talked about Professor

13        Ryckman, and you testified that you did not want

14        to see him.  And after talking with Professor

15        Rosenfeld, you declined to see Professor

16        Ryckman.

17   A    Yes.

18   Q    To your knowledge, did Professor Ryckman ask

19        Professor Rosenfeld if he could speak with you?

20   A    Yes.

21   Q    Or encouraged you to speak with him?

22   A    Yes.

23   Q    And you still declined?

24   A    Yes.

                                                    74


1    Q    You also testified that the first time you saw

2         Professor Ryckman was at the hearing in

3         September of 2003?

4    A    Yes.

5    Q    Was that the only time you saw or met with

```
 6            Professor Ryckman?

 7    A       Yes.

 8    Q       You didn't meet with him again afterward?

 9    A       No.

10    Q       Please take a look at Exhibit 1, which is the

11            Complaint that you filed in this case.

12                    MR. TARIRI:  What page?

13    Q       Turn to the very last page.  Ms. Kiani, the last

14            page of Exhibit 1 is the second page of Exhibit

15            F to the Complaint.

16    A       Okay.

17    Q       Can you see that?

18    A       Yes.

19    Q       Your complaint included as an attached exhibit a

20            photocopy of two pages of the Student Discipline

21            Code; is that correct?

22    A       Yes.

23    Q       Now, on the very top of the last page, the

24            paragraph is incomplete, but it's bracketed.
```
                                                        75

```
 1    A       I see that.

 2    Q       Did you or your attorney bracket that paragraph?

 3    A       My attorney now?

 4    Q       Yes.

 5    A       I have no way of knowing that.

 6    Q       Ms. Kiani, the first complete sentence on the

 7            top of the last page of the Complaint,
```

```
 8          Exhibit 1, states, "All students are to be
 9          informed of the right to counsel and the right
10          to remain silent, and shall be warned that
11          anything the student may say may be used against
12          the student."  Did I read that correctly?
13    A     Yes.
14    Q     The second sentence says, "The student shall be
15          requested to sign a statement to the effect that
16          he or she has been informed of the above rights
17          and has received the above warning."  Did I read
18          that correctly?
19    A     Yes.
20    Q     Ms. Kiani, you filed a Complaint against Boston
21          University alleging breach of contract.
22    A     Yes.
23    Q     As I understand the Complaint, the breach of
24          contract claim is based on your assertion that
```
                                                    76

```
 1          you did not get these rights; is that correct?
 2    A     Yes.
 3    Q     Is there any other basis for the breach of
 4          contract claim, if you know?
 5    A     Do I have a moment to --
 6    Q     No, you cannot talk with your attorney, but if
 7          you don't know the answer, that's fine.
 8    A     I think so, but I don't know.
 9    Q     Okay.  I don't know is an acceptable answer as
10          long as it's truthful.
```

11    A    Okay.

12    Q    Now, please turn to page 4 and page 5 of the

13         Complaint itself.  These pages are numbered.  Do

14         you see on the bottom of page 4, it's the

15         beginning of Count 1, Breach of Contract?

16    A    I do.

17    Q    Turning to page 5, Count 1 continues.

18    A    Right.

19    Q    And it asserts that the University breached its

20         contract with you because the University

21         violated the procedural rules and regulations

22         requiring that the student be afforded the right

23         to remain silent?

24    A    That's correct.

                                                        77


1     Q    Ms. Kiani, were you ever given the right to

2          remain silent --

3     A    I was not.

4     Q    -- at any point during the proceedings?

5     A    I was not.

6     Q    Now, let's get back to the question that I asked

7          you immediately before we broke for lunch, which

8          was, did you read Boston University's motion to

9          dismiss?  And you weren't certain --

10    A    Which one is that?

11    Q    There was only one motion to dismiss, but if

12         you're not sure if you've read it, simply say so

13          and we can move on.

14    A     If I ask you something, will you be able to

15          clarify it?

16    Q     No, it's my job to ask the questions, you just

17          need to answer them.

18    A     I don't know.

19    Q     That's a perfectly fine answer.

20                Ms. Kiani, I'm going to represent that

21          the following document, which will be labeled as

22          Exhibit 19, was attached to Boston University's

23          Motion to Dismiss.

24                          (The document was marked as Exhibit

                                                            78


1                          No. 19.)

2     Q     Why don't you look at it?

3     A     Is there supposed to be a blank page?

4     Q     Yes.

5     A     (Witness reviews document.) Okay.

6     Q     Ms. Kiani, have you ever seen this document

7           before?

8     A     I have.

9     Q     Where did you see it?

10    A     As you said, it was attached to your Motion to

11          Dismiss.

12    Q     Ms. Kiani, this is a transcript, and as you can

13          see, there are four pages per sheet of paper.

14          That's the way this transcript was prepared.

15    A     Okay.

16    Q    Do you see in the top left hand corner, page 1?

17    A    I do.

18    Q    And this document is called Partial Transcript

19         of Hearing of the School of Law Judicial

20         Committee, September 12, 2003.

21    A    Yes.

22    Q    Now, Ms. Kiani, please turn to the second sheet,

23         and in the upper right-hand box, the upper

24         right-hand corner is page 7 of the transcript.

                                                        79


1          Do you see page 7 up on the top right?

2     A    Right, I do.

3     Q    The first text is, "Mr. Rosenfeld:  I thought

4          you were doing it," and then Professor Ryckman.

5     A    Right.

6     Q    Please read to yourself Professor Ryckman's

7          remarks that start at the top of page 7 and go

8          to the bottom.

9     A    (Witness reviews document.) Yes.

10    Q    The second paragraph contains the following

11         sentence.  This is Professor Ryckman now.

12         "Obviously, the student has a right to remain

13         silent, and on advice of counsel, I was informed

14         that Ms. Kiani did not wish to be interviewed by

15         me."

16    A    Right.

17    Q    Were you at the hearing when Professor Ryckman

18          said, "Obviously, the student has a right to

19          remain silent"?

20     A    Yes.

21     Q    Do you recall Professor Ryckman saying this?

22     A    Yes.

23     Q    You knew you had this right because you had read

24          the discipline rules; is that correct?

                                                        80


1      A    No, like I said, I just skimmed procedurally to

2           see what the process was.

3      Q    Your testimony so far is, you skimmed the rules

4           in the fall of 2000?

5      A    Right.

6      Q    And that you read then more carefully after you

7           received your letter of suspension?

8      A    Yes.

9      Q    Did you read them or skim them?

10     A    I don't remember.

11     Q    Did you discuss your right to remain silent with

12          Professor Rosenfeld, your attorney?

13     A    No.

14     Q    This text, Professor Ryckman's text says,

15          "Obviously, the student has a right to remain

16          silent, and on the advice of counsel, I was

17          informed that Ms. Kiani did not wish to be

18          interviewed by me."  Is that correct?

19     A    Yes.

20     Q    Did you speak at this hearing on September 12,

21        2003?

22   A    Yes.

23   Q    Was your attorney present?

24   A    Yes.

                                                    81

1    Q    Did your attorney ask you questions?

2    A    Yes.

3    Q    Did your attorney tell you not to respond to any

4         questions?

5    A    No.

6    Q    Did you answer questions from other participants

7         of the hearing?

8    A    Yes.

9    Q    Did your attorney tell you to answer or not to

10        answer any of those questions?

11   A    No.

12   Q    Now Ms. Kiani, in light of this transcript, is

13        it accurate to say that you were advised of your

14        right to remain silent?

15   A    No.

16   Q    Why not?

17   A    My previous testimony, if you recall, was that

18        before I even went to Professor Rosenfeld to ask

19        him to represent me, was that I knew I didn't

20        want to talk to Professor Ryckman.  So it wasn't

21        based on anybody's advice that I shouldn't talk

22        to him.  It was, as I said before, it

23          reconfirmed what I already knew.

24    Q     Which was?

                                                    82

1     A     That I didn't want to talk to him.

2     Q     And you understood that you had a right not to

3           talk to him?  Nobody was forcing you to talk to

4           him?

5     A     No.  You're correct, nobody was forcing me.

6     Q     So you understood you had the right not to talk

7           to Professor Ryckman?

8     A     Yes.

9                       (The document was marked as Exhibit

10                      No. 20.)

11    A     (Witness reviews document.)

12    Q     Are you familiar with Exhibit 20?

13    A     I am.

14    Q     What is Exhibit 20?

15    A     It talks about a decision being reached in the

16          case.

17    Q     Was this the decision of the Judicial Committee?

18    A     Yes.

19    Q     What did the decision conclude?

20    A     That I had violated the disciplinary regulations

21          of the school.

22    Q     Did it impose a sanction?

23    A     Yes.

24    Q     How much was that sanction?

                                                    83

1    A    Six months.

2                        (The document was marked as Exhibit

3                        No. 21.)

4    Q    Just take a look at Exhibit 21.

5    A    (Witness reviews document.)

6    Q    Have you read Exhibit 21?

7    A    Yes.

8    Q    Did you receive Exhibit 21?

9    A    Yes.

10   Q    Exhibit 21 is a letter from Mary Jo Sullivan,

11        the Registrar of the Law School, to you, dated

12        December 18, 2003.  Can you summarize its

13        contents, please?

14   A    It's basically saying that due to the decision

15        made by the Judicial Committee, my grades have

16        been changed in some courses, and subsequently,

17        I have been dropped for academic deficiency.

18                        (The document was marked as Exhibit

19                        No. 22.)

20   Q    Can you identify Exhibit 22, please?

21   A    (Witness reviews document.) The first page is a

22        final transcript, and the second attached page

23        is the course that I took at Suffolk.

24   Q    The first page on the bottom right, it appears

                                                            84

1         to be dated December 18, 2003?

2      A     Yes.

3      Q     The same day as Ms. Sullivan's letter?

4      A     Yes.

5      Q     And it indicates that you were dropped for

6            academic deficiency in the lower left?

7      A     Yes.

8      Q     Is this the final transcript you received from

9            Boston University?

10     A     Yes.

11                       (The document was marked as Exhibit

12                       No. 23.)

13     A     (Witness reviews document.)

14     Q     Can you identify Exhibit 23?

15     A     I wrote this to the faculty as part of my

16           petition for reinstatement.

17     Q     There's no date on this document.  Do you know

18           approximately when you wrote this?

19     A     No, I don't.

20     Q     Would it be fair to presume that it was written

21           after December 18, 2003?

22     A     Yes.

23     Q     Were you still being represented by Arnie

24           Rosenfeld?

                                                      85


1      A     Yes.

2      Q     Did he also file a petition on your behalf?

3      A     Yes.

4                        (The document was marked as Exhibit

```
5                         No. 24.)

6    Q    Can you identify Exhibit 24?

7    A    It's a letter from Chris Marx and she is saying

8         that the Academic Standards Committee is not

9         inclined to recommend to the faculty that I be

10        reinstated, but that I have one last chance to

11        appear before them to make my case.  And if I

12        wish to do so, could I please let her know.

13   Q    Did you wish to do so?

14   A    Yes.

15   Q    Did you appear before the Academic Standards

16        Committee?

17   A    I did.

18                  (The document was marked as Exhibit

19                   No. 25.)

20   Q    Can you identify Exhibit 25, please?

21   A    This is basically saying that my petition for

22        reinstatement had been denied.

23   Q    This is a letter from Dean Marx to you dated

24        December 5, 2004?
```

                                                          86

```
1    A    February 5th

2    Q    February 5, 2004.  I beg your pardon.

3    A    Yes.

4    Q    Was this letter written after you appeared

5         before the committee?

6    A    Yes.
```

7     Q     Ms. Kiani, was there a subsequent petition?

8     A     You mean after?

9     Q     After the --

10    A     After the petition?

11    Q     Yes, did you have one more appeal?

12    A     Appeal, no.

13    Q     One more petition?

14    A     I'm not sure.

15                    (The document was marked as Exhibit

16                    No. 26.)

17    Q     Ms. Kiani, Exhibit 26 is a letter from Dean Cass

18          to Arnie Rosenfeld with a copy to you dated

19          March 1, 2004.  Do you remember receiving this

20          document?

21    A     Yes.

22    Q     This letter indicates that the faculty met on

23          February 23rd to consider your petition for

24          reinstatement?

                                                    87


1     A     Yes.

2     Q     Did you petition the full faculty after the

3           Academic Standards Committee denied your

4           petition for reinstatement?

5     A     Yes.

6     Q     The full faculty also denied your petition for

7           reinstatement?

8     A     Well, I'm not sure how the process worked.

9           Professor Rosenfeld did submit something to

```
10          them.

11    Q     To the full faculty?

12    A     Yes.  I'm just not sure like how it came to play

13          after everything.

14    Q     This letter would indicate that the full faculty

15          considered that petition and declined to allow

16          you to re-enroll?

17    A     Yes.

18    Q     Ms. Kiani, who is Cory Welles?

19    A     My college freshman English Professor, freshman

20          and sophomore.

21    Q     Did you talk with Professor Welles about this

22          case?

23    A     I did.

24    Q     What did you tell her?
```

                                                            88

```
1     A     Well, everything.  Everything.

2     Q     What is everything?

3     A     From beginning to end, basically.

4     Q     Who is Joe Ostrowsky?

5     A     He is an attorney.

6     Q     Did you talk to him with a mind of asking him to

7           represent you?

8     A     No.

9     Q     Is he a friend?

10    A     Yes.

11    Q     Did you talk to him about everything, to use
```

12          your word?

13    A     Yes.

14    Q     Ms. Kiani, in your interrogatories, you indicate

15          that Professor Pettit and Professor Miller will

16          be called as witnesses should this case come to

17          trial.

18    A     Yes.

19    Q     What do you expect Professor Pettit will testify

20          about?

21    A     He knew me best, and I don't know what he will

22          testify about.

23    Q     How about Professor Miller?

24    A     I don't know what he is going to testify about.

                                                          89


1     Q     Ms. Kiani, please take a look at Exhibit 2 and

2           turn to Interrogatory Number 12.

3     A     Yes.

4     Q     About midway down that paragraph, Paragraph C,

5           you write, "Professor Ryckman stated that I

6           would have been informed of my right to remain

7           silent had I met with him, but that was not the

8           requirement for informing a person of the right

9           to remain silent."

10               What do you mean here?

11    A     That's what he said, that he didn't tell me

12          directly of my right to remain silent because I

13          didn't meet with him.

14    Q     He told you of your right to remain silent at

15          the Judicial Disciplinary Committee hearing,

16          didn't he?

17    A     No, he made a general statement.

18    Q     He made a general statement of your right to

19          remain silent?

20    A     That wasn't to me.

21    Q     He made a general statement of the right to

22          remain silent and you heard it, didn't you?

23    A     Yes.

24    Q     Were you the only student before the Judicial

                                                        90


1           Committee at that particular day?

2     A     Yes.

3                 MR. ELSWIT:  Well, Ms. Kiani, you have

4           been a delightful witness, and I have no further

5           questions.

6                 THE WITNESS:  Really?

7                 MR. ELSWIT:  Really.

8                 THE WITNESS:  I didn't think this

9           would end so soon.

10                MR. TARIRI:  I have some questions, if

11          I may.

12                MR. ELSWIT:  Sure.

13

14                      CROSS EXAMINATION

15    BY MR. TARIRI:

16    Q     Regarding the issue of being advised of the

17          right to remain silent, were you ever advised

18          that you had a right to remain silent by anyone

19          from BU?

20    A     No.

21    Q     Either in writing or verbally?

22    A     No.

23    Q     Ms. Kiani, I direct your attention to Exhibit

24          Number 7.  Can you identify that exhibit,

                                                    91


1           please?  What does it appear to be?

2     A     A letter from Dean Chris Marx.

3     Q     Did you receive a letter like that from Dean

4           Marx?

5     A     I have never seen this until now.

6     Q     So you don't recall receiving anything like

7           this?

8     A     No.

9     Q     Were you advised of the requirements for

10          obtaining accommodations in any form from Dean

11          Marx?

12    A     No.

13    Q     Ms. Kiani, you had asked for certain

14          accommodations that you had not received?

15    A     Yes.

16    Q     What would have happened had you received those?

17                MR. ELSWIT:  Objection.

18                MR. TARIRI:  Objection noted.

19    Q     You can answer.

20   A   I would have been on a level playing field with

21         everyone else.  Everyone else is able to take

22         notes and I'm not.  So I would have been on -- I

23         would have had the same things that everyone

24         else had.

                          92

1   Q   So how were you taking notes in class in law

2         school?

3   A   I was using a tape recorder.

4   Q   Can you just elaborate.  What would you do then?

5         Can you describe the procedure?

6   A   Yes, I would tape the lectures in class, then I

7         would have to go home and type those out by

8         hand.

9   Q   Generally, how long would it take you to type an

10        hour speech, an hour lecture by hand, after

11        having had the tape?

12   A   For one class, it would take five hours.  I

13        timed this.

14              MR. TARIRI:  I have no further

15        questions.  Thank you.

16

17              REDIRECT EXAMINATION

18 BY MR. ELSWIT:

19   Q   Ms. Kiani, could you take a look at Exhibit 7?

20   A   Sure.

21   Q   Just now you testified that you have never seen

22          this document?

23    A     Right.

24    Q     Did you have an e-mail exchange with Dean Marx

                                                              93


1           about your accommodations?

2     A     I don't remember.

3     Q     When we discussed this document this morning, do

4           you remember we discussed this document in some

5           detail?

6     A     Yes.

7     Q     Why didn't you testify in the morning that you

8           had not seen this document?

9                  THE WITNESS:  Is it possible that I be

10          read back what I said?

11                 MR. ELSWIT:  Certainly, if you can get

12          back to it.

13                      (Page 25, Lines 7-22 were read by

14                       the court reporter.)

15    Q     On review of the record, it appears that this

16          morning you did testify that you did not

17          remember this document.

18    A     Thank you.

19                 MR. ELSWIT:  And with that, I am done.

20                 MR. TARIRI:  I'm all set.  Thank you.

21

22                      (Whereupon at 1:48 p.m., the

23                       deposition was concluded.)

24

94

SIGNATURE PAGE/ERRATA SHEET

Re: Layla Kiani vs. Trustees of Boston University

April 21, 2005
Deposition of Layla Kiani


        I, LAYLA KIANI, do hereby certify that
I have read the foregoing transcript of my testimony
and further certify that it is a true and accurate
record of my testimony (with the exception of the
following changes listed below):

| Page | Line | Correction |
|------|------|------------|
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |
| ____ | ____ | _____ |

        Signed under the pains and penalties

of perjury this _____day of_____200___.


                        _____
                        LAYLA KIANI

95

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
NORFOLK, SS.

I, Camille Macomber, Notary Public and

Registered Professional Reporter in and for the

Commonwealth of Massachusetts, do hereby

certify:

That Layla Kiani, the witness whose

deposition is hereinbefore set forth on pages 5

through 93, inclusive, was duly sworn by me;

that her testimony thereupon given was recorded

by me stenographically and transcribed by me;

and that such deposition is a true record of the

testimony given by the said witness to the best

of my knowledge, skill and ability.

IN WITNESS WHEREOF, I hereunto set my

hand this 2nd day of May 2005.

_____
Camille Macomber, RPR
Court Reporter
Notary Public

My Commission Expires:
August 19, 2005