# Plaintiff's Exhibit "L"

1

```
1              Volume: I
2              Pages: 1-57
3       UNITED STATES DISTRICT COURT
4       DISTRICT OF MASSACHUSETTS
5
  - - - - - - - - - - - - - - - - - x
6  LAYLA KIANI,
7          Plaintiff,
8   v.
9  TRUSTEES OF BOSTON UNIVERSITY,
10          Defendants.
  - - - - - - - - - - - - - - - - - x
11
12       DEPOSITION OF CHRISTINE A. MARX
13     Monday, April 25, 2005, 1:04 p.m.
14         Law Office of Ben Tariri
15          343 Washington Street
16         Newton, Massachusetts 02458
17  -------Reporter:  Toni F. Beckwith, RMR-------
18
19               ********
20
21
22    Toni F. Beckwith, Registered Merit Reporter
                50 Winsor Avenue
23     Watertown, Massachusetts 02472
                Tel: 617.924.2731
24            Fax: 617.924.9899
```

2

```
1  APPEARANCES:
2
3   LAW OFFICE OF BEN TARIRI
4   By Ben Tariri, Esquire
5   343 Washington Street
6   Newton, Massachusetts 02458
7   Counsel for the Plaintiff
8
9   BOSTON UNIVERSITY
10   OFFICE OF THE GENERAL COUNSEL
11   By Lawrence S. Elswit, Esquire
```

12   125 Bay State Road
13   Boston, Massachusetts 02215
14   Counsel for the Defendants
15
16
17
18
19
20
21
22
23
24

                                    3
1              I N D E X
2    Deposition of:   Direct Cross Redirect Recross
3    CHRISTINE A. MARX
4      By Mr. Tariri   4
5
6
7
8
9
10
11            E X H I B I T S
12   No.                            Page
13
14   1       E-mail to L. Kiani
15           from C. Marx              21
16   2       Letter dated 1/14/04 to
17           L. Kiani from C. Marx        37
18   3       Article V.  The Judicial
19           Committee              44
20
21
22
23
24

                                    4
1            P R O C E E D I N G S
2        MR. TARIRI:  Swear the witness.
3
4        CHRISTINE A. MARX,
5    having been satisfactorily identified by the

6   production of her driver's license, and duly
7   sworn by the Notary Public, was examined and
8   testified as follows:
9
10              DIRECT EXAMINATION
11  BY MR. TARIRI:
12      Q.  Good afternoon.  My name is Ben
13  Tariri.  I'm attorney for the plaintiff Layla
14  Kiani.  Present today at the deposition is Chris
15  Marx.
16      A.  Christine is my full name.
17      Q.  And Attorney Lawrence Elswit.
18          Ms. Marx, if I ask you any questions,
19  I would expect that you would give an answer.
20  Your attorney is welcome to object.
21  Notwithstanding that objection, I will expect
22  you to answer.
23          Ms. Marx, have you had an opportunity
24  to discuss this deposition with your attorney?

                                    5
1       A.  With --
2       Q.  With your attorney?
3       A.  Lawrence Elswit, yes, I have.
4       Q.  When was the last time you spoke with
5   him regarding this deposition?
6       A.  Just now out in the hall.
7          MR. ELSWIT:  That's the answer.
8       Q.  How do you spell your last name,
9   Ms. Marx?
10      A.  M A R X.
11      Q.  What do you do, Ms. Marx?
12      A.  I'm assistant dean for student affairs
13  at Boston University School of Law.
14      Q.  How long have you worked for Boston
15  University?
16      A.  I've been there since the summer of
17  1987.
18      Q.  What was your position when you
19  started your work?
20      A.  At BU?
21      Q.  At Boston University.
22      A.  It was the same position, assistant
23  dean for student affairs.
24      Q.  What does it take to become an

6

1  assistant dean?
2      A.  Do you mean educational background or?
3      Q.  Experience, background, educational
4  background.
5      A.  I don't think there's any set
6  requirements.  Different schools have different
7  qualifications and have hired different sorts of
8  people to be it.  From what I can tell, there's
9  no one set career path of how you become an
10  assistant dean of student affairs.
11      Q.  My question is:  Does it require
12  experience in the same field or similar field?
13      A.  You mean law or legal education?
14      Q.  Student affairs.
15      A.  I think it's helpful, but I think it's
16  also helpful to have a law background.  So I
17  think it just depends.  It depends on the
18  institution.  That's all I can really...
19      Q.  Do you have a law background?
20      A.  Yes, I do.
21      Q.  What degree do you have in law?
22      A.  I have a J.D. degree.
23      Q.  Prior to BU, did you work for any
24  other academic institution?

7

1      A.  No, I did not.
2      Q.  What did you do before you started
3  working for BU?
4      A.  My last job before that was working at
5  a small firm in Boston, McCormack & Epstein.
6      Q.  In what capacity?
7      A.  I was an associate at the firm.
8      Q.  What prompted you to look for a
9  position as an assistant dean?
10      A.  The position actually was brought to
11  my attention by someone who knew that I had both
12  a J.D. degree and a Master's degree in social
13  work.  And they thought that given that, that's
14  somewhat of a unique combination of experiences,
15  that it might be a position that I would be good
16  at and might be interesting to me.
17      Q.  Do you specifically work for the law
18  school?
19      A.  Yes, I do.  I guess I'm considered an

20  employee of Boston University, but I work day to
21  day within the law school.
22      Q.  That's who you've been working for
23  since 1987?
24      A.  Yes, that's correct.


                                    8
1       Q.  Ms. Marx -- may I call you Ms. Marx?
2       A.  Sure.
3       Q.  Can you describe your position?  What
4   do you do?
5       A.  I think there are two major parts to
6   my position:  One is the day-to-day advising and
7   counseling with law students.  I deal
8   specifically with the J.D. students.  And the
9   other big piece would be doing programming and
10  workshops for J.D. students.  Those are the two
11  main areas.
12      Q.  On a given day, how many students do
13  you see on an average given day?
14      A.  It varies depending on the time of
15  year because the academic calendar dictates how
16  busy it is.
17      Q.  True.
18      A.  Because of what's going on.  For
19  example, now we're entering into our exam
20  period, so I might see six to eight students a
21  day and get probably that, but it really varies
22  day by day.  It depends on the time of year.
23      Q.  Would you say you see more than ten
24  students a day on an average given day?


                                    9
1       A.  Probably not on an average day.  But I
2   can't pin it down because it really depends on
3   the time of year, so it's even hard to average
4   it out.
5       Q.  Can you give us an example as what you
6   do, just an example as what you do for any
7   average student?  You know, if a student comes
8   to you, why would they come to you rather than
9   go to somebody else?
10      A.  They come to me with the gamut of
11  issues from any kind of personal issue they
12  might have:  My mother was just diagnosed with
13  cancer, and I don't know if I should stay in

14  school; it's exam period, and I'm going to have
15  to go home to help my mother who is ill; I'm not
16  sure can I take my exam; I'm living with another
17  law student who is driving me crazy, and can you
18  do something about it; I have a professor who I
19  think is giving more work than other professors,
20  and I really hate to complain about it, but it's
21  really driving me crazy, can you do something
22  about it; why is BU giving up the Sergeant
23  Gymnasium which is really close to the law
24  school.

                          10
1      Q.  Do you blame them?
2      A.  Even though I know they have a new
3  fitness center, but that's really going to be
4  inconvenient for me.  I could go on and on.
5      Q.  What do you do to respond to them?
6      A.  Well, obviously it depends on what the
7  issue is.
8      Q.  What can you do?
9      A.  Well, again, it depends on the issue,
10  what the issue is that they raise.
11     Q.  Well, for instance, you gave an
12  example, if I recall, a student who comes in and
13  says my roommate is -- I'm not happy with my
14  roommate.
15     A.  Mm-hmm.
16     Q.  What would you do?
17     A.  You mean if the roommate is a law
18  student?
19     Q.  Yes.
20     A.  I would talk to the student further
21  about it to try and get more information.  I
22  would probably let the student know that
23  situations that are outside the law school that
24  delve more into the students' personal lives are

                          11
1  harder to deal with, and it can be very
2  threatening to another law student if somebody
3  in the Dean's Office contacts that student and
4  calls them in, even in a way to be helpful, it
5  still is, some people think of it as it can be
6  intimidating.
7          But if the complaining student wants

8  me to, I'll probably offer to talk to the other
9  student and see if maybe I could at least try to
10  think of some solution that all of them might be
11  happy with but also make it clear what my
12  limitations are.
13      Q.  What are those limitations?  Are any
14  of the decisions absolutely binding?
15      A.  That I would make?
16      Q.  Yes.
17      A.  I'm trying to think.
18       (Pause)
19      A.  I don't know.  That's hard for me to
20  answer.  I don't know.  I guess it depends on
21  what the decision is.
22          MR. ELSWIT:  If you don't know, you
23  don't know.
24      A.  I just don't know.


                                12
1      Q.  Do you also deal with handicapped
2  students?
3      A.  Yes, I do.
4      Q.  On a regular basis?
5      A.  Yes.
6      Q.  What do you do for them?
7          MR. ELSWIT:  Objection.
8          MR. TARIRI:  Objection noted.
9      A.  A sort of general thing I do is I send
10  letters out in the summer to accepted students
11  who we have pretty much assurance that they're
12  going to be coming to the law school, and I give
13  them information about a lot of things:
14  Orientation, registration, computer facilities.
15  And then I also include information about, for
16  students with disabilities, what the procedure
17  is if they think, if they have a disability and
18  are seeking some accommodations for the
19  disability, what the University's procedure is
20  on that.  So that would be a start.
21      Q.  Do you have a large handicapped
22  student group?
23          MR. ELSWIT:  Objection.  Large.  Could
24  you define that, please?


                                13
1      Q.  In relation to the number of students

2   in the school, do you have more than 10 percent
3   handicapped students?
4        A. I don't know what the current number
5   is.
6        Q. In your estimation, how many students
7   are handicapped?
8          MR. ELSWIT: Objection.
9        A. I would just be speculating.
10         MR. TARIRI: What is the basis of your
11  objection?
12         MR. ELSWIT: My objection is that,
13  aside from the fact the question has no real
14  bearing on this case, my objection is that
15  you've asked her to speculate, and the term
16  handicapped covers such a wide array of
17  potential issues, that even if Dean Marx Knew
18  how many students had disabilities, it would not
19  be informative of anything. Because there are
20  so many different types of disabilities that
21  require so many different adjustments and raise
22  so many different unique sets of needs that as a
23  number, it's meaningless.
24         MR. TARIRI: I'm not looking for

                              14
1   whether it's meaningless or not. I'm looking
2   because she's been an assistant dean since 1987.
3   So she would be in the right position to know
4   whether there are handicapped students at the
5   school.
6          MR. ELSWIT: Dean Marx has already
7   testified that there are students with
8   disabilities in the law school.
9          MR. TARIRI: I just asked her how
10  many.
11         MR. ELSWIT: She testified she doesn't
12  know, and you're asking her to speculate.
13         MR. TARIRI: I'm just asking her to
14  give me a ballpark figure.
15       Q. Could you give me a ballpark figure?
16       A. I can't. I just can't.
17       Q. Would it be more than five?
18         MR. ELSWIT: Objection.
19       A. I could answer that there -- I'm
20  confident there are more than five, but that's
21  all. I just can't give a definite number.

22      Q.  You testified that students come in
23  with various handicapped disabilities.  Can you
24  give us several examples of, two or three

                                      15
1  examples of, what those disabilities could be?
2      A.  Well, I don't think I did say that
3  students came in with various disabilities.
4  Maybe I did, but I don't remember saying that.
5          But there could be learning
6  disabilities, hearing impairment, visual
7  impairment, mental illness.
8      Q.  Do you have any students who have come
9  in with, in the time that you've been there, who
10  have had cerebral palsy?
11      A.  I don't always know the exact
12  diagnosis unless the student tells me because
13  the University's process initially goes through
14  the Office of Disability Services at BU.  So
15  they're the ones that get all the documentation
16  and know the exact nature of someone's
17  disability if they choose to inform somebody in
18  the University about it.
19      Q.  Let me restate that.  Have you seen
20  any students who are wheelchair-bound?
21      A.  Yes.  You mean at the law school?
22      Q.  At the law school.  I'm referring to
23  the law school because you are the assistant
24  dean of the law school.

                                      16
1      A.  Right.
2      Q.  Have you seen students who have
3  dexterity issues, issues with writing?
4      A.  Yes.
5      Q.  Do you have an opportunity to interact
6  with them?
7      A.  Yes.
8      Q.  Can you give us an example of that?
9      A.  I'm trying to remember.  I'm not sure
10  what the question is.  I'm not sure what the
11  interaction -- it's so broad.
12      Q.  Let me rephrase.  You testified that
13  you've had students who have handicap status who
14  have dexterity problems?
15      A.  Yes.

16      Q.  And you also said that you've known
17  students who could not, who could not write --
18  well, you may not have said that.  But would you
19  say that you have known students who could not
20  write or at least easily write?
21      A.  Yes.  I have known students who inform
22  me that they have difficulty writing.
23      Q.  And what did you do when they informed
24  you of that?

17

1      A.  Well, it depends on the nature of why
2  they're coming to see me.  I mean, if it's to
3  ask for accommodations related to their
4  disability, then I make sure they understand the
5  University's procedure which the law school
6  follows for requesting accommodations for
7  disability.
8      Q.  If they came to you for
9  accommodations, did you advise them of that?
10      A.  Yes, what the procedure is for
11  requesting accommodations.
12      Q.  Now we're speaking about a particular
13  student who had difficulty writing.  Did that
14  student receive the accommodation that he or she
15  was looking for?
16      A.  I don't know, because I don't make the
17  initial determination.
18          MR. ELSWIT:  I don't know.  Just
19  answer the question.
20      A.  I don't know.
21      Q.  Was this a recent student?
22      A.  What do you mean by recent?
23      Q.  The student that you just referred to
24  who had difficulty writing, was this a recent

18

1  case?
2          MR. ELSWIT:  How recent?
3          MR. TARIRI:  In the last five years.
4      A.  Yes.
5      Q.  Do you know this person personally on
6  a name basis?
7      A.  Yes.
8      Q.  What is that person's name?
9          MR. ELSWIT:  Objection.  Don't answer.

10  I'm going to instruct the witness not to answer
11  it because that involves information that would
12  cause the witness to violate the privacy of
13  another student, and we're not going there.
14      Q.  Ms. Marx, can you tell us if it was a
15  female or a male?
16      A.  A female.
17      Q.  Was it more than one person?
18      A.  Yes.
19      Q.  How many?
20      A.  I don't know.  I just don't know.
21      Q.  Well, again, we're discussing just the
22  last five years.
23      A.  I would have to go through all my
24  records and the records of the school.  I'm just

                              19
1  not -- I didn't do that in preparation for this.
2      Q.  What is the procedure to receive
3  accommodations in your school?
4      A.  We follow the University's procedure;
5  which is, students contact the BU Office of
6  Disability Services and they submit their
7  documentation to that office.
8          That office makes a preliminary
9  recommendation which goes to our associate dean
10  for academic affairs.  This is just dealing with
11  the J.D. students.
12          And then the associate dean for
13  academic affairs in the law school does a
14  recommendation to the dean of the law school
15  because the dean of the law school ultimately
16  must approve the accommodations or the
17  recommendation as not being inconsistent with
18  the academic program.
19          And then once the dean makes a
20  decision, then the Registrar's Office notifies
21  the students in writing what accommodations have
22  been approved, and I get a copy of that.
23      Q.  Ms. Marx, are you familiar with Ms.
24  Layla Kiani?

                              20
1      A.  Yes, I am.
2      Q.  How do you know her?
3      A.  She was a student at Boston University

4  School of Law.
5      Q.  How long have you known her?
6      A.  I don't remember the exact year,
7  whenever she matriculated at the law school.  I
8  just don't remember what the year was.
9      Q.  If I said it was in the year 2000,
10  would that be a fair estimate of the time?
11      A.  I think so, but I'm not 100 percent
12  sure.
13      Q.  Do you recall the first time you met
14  her or were in contact with her?
15      A.  No, I don't.
16      Q.  Do you recall if you were ever in
17  contact with her?
18      A.  Yes.
19      Q.  Ms. Marx, do you believe that
20  Ms. Kiani has a disability?
21      A.  Yes, I do.
22         MR. ELSWIT:  Objection.
23      Q.  Did Ms. Kiani at any time in her first
24  year communicate with you regarding her

                    21
1  disability and dexterity problems?
2      A.  I don't recall.  I just don't
3  remember.
4       (Exhibit 1 marked
5        for identification)
6      Q.  If you would look that over and read
7  it to yourself.
8       (Pause)
9      A.  Okay.
10      Q.  Do you recognize this document?
11      A.  Yes, I do.
12      Q.  Was this written by you?
13      A.  The top part where it says, Hi again
14  down to colon, 06.
15      Q.  Was the top part written by you?
16      A.  Yes.
17      Q.  Do you recall when you wrote this?
18      A.  No, I don't.
19      Q.  This is an undated document --
20      A.  Mm-hmm.
21      Q.  -- so it's not clear as to the date.
22         Why did you write this letter?
23      A.  It was in response to Layla's e-mail

24  to me that is set out below.

                                    22
1       Q.  At the time, had you seen her, had you
2   seen Layla Kiani?
3       A.  I don't remember.
4       Q.  Can you read the date in the middle of
5   the document.  It starts with 06?
6       A.  06, colon, 06 p.m., 10/26/00 EDT.
7       Q.  Would it be fair to say that this was
8   at the beginning of Ms. Kiani enrollment in the
9   school?
10      A.  I don't know.  I honestly don't know.
11      Q.  Did you say that you had seen
12  Ms. Kiani prior to writing this e-mail?
13      A.  I don't remember.
14      Q.  You said you had sent this letter in
15  response to Ms. Kiani's e-mail, Exhibit No. 1?
16      A.  That's correct.
17      Q.  Is it normal for you to send this sort
18  of an e-mail to a student when a student
19  communicates with you?
20      A.  I would say almost always when a
21  student e-mails me, at some point, and
22  preferably as soon as possible, I e-mail them
23  back to make some kind of a response, yes.
24      Q.  When you sent this e-mail, were you

                                    23
1   familiar with Ms. Kiani's disability?
2       A.  I don't remember.
3       Q.  Apparently Ms. Kiani was looking for
4   what she calls a transcriber; am I correct?
5       A.  According to her e-mail, yes.
6       Q.  In your experience, what is a
7   transcriber, which is probably another name for
8   a stenographer?
9       A.  My understanding of a transcriber
10  would be someone who writes down in some
11  official way or with some machine something
12  that's said orally for use by someone else.
13      Q.  Do you employ such a person at the
14  school?
15      A.  Transcriber, no.
16      Q.  Have you ever had a transcriber at the
17  school?

18      A.  Not that I'm aware of, but I don't
19  know that for sure.
20      Q.  So if a student needs this sort of
21  accommodation, what would you do?
22      A.  I would advise them to go to the BU
23  Office of Disability Services to have them
24  review their disability and what the

                                    24
1  accommodation is.
2      Q.  You're not answering my question.
3       If a student needs a transcriber --
4  and you just testified that BU does not provide
5  transcribers, you've never seen one.
6      A.  Not that I'm aware.
7      MR. ELSWIT:  Objection.  That is not
8  what the witness said.  What the witness said
9  was, the school, presumably referring to the law
10  school, does not employ a transcriber.  The
11  question of whether the University provides a
12  transcriber has not yet been asked.
13       And she was in the process of
14  answering your question, which is:  When a
15  student needs an accommodation, what do you do.
16  And she was telling you that she refers them to
17  the Office of Disability Services before you
18  interrupted her.
19      Q.  I'm not looking for the procedure.  I
20  already asked that question.  I'm just
21  interested in knowing if a student needs a
22  transcriber, and you testified earlier that the
23  school does not employ transcribers, what does
24  the student do who needs a transcriber?

                                    25
1      MR. ELSWIT:  Objection again.  Are you
2  asking the witness -- first, you asked the
3  witness whether the school employed a
4  transcriber.  I think, for the record, it would
5  be useful to state, to reframe that question in
6  terms of the law school so that we know actually
7  what Dean Marx is testifying about and then go
8  forward.
9      MR. TARIRI:  My question was regarding
10  the school as a whole.
11      MR. ELSWIT:  Boston University?

12        Q.  Does Boston University employ a
13   transcriber?
14        A.  I don't know that.
15        Q.  In your experience as the assistant
16   dean of the law school, has Boston University
17   Law School employed a transcriber during the
18   time that you have been their employee?
19        A.  You mean the law school?
20        Q.  The law school.
21        A.  Not that I'm aware of, no.
22        Q.  And you've been there since 1987?
23        A.  Right.  That's correct.
24        Q.  Ms. Marx, you also said that you had a

26

1   student recently in the last five years who
2   needed help because of dexterity issues.
3   Without going into details, how did you address
4   that issue?  Was he or she assigned a
5   transcriber?
6        A.  Not that I'm aware of.
7        Q.  In your experience and in your
8   knowledge as the assistant dean, is it the
9   policy of the law school to accommodate students
10   who have dexterity issues with stenographers or
11   transcribers?
12        A.  We get our recommendation first from
13   the BU Office of Disability Services, and then
14   ultimately it has to be approved by the dean of
15   the law school, so that's how that would be
16   handled.
17        Q.  But it is the policy of the school to
18   not provide transcribers?
19        A.  The law school?
20        Q.  The law school, I'm sorry.
21        A.  Again, we would go by what
22   accommodations were recommended by the BU office
23   of Disability Services and approved by the dean
24   of the law school.

27

1        Q.  Do you recall what accommodations were
2   actually provided for Ms. Kiani?
3        A.  I believe the Disability Services
4   Office recommended, and Dean Cass, who was the
5   dean of the law school, approved that she have a

 6  note taker in classes that could tape-record her
 7  classes.  I believe that she had up to double
 8  the regularly-allotted time for in-class and
 9  eight-hour take-home exams and for her exams
10  that she be allowed to either dictate them and
11  have them typed up or have a scribe to write the
12  exam for her.
13      Q.  Seems you have a very clear memory of
14  what she was given as an accommodation.
15          Do you recall anyone else who received
16  similar accommodations during your period at the
17  law school?
18      A.  Yes.
19      Q.  Do you recall anyone who received more
20  accommodations than what Ms. Kiani did during
21  your employment?
22      A.  I don't remember.
23      Q.  Do you recall, I may have asked this
24  before, but do you recall why she needed a

                              28
 1  transcriber?
 2      A.  My only recollection is her e-mail to
 3  me where she sets it out in her e-mail.  That's
 4  all I remember.
 5      Q.  When was the first time you met her?
 6      A.  I don't remember.
 7      Q.  Would it have been prior to 2003 or
 8  after 2003, let's say January of 2003?
 9      A.  Before 2003.
10      Q.  Do you recall why you met her, under
11  what circumstances you met her?
12      A.  She was a student at the law school.
13  I remember that she would periodically come to
14  my office or e-mail me like a lot of students
15  do.
16      Q.  Was she in a wheelchair?
17      A.  Sometimes.
18      Q.  Do you recall a specific instance when
19  she actually came to see you for a specific
20  purpose?  As far back as possible, if you could,
21  please.
22      A.  No, I don't remember.
23      Q.  Do you recall discussing her
24  disability in the year 2000 with anyone?

29

1      A.  With anyone?
2      Q.  With anyone.
3      A.  I recall talking to Allan Macurdy, who
4  was the director of BU Office of Disability
5  Services, after Layla sent me this e-mail.
6      Q.  What did you tell him?
7      A.  I don't remember the specific
8  conversation, exactly what I said to him.
9      Q.  Do you keep notes?
10      A.  Sometimes.
11      Q.  You don't have too many handicapped
12  students in your law school, do you?
13      A.  I don't know.
14      Q.  In other words, you would remember
15  Ms. Kiani if you saw her?
16         MR. ELSWIT:  Objection.  That's not
17  what she said.
18      Q.  Would you remember Ms. Kiani if you
19  saw her for the first time?
20      A.  I mean, I remember her.  I remember
21  who she is.
22      Q.  Well, I guess my question is:  Does
23  she leave an indelible mark in one's mind?
24         MR. ELSWIT:  Objection.

30

1      A.  I can't answer that.  I don't know.  I
2  can't speculate about that.
3      Q.  When she sent you this e-mail, and you
4  claim to have responded to this e-mail, to her
5  e-mail?
6         MR. ELSWIT:  Objection.
7      Q.  This is referring to Exhibit 1.  Did
8  you respond to her e-mail as shown on Exhibit 1?
9      A.  Yes.  That's my e-mail response to
10  Layla.
11      Q.  Did you send that through the BU Law
12  School e-mail --
13      A.  Yes.
14      Q.  -- server?
15      A.  However BU does its e-mail, but it's
16  through my BU address.
17      Q.  Do you keep a record of your e-mails?
18      A.  What do you mean by record?
19      Q.  Do you keep your e-mails?

20     A.  Not all of them.
21     Q.  What do you do with them?
22     A.  You mean the ones I keep or the ones
23  I --
24     Q.  The ones you don't keep.


31

1     A.  I try to clean out my e-mail
2  periodically because I get so much e-mail, I've
3  been finding that my e-mail actually doesn't
4  work sometimes.  And I've been told to try to
5  clean it out a little bit.
6     Q.  When was the last time you cleaned out
7  your e-mail?
8     A.  Well, let's see, today I would have
9  deleted some e-mails that I got after I
10  responded to them or if I didn't need to respond
11  to them.
12     Q.  So would it be fair to say that you
13  deleted e-mails that were sent to you in the
14  last year?
15     A.  Yes.
16     Q.  And would it also be fair to say that
17  you deleted e-mails that were sent to you in the
18  year before last year?
19     A.  Yes.
20     Q.  Would it be fair to say that you would
21  delete e-mails that were sent to you in the year
22  2000 and the responses that you sent out in the
23  year 2000?
24     A.  Yes.


32

1     Q.  In your opinion, when was this e-mail
2  saved?  We have a printout here as you can see
3  on Exhibit 1.  When was this e-mail saved?
4     A.  I have no idea.  I don't know.
5        MR. ELSWIT:  Ben, what are you
6  insinuating with this line of questioning?
7        MR. TARIRI:  I'm not insinuating.  I'm
8  just asking questions.  I'm just trying to find
9  out where this e-mail was.
10        MR. ELSWIT:  It was obviously in Dean
11  Marx's file because Boston University produced
12  it as Document No. 0232.  And the fact that her
13  server apparently does not have the date on it

14  doesn't take away from the fact that it was
15  saved and it was produced in response to a
16  document request.
17      Q.  Ms. Marx, I'm going to ask you this
18  point-blank:  Did you send this e-mail?
19      A.  As far as I can remember, yes.
20      Q.  Well, you would know because this came
21  from your e-mail address, so you would know if
22  you sent this e-mail?
23      A.  Yes.  That's my e-mail address.
24      Q.  Did you receive any response from

33

1  Ms. Kiani subsequent to this e-mail?
2      A.  You mean an e-mail response or?
3      Q.  Any response.
4      A.  I don't remember.
5      Q.  Did you think about her after you sent
6  this e-mail?  Were you wondering?
7          MR. ELSWIT:  Objection.
8          MR. TARIRI:  Objection noted.
9      A.  I remember feeling badly that, you
10  know -- whenever a student e-mails me about an
11  issue, usually when they e-mail me, it's because
12  they're concerned about an issue.  So I do
13  remember feeling badly, and I wanted to try to
14  help if I could, which is why I called Allan
15  Macurdy and talked to him, because I wanted to
16  help as best as I could, so I do remember that.
17      Q.  Did you talk to Ms. Kiani.  Did you
18  follow up on this?  Two questions.  I'm sorry.
19  You can answer the first question first.
20      A.  You mean after I sent this e-mail?
21      Q.  Yes.
22      A.  I don't remember.
23      Q.  Did you follow up to see whether she
24  actually contacted the provost?

34

1      A.  I don't remember.
2      Q.  Did she contact you?
3      A.  I don't remember.
4      Q.  When was the first time that you
5  recall having met her?
6      A.  I don't remember.
7      Q.  When was the first time that

8  Ms. Kiani's name actually came up?

9      A.  I don't remember.

10      Q.  When was the first time that you

11  actually met her, that you recall?

12      A.  I don't remember.

13      Q.  You did testify that you met her?

14      A.  Yes.

15      Q.  Ms. Marx, are you familiar with this

16  case?  Are you somewhat familiar with this case?

17      A.  Somewhat familiar.

18      Q.  You do know that Ms. Kiani has filed a

19  lawsuit against BU Law School for discrimination

20  as well as for breach of contract?

21      A.  I'd have to look at the complaint

22  again.

23      Q.  In fact, you are a defendant in the

24  lawsuit?  You were one of the defendants in the

                                35

1  lawsuit?

2      A.  You mean originally?

3      Q.  Originally.

4      A.  As an individual, yes.

5      Q.  Do you know what the lawsuit was about

6  as far as it concerning you?

7      A.  No.  I couldn't understand it.

8      Q.  Do you know generally why there was a

9  lawsuit, that there is a lawsuit?

10      A.  I think there's something related to

11  this transcriber issue, but that's all I know.

12  I'm not sure about the breach of contract.  I

13  don't remember.

14      Q.  Are you familiar with Professor Kull?

15      A.  Yes, I am.

16      Q.  Do you know Professor Mariner?

17      A.  Yes.

18      Q.  And Dean Cass?

19      A.  Yes.

20      Q.  Are you familiar with the issues

21  surrounding Ms. Kiani prior to this lawsuit?

22      MR. ELSWIT:  Objection.

23      Q.  To be more specific, issues being that

24  she was charged with plagiarism?

                                36

1      A.  Yes.

2      Q.  When was the first time you heard
3   about that, about plagiarism?
4      A.  I don't remember when.
5      Q.  Did you have any conversations with
6   anyone regarding the plagiarism, quote/unquote,
7   plagiarism?
8          MR. ELSWIT:  Objection.
9      A.  I don't remember specific
10  conversations about that.
11     Q.  Do you recall at all communicating
12  with anyone regarding Ms. Kiani as far as what
13  her status was subsequent to her being charged
14  with plagiarism?
15     A.  You mean with regard to the plagiarism
16  issue?
17     Q.  Correct.
18     A.  I don't remember any.  I just don't
19  remember.
20     Q.  Do you recall communicating with
21  Ms. Kiani?
22     A.  About?
23     Q.  Well, do you recall communicating with
24  her subsequent to January 1, 2003?

                                        37
1      A.  I don't remember specific dates, no.
2          MR. TARIRI:  Please mark this as
3   Exhibit 2.
4       (Exhibit 2 marked
5        for identification)
6      Q.  Ms. Marx, could you examine that
7   document?
8       (Pause)
9      A.  Okay.
10     Q.  Do you recall writing this letter?
11     A.  Yes.
12     Q.  Was that the first time that you
13  communicated with her, with Ms. Kiani?
14         MR. ELSWIT:  Objection.  We've already
15  established that Dean Marx and Ms. Kiani had an
16  e-mail exchange two and a half years earlier,
17  three and a half years earlier.
18     Q.  Subsequent to that previous e-mail in
19  Exhibit 1, is this the first time that you
20  communicated with Ms. Kiani?
21     A.  No.

22     Q.  So you communicated with her earlier,
23  then?
24     A.  I'm not sure of the timing.

38

1     Q.  Ms. Marx, prior to coming in to this
2  deposition today, did you have an opportunity to
3  consult with your records concerning Ms. Kiani?
4     A.  Yes.  I looked at her file in the
5  Registrar's Office.
6     Q.  In the year 2003, did you discuss
7  Ms. Kiani with Professor Kull?
8     A.  I don't recall discussing her with
9  Professor Kull.
10     Q.  Who did you discuss anything about
11  Ms. Kiani with in the year 2003?
12     A.  I just don't know the dates.
13     Q.  I'm not looking for the specific
14  dates, just --
15     A.  Or even the year.
16     Q.  Ms. Marx, do you recall that Ms. Kiani
17  was charged with plagiarism?
18     A.  Yes.
19     Q.  Do you know why she was charged with
20  plagiarism?
21     A.  No, I don't.
22     Q.  Do you know any of the parties
23  involved who charged her with plagiarism?
24     A.  I think Professor Mariner.

39

1     Q.  Do you know what the issue was?
2     A.  No, I don't.
3     Q.  Did anyone tell you what the issue
4  was?
5     A.  No.
6     Q.  Did you know Ms. Kiani was due to
7  graduate in May of 2003?
8     A.  In May of?
9     Q.  2003.
10     A.  I believe that's right.
11     Q.  Do you also know that she was notified
12  by Dean Cass that she could not graduate because
13  of issues concerning one of her courses?
14     A.  Yes.
15     Q.  What do you know about that?

16      A.  From what I recall, Dean Cass was
17  looking into an investigation of possible
18  plagiarism charges.  And because Layla was
19  scheduled to graduate, he, I believe, exercised
20  his discretion to suspend her temporarily which
21  is a law under our academic regulations, our
22  disciplinary regulations.
23      Q.  Do you recall speaking to Ms. Kiani
24  about that?

40

1      A.  I don't remember.
2      Q.  Do you recall at one point you had a
3  conversation with Ms. Kiani on or about February
4  3, 2003?
5      A.  I don't remember.
6      Q.  Do you recall putting your hands on
7  your ears when you were speaking to Ms. Kiani?
8      A.  No.  I don't remember that.
9      Q.  Placing your hands on your ears?
10      A.  No.  I don't remember that.
11      Q.  Would you ever place your hands on
12  your ears?
13      A.  When?
14      Q.  When somebody is speaking to you?
15      A.  I can't recall doing that.  That's not
16  like me, but I have no memory of that.
17      Q.  Was Ms. Kiani scared of you?
18      MR. ELSWIT:  Objection.
19      A.  She never said that to me.  I helped
20  her with a lot of things in the law school, and
21  I always thought we had a very good
22  relationship.  I never got any sense from her
23  that she was afraid of me.
24      Q.  You said you helped her.  What did you

41

1  help her with?
2      A.  An example would be her petition for
3  reinstatement with the Academic Standards
4  Committee -- I'm an ex officio member of that
5  committee -- helping explain the process to her
6  for petitioning for reinstatement.  That would
7  be an example.
8      Q.  Did you have face-to-face conversation
9  with her?

10      A.  You mean --
11      Q.  At any point.
12      A.  Yes.
13      Q.  Did you have several face-to-face
14  conversations with her?  Several meaning more
15  than three.
16      A.  Yes.
17      Q.  And how did she appear to you as far
18  as cognitively?  Was she alert?
19      A.  Yes.
20      Q.  Was she with it?
21      MR. ELSWIT:  Objection.
22      Q.  Was she aware of her surroundings?
23      A.  Yes.
24      Q.  Did you ever think that she was

                        42
1  incoherent?
2      A.  No.
3      Q.  Did you ever ask her if she was taking
4  medications?
5      A.  No.
6      Q.  Did you think that she was taking
7  medication?
8      A.  No.  I don't think so.
9      Q.  Did you ever ask her if she received
10  the stenographer that she was asking for in the
11  first year?
12      A.  I don't remember.
13      Q.  Would it be normal for you to ask her
14  if she received a stenographer that she had
15  asked for two years earlier?
16      A.  Well, she wrote me this e-mail
17  indicating that it hadn't been approved, and I
18  wrote her back with what the University's next
19  process would be for her to try to get that
20  decision changed.  I imagine I would have
21  followed up with her on that, but I don't have a
22  specific memory of it.
23      Q.  Between the year 2000 and now, how
24  many handicapped students received a

                        43
1  stenographer?
2      A.  I don't know.
3      Q.  Did any?

 4      A.  I just don't remember.
 5      Q.  Are you familiar with the Judicial
 6  Discipline Committee, the procedures of the
 7  Judicial Discipline Committee?
 8      A.  Yes.
 9      Q.  Did you say you sat on one of those
10  committees before?
11      A.  No.  I'm an ex officio member of
12  Academic Standards Committee, which is a faculty
13  committee.
14      Q.  You said you're familiar with the
15  procedures of the Judicial Discipline Committee?
16      A.  I know what the disciplinary
17  regulations are, and they're part of that
18  process.
19      Q.  Do you recall if one of the
20  requirements is to notify a student of his or
21  her right to remain silent?
22      A.  Yes.  That's in our disciplinary
23  regulations.
24      Q.  So you're familiar with the

                              44
 1  regulations?
 2      A.  Yes.
 3      Q.  How would you notify a student of
 4  their right to remain silent?  What is required,
 5  and what do you do?
 6      A.  I'd have to look at the regulations
 7  again just to make sure I'm stating it
 8  accurately.  Do you have those in front of you?
 9  I don't have a copy with me.
10      MR. TARIRI:  Please mark this as
11  Exhibit 3.
12      (Exhibit 3 marked
13      for identification)
14      (Recess taken)
15      MR. TARIRI:  Back on the record.
16  BY MR. TARIRI:
17      Q.  Ms. Marx, I now hand you what has been
18  marked as Exhibit 3, and you have a copy of it
19  as well.  Could you read to yourself the very
20  first paragraph which has been bracketed.
21      (Pause)
22      A.  Okay.
23      Q.  Do you recognize this document?

24      A.  It looks like part of our disciplinary

45

1  regulations.
2      Q.  You are right.  Do all the students
3  have the right to remain silent before they
4  appear before the Judicial Discipline Committee?
5      A.  I don't know the procedures because I
6  don't get involved in the judicial process, so I
7  don't know the specific procedures and how they
8  all -- the timing and how it all works.  I just
9  know what's in the regulations.
10      Q.  I asked you earlier if you were
11  familiar with the procedure, and you said you
12  were?
13      A.  Yes.  It's based on what is in our
14  disciplinary regulations.
15      Q.  In your experience, are the students
16  who appear before the Judicial Discipline
17  Committee, are they given a form that informs
18  them of the right to remain silent?
19      A.  I don't know.
20      Q.  Have you ever heard of anyone being
21  given that in written form, their right to
22  remain silent?
23      A.  I don't remember.
24      Q.  Does BU Law School follow its written

46

1  procedures?
2          MR. ELSWIT:  Objection.
3      A.  To the best of my knowledge, yes.
4      Q.  After having read this, the first
5  paragraph in Exhibit 3 at the top of the page,
6  do you believe that a student is entitled to
7  receive a written document informing him or her
8  of their right to remain silent?
9          MR. ELSWIT:  Objection.  The document
10  that's been marked as Exhibit 3 speaks for
11  itself.
12          MR. TARIRI:  I'm asking Ms. Marx for
13  her opinion, does she believe that a person
14  should receive a written warning of her right to
15  remain silent.
16          MR. ELSWIT:  Objection as to the
17  relevance of Dean Marx's opinion, but go ahead

18  and answer.
19      A.  Again, I'm not involved in the
20  judicial process when students are investigated,
21  so I don't know how the process actually plays
22  out.
23      Q.  Do you know anyone who has had to
24  appear before the Judicial Committee?  Have you

47

1  ever known anyone who has appeared?
2      A.  Yes.
3      Q.  Can you give us an example of a case
4  and the outcome?
5          THE WITNESS:  That deals with another
6  student.
7      Q.  You can't ask questions of your
8  attorney.
9          MR. ELSWIT:  You can answer without
10  identifying another student by name.
11          THE WITNESS:  Okay.
12      A.  Yes.  I remember there was a student
13  who went before a judicial panel, and the
14  allegation was that the student had forged the
15  signature of a physician for medical
16  documentation that the student used to get
17  permission to reschedule an exam.
18      Q.  Were you involved in that case?
19      A.  No.  I just heard about it.
20      Q.  Was the student handicapped?
21      A.  No.
22      Q.  Do you know of any handicapped
23  students that appeared before the Judicial
24  Discipline Committee?

48

1      A.  Yes.
2      Q.  Can you give us that example?  How
3  many were there?
4      A.  I don't know.  I don't remember.
5      Q.  Can you give an example that you
6  remember?
7      A.  In Layla's case, I believe she went
8  before the judicial panel.
9      Q.  I meant someone other than Layla
10  Kiani.
11      A.  Who has a disability?

12      Q.  I'll rephrase my question.  Do you
13  know of any handicapped students who have
14  appeared before the Judicial Discipline
15  Committee?
16      A.  You mean besides Layla?
17      Q.  Thank you.  Besides Layla?
18      A.  I don't know.
19      Q.  Would it be fair to say that no other
20  handicapped students were ever brought before
21  the Judicial Discipline Committee?
22      A.  I don't know that.
23      Q.  I'm sorry?
24      A.  I don't know that.

                              49
1      Q.  But if a student had appeared before
2  the Judicial Discipline Committee and you being
3  the assistant dean of the students, you would
4  know about it; wouldn't you?
5      A.  I think usually, but I can't say 100
6  percent.
7      Q.  Does the Judicial Discipline Committee
8  not notify you of cases that come before it
9  regarding students?
10      A.  No, they do not.
11      Q.  So how do you find out if a case is
12  pending before the committee?
13      A.  Sometimes the Dean's Office will
14  notify me in case the student comes to me with
15  any questions just so I know and can anticipate
16  that.
17      Q.  Let me rephrase the previous question
18  regarding handicapped students.
19          So you have not heard of any
20  handicapped students being brought before the
21  Judicial Discipline Committee?
22          MR. ELSWIT:  The witness has testified
23  that she doesn't know if handicapped students,
24  if disabled students have been brought before

                              50
1  the Judicial Discipline Committee.
2          MR. TARIRI:  My question was that she
3  has not heard of, and that would be equivalent
4  to because she doesn't know.
5      A.  I don't know.

6      Q.  I'm sorry.  My question is:  So you
7  have not heard of any handicapped students being
8  brought before the Judicial Discipline
9  Committee?
10      A.  I don't know.
11      Q.  You don't know?
12      A.  If I have heard.
13      Q.  Would you like to elaborate?
14      A.  I don't know.  I don't know what I've
15  heard in all of my time at BU School of Law.  I
16  don't know.  I've been there a long time.
17      Q.  Has there been a single instance where
18  a handicapped student has been brought before
19  the Judicial Discipline Committee other than
20  Layla Kiani, as far as you recall?
21      A.  I don't know.
22      Q.  So your answer is you don't know if
23  that has been?
24      A.  That's correct; I don't know.

51

1      Q.  Did any of the professors ever talk to
2  you about Layla Kiani and plagiarism?
3      A.  Not that I recall.
4      Q.  Are you familiar with the drug
5  Phenergan?
6      A.  No.
7      Q.  Are you familiar with any medications
8  that Ms. Kiani was taking.
9      A.  No, not specific medications.
10      Q.  How long is law school?  How long is
11  BU Law School, the J.D. program for BU Law
12  School?
13      A.  You mean how many years to get the
14  J.D.?
15      Q.  Yes.
16      A.  Three years.
17      Q.  Do you recall how many years Ms. Kiani
18  was at the law school?
19      A.  I don't remember specifically.
20      Q.  Would it be fair to say that she was
21  there for three years?
22      A.  I think she was close to graduation,
23  so it would have been around three.  She was
24  close to graduation.

52

1    Q.  When you heard about the plagiarism,
2  that Ms. Kiani was charged with plagiarism or
3  was going to be charged with plagiarism, what
4  was your reaction?  Did you have any?
5    A.  I felt badly for her because I know
6  how stressful it is for students to go through a
7  disciplinary proceeding.  But I had no knowledge
8  of the merits.  I never get involved in the
9  merits of disciplinary cases, so I just, you
10  know, that's all.
11    Q.  Did you talk to her subsequent to
12  finding out?
13    A.  I don't remember.
14    Q.  Did you ever sit down with her to ask
15  her how she was feeling?
16    A.  I don't remember.
17    Q.  Did you ever talk to her mother?
18    A.  Yes.
19    Q.  What did you talk about?
20    A.  If I talked to her mother, it would be
21  just kind of chitchat because her mother didn't
22  understand English, I think, that well, so it
23  would be more if she was with Layla, and I would
24  say hi and I would say hi to her mother.  So

53

1  nothing really beyond kind of niceties that I
2  can remember, just, Hi, how are you, have a good
3  day.
4    Q.  Did you talk about the case at all
5  with her?
6    A.  I don't remember.
7    Q.  Have you had any handicapped students
8  since the graduation -- actually, since May of
9  2003 enrolling in the law school program?
10    A.  I know we have students who have
11  disabilities currently.
12    Q.  Can you just give us an idea of what
13  sort of disabilities?
14    A.  I don't remember.
15    Q.  Do you talk to these students?
16    A.  It depends.
17    Q.  Do students who have disabilities such
18  as being bound to a wheelchair, do they, if they
19  ask for it, would they receive a room in the

20  library to study?
21        A.  I think there have been occasions
22  where if a student has asked for a room because
23  of a disability, I always check with the library
24  to see if that's possible and try to work it out

                              54
1  with the library because the library controls
2  their space.
3        Q.  But if the library approves, then the
4  student will receive the use of a room to study?
5        A.  I think they have done that on
6  occasion, if they have room, and if it can be
7  worked out.
8        Q.  Do you recall if Ms. Kiani asked for a
9  room to study?
10        A.  I don't remember.
11        Q.  Did she receive a room to study?
12        A.  I don't know.
13        Q.  Since May of 2003, have you, other
14  than the professors that you mentioned,
15  Professor Mariner, Professor Kull and Attorney
16  Rosenfeld, have you talked to anyone else -- and
17  Professor Ryckman and Dean Cass, have you talked
18  to anyone else regarding Ms. Kiani?
19        A.  I'm not sure -- it sounds like from
20  your question that I said I talked to
21  Professor Ryckman and --
22        Q.  And you haven't?
23        A.  I don't remember.
24        Q.  Then please clarify.  Who have you

                              55
1  talked to since the beginning of the year of
2  2003 regarding Ms. Kiani and plagiarism?  And
3  please mention by name.
4        A.  Probably Dean Cass.  That's all I can
5  recall.
6        Q.  So you only spoke to Dean Cass
7  regarding Ms. Kiani?
8        A.  That's all I can recall.
9        Q.  And you did not talk to anyone else?
10        A.  Not that I remember.
11        MR. TARIRI:  I have no further
12  questions.
13        MR. ELSWIT:  No questions.

```
14          MR. TARIRI:  Thank you, Ms. Marx.
15          MR. ELSWIT:  Thank you.
16      (The deposition was concluded at 2:38 p.m.)
17
18
19
20
21
22
23
24
```

                                    56
```
 1   IN RE:  Kiani v. Trustees of Boston University
 2   TAKEN:  Monday, April 25, 2005
 3
 4          C E R T I F I C A T E
 5          I, CHRISTINE A. MARX, do hereby certify
     that I have read the foregoing transcript of my
 6   testimony, and further certify that it is a true
     and accurate record of my testimony (with the
 7   exception of the corrections listed below):
     Page   Line            Correction
 8
     _____  _____  _____
 9
     _____  _____  _____
10
     _____  _____  _____
11
     _____  _____  _____
12
     _____  _____  _____
13
     _____  _____  _____
14
     _____  _____  _____
15
     _____  _____  _____
16
     _____  _____  _____
17
     _____  _____  _____
18
     _____  _____  _____
19
```

20 _____ _____ _____

21 _____ _____ _____

22      _____

         CHRISTINE A. MARX

23

24

                                        57

1             CERTIFICATE
2  Commonwealth of Massachusetts
3  Suffolk, ss.
4   I, Toni F. Beckwith, Registered Merit
5  Reporter and Notary Public in and for the
6  Commonwealth of Massachusetts, do hereby certify
7  that CHRISTINE A. MARX, the witness whose
8  deposition is hereinbefore set forth, was duly
9  sworn by me and that such deposition is a true
10  record of the testimony given by the witness.
11   I further certify that I am neither related
12  to or employed by any of the parties in or
13  counsel to this action, nor am I financially
14  interested in the outcome of this action.
15   In witness whereof, I have hereunto set my
16  hand and seal this 2nd day of May 2005.
17         _____
18              Notary Public
19              CSR No. 111293
20  My commission expires:
21  February 11, 2011
22
23
24