# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

C. A. NO. 04-CV-11838-PBS

| | |
|---|---|
| LAYLA KIANI )<br>Plaintiff, )<br> )<br> )<br> )<br> )<br> )<br> )<br>TRUSTEES OF BOSTON )<br> )<br>UNIVERSITY, et al. )<br>Defendants. )<br> )<br> )<br> )<br> )<br> )<br>_____) | **PLAINTIFF'S OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON THE DEFENDANTS MOTION FOR SUMMARY JUDGMENT DATED NOVEMBER 10, 2005** |

## INTRODUCTION

Now comes Plaintiff, Layla Kiani, and through her attorney respectfully objects to the Honorable Magistrate Judge Leo T. Sorokin's Report and Recommendation on Defendants' Motion for Summary Judgment, dated November 10, 2005 ("Report"), Ms. Kiani puts forth her legal argument, establishing that there are genuine issues of material fact, which can only be determined by the trier of fact, thus precluding this Court from allowing such a motion. Therefore, Ms. Kiani respectfully requests that the Honorable Judge Patti B. Saris, the Judge assigned to hear her case, to make a de novo determination upon the record pursuant to Fed. R. Civ. P. 72(b), and reject the conclusion reached in the Report and Recommendation.

# PLAINTIFF RESPECTFULLY RENEWS HER REQUEST FOR AN ORAL HEARING [1] [2]

## PRELIMINARY STATEMENT

Ms. Kiani hereby states that the Magistrate Judge has erred on both the facts of the case, as well as on the principles of law. This is not a case about a plagiarizing student who once caught red-handed, now wishes to be afforded another opportunity.  On the contrary, in fact, Ms. Kiani has repeatedly stated in her pleadings as well her several memoranda submitted to this Court that this case is about a handicapped student who did *not* commit plagiarism, and who is mainly seeking an equitable remedy to her ejection from the School. See e.g., Pl. Mem. 2. This case is also about a school, which refuses to reopen a case simply because it knows that it did not follow its own rules, and does not wish to revisit the issue especially since it is aware that it acted in a discriminatory manner, and that it purposely ignored its own rules the first time. [3] In their Motion, Defendants have asked this Court to defer to the decision made by their school. The Report, too, alludes to this deference.[4] While it may be appropriate to defer in certain instances where academic

---

[1] This case raises novel issues of law in the somewhat un-chartered territory of academic setting. Plaintiff, therefore, requests an oral argument, pursuant to Local Rule 7.1 (D). An oral argument will also assist the Court in elucidating the intricacies of the various issued raised in this case.

[2] This case appears to be a case of first impression for this Court. Plaintiff, and apparently the Defendants and the Magistrate have not been able to locate any cases, which could be directly on point or analogous, either legally or factually, to the case at hand.

[3] See Exhibit A.

[4] Although well-intended, the Report purports to portray Plaintiff as a person who was justly expelled from her school for committing plagiarism, and who is now *unhappy* about it and seeks readmission via judicial means.  Report 2.  At a minimum, this is a fallacious portrayal of Plaintiff. In any event, Ms. Kiani requests that this should not cloud the Court's decision as to the ultimate issue in this case. A handicapped student who has spent three grueling years in law school, who has substantially exhausted all her financial resources (her own funds as well as borrowed funds),  has been aggrieved by the actions of the Defendants. She has always argued that she did not commit plagiarism, and that she was under the influence of a medicine when she failed to correctly and adequate cite her sources on her term papers. In fact, she never intended to do anything wrong or unlawful. If the Defendants have their way, as the Report seems to recommend, Plaintiff will never have any means to redress her grievances. As this document will further establish, this is not a

decision-making requires independence of action, in certain cases such as the current one

where the school has simply ignored its own rules, the courts will need to step in and

protect the individual who has been wronged. Otherwise, the actions of a school, no matter

how egregious, can go unnoticed. In sum, the interests of justice will not be served if the

Court throws out Ms. Kiani's claims simply because she has filed a complaint against a

school, without an opportunity for a jury to consider the merits of the case. [5]

---

frivolous action. Defendants have committed an injustice by disregarding their own rules, and by acting
prejudicially toward Plaintiff. This Court must respectfully hold them accountable for their actions.

[5] In this Memorandum, Ms. Kiani finds it imperative to retell some of the facts. A recitation of these facts

will provide context for several of the factual issues discussed in the Report. It will also reveal that the

Report, as well as Defendants' Memorandum in support of its motion for summary judgment, does not by

any means recite the facts as they existed at the time. She then engages in a legal analysis as to why

summary judgment is a poor vehicle to decide this case.

    The Report correctly states that Ms. Kiani emailed Dean Christine Marx on Oct. 26, 2000.  See

Defendants' Mem. Ex. 7. However, Ms. Kiani has maintained that she did not receive a reply from Dean

Marx. Kiani Dep. 91. The Report in a footnote states that Ms. Kiani has "submitted no evidence disputing

the exchange occurred." Report 2. Ms. Kiani's Deposition in pertinent part reads:

23    Q    Ms. Kiani, I direct your attention to Exhibit

24        Number 7.  Can you identify that exhibit,
                              91
1        please?  What does it appear to be?

2    A    A letter from Dean Chris Marx.

3    Q    Did you receive a letter like that from Dean

4        Marx?

5    A    I have never seen this until now.

6    Q    So you don't recall receiving anything like

7        this?

8    A    No.

9    Q    Were you advised of the requirements for

10    obtaining accommodations in any form from Dean
11    Marx?

12    A    No.

Later in the same deposition the following exchange occurred:

17              REDIRECT EXAMINATION

18   BY MR. ELSWIT:

19    Q    Ms. Kiani, could you take a look at Exhibit 7?

20    A    Sure.

21    Q    Just now you testified that you have never seen

22     this document?

23    A    Right.

24    Q    Did you have an e-mail exchange with Dean Marx

                          93

1     about your accommodations?

2    A    I don't remember.

3    Q    When we discussed this document this morning, do

4     you remember we discussed this document in some

5     detail?

6    A    Yes.

7    Q    Why didn't you testify in the morning that you

8     had not seen this document?

9              THE WITNESS:  Is it possible that I be

10              read back what I said?

11              MR. ELSWIT:  Certainly, if you can get

12              back to it.

13               (Page 25, Lines 7-22 were read by

**OBJECTIONS**

**A.** The Breach of Contract Claim (Count I)

> **Miss. Kiani objects to the recommendation made in the Report that Defendants' Motion for Summary Judgment be allowed on Count I of her complaint regarding Defendants' breach of contract, on the grounds that there are issues of material fact, which can only be determined by a jury, where Defendants beached their contract when they failed to follow their own rules and did not take any steps to advise Plaintiff to remain silent in accordance with the rules.**

It is clear from the Report, that there is no dispute about the existence of a legally

enforceable contract between the parties.  Neither the Honorable Magistrate Judge in his

report, nor Defendants through their counsel have refuted this assertion. In fact, the

Report states:

> For purposes of this motion, Defendants do not dispute that an entering student forms a contractual relationship with her university and that a disciplinary code can be part of that contract. Thus the Court assumes, without deciding, that the Disciplinary Regulations are part of a valid contract between Ms. Kiani and the law school.
> Report 10.

The issue at hand, therefore, is, whether the Defendants breached this contract. "A

breach of contract is a failure to perform  the terms of an agreement without legal

excuse." Guckenberger v. Boston University, 957 F. Supp. 306, 315 (D. Mass.

---

14          the court reporter.)

15    Q    On review of the record, it appears that this

16          morning you did testify that you did not

17          remember this document.

18    A    Thank you.

1997). In order to do discern the validity of a contract or a provision, one has to look at the four corners of the contract or provision. <u>See</u> Somerset Savings Bank v. Title Ins. Co., 420 Mass. 422 (1995).

As stated in Ms. Kiani's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Mem.") [6], in interpreting "university contracts" the courts are generally guided by the principles set out in <u>Schaer v. Brandeis Univ.</u>, 432 Mass. 474, 735 N.E.2d 373 (2000). In <u>Schaer</u>, the Court required a standard of "reasonable expectation -- what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." <u>Id.</u> at 478, (quoting <u>Giles v. Howard University</u>, 428 F. Supp. 603, 605 (D.D.C. 1977)); <u>Cloud v. Trustees of Boston University</u>, 720 F.2d 721, 724 (1st Cir. 1983). When Plaintiff applied for admission to the Defendants' school it was certainly reasonable for her to expect that Defendants would adhere to their own rules and standards. Equally, while she was at the School, dutifully abiding by all the various rules and regulations of the School, she reasonably expected Defendants to at least do likewise.

To be sure, as a Massachusetts appeals court has held, a student has no "reasonable expectation that the [school] would not follow its own procedures developed to resolve such disputes but would instead agree to adopt a different approach that the student preferred. " Sullivan v. The Boston Architectural Center, 57 Mass. App. Ct. 771, 772 (2003) (quoting Schaer v. Brandeis Univ., supra at 478). In <u>Sullivan</u>, the Student had brought a breach of contract claim against her school for not completing and receiving credit for a class, and then applying for an "annulment," a procedure which was not in any of the School's rules and regulations. <u>Id.</u> The Court held that Plaintiff's expectation

---

[6] Pl. Mem. 7.

regarding completing and receiving credit for a class were well-defined in the student handbook and that it should not be required to change its rules for one student.

Conversely, in the current case, as illustrated below, the School is attempting to turn the holding in Sullivan on its head by asking that the student agree to a procedure that is not in any of its rules and regulations. Accordingly, as Ms. Kiani's argument establishes, this is an unreasonable request, which must surely fail.

Defendants failed to abide by their own rules when they did not warn the student, in any form, and did not provide a written warning as mandated by the School's disciplinary rules and regulations promulgated by Defendants.

Article IV (1) of the Disciplinary Regulations (hereinafter referred to as the "Warning") in pertinent part, states that:

> All students are to be informed of the right to counsel and the right to remain silent, and shall be warned that anything the student may say may be used against the student. The student *shall be requested to sign a statement to the effect that he or she has been informed of the above rights and has received the above warning.* (Emphasis added).
> Exhibit A.

The Report states that the School did not breach its contract because the School has met its "substantive and Procedural obligations." Report 11. This blanket assertion can only be interpreted in one manner: that Defendants fully adhered to the terms of a contract, which incidentally, was drafted, written, and promulgated by Defendants themselves. In this Memorandum, Ms. Kiani will undertake to legally dissect and analyze the language of the Warning. She will then examine the steps taken by Defendants in furtherance of the purpose of the Warning. Under the laws of Civil Procedure, summary judgment is appropriate in those cases where there are "no genuine issues of material fact." Fed. R. Civ. P. 56. "If the facts, taken in the light

most favorable to [Plaintiff}, do not create a genuine issue of material fact regarding

[], summary judgment [is] proper. <u>Lopez-Carrasquillo v. Rubianes,</u> No. 99-2137 (1st

Cir. 10/23/2000). In the current case, if at the end of her analysis, Ms. Kiani can

establish that Defendants did indeed follow their own rules, then Defendants' Motion

shall be allowed. Otherwise, it must surely be denied.

## Analysis:

A document, entitled "Disciplinary Regulations for all BUSL Students" sets the

ground rules for the Students' as well as Defendants' responsibilities vis-à-vis each other

regarding their rights and responsibilities. Exhibit A. On its first page, the document

reads:

> **Scope of Disciplinary Action by BUSL.** Disciplinary action by BUSL is
> governed by these Regulations.
>  (Emphasis in original). <u>Id.</u> 1.

The document clearly requires the students to abide by its rules or otherwise face

severe consequences , as set by the School. In fact, it further reads on the same page :

> **Article II**. **Violations of BUSL Rules and Regulations**
>
> 1. **General Rule**. Any student who violates BUSL's rules and regulations, as
> published from time to time, may be subject to disciplinary action pursuant to
> these Regulations.
> (Emphasis in original). <u>Id.</u> P.1.

Every contract carries with it an implied covenant of good faith and fair dealing.

This implied covenant "requires that neither party to a contract will injure the right of the

other to receive the benefits of the agreement." <u>Rui One Corp. v. City of Berkeley</u> No.

02-15762 (9th Cir. 06/16/2004) (2004) (quoting <u>Johnson v. Mutual Ben. Life Ins. Co.,</u>

847 F.2d 600, 603 (9th Cir. 1988).  Therefore, it is reasonable to assume that a contract

8

which places a responsibility on one of the parties, will ensure that the other party also adheres to the terms of the contact as applied to him or her.

Indeed, the Warning, a somberly-worded provisions, creates several serious obligations for Defendants. Apparently, these obligations are placed squarely on the shoulders of the School, and there is no indication in the document that these duties can be taken lightly by the School. In fact, there seems to be no room to maneuver or modify the provision. Of course, this restrictive language, in the context of the whole Disciplinary Regulations, intended for a major American university, seems highly proper. Anything short of full adherence would render the Disciplinary Regulations a useless parchment, and its deterrence effect, a toothless tiger. A document that is replete with words which are interchangeable at a whim will be viewed as meaningless by those it is aiming to discipline. There is no evidence to suggest that this is the case.

First, the wording in the Warning is written in simple and unambiguous terms. A contract written by a drafter is to be construed against the drafter of the contract. See Merrimac Valley Nat'l Bank v. Baird, 372 Mass. 721 (1977). In this case, the elements of the Warning are the following:

(1) "All students are to be Informed. . .": This requires meeting the student in person or corresponding with him or her before the interview or proceeding, and informing the student of his or her right to remain silent. This did not happen. The School made no effort to inform Ms. Kiani of her right. Since Ms. Kiani was represented by counsel, the School could have sent a letter or other forms of communication to this effect to Mr. Rosenfeld. They did not. Defendants have never disputed this assertion.

(2) "Shall be warned that anything the student may say may be used against the student. . .": The Report suggests, without any evidentiary support, that Defendants have met this duty. Indeed, Defendants have never produced any document to this effect.

(3) "The student shall be requested to sign a statement. . .": There is no such document in evidence.

(4) Framers' Intent: What meaning did the writers intend to convey in the Disciplinary Regulations in general, and the Warning in particular? It will be reasonable to suggest that the Regulations were promulgated in order to streamline the School's disciplinary standards and also to create a uniform approach for handling these matters by apprising both students and the faculty of their rights and responsibilities. The main purpose of the Warning, and specially its writing requirement, it seems, is to protect the student and create a fair and equitable environment for the proceedings. Indeed, the highly emotional atmosphere that usually surrounds such proceedings tend to obscure the view of the accused and consequently can cloud her judgment during the proceedings. Thus it is quite feasible to presume that the authors of the Warning chose every word very carefully, and after much debate, in order to ensure that the regulations of the law school are uniformly applied and followed.

The Report states that Ms. Kiani was given "notice. . . a number of times." Report 12. It then provides the example of Mr. Ryckman's statement, the only time that Defendants ever made even a passing allusion to the Warning. See Report 11 (making reference to the statement made at the Hearing that "obviously a student has a right to

remain silent."). First, it is wholly erroneous that a single statement made by Mr. Ryckman, not even directed towards Ms. Kiani, will constitute Notice, as the Report puts it. The statement clearly does by no means satisfy any of the elements of the Warning as analyzed above. Moreover, the Statement must be read in context of the Hearing. As the transcript of the Hearing illustrates, at the beginning of the proceedings, Mr. Ryckman had engaged the faculty and the members of the Judicial Discipline Committee in a conversation on record about procedural matters. See Judicial Cmte. Hr'g Partial Tr. , Def. Ex. 18. There was never any mention of Ms. Kiani as the person to whom the conversation was addressed.

Second, as an accused in a proceeding that could have conceivably undone three years of her hard work, Ms. Kiani was focused on her own testimony and was not in the state of mind to pay attention to the administrative minutiae of a quasi-judicial proceedings, with which she had had no experience. It is also noteworthy that the statement was made before the witnesses were called. It is unreasonable to place the grave duty of following the procedural requirements on the accused under these circumstances. Although Ms. Kiani did state in her deposition that she had heard the statement, she also stated that she believed that the statement was a "general statement" and that it was not directed to her. Kiani Dep. 90. Also, she had never been told by her counsel that she had the right to remain silent. Consequently, unless Ms. Kiani knew why that statement was made, she had no reason to interpret the statement as a warning to her.

Lastly, even if the warning was given in a correct manner, which it surely was not, it would have been too late. A rushed, last-minute warning would hardly meet the requirements of the Warning as written in the Disciplinary Regulations. The accused can

11

not be expected to make up her mind immediately upon hearing the warning as to whether she should or should not speak. Given the fact that Mr. Ryckman's statement at the hearing did not even meet the minimum threshold requirements of the Warning, therefore this last argument is inapplicable to this matter.

The Report concludes that Ms. Kiani's testimony not only did not hurt her, but that it even "helped her'' case. Report 14. During the over five-hour testimony[7], Ms. Kiani repeatedly implicated herself by admitting that she had improperly cited her sources.[8] In fact, the Committee's memorandum states that "Ms. Kiani concedes, with respect to all four counts, that she extensively used the expressions of another without adequate attribution. . ." Def. Mem. Ex. 19,  2.  Had she been warned about her right to remain silent, she would have, at a minimum, opted to not testify or to refuse to testify about certain aspects of her case, which would have made her culpable. Furthermore, it is simplistic to assume that this was merely a "paper case," where she would have been found guilty even without her testimony. Report 13.  Indeed, as the result of Ms. Kiani's testimony, she was found to have violated the disciplinary rules, which finding allowed the Professor Mariner to change her grade. It is entirely possible that had she not testified, the Committee would have reached a different conclusion based on the medical documentation that she had provided. It is no secret that at the very least, the faculty harbored deep resentment toward Ms. Kiani. See, e.g., Professor Mark Pettit Jr.'s Affidavit ¶ 6  Def. Ex. 16 ("[i]t had been a mistake to admit her."]). Her testimony

---

[7] At the Summary Judgment hearing, Ms. Kiani's attorney orally offered to hand over the complete audio CD of the Hearing, which tends to show that there was about eight hours of audio record of the record, The Magistrate Judge Sorokin advised that at that time it was not necessary. Ms. Kiani will provide same if it will help the Court.
[8] Of course, she had also argued that she had not intended to plagiarize since the improper citations were too obvious to show any intent to plagiarize, and that they were done because she was drowsy and under the influence of the drug, Phenergan. See Def. Mem. Ex. 19.

therefore was the ideal vehicle to assure that she would implicate herself beyond any possibility of rehabilitation.. Indeed, as the result, Professor Mariner, who has already admitted that she "knew" that Ms. Kiani had committed plagiarism back in the spring of 2003, was given a second chance to ensure that Ms. Kiani is ejected from the School by changing her grade in December of 2003. Mariner Dep. 36-38. It must be noted that the Report makes conclusive statements (i.e. "Professor Mariner found instances of . . . plagiarism." Report 3 ) without further delving into the facts. The facts show that the material, which were allegedly plagiarized, at least in this case, were the same material written by the same Professor Mariner. Moreover, the professor had two months to raise her concern, during which she did not. See Id. [9] Therefore, as the result of Defendants' breach of contract by failing to follow the requirements of the Warning, Ms. Kiani was ultimately ejected from the law school.

The Report alludes to Article VI(2) of the Disciplinary Regulations[10] and suggests that "procedural errors and defects do not invalidate" the proceedings. Report 12. However, this argument is not without flaw: Upon reading  the pertinent section of the Disciplinary Regulations, it appears that in the event of procedural errors, at the very least "corrective measures" should have been taken. There is nothing in record to suggest

---

[9] One of the key elements of Ms. Kiani's argument for discrimination is that Ms. Mariner knew in the spring of 2003 that Ms. Kiani had not correctly cited her sources, and that she had used the professor's own material, yet waited until Dec. of 2003 to change her grade.

[10] The relevant section reads as follows:

> [VI] 12. Effect of procedural error. If, in the judgment of the Judicial Committee, any representative of  the Dean's Office has failed to comply with the obligations of the Dean's Office under this Code or has otherwise acted in a manner that unduly prejudices the student, appropriate corrective measures may be directed at any stage of the proceedings. Corrective measures shall be within the discretion of the Committee, but procedural error *need not* require exclusion of evidence or otherwise invalidate the proceeding or disposition of the case. The proceedings of the Judicial Committee shall not ordinarily be invalid by reason of a defective mechanical recording of the proceeding.
> Emphasis added.

that Defendants took any measures at all to correct the problem. Moreover, by using the term, "need not" instead of the ubiquitous "shall not," in the Regulations hand book, it appears that in fact, this section tends to keep open the possibility of invalidation of the Hearing even under its own rules. [11]

Ms. Kiani, therefore, respectfully asks this Court to deny the Defendants' motion on the ground that there are several key issues regarding the breach of contract, which could only be addressed by the trier of fact.

B. The ADA Claim (Count III)

**Miss. Kiani objects to the recommendation made in the Report that Defendants' Motion for Summary Judgment be allowed on Count III of her complaint regarding Defendants' violation of the Americans with Disabilities Act ("ADA") of 1990, on the grounds that there exist issues of material fact, which can only be determined by a jury, where Defendants engaged in discriminatory acts manifested by both discriminatory remarks and actions, which ultimately resulted in the ejection of Ms. Kiani from the Defendants' school.**

In Gonzalez v. El Dia, Inc., cited in the Report, the Court had held that remarks "standing alone" do not satisfy the requirements of a "discriminatory animus." Gonzalez v. El Dia, Inc., 304 F.3d 63, 67 (1st Cir. 2002). However, in her pleadings, Ms. Kiani has never made any allusions about remarks that were not preceded or followed by action. Ms. Kiani has always alleged that Defendants on various occasions had made remarks, which combined with their actions, tend to show their discriminatory motives. In Count III of her Complaint, Ms. Kiani alleged the following:

---

[11] The Report seems to allow great deference to the words contained in the Disciplinary Regulations by referring to it on numerous times in the Report. However, it would be unreasonable and a double standard to defer to the sections of the Regulations that one agrees with, while in the same breath, denying the necessity of even partial deference to another section in the same document.

75. Based on the subsequent actions of the Defendants, it is clear that the Plaintiff's
disability was a motivating factor in her exclusion from the JD program.
Pl. Complaint. ¶75.

In fact, Ms. Kiani has always stated that it was the Defendants' subsequent

actions, which were discriminatory, not the discriminatory remarks by themselves. For

example, Professor Mark Pettit, one of Ms. Kiani's professors, in his affidavit given

on behalf of Defendants

states:

> 6.    Subsequently, I was a participant in conversations with people who wondered
> whether she had been properly admitted to the Law School.  Although she had a high
> undergraduate GPA, she had very low LSAT scores, and the quality of her work, coupled with
> multiple instances of plagiarism, made many of us wonder if it had been a mistake to admit her.
> It is certainly possible that I expressed those concerns to her attorney, Mr. Rosenfeld.

Pettit Aff. Def. Ex. 16.

Professor Pettit was an active participant in the proceedings against Ms. Kiani. In

fact, he and Professor Kull presented documents and testified at the Hearing. This is in

direct contravention of the Report, that " Ms. Kiani has never specified who said the

remarks or when they were said." Report 17.  It is of no consequence that Ms. Kiani

heard of the remarks through third parties. The fact is that they were said.

The Report further states that "there is no evidence that either Professor Pettit or

Kull made any of the alleged remarks. " Id.  The above statement by Professor Pettit

squarely invalidates this assertion. The statement made in the Report that "there is no

evidence that the speakers had any role in the decision of which she complains," is

also equally erroneous. Id.  There can be little doubt that without the testimony of

these two individuals, who, other than Ms. Kiani, were the only witnesses testifying, the case would have been a much weaker case.

The discriminatory actions of Defendants include the refusal to accommodate Ms. Kiani with a stenographer, the refusal to allow her to use a private room in the library for her first year, as well as the manner with which she was led to believe that she was not violating any rules during her third year of law school. The fact that at least two of her professors, Kull and Mariner, knew well in advance of their grading of her papers that she had not completely cited her sources. For instance, Professor Kull had reviewed Ms. Kiani's paper "six or seven" times before her final submission.[12] Kull Dep. 16 Pl.. Mem. Ex.C.  In another instance, upon learning of the decision of the Judicial Discipline Committee, which had suspended, but not expelled Ms. Kiani, Ms. Mariner hastily changed her grade to a F, and hastily submitted it to the office of the Registrar. See Mariner's Letter, Def. Ex. 20.

Consequently, there remain factual issues that can determine whether Defendants indeed intended to discriminate against Ms. Kiani. These issues cannot be addressed without an in-depth examination of witnesses and testimony of Ms. Kiani. Therefore the Defendants' Motion on Count III must be denied.

---

[12] The Report bases its belief of Ms. Kiani's guilt on the depositions of Defendants as well as affidavits provided by Defendants. For instance, the Report refers to Andrew Kull who was one of the professors who testified against Ms. Kiani at the Judicial Discipline Committee Hearing held on Sept. 12, 2003 (the "Hearing"). It states that " in January 2003, while grading Ms. Kiani's term paper, Professor Kull discovered instances of what he believed to be plagiarism." Report 3. The Report fails to mention that in fact Professor Kull had reviewed the same document at least "Six or Seven times" before she submitted her final draft to him. See Pl. Mem. Exhibit C:, Kull Dep. 16. Despite his in-depth reviews of the term paper, and although Ms. Kiani's final draft was "identical to the previous draft with a few pages added at the end," the Professor never mentioned to her that any of her citations were improper. Id.
In another instance, another professor had graded Ms. Kiani's mid-term paper, although it contained "improper citations" and two months later graded her final paper. Pl. Mem. Exhibit D Mariner Dep. at 36. Ironically, the "improper citations" in the mid-term paper, were on material, which was written by the very professor who was grading it. Id. at 42.

C. The Rehabilitation Act Claim (Count IV)

**Ms. Kiani objects to the recommendation made in the Report that Defendants' Motion for Summary Judgment be allowed on Count IV of her complaint regarding Defendants' violation of the Section 504 of the Federal Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (1988), on the grounds that there exist issues of material fact, which can only be determined by a jury, where Defendants engaged in discriminatory acts by failing to provide Ms. Kiani with proper accommodations, which she had requested, and where there is in dispute whether the Statute of Limitations bars the Claim.**

From a factual perspective, Defendants failed to provide Ms. Kiani with the appropriate and much-needed accommodations. As part of her expectations, the Plaintiff reasonably expected to receive reasonable accommodations in order to enable her to undergo the rigors of law school.[13] For example, when she enrolled in the program, she expected the benefit of the assistance of a stenographer, if one was needed. However, once (within the first two weeks of her enrolment) she realized that due to her dexterity problems, she could not function without one, her request was refused. It is Ms. Kiani's position that the school did not wish to accommodate its handicapped student, mainly because of her handicap and due to the costs associated with such accommodation.[14]  She was also deprived of the use of a library room for the duration of her first year in law school, simply because she could not use a room during this period.

However, because the Report's only issue is whether the Statute of Limitations prevents putting forth this claim, only that issue will be discussed below.

---

[13] According to the School's own web site, handicapped students were expected to receive special accommodations based on their needs. See http://www.bu.edu/disability.
[14] .  It must be noted that Defendants have not produced any documents to show that they have ever had a student with cerebral palsy at the law school.

To begin, nowhere in Count IV of Ms. Kiani's complaint, has she alleged that she suffered her injury only on Oct. 26, 2000. In her complaint, Ms. Kiani refers to "various attempts by the Defendants to isolate her and discriminate against her." Complaint ¶80. As she continues onto the next paragraph, "since the very beginning of the First year, and in fact throughout the course of her studies, the Defendants refused the Plaintiff's request that she be accommodated with a Stenographer, which was essential to her work." Id.¶ 81.

Courts in this state have generally held that statutes of limitations applicable to a case are determined based on the nature of the injury in that particular case. Ms. Kiani has already conceded that a three-year statute of limitations may apply, as that for personal injury claims. However, that is where the similarities between Ms. Kiani's case and personal injury cases end. The former concerns concrete and tangible injuries, where the injured person can show the harm by simply pointing to a doctor's report, or the like. Ms. Kiani's case on the other hand, is one of a continuing violation of her rights under the Rehabilitation Act. One cannot pinpoint with precision when and how the injury happened. Massachusetts courts have invariably made distinctions among the various types of causes of action. Carter v. Commissioner of Correction, 681 N.E.2d 1255 Mass.App.,1997 (holding that the three-year statutory period for unlawful discrimination complaint began to run as of date of employer's last act of discrimination, which was the date of last act of retaliation against employee arising out of her original claim of gender and race discrimination, and which was sufficient to establish continuing violation); Pagliuca v. City of Boston, 626 N.E.2d 625 Mass.App.,1994 (holding that a Massachusetts' three-year statute of limitations for civil rights actions began running on

plaintiff's state civil rights claim alleging loss of reputation and severe emotional distress on last date of defendants' allegedly wrongful conduct and not on date that plaintiff suffered breakdown; although plaintiff may not have known severity of harm she suffered from defendants' actions until after her breakdown, she knew of all facts necessary to make out her civil rights claim on last date of defendants' allegedly wrongful conduct); Morrison v. Northern Essex Community College, 780 N.E.2d 132 Mass.App.,2002 (holding that whether a sexual harassment claim brought under Title IX or state law against a college is barred by the statute of limitations depends on the claim and on the nature of the violative conduct, that is, whether the conduct consisted of a discrete act or was a continuing violation) (;A plaintiff who demonstrates a pattern of sexual harassment that creates a hostile educational environment and that includes conduct within the three-year statute of limitations may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period).

On or about October 26, 2000, Ms. Kiani learned that she was not going to receive the assistance of a stenographer. However, she continued to study and take notes for the next three years of law school. In fact, despite her immense difficulties, she did not fail any of her courses in her First and Second years. See Kiani School Transcript, Ex. D. In other words, although she was gravely affected by Mr. McCurdy's refusal in October of 2000, she was not injured until 2003, especially since she received her first grade of F in 2003. Ms. Kiani's case can be analogus to the case in Morrison v. Northern Essex Community College, where the plaintiff brought suit alleging sexual harassment over a period of time. See 780 N.E.2d 132; Mass.App.,2002. There, the Court held that:

Because the creation of a hostile educational environment may occur through accretion of sexually offensive behavior over time, the most recent incident of conduct which need not itself be independently actionable, anchors prior, related events for purposes of determining whether the statute of limitations bars suit even though a large portion of the discriminatory conduct may have taken place more than three years prior to the complaint.

Id.

In certain instances such as in educational or similar settings, the individual plaintiff cannot be expected to know for certain when his or her injury accrues until she actually sees or feels the injury. For instance, when a plaintiff brought suit against her therapist for malpractice, the Court denied the Defendant's motion for summary judgment by holding that:

> an action against a psychotherapist for malpractice does not accrue, and therefore the statute of limitations does not begin to run, until the plaintiff knew or reasonably should have known that he may have suffered injury because of the psychotherapist's conduct. We further hold that the question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact.
> Robert Scott Riley v. Walter M. Presnell, 409 Mass. 239, 240, 565 N.E.2d 780

There is nothing in the pleadings and related documents that suggest a set date as the date of the injury. Therefore, any argument to suggest otherwise can be categorized as simply uninformed.

The Report cites Delaware State College v. Ricks, 449 U.S. 250(1980), and states that the suspension was a "mere consequence of the discriminatory act and not the act itself." Report 19-20. However, Delaware State College is inapposite here because that case involved an employment case, where the College had decided not to grant tenure to the plaintiff. There were no other allegations of discrimination. There, the Court observed that "the only alleged discrimination occurred -- and the filing limitations periods

therefore commenced -- at the time the tenure decision was made and communicated to Ricks." Id.  259. In the current case, Ms. Kiani has alleged "various" and continuous acts of discrimination. As the Morrison Court concludes, "Hostile educational environment claims generally involve continuing violations and repeated conduct, and thus cannot be said to occur on any particular day."

For the above reasons, Plaintiff hereby objects to the allowance of summary judgment for Count I of her complaint.

## CONCLUSION

WHEREFORE, Plaintiff hereby respectfully, but strenuously, objects to the Magistrate Judge's Report pertaining to all three COUNTS and asks that since there are factual issues in every count that can only be decided by a trier of fact, the Defendants' Motion for Summary Judgment be denied. Plaintiff also requests an oral hearing on all the matters contained herein.


Dated: November 21, 2005

Respectfully submitted,

Plaintiff, Layla. Kiani, by her attorney,

_____

 /s/ Benjamin B. Tariri

f.k.a Ben Tahriri

128A Tremont Street
Boston, MA 02108
Tel: (617) 574-9080
Fax: (617) 574-9070
BBO# 652042

**CERTFICATE OF SERVICE**

I, Ben Tahriri, Esquire, hereby certify that
I have this 21st  day of November, 2005, served
a true copy of the above document upon
the Defendants' attorney of record
via electronic mail.

_____

/s/Ben Tariri' , Esquire