# Plaintiff's Exhibit "C"

```
1                    Volume: I
2                    Pages: 1-60
3           UNITED STATES DISTRICT COURT
4           DISTRICT OF MASSACHUSETTS
5
   - - - - - - - - - - - - - - - - - x
6  LAYLA KIANI,
7          Plaintiff,
8    v.
9  TRUSTEES OF BOSTON UNIVERSITY,
10          Defendants.
   - - - - - - - - - - - - - - - - - x
11
12           DEPOSITION OF ANDREW KULL
13         Monday, April 25, 2005, 10:04 a.m.
14           Law Office of Ben Tariri
15            343 Washington Street
16           Newton, Massachusetts 02458
17    -------Reporter:  Toni F. Beckwith, RMR-------
18
19              ********
20
21
22     Toni F. Beckwith, Registered Merit Reporter
              50 Winsor Avenue
23        Watertown, Massachusetts 02472
              Tel: 617.924.2731
24            Fax: 617.924.9899
```

```
                            2
1  APPEARANCES:
2
3    LAW OFFICE OF BEN TARIRI
4    By Ben Tariri, Esquire
5    343 Washington Street
6    Newton, Massachusetts 02458
7    Counsel for the Plaintiff
8
9    BOSTON UNIVERSITY
10    OFFICE OF THE GENERAL COUNSEL
11    By Lawrence S. Elswit, Esquire
12    125 Bay State Road
```

13    Boston, Massachusetts 02215
14    Counsel for the Defendants
15
16
17
18
19
20
21
22
23
24

                                        3
1              I N D E X
2    Deposition of:   Direct Cross Redirect Recross
3    ANDREW KULL
4    By Mr. Tariri      5
5
6
7
8
9
10
11              E X H I B I T S
12   No.                          Page
13
14   1       E-mail dated 9/16/03       23
15   2       One-Page Excerpt from
16           Boston University's
17           Disciplinary Regulations      30
18   3       Letter dated 5/12/03 to
19           L. Kiani from R. Cass         44
20
21
22
23
24

                                        4
1          P R O C E E D I N G S
2          MR. TARIRI:  Could you swear in the
3    witness, please.
4       Q.  Good morning, my name is Ben Tariri.
5    I'm the attorney for plaintiff Layla Kiani.
6    Today is April 25, 2005.  We are deposing

7  Professor Andrew Kull, and present is Attorney
8  Lawrence Elswit as well.
9      MR. TARIRI:  The usual stipulations
10  apply, that you need to answer regardless
11  whether your attorney has any objections.  The
12  objections will be noted; but, however,
13  notwithstanding the objection, you will need to
14  answer.  If you wish to preserve your right to
15  sign within 30 days, then you may wish to do so,
16  otherwise you can waive that.  So we can move
17  forward with discovery, which is due to expire
18  on April 29.
19      Am I missing something?
20      MR. ELSWIT:  I don't stipulate that
21  Professor Kull will answer every question
22  regardless of my objection.  There may be some
23  questions that I direct him not to answer,
24  otherwise the rules of evidence govern his

5

1  answering questions.
2      MR. TARIRI:  That's correct.  I stand
3  corrected.
4
5      ANDREW KULL,
6  having been satisfactorily identified by the
7  production of his driver's license, and duly
8  sworn by the Notary Public, was examined and
9  testified as follows:
10
11      DIRECT EXAMINATION
12  BY MR. TARIRI:
13      Q.  Professor Kull, could you state your
14  name, please.
15      A.  Andrew Kull.
16      Q.  How do you spell that?
17      A.  K U L L.
18      Q.  There's no middle initial?
19      A.  No.
20      Q.  Professor Kull, what do you do?
21      A.  I teach law at Boston University.
22      Q.  How long have you been doing that?
23      A.  We are just finishing my third year
24  there.

6

1    Q. Are you tenured?
2    A. Yes.
3    Q. Did you teach at Boston University
4  prior to the tenure?
5    A. No.
6    Q. Where did you teach before that?
7    A. Emory University, E M O R Y.
8    Q. How long did you teach there?
9    A. 13 or 14 years.
10    Q. What did you teach, what subjects did
11  you teach?
12    A. At Emory?
13    Q. At Emory.
14    A. Contracts, property, constitutional
15  law, restitution, uniform commercial code.
16    Q. Very diverse. Do you generally teach
17  in a class setting or is it like a seminar
18  setting?
19    A. Both.
20    Q. Do you teach during the day or at
21  night?
22    A. During the day.
23    Q. This is at BU Law School?
24    A. I have been talking about Emory. But

                              7
1  that's also true at BU.
2    Q. Do you teach any evening classes?
3    A. No.
4    Q. Are there any evening classes, to your
5  knowledge?
6    A. I believe that some classes taught by
7  adjunct at BU are taught in the early evening.
8    Q. Are you familiar with the other
9  professors? Do you know them? Are they your
10  acquaintances, other BU law professors?
11    A. Yes.
12    Q. Would you say that you know them all?
13    A. No.
14    Q. Would you say that you know most of
15  them?
16    A. Most of the full-time faculty.
17    Q. Professor Kull, do you have a
18  professors' lounge that you go to?
19    A. They have a professors' lounge, and I
20  sometimes go there.

21    Q.  What do you do when you go there?
22    A.  They have workshops and faculty
23  meetings to which the whole faculty is invited,
24  and sometimes they serve lunch.

8

1    Q.  I might have to sit over here just to
2  be able to see both of you.
3    (Pause)
4    Q.  When you go there, do you sit with
5  other professors?
6    A.  Yes.
7    Q.  And do you talk about events?
8    A.  Not often.
9    Q.  So what do you generally talk about?
10    MR. ELSWIT:  Objection.
11    MR. TARIRI:  Objection noted.
12    A.  At a faculty meeting or any sort of
13  meeting there will be an agenda of law school
14  business.  At workshops, as they are called,
15  there's usually somebody presenting a paper that
16  is then discussed by the group.
17    Q.  I'm sorry.  I wasn't clear in my
18  question.
19    I was referring to when you go to the
20  professors' lounge, do you socialize there as
21  well?
22    A.  No.
23    Q.  So you don't socialize with any
24  professors?

9

1    A.  Not in the faculty lounge.
2    Q.  Do you socialize with them outside of
3  the faculty lounge?
4    A.  People come and see me in my office; I
5  see colleagues in their offices.  Sometimes I
6  see my colleagues at social functions outside
7  the law school.
8    Q.  Professor Kull, do you talk about
9  other students sometimes?
10    A.  Sometimes.
11    Q.  And do you strictly talk about their
12  academic affairs, or do you talk about other
13  issues that may be somehow related to academic
14  affairs?

15          Let me clarify.  Is it fair to say
16   that you do talk about students with other
17   professors?
18       A.  Yes.
19       Q.  In general?
20          MR. ELSWIT:  Objection.
21       A.  I would have said occasionally.
22          MR. TARIRI:  Objection noted.
23       A.  Yes, occasionally.
24       Q.  Thank you.

                             10
1           Are you familiar with Layla Kiani?
2        A.  Yes.
3        Q.  How are you familiar with her?
4        A.  She was a student in a seminar that I
5    taught in my first semester at BU Law School in
6    the fall of 2002.
7        Q.  Do you recall what that seminar was
8    on?
9        A.  It was on restitution.
10       Q.  Is restitution a stand-alone subject?
11       A.  Yes.
12       Q.  What do you require as a professor,
13   what do you require for a student to accomplish
14   in order to graduate, to obtain a grade, at
15   least for that particular class?
16       A.  That class was taught that semester as
17   a seminar, and on that occasion the requirement
18   for the grade and credit was to write a paper at
19   the end of the semester.
20       Q.  So if you wrote the paper as a student
21   and the paper was satisfactory to you, the
22   student would pass?
23       A.  Yes.
24       Q.  Do you recall how long the papers were

                             11
1    required to be?
2        A.  I don't recall whether I set a minimum
3    that semester.
4        Q.  Do you recall how long Ms. Kiani's
5    paper was?
6        A.  I'd have to see it.
7        Q.  Do you recall the paper?
8        A.  Yes.

9      Q.  So you do recall the paper, but you
10  don't remember how long it was?  Was it a
11  voluminous paper, or was it just a short --
12        MR. ELSWIT:  Objection.
13        MR. TARIRI:  Objection noted.
14      Q.  I asked you are you familiar with
15  Layla Kiani, and you said you were.  Did she
16  attend every session of your class?
17      A.  No.
18      Q.  Can you elaborate on that, please?
19      A.  We met once a week.  There were
20  probably 13 class meetings, and I think she
21  might have been absent twice.
22      Q.  Do you know why she was absent?
23      A.  No.
24      Q.  Did she tell you?

12

1      A.  I don't recall whether we discussed
2  it.
3      Q.  So you didn't ask her why she was
4  absent?
5      A.  No.
6      Q.  Professor Kull, are you familiar with
7  this case, with this particular case that this
8  deposition is for?
9      A.  I was a defendant.
10      Q.  So your answer is you are familiar
11  with this case?
12      A.  I received a complaint.
13      Q.  Professor Kull, for this particular
14  deposition, did you have any discussions with
15  your attorney?
16      A.  I spoke to Mr. Elswit about it.
17      Q.  When did you speak to him?
18      A.  Last week.
19      Q.  Did you also speak to him today before
20  you came in just now?
21      A.  Yes.
22      Q.  So you had a discussion with your
23  attorney before you came in?
24      A.  Yes.

13

1      Q.  Concerning this deposition?
2      A.  Yes.

3      Q.  Professor Kull, on that restitution
4  course, do you recall, when you said there was a
5  term paper required to be turned in, when that
6  term paper was supposed to be turned in?
7      A.  To the best of my recollection, I told
8  the students that they could have the maximum
9  amount of time allowed by the law school
10  regulations, which probably meant until the
11  final day of the examination period that
12  semester.
13      Q.  And the final day of the examination
14  period would have been sometime in December of
15  2002?
16      A.  Yes.
17      Q.  Did she turn her paper in in due time?
18      A.  Yes.
19      Q.  Did you receive it yourself?
20      A.  Yes.
21      Q.  So it was turned in on time?
22      A.  Yes.
23      Q.  What is your procedure in grading
24  papers?  Do you attend to them as you receive

                          14
1  them, or do you wait for all the papers to come
2  in?
3      A.  I don't have a set procedure.
4      Q.  What was your procedure for this
5  particular course and for this particular term
6  paper?
7      A.  As best I recall, Ms. Kiani's paper
8  was submitted well before any of the others, and
9  I read it shortly after she gave it to me.
10          I do recall that I didn't read any of
11  the other papers until the day before the grades
12  for that semester had to be submitted.
13      Q.  Can you tell us about when you read
14  Ms. Kiani's paper, what day or month?  I do
15  realize it was two years ago, so...
16      A.  In fact, the paper that she submitted
17  to me as her final draft, in other words, the
18  final version of the paper that she was
19  submitting for grading and credit, I read at the
20  same time as I read everybody else's paper,
21  which was the day before the grades were due
22  from the fall semester, and that means it was

23   some day in January, in late January.
24       Q.  You said "her final draft."  Did she

15

1   submit other drafts before the final draft?
2       A.  Yes.
3       Q.  Were they not accepted?
4       A.  It wasn't a question of being
5   accepted.  She submitted a series of drafts on
6   which she asked my help and advice.
7       Q.  Do you recall how many drafts she
8   submitted?
9       A.  Numerous drafts.
10      Q.  This is all for this paper for the
11  course restitution?
12      A.  Yes.
13      Q.  Can you elaborate on what you mean by
14  numerous?
15      A.  There was no requirement that any
16  student submit any draft.  The requirement for
17  me was to submit a paper for credit at the end
18  of the semester.
19          Ms. Kiani told me that it would help
20  her if I would read tentative drafts of her work
21  and give her comments and help her with them.
22      Q.  And did you agree?
23      A.  Yes.
24      Q.  Did you agree to read numerous drafts?

16

1       A.  Yes.
2       Q.  I'm sorry, did you say how many drafts
3   there were?
4       A.  I didn't say specifically because I
5   don't recall.
6       Q.  Can you make a ballpark?  Was it more
7   than five?
8       A.  To the best of my recollection, she
9   came to see me with some piece of a paper,
10  something written, some question, certainly five
11  times, perhaps six or seven times, not as many
12  as ten times.
13      Q.  Thank you.
14          Did you every time, obviously, try to
15  help her?
16      A.  Yes.

17    Q.  How did you try to help her?
18    A.  I tried to help her find a topic that
19  would be manageable, and I tried to explain to
20  her how to go about doing the work.
21    Q.  When you said she submitted five or
22  six drafts, were these all on the same subject,
23  or did she change the subjects?
24    A.  I believe she started on one topic; we

17

1  might have had two meetings on that first topic.
2  Then she changed her mind and decided to pursue
3  a second one.
4    Q.  Where did you have these meetings, in
5  your office?
6    A.  Yes.
7    Q.  How long did these meetings last,
8  approximately?
9    A.  I presume it varied.  Perhaps between
10  15 minutes and an hour.
11    Q.  During these meetings, did she make
12  any comments about having difficulty with the
13  course or with the whole process or with law
14  school?
15    A.  No.
16    Q.  She made no comments regarding her
17  difficulties?
18    A.  We had some conversation about
19  research methods, and I recall her saying to me
20  that she preferred to do research that could be
21  done online because she had physical
22  difficulties in dealing with paper materials.
23    Q.  What did you perceive those physical
24  difficulties to be?

18

1    A.  She was in a wheelchair.  It was very
2  obvious to me that she had physical disabilities
3  of various kinds, and it made sense that she
4  would have problems using the library in normal
5  ways.
6    Q.  Did you at any point during your
7  meetings with her -- you said you had at least
8  two meetings on the first topic and apparently
9  more meetings on the actual final second
10  topic -- did you ever come to the conclusion

11   that she was on medication?
12       A.  No.
13       Q.  Did you think she was on medication?
14       A.  I didn't think about it.
15       Q.  When she spoke to you, was she
16   coherent?
17       A.  That depends what you mean by
18   coherent.
19       Q.  Would she respond to every question
20   that you asked, and would she actually
21   articulate questions to ask you that were well
22   versed?
23       A.  She responded.  We would have a normal
24   conversation.  It was in that sense coherent.

                           19
1        Q.  Was she coherent about the subject?
2    In other words, did she present to you that she
3    had a somewhat clear understanding of what the
4    subject matter was?
5        A.  I found that she depended on me, as it
6    seemed, to discover a research topic, explain it
7    to her and explain to her how one might go about
8    it.
9            Once I had done those things, she
10   seemed to understand what we were talking about
11   and said that she did, and to some extent, I
12   believe, did understand.
13       Q.  To some extent.  Professor Kull, could
14   you very briefly, and I mean very briefly,
15   outline the format for your classes, your
16   seminar?  How does it work?  I don't mean
17   substantively, just procedurally.
18       A.  There would be readings assigned,
19   cases primarily in the law of restitution,
20   assignments in advance for each meeting.  This
21   was in the form of a seminar which meant mostly
22   that it was a very small group, perhaps six.  I
23   would introduce the topic and invite comments
24   and do my best to stimulate a discussion among

                           20
1    the students.
2        Q.  Did you have any other handicapped
3    students in your class?
4        A.  Not that I'm aware.

5      Q.  To continue on just on that format,
6   did you have to basically talk about the subject
7   matter and students would take notes, either
8   from you or from each other, from each other's
9   comments?
10      A.  We would talk about the subject
11  matter.  I don't know what else they did.
12      Q.  But you were there?
13      A.  Yes.
14      Q.  Were the students taking notes?
15      A.  I don't know.
16      Q.  Professor Kull, this was a very small
17  seminar class setting.  So you're surely -- you
18  know, you can tell whether they're taking notes
19  or they're not taking notes.
20         MR. ELSWIT:  There's no question.
21  There's nothing for you to respond to.
22      Q.  Were they taking notes?
23         MR. ELSWIT:  Asked and answered.
24      Q.  Was Ms. Kiani taking notes?

                              21
1      A.  I don't know.
2      Q.  During your meetings was she taking
3   notes?
4      A.  I don't know.
5      Q.  You testified earlier that you
6   suggested to her to focus on a certain area and
7   do the research in that area; am I correct?
8      A.  She came to me initially for help in
9   finding a topic.  We had at least two meetings
10  on the question of what would be a topic that
11  she would like to do.  And once we found one, I
12  did my best to see that she understood the task
13  and had an idea of how to go about it.
14      Q.  Was she taking notes during these
15  meetings?
16      A.  I don't know.
17      Q.  So what happened after the final draft
18  was accepted by you?  What did you do?
19      A.  Are you referring to the time in
20  December when she brought me the paper?
21      Q.  That she brought you the final draft,
22  yes.
23      A.  I put it somewhere on my desk,
24  possibly in a file folder or an envelope in

22

1  which I would put the other papers as they came
2  in.
3      Q.  Did you actually receive the paper
4  from her physically?
5      A.  She brought it in in person.
6      Q.  So you received it from her?
7      A.  Yes.
8      Q.  What did you do with it after you
9  placed it in the folder?  At what point did you
10  actually look at the paper?
11      A.  The day before the grades were due.
12      Q.  How long was that from the time that
13  she gave you the paper?
14      A.  Approximately five weeks.
15      Q.  You waited five weeks before you
16  looked at the paper?
17      A.  As it turned out, five weeks passed
18  before I read Ms. Kiani's final paper because it
19  had been placed in the file with the other
20  students' papers, and I read them all at once
21  when I realized that the grades were due in the
22  Registrar's Office.
23      Q.  When were they due?
24      A.  Some day about the third week of

23

1  January.
2      Q.  But when were they due in relation to
3  the day that you discovered the paper?  You
4  already testified earlier that it was the day
5  before.
6      MR. ELSWIT:  Objection to the use of
7  the word discovered.  That suggests the paper
8  was lost.  Professor Kull testified that he put
9  the paper with all of the students' papers in a
10  folder or an envelope and read them all on the
11  same day.
12      Q.  So the paper was never lost?
13      A.  That's right.
14      MR. TARIRI:  Please mark this as
15  Exhibit No. 1.
16      (Exhibit 1 marked
17      for identification)
18      Q.  Please look at what has been marked as

19   Exhibit No. 1.  Do you recognize that document?
20       A.  Yes.
21       Q.  What is the document?
22       A.  This looks like a copy of an e-mail
23   sent from me to the BU Disciplinary Committee on
24   September 15, 2003.

24

1       Q.  Do you know how we obtained this
2   document?
3       A.  No.
4       Q.  If you could look at the line where it
5   says cc, copy.  At the very end of the line it
6   was sent to Arnold Rosenfeld; am I correct?
7       A.  That's what it says.
8       Q.  But it came from your e-mail?
9       A.  I believe I recognize it, yes.
10       Q.  Professor Kull, could you read the
11   first sentence in the first paragraph, the
12   paragraph numbered one, the very first sentence?
13       A.  Out loud?
14       Q.  Yes, please.
15       A.  One, period, Friday, January,
16   parentheses, 24, question mark, close paren,
17   colon, I discover the plagiarism as described.
18   Brief conversation with Professor Pettit.
19       Q.  Thank you.  Thank you.  That will do
20   it.
21           So would it be fair to say that it was
22   January 24 that you read Ms. Kiani's paper?
23       A.  It looks like it.
24       Q.  When were the grades due?

25

1       A.  If this was a Friday, I expect the
2   grades were due that day.
3       Q.  Did you submit the grades that day for
4   Ms. Kiani?
5       A.  No.
6       Q.  Professor Kull, you testified earlier
7   that you had several meetings with Ms. Kiani,
8   and you also testified that you reviewed
9   documents with her, various drafts of the paper.
10           Once you both decided on a certain
11   topic for her to write her term paper on --
12           MR. ELSWIT:  Objection.

13      Q.  -- were you familiar with the topic
14   that she was going to write the term paper on?
15         MR. ELSWIT:  Objection.  It assumes a
16   fact not in evidence, in fact, contrary to
17   evidence.  Professor Kull's testimony is
18   Ms. Kiani decided on a paper topic, not that
19   Professor Kull and Ms. Kiani decided on the
20   paper topic.
21      Q.  Did Ms. Kiani decide on that paper
22   topic, or did you recommend to her to use that
23   particular paper topic?
24      A.  She asked me for suggestions.  I made

26

1   an initial suggestion which I believe she
2   pursued for a week or two before coming to me
3   and asking for another suggestion.  I developed
4   a second suggestion based, I believe, on some
5   cases that she had read and found interesting.
6      Q.  So you made the suggestion to her?
7      A.  I expect that I tried to help her
8   formulate a manageable topic based on some ideas
9   in which she had expressed an interest.
10      Q.  Professor Kull, if you could, please,
11   when I ask you a question, just to be accurate
12   on the record, when I ask a question that
13   requires a yes or no answer, if you could just
14   please answer it in that manner.
15         MR. ELSWIT:  That question didn't call
16   for a yes or no answer.
17         MR. TARIRI:  I asked the question, so
18   you suggested a topic, and the answer would have
19   been yes or no.
20         MR. ELSWIT:  Will, the record is what
21   the record is.  Go ahead.
22         MR. TARIRI:  Can we go back to the
23   question that I asked, please.
24         (Record read)

27

1   BY MR. TARIRI:
2      Q.  Professor Kull, did you read the term
3   papers, the drafts that she brought in for you
4   to look at?
5      A.  Yes.
6      Q.  And had she cited authorities

7  throughout the drafts?
8     A.  There were citations.
9     Q.  Were the citations correct?
10    A.  I don't know.
11    Q.  Can you elaborate on that, please?
12    A.  I was reading her drafts in order to
13  help her pursue a research topic, not to check
14  the accuracy or the adequacy of her citations.
15    Q.  Professor Kull, you already testified
16  that January 24 was the correct date that you --
17  I'm going from your e-mail which is Exhibit 1 --
18  that you discovered plagiarism, and you also
19  said earlier that it was that day, the day
20  before the grades were due, that you actually
21  read her paper; is that correct?
22    A.  January 24 must have been the day that
23  I read what she called her final draft for the
24  first time.

                              28
1     Q.  And on that day, did you have an
2  opportunity to check the citations, to check the
3  authorities?
4     A.  Yes.
5     Q.  And how did you do that?
6     A.  When I read Ms. Kiani's final draft on
7  January 24, I noticed for the first time that
8  some of the statements in her paper sounded
9  familiar, and I began to look to see where they
10  had come from, and in the space of the next half
11  hour found three or four passages of the paper
12  that were plagiarized from various sources.
13    Q.  And these excerpts were not in the
14  drafts that she submitted before?
15    A.  I believe some of them had been.
16    Q.  Did they not sound familiar at the
17  time of the draft?
18    A.  No.
19    Q.  Can you just give us an example -- I
20  don't mean verbatim example -- an example of how
21  long the citation, how long she used someone
22  else's work without citation in terms of how
23  many lines, just an example?
24    A.  I could show you an example if I had
                              29

1  the paper.  But in general terms, the
2  plagiarized passages were extensive.  It was not
3  a word here and a word there.
4      Q.  Would it be fair to say that they were
5  obvious?
6      A.  Plagiarism is very obvious once you
7  know what's going on.
8      Q.  Was it obvious that this was a saying
9  from someone else's work pretty much put in
10 there verbatim and it's long enough to be
11 recognized by an authority like yourself?
12      A.  It was not obvious to me the first few
13 times I read it.
14      Q.  So it became obvious to you on that
15 date when you actually read the paper?
16      A.  When I read the final paper on January
17 24, something about it raised a question in my
18 mind.  The question is what leads one to then go
19 and look for the sources.  At that point, it's
20 obvious to anybody.
21      Q.  When that question, as you put it, was
22 raised in your mind, what did you do?  Did you
23 contact Ms. Kiani?
24      A.  When the question was raised in my

                              30
1  mind, I looked around my office for some easily
2  available sources to check whether, in fact,
3  there were plagiarized passages in this paper,
4  and I found that there were.
5      Q.  Professor Kull, you refer to it as
6  plagiarized passages.  Did you already know that
7  she had plagiarized?
8      A.  Yes.
9      Q.  So you believe this was plagiarism?
10      A.  It was obvious.
11      MR. TARIRI:  Please mark this as
12 Exhibit 2.
13      (Exhibit 2 marked
14      for identification)
15      Q.  What I have handed you is a page from
16 Boston University's disciplinary regulations for
17 all BU students.  It's just one page.
18      MR. TARIRI:  It really should be -- I
19 was hoping if you could place that sticker...
20      MR. ELSWIT:  Why don't we stipulate

21  that Exhibit 2 to Professor Kull's deposition is
22  a page of the disciplinary regulations that was
23  previously identified as Exhibit B to the
24  complaint in this case.  Are you okay with that?

31

1       MR. TARIRI:  I'm fine.  Thank you.
2  BY MR. TARIRI:
3      Q.  Professor Kull, could you just look
4  over Exhibit 2.
5        (Pause)
6      Q.  More specifically, if you could look
7  at Paragraph E, the first sentence of
8  Paragraph E, if you could just read it to
9  yourself.
10        (Pause)
11      Q.  Could you please read that first
12  sentence of Paragraph E out loud?
13      A.  E:  Plagiarism.  Plagiarism is the
14  knowing use, without adequate attribution, of
15  the ideas, expressions, or work, of another,
16  with intent to past such materials off as one's
17  own.
18      Q.  Thank you, Professor.
19        You testified earlier that you
20  believed Ms. Kiani had plagiarized.  Were you
21  familiar with Boston University School of Law
22  discipline regulations for all students?  Had
23  you read the disciplinary regulation for all
24  students prior to forming this opinion?

32

1      A.  No.
2      Q.  What did you base the formation of the
3  idea plagiarism on?
4      A.  My judgment as a teacher and an
5  author.
6      Q.  But not based on the regulations of
7  Boston University Law School?
8      A.  No.
9      Q.  In fact, you had never read this
10  excerpt before, prior to forming that opinion of
11  plagiarism?
12      A.  I don't recall it.
13      Q.  You testified that plagiarism, in your
14  mind, was based on your experience both as a

15  professor and an author.  Can you define what
16  plagiarism is in your mind, in your experience?
17          MR. ELSWIT:  Objection.
18      Q.  Do you have a definition of plagiarism
19  in your mind?
20      A.  I don't have any doubt about what it
21  is.  If you wanted me to write a definition, it
22  would take some time.
23      Q.  But is it based on you'll recognize it
24  if you see it?

                            33
1       A.  There are close cases.  This was not
2   one.
3       Q.  Is it your opinion that plagiarism
4   requires intent or no intent?
5       A.  That's an aspect of a definition that
6   causes a great deal of difficulty, and I can't
7   answer it in a yes or no manner.
8       Q.  But when you formed your opinion as
9   Ms. Kiani having plagiarized, did you think she
10  intended to plagiarize, or did she plagiarize by
11  the fact that she used someone else's words and
12  works without citation?
13      A.  Considering the paper as work
14  submitted for a grade and for a credit in a
15  course I was teaching in the law school, it was
16  plagiarized beyond question without regard to
17  whether it was fraudulently intended.
18      Q.  So in your mind, no intent is
19  required?
20          MR. ELSWIT:  Objection.
21          MR. TARIRI:  Objection noted.
22          MR. ELSWIT:  That's not what he said.
23  He's talking about this paper.  He was not
24  giving a blanket definition.

                            34
1       Q.  As far as this particular paper is
2   concerned, no intent was required; am I correct?
3       A.  The paper was plagiarized.  I had no
4   doubt about that.  I was in considerable doubt
5   as to what to do about it.  And I think that
6   your questions are really addressed to that
7   aspect of the matter, but I don't want to argue
8   with you about definitions.

9     Q.  And I don't either, Professor.  Thank
10  you.
11          Just one last time, so as far as you
12  were concerned, this paper was plagiarized
13  regardless of whether she intended or not?  Just
14  please answer yes or no.
15          MR. ELSWIT:  You know, Ben, the
16  problem, and I'm going to object to the question
17  because the problem is that this definition
18  which is six or seven sentences long includes
19  the following sentence:  The use of the exact
20  language of another without identification as a
21  direct quotation by quotation marks or otherwise
22  is plagiarism even though the source is cited in
23  the student's work, close quote.
24          But you are trying to pin the witness

35
1  down on one word which involves state of mind.
2  And that is not only not fair, it is virtually
3  impossible to ask Professor Kull what was in his
4  student's mind in the fall of 2002.
5          With that objection, if you can answer
6  his question, go ahead.
7     A.  My conclusion on January 24 was that
8  the paper was plagiarized, first; that this
9  meant that I would not submit a grade that day,
10  second; and that I was going to have to take
11  some time to decide what to do for a grade for
12  Ms. Kiani.
13     Q.  Just to refer back to my question, you
14  opted not to answer my question.
15          MR. ELSWIT:  The witness testified
16  that the paper was plagiarized.  He answered
17  your question.
18     Q.  What did you do, Professor Kull, once
19  you, quote/unquote, believed that this paper was
20  plagiarized?  Did you call her?
21     A.  I went to see one of my colleagues,
22  and I said --
23     Q.  Which colleague was that?
24     A.  I don't know.  I asked what is the

36
1  practice at the BU Law School for dealing with
2  student plagiarism.

3    Q.  What did he or she say?
4    A.  I was told that you report this to the
5   associate dean, and he will worry about it; he
6   will decide what to do.
7    Q.  Is that what you did?
8    A.  That is what I did.
9    Q.  What else did you do?
10    A.  Well, my recollection is refreshed by
11   Exhibit 1 to suggest that it was on that day
12   that I walked down the hall and asked
13   Professor Pettit whether he had had any similar
14   experience or knowledge of Ms. Kiani.
15    Q.  And what did Professor Pettit tell
16   you?
17    A.  He said something like, Oh, no.  Not
18   again.  Something like that.
19    Q.  Did you at any point contact
20   Ms. Kiani?
21    A.  On Monday morning I came to the law
22   school intending to send her an e-mail, which
23   was how she and I used to communicate, to tell
24   her what I had discovered.  And she was waiting

37

1   for me outside my office when I got there about
2   8:00 in the morning.
3    Q.  Did you discuss the, quote/unquote,
4   plagiarism with her?
5       MR. ELSWIT:  Objection.
6    A.  Yes, slightly.
7    Q.  Professor Kull, you testified earlier
8   that you had had several meetings with Ms. Kiani
9   regarding her term paper.
10       Would it be fair to say that you
11   conversed with her during those meetings?
12    A.  Yes.
13    Q.  The previous meetings?
14    A.  Yes.
15    Q.  And did you have conversation during
16   this meeting on Monday as you testified?
17    A.  Yes.
18    Q.  What was the topic on?
19    A.  She asked me why no grade had been
20   reported for my seminar on her transcript.
21    Q.  Was she concerned about her grade?  Is
22   that why she was in your office, in your belief?

23      A.  She was waiting outside my office to
24   ask why no grade had been reported.

                                    38
1       Q.  And what did you tell her?
2       A.  I said, Because I discovered your
3    paper is plagiarized.
4       Q.  Did you ever tell her that you lost
5    her paper?
6       A.  No.
7       Q.  Did you ever tell her that you
8    misplaced her paper?
9       A.  I don't accept the premise of the
10   question.
11      Q.  I'm asking you did you ever tell her
12   that you lost or misplaced the paper?
13      A.  I did not lose it; I did not misplace
14   it.  In December I had read one of her later
15   drafts believing that it was the final draft she
16   had submitted, so I made a mistake about which
17   was her final draft in December which I assume
18   is what you're referring to.
19          The paper that she submitted as the
20   final paper was never lost, it was never
21   mislaid, and I read it with all of the others,
22   apparently, on January 24.
23      Q.  When you read what you believed as to
24   be her final draft in December, were you

                                    39
1    intending to grade her?
2       A.  Yes.
3       Q.  And did you discover any plagiarism
4    during that time?
5       A.  No.
6       Q.  When you read what in actuality was
7    her final draft on January 24, was it very
8    different from the previous draft?
9       A.  I believe it was identical to the
10   previous draft with a few pages added at the
11   end.
12      Q.  Is it your testimony that the
13   plagiarism was in those few pages at the end?
14          MR. ELSWIT:  Objection.
15          MR. TARIRI:  Objection noted.
16      A.  I believe that there were frequent

17  instances of plagiarism both at the beginning
18  and at the end and in the middle as well.
19      Q.  Professor Kull, did you know that
20  Ms. Kiani, while she was taking your course, she
21  was in her final year, in her third year of law
22  school?
23      A.  No.
24      Q.  Are you supposed to know if your

40

1  students are in their third year or second year?
2  Are you not told?
3      A.  I'm not aware that I'm told.
4      Q.  Professor Kull, when you gave her no
5  grade on January 24, were you aware that this
6  would preclude her from graduating if she
7  received an F?
8      A.  No.
9      Q.  Did you ever inquire about that?
10      A.  I learned that Ms. Kiani was in her
11  final year at the law school after I reported
12  this matter to the associate dean.
13      Q.  Who was the associate dean?
14      A.  Professor Marks.
15      Q.  Do you know Professor Marks pretty
16  well?
17      A.  I know him as a colleague.
18      Q.  Do you also know Dean Marx?
19      A.  Yes.
20      Q.  Do you socialize with Professor Marks?
21      A.  Not particularly.
22      Q.  Have you?
23      A.  At law school functions; probably not
24  elsewhere.

41

1      Q.  Do you socialize with Chris Marx?
2      A.  At law school functions, but not
3  elsewhere.
4      Q.  Did you talk about this case with
5  others?  You already testified that you spoke to
6  Professor Pettit.  Who else did you talk to
7  about this, quote/unquote, plagiarism?
8          MR. ELSWIT:  Objection.
9          MR. TARIRI:  Objection noted.
10      A.  I talked to Professor Marks as

11  associate dean, and I talked to the dean of the
12  law school, Ron Cass.  Sometime later I talked
13  to Professor Ryckman.
14      Q.  How much time later?
15      A.  Some months later.
16      Q.  I'm still concerned about that period,
17  that time period from January 24 to January 27.
18  Did you speak to anyone else?
19      A.  Anyone else?
20      Q.  Any other professors?
21      A.  I recall speaking about the matter to
22  Professor Marks, Dean Cass, Professor Pettit,
23  but I believe that's all.
24      Q.  Back to your meeting on Monday when

                              42
1  she was waiting in front of your office, what
2  did you talk about?  Do you recall the
3  substance?
4      A.  She asked me why I had not reported a
5  grade; I told her why.  I said, I've discovered
6  your paper is plagiarized.  She said to me, Oh,
7  I know all about that.  I know about that from
8  Professor Pettit.
9      Q.  What did she mean by that?
10      MR. ELSWIT:  Objection.
11      MR. TARIRI:  Objection noted.
12      A.  I don't know.
13      Q.  Please go on.
14      A.  She asked me, How are we going to
15  rectify the situation?  I said, I have not
16  decided what I'm going to do, and I have
17  reported this matter to the associate dean.
18      Q.  Professor Kull, at this point, were
19  you familiar with the procedure if a student
20  receives an F on an exam or term paper how he or
21  she is required to make up that class?  Were you
22  familiar with that procedure?
23      A.  I would certainly assume that if a
24  student gets an F, then he or she receives no

                              43
1  credit for the course.  I had no familiarity
2  with any specifics of procedures at the BU
3  Registrar's Office or otherwise at the law
4  school.

5      Q.  In other words, you were not familiar
6  with the period during which you had to add or
7  drop a course?
8      A.  No.
9      Q.  And did anyone, including Ms. Kiani,
10  tell you that the add/drop period had expired or
11  was about to expire?
12      A.  Ms. Kiani informed me sometime later.
13  I had offered to help her make up the missing
14  credit by supervising her with an independent
15  study project or something of that kind.  And
16  she first said she would think about it.  And
17  she came back to me probably the last meeting we
18  had in our office and said, I can't do that
19  because the time to enroll for such a thing has
20  expired.
21      Q.  At this time, had you given her a
22  grade?
23      A.  At the time of the last conversation?
24      Q.  No, at the time she said that the time

44

1  to add a course had expired.
2      A.  By that point, I had decided that I
3  was going to give her an F in my course, and I
4  had reported that.
5      MR. TARIRI:  Please mark this as
6  Exhibit 3.
7      (Exhibit 3 marked
8       for identification)
9      Q.  Professor Kull, could you please look
10  at what has been marked as Exhibit 3.  And once
11  you've had an opportunity to read it, let me
12  know.
13      (Pause)
14      A.  Yes.
15      Q.  Do you recognize that letter?
16      A.  No.
17      Q.  Did you just read it?
18      A.  Yes.
19      Q.  What does it say?  Just sum up what it
20  says.
21      MR. ELSWIT:  Well, Exhibit 3 speaks
22  for itself.  And since Professor Kull has never
23  seen it before and there is no evidence from the
24  face of it that he received a copy of it,

45

1   there's no purpose in having him summarize it.
2   The text is what the text is.  Let's move this
3   along.
4       Q.  Were you aware that sometime in May of
5   2003 Ms. Kiani was notified by Dean Cass that
6   she would not be allowed to graduate?
7       A.  I became aware of that subsequently.
8       Q.  Subsequent to what?
9       A.  Subsequent to the event.
10      Q.  Professor Kull, when you reported the
11  plagiarism -- you said you reported the
12  plagiarism -- what did the dean's office do, do
13  you recall?
14      A.  I reported the plagiarism on the
15  Friday, January 24th, to Professor Marks as
16  associate dean.  To the best of my recollection,
17  there was a meeting the following Monday
18  afternoon, the 27th, in Dean Cass's office which
19  the dean, Professor Marks and I discussed this
20  matter.
21          The upshot of that meeting, to the
22  best of my recollection, was that the dean said
23  to me, We will make the decision about
24  disciplinary proceedings in the dean's office.

46

1   You are not concerned in that.  It's up to you
2   to decide what to do as the teacher in your
3   course regarding what grade is reported for
4   Ms. Kiani.
5       Q.  Do you recall if the case was pursued,
6   if the issue was pursued by the office of the
7   dean?
8       A.  I didn't hear anything about it until
9   the day in the summer of 2003 when
10  Professor Ryckman came to discuss the matter
11  with me.
12      Q.  This is despite the fact that you
13  recorded what you perceived to be plagiarism?
14      A.  Yes.
15      Q.  Professor Kull, you testified earlier
16  that Ms. Kiani was in your classes for one
17  semester, right?
18      A.  Yes.

19     Q.  And that there were 13 meetings of
20  which 11 of them she was present and two of them
21  she was not, to the best of your recollection?
22     A.  Yes.
23     Q.  You also testified this was a small
24  class?

47

1     A.  Yes.
2     Q.  You testified there were about six --
3  the student number was about six.  Did you
4  interact with the students on an individual
5  level in class?
6     A.  There was a general conversation back
7  and forth sometimes between the students.
8     Q.  Did the conversations involve you?
9     A.  Usually.
10     Q.  And did they also involve Ms. Kiani?
11     A.  Yes.
12     Q.  How did she interact?  Did she
13  interact like other students would?
14     A.  My recollection is that she might be
15  quiet for considerable periods, but then raise
16  her hand, offer something to say, which is,
17  frankly, what I would say about most of them.
18     Q.  How would you rate her in terms of
19  attentiveness?  I'm not asking you to rate her
20  as a student, but as an attentive student in
21  class.  Was she highly attentive, moderately
22  attentive or not attentive at all?
23        MR. ELSWIT:  Objection.
24        MR. TARIRI:  Objection noted.

48

1     A.  I recall that there were times when
2  she seemed inattentive; other times when she was
3  participating.
4     Q.  Can you describe her demeanor?  How
5  was she not attentive?  You said she was
6  inattentive at times.
7     A.  She would be quiet for considerable
8  periods, and I would have a sense that she was
9  not following the discussion.
10     Q.  Would you characterize her as to be
11  "out of it?"
12        MR. ELSWIT:  Objection.

13    MR. TARIRI:  Objection noted.
14    A.  I believe that during the summer of
15  2003, when I discussed this matter with
16  Professor Ryckman and then on another day with
17  Mr. Rosenfeld, I used that expression in
18  describing Ms. Kiani's behavior at certain times
19  in my seminar.
20    I'm not sure whether I was talking
21  about these periods of inattentiveness or
22  another feature of her participation in the
23  class, which is that sometimes when she would
24  volunteer something to say, it would be of

                              49
1  marginal relevance of the discussion.
2    Speaking very casually saying that a
3  student seemed "out of it" might refer to one or
4  the other or some combination of those factors.
5    Q.  Did you know during your professorship
6  of her that she was under medication?
7    A.  No.
8    Q.  Had you known that, would you have
9  treated her differently?
10    A.  No.
11    Q.  So had you known that she was acting,
12  in fact, drowsy, you would still have treated
13  her like you would any other person?
14    MR. ELSWIT:  Objection.  There is no
15  evidence on the record that she was acting
16  drowsy.
17    MR. TARIRI:  Objection noted.
18    A.  It seemed to me observing Ms. Kiani,
19  but without any technical knowledge, that she
20  clearly suffered from serious disabilities of
21  one kind and another.  If she had not had this
22  appearance, I might have responded to her
23  occasional inattentiveness or marginal
24  participation more severely, would have asked

                              50
1  her what she was doing, would have required more
2  of her.
3    As it was, I was probably more lenient
4  with her than I would have been.  Whether if
5  someone had told me that she was taking a
6  particular medication, it's difficult for me to

7    imagine what I would have done differently.
8        Q.  Professor Kull, you testified that you
9    taught at Emory College, is it Emory University?
10       A.  Yes.
11       Q.  For about 15 years and three years at
12   BU also; is that correct?
13       A.  Yes.
14       Q.  During your professorship, did you
15   have other handicapped students?
16       A.  Yes.
17       Q.  Can you describe what sort of handicap
18   they had?  Were there many?
19           MR. ELSWIT:  Objection.
20       A.  I don't know how many.
21           MR. TARIRI:  Objection noted.
22       A.  And I don't have specific
23   recollections beyond one, which is that one day
24   in the middle of class I had a student who had

                          51
1    some sort of seizure which brought everything to
2    a dramatic halt.  That's impossible to forget.
3        Q.  Do you recall having any student whose
4    symptoms, handicapped symptoms, resembled
5    Ms. Kiani's?
6        A.  I don't have a clear or specific
7    recollection.  She was certainly not the first
8    student I ever had who was in a wheelchair or
9    would have had difficulty using a pen or
10   something.
11       Q.  Did you have any students in your
12   class at Boston University who used a
13   stenographer?
14       A.  You mean seated in the classes like
15   this (indicating).
16       Q.  Correct.
17       A.  I don't recall.  I don't believe so.
18       Q.  Did you have any students that had
19   difficulty with taking notes because of
20   dexterity?
21       A.  I assume so, yes.
22       Q.  How did they cope with it?
23       A.  These days I believe people address
24   those issues by using typically laptop computers
                          52

1  or things like that to take notes.
2      Q.  What if they could not use a laptop
3  computer?
4      A.  I've never been asked about it.
5      Q.  In the case of Ms. Kiani, did you pay
6  attention as to how she was taking notes?
7      A.  No.
8      Q.  Were you interested?
9      A.  It never occurred to me.
10      Q.  Professor Kull, did you ever sit down
11  to talk to Ms. Kiani about her condition and how
12  she copes with her studies in your class, in
13  your particular course?
14      A.  During our conversations about her
15  paper, I recall at least one occasion discussing
16  her difficulty with consulting printed books in
17  a library and her preference to consult online
18  materials.  And I believe I responded by
19  emphasizing those sources that would be
20  available as online material.  At the same time
21  it was quite clear that she could consult
22  printed paper materials because she did so.
23      Q.  Did you ever ask her how she was
24  feeling in general?

                         53
1      A.  No.
2      Q.  Were you curious?
3        MR. ELSWIT:  Objection.
4        MR. TARIRI:  Objection noted.
5      A.  I may have been curious, but I don't
6  ask my students about their personal lives
7  unless it seems necessary.
8      Q.  I wasn't referring to her personal
9  life.  In general, I was referring to how she
10  was feeling about this course -- I'm sorry I
11  wasn't clear -- and how she was coping with it.
12        MR. TARIRI:  I'm sorry.  You can
13  strike the last question, please.
14      Q.  Professor Kull, did you have any
15  conversations with Professor Mariner about
16  Ms. Kiani at any point?
17      A.  During the summer of 2003
18  Professor Ryckman came to see me and informed me
19  that some other issues involving work that
20  Ms. Kiani had done for other professors had come

21  up since the episode with the paper for me.  I
22  don't recall whether he told me at that point
23  that these involved, perhaps among others,
24  Professor Mariner.  But sooner or later I heard

54

1  that the new charges of disciplinary violations
2  involved Professor Mariner.  And at some point
3  during the summer, I believe, she telephoned me,
4  introduced herself and asked me to describe my
5  experience with Ms. Kiani.
6      Q.  What did you say to her?
7      A.  I described it as best I could recall.
8      Q.  Can you elaborate at all?
9      A.  I tried to reconstruct the sequence of
10  events, explained the decision that I had been
11  faced with and what I had done.
12      Q.  Did you tell her that she had
13  plagiarized on her term paper for your class?
14      A.  Indeed I did.
15      Q.  Did you tell anybody else that she had
16  plagiarized on her term paper for your class,
17  that's, quote/unquote, plagiarism?
18          MR. ELSWIT:  Objection.
19          MR. TARIRI:  Objection noted.
20      A.  Well, as I just said,
21  Professor Ryckman had come to see me perhaps at
22  the beginning of the summer in connection with
23  his functions in the disciplinary proceeding
24  that was then underway or at least under

55

1  consideration.  And he asked me to tell him the
2  story, and I did so to the best I could recall
3  it.  And at some point later in preparation for
4  the disciplinary proceeding, Mr. Rosenfeld came
5  to me and asked the very same thing and many of
6  the questions that you've been asking, and I
7  told him the story as best I could recall.
8      Q.  Do you recall speaking to anyone else
9  regarding Ms. Kiani's, quote/unquote,
10  plagiarism?
11          MR. ELSWIT:  Objection.
12      A.  At any time from that date to today?
13      Q.  At any time from -- no.  I'm concerned
14  about the period at any time from January 24,

15  2003 to September 12, 2003.
16      A.  Other than the people we've already
17  mentioned?
18      Q.  Correct.
19      A.  My wife.
20      Q.  I'm interested in people at school.
21      A.  The next occasion would have been when
22  I appeared as a witness before the disciplinary
23  committee which was eventually convened to
24  consider charges against Ms. Kiani.


                                    56
1      Q.  So it is your testimony, then, that
2  you did not speak to anyone else other than
3  Professor Ryckman and Professor Mariner and
4  Professor Pettit, Professor Marks and Attorney
5  Rosenfeld; am I correct as far as --
6      A.  That's my recollection.
7      Q.  When did you give Ms. Kiani finally,
8  when did you actually grade her term paper?  Do
9  you recall the day?
10     A.  The Friday, January 24, having
11  discovered the plagiarism, having inquired what
12  is the procedure, having informed the associate
13  dean, Professor Marks, who told me we will have
14  to talk about this; don't do anything meanwhile.
15  I went down to the Registrar's Office, I handed
16  in the other grades for the course, and I said,
17  No grade is being recorded for this one
18  particular student.  It is simply going to be
19  deferred.  They said, Oh.
20          On Monday morning when she was waiting
21  for me as I got there, I informed Ms. Kiani I
22  have not decided what to do.  After the meeting
23  that I already described to you, which I believe
24  was that Monday afternoon, I spent perhaps 48


                                    57
1  hours trying to decide what to do.  I eventually
2  came to the conclusion that I would report a
3  grade of F, whatever the law school did or did
4  not do as a disciplinary matter.
5          And my recollection is that on the day
6  when I had made that decision and was intending
7  to get in touch with Ms. Kiani to come in and
8  see me, she was once again waiting for me, I

9  believe, so I didn't have to say, Please come to
10  see me; she was there.
11        So I said, I've decided that I'm going
12  to report an F in my course.  The disciplinary
13  procedure, whatever it is, and if there's going
14  to be one, is in the hands of the Dean's Office,
15  and you should go and talk to the associate dean
16  about that.
17        I said, I would be happy to help you
18  make up the three credits if you wanted to do
19  work for me.  I would understand you might
20  prefer to do it with somebody else.  She said,
21  I'll think about it, and she left.
22        And I wrote a memorandum to the
23  registrar saying, Please report a failing grade
24  for this student in this course.

58
1      Q.  Professor Kull, before you gave that
2  grade of F, did you also consult Ms. Kiani's
3  academic record?
4      A.  No.
5      Q.  Were you interested in knowing what
6  her other grades were?
7      A.  No.
8      Q.  Did you at any point tell anyone that
9  had you known she was on medication, you would
10  have treated her differently?
11      A.  No.
12      Q.  This is Ms. Kiani?
13      A.  No.
14        MR. TARIRI:  I have no further
15  questions for you.  Thank you so much.
16        MR. ELSWIT:  No questions.  Thank you.
17  (The deposition was concluded at 11:50 a.m.)
18
19
20
21
22
23
24

59
1  IN RE: Kiani v. Trustees of Boston University
2  TAKEN: Monday, April 25, 2005

3
4        C E R T I F I C A T E
5        I, ANDREW KULL, do hereby certify
    that I have read the foregoing transcript of my
6   testimony, and further certify that it is a true
    and accurate record of my testimony (with the
7   exception of the corrections listed below):
    Page   Line            Correction
8
    _____  _____  _____

9
    _____  _____  _____

10
    _____  _____  _____

11
    _____  _____  _____

12
    _____  _____  _____

13
    _____  _____  _____

14
    _____  _____  _____

15
    _____  _____  _____

16
    _____  _____  _____

17
    _____  _____  _____

18
    _____  _____  _____

19
    _____  _____  _____

20
    _____  _____  _____

21
        _____

22
            ANDREW KULL
23
24

                            60
1            CERTIFICATE
2   Commonwealth of Massachusetts
3   Suffolk, ss.
4     I, Toni F. Beckwith, Registered Merit

5   Reporter and Notary Public in and for the
6   Commonwealth of Massachusetts, do hereby certify
7   that ANDREW KULL, the witness whose deposition
8   is hereinbefore set forth, was duly sworn by me
9   and that such deposition is a true record of the
10  testimony given by the witness.
11     I further certify that I am neither related
12  to or employed by any of the parties in or
13  counsel to this action, nor am I financially
14  interested in the outcome of this action.
15     In witness whereof, I have hereunto set my
16  hand and seal this ^  day of ^  2005.
17              _____
18                 Notary Public
19                 CSR No. 111293
20  My commission expires:
21  February 11, 2011
22
23
24